# Exhibit B

## EXPERT REPORT OF C. SCOTT COURREGE

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

**ALEXANDER CLARK**

**VERSUS** **NO. 3:22-CV-00326-SDD-RLB**

**JEAN HOTARD, ET AL.**

# **EXPERT REPORT OF C. SCOTT COURREGE**

## I. INTRODUCTION

I have prepared the following report regarding the above-captioned matter. I have reviewed the evidence available to me to date, and I have formed opinions that address police training, use of force principles, and generally accepted police practices. If additional discovery, information, or evidence becomes available, I reserve the right to amend or supplement my opinions accordingly.

## II. TABLE OF CONTENTS (FOLLOWING FED. R. CIV. P. 26)

(i) A complete statement of my opinions and the basis and reasons for them are set forth in Sections "V" and "VI";
(ii) The facts and data considered in forming my opinions are set forth in Section "IV";
(iii) My Curriculum Vitae (CV) is attached to this report as Exhibit "A" and is incorporated herein *in extenso*;
(iv) My qualifications and publications are set forth in Section "III" and Exhibit "A";
(v) My testimony within the previous four years is set forth in Section "III.C" and Exhibit "A"; and
(vi) My fee schedule for this matter is attached as Exhibit "B".

## III. QUALIFICATIONS

### A. PROFESSIONAL EXPERIENCE

In June 2000, I first became employed in law enforcement with the Harrison County Sheriff's Office in Mississippi as a Community Service Officer and as a Reserve Deputy Sheriff. In July 2001, I transferred to the Gulfport Police Department as a Police Officer. In both roles, I engaged in generalized uniform policing duties that included, but were not limited to, responding to calls for service, writing reports of investigation, conducting follow-up investigations, arresting suspects, performing traffic and pedestrian stops, testifying in court, and initiating proactive patrols.

In May 2003, I was hired by the United States Border Patrol as a Patrol Agent and was assigned to the Brownfield Station in San Diego, California. In this uniformed position, I was tasked with immigration enforcement operations on the United States/Mexico border. My assignments included both fixed checkpoints and roving patrols. I was responsible for detecting

and apprehending undocumented immigrants and drug traffickers through traffic stops, bus checks, and tracking. I later transferred to the San Diego Sector Air Mobile Unit as a Senior Patrol Agent. My job duties shifted to intelligence-driven and specialized proactive enforcement operations, often in high-trafficking areas. I was also temporarily assigned to special duty in Ajo, Arizona.

In January 2006, I was hired by the Drug Enforcement Administration (DEA) as a Special Agent and was assigned to the Sierra Vista Resident Office within the Phoenix, Arizona Field Division. In this plain clothes position, I primarily performed covert federal and state drug investigations. My duties included, but were not limited to, general investigations, physical surveillance, undercover operations, informant management, arresting suspects, drafting and executing search warrants, tactical operations, and utilizing extensive electronic surveillance techniques.

In January 2008, I began a security director position with a diamond cutter in Boca Raton, Florida. As such, I planned and executed covert security operations within the United States, Africa, and Europe. I also coordinated the import and export of diamonds and large sums of currency.

In April 2009, I was hired by the East Baton Rouge Sheriff's Office in Louisiana as a Deputy Sheriff and was ultimately promoted to the rank of Detective-Sergeant. I held positions in Uniform Patrol, Community Policing Unit, Special Community Anti-Crime Team, Narcotics, and Training. In addition to the uniformed policing and narcotics investigator duties mentioned in the above paragraphs, my other duties in these positions included, but were not limited to, supervising narcotics investigations, providing guidance directed to specific operational issues, developing and instructing in-service and academy training courses, policy and procedure drafting, review, and revision, and consulting with office legal counsel on use of force cases.

In January 2022, I founded Courrege Consulting Group, LLC, wherein I offer contract services as a law enforcement expert, consultant, and trainer. I have developed and routinely instruct courses on current legal trends and updates of law, use of force, narcotics investigations, search and seizure, search warrant drafting and execution, stop and frisk, and pursuit liability. Additionally, I have been engaged to review and provide professional opinions regarding policy and procedure, use of force, emergency vehicle operations, pursuits, drug investigations, and search and seizure.

## B. TRAINING AND CERTIFICATIONS

In my law enforcement career, I have completed four police academies: (1) Southern Regional Public Safety Institute; (2) Federal Law Enforcement Training Centers, Border Patrol Basic Training; (3) DEA Basic Agent Training; and (4) Capital Area Regional Training Academy. Combined, these academies exceeded 60 weeks of formal training and extensively covered the areas of use of force, defensive tactics, firearms, search and seizure, search warrants, constitutional considerations, emergency vehicle operations, pursuits, specialized investigative techniques, interview and interrogation, and tactical operations.

I have attended over 20 additional training courses, some of which included extensive study of human performance and the effects that stress has on perception and decision-making, particularly in use of force situations (Force Science Analyst and Advanced Specialist certifications). I have applied this information and training to officer involved shootings in order to evaluate the reasonableness of the shooters' actions and the limitations of human performance during those encounters.

I have been recognized by the Louisiana POST Council as a "Subject Matter Expert" in order to perform instruction and hold certifications as a Federal Law Enforcement Training Centers Use of Force instructor and NHTSA Standardized Field Sobriety Testing (SFST) instructor. I regularly teach law enforcement officers mandatory Louisiana POST curriculum, including Legal Aspects, Use of Force (Integrated Use of Force Management – Response to Resistive Behavior), Operating While Intoxicated (OWI) Investigations, Standardized Field Sobriety Testing (SFST), and Drug ID and Investigations.

## C. PREVIOUS TESTIMONY AND EXPERT QUALIFICATIONS

In the past four years, I have been qualified and/or accepted as an expert in the following matters: *State of Louisiana v. Johnathan Larue*, 35th JDC (No. 20-727) (testified at criminal trial as defense expert in the areas of general police practices, police training, and use of force); *State of Louisiana v. Travis Clay Depew*, 20th JDC (No. 21-CR-453) (testified at criminal trial as prosecution expert in the areas of general police practices and use of force); and *State of Louisiana v. Byron Franklin*, 24th JDC (No. 22-822) (testified at criminal pre-trial hearing as defense expert in use of force and human factors related to self-defense shootings).

I have testified at the Grand Jury for the Parish of Tangipahoa (21st JDC) in *State v. Craig Dunn* as a proffered expert in use of force and human performance factors related to officer-involved shootings.

I have also testified at deposition in the following matters: *Brown v. Baton Rouge Police Dept., et al.*, Middle District of Louisiana (3:23-CV-1313) (proffered defense expert regarding general police practices, police training, and policy and procedure); *White, et al. v. Taylor, et al.*, Southern District of Alabama (1:24-CV-1733) (proffered plaintiff expert regarding general police practices, use of force, DUI investigations, and drug identification and investigations); and *George v. Fontenot, et al.*, 19th JDC (No. 715,091) (proffered plaintiff expert regarding general police practices and emergency vehicle operations).

## D. FORMAL EDUCATION, PRESENTATIONS, AND PUBLICATIONS

In August 2002, I graduated from the University of Southern Mississippi with a Bachelor of Arts in Criminal Justice and a minor in Forensic Science, with Honors. In December 2017, I received my Juris Doctor from the Southern University Law Center, *Magna Cum Laude*. I am a licensed and practicing attorney in the State of Louisiana and have been admitted since May 2018. Primarily, my law practice at Due' Guidry Piedrahita Andrews Courrege, LC consists of representing plaintiffs in personal injury matters in both federal and state courts. Additionally, I provide *pro bono* legal consultations to law enforcement officers following use of force encounters.

I have presented as a guest speaker and/or Continuing Legal Education (CLE) instructor for the Legal Exposure Mentorship Program (2021 & 2022), Louisiana Nuts & Bolts Judicial Seminar (2021), Louisiana Association for Justice (2020 & 2024), and Louisiana District Attorney's Association (2020 & 2022). I have published a law review article entitled, "Drugged Driving: How the Legalization of Marijuana has Impaired the Ability of the Louisiana DWI Law" in the Southern University Law Review, Vol. 44, Spring 2017, No. 2.

I have also published the following online articles/blogs at www.courregeconsulting.com: "The U.S. 5th Circuit Court of Appeals Grants Officer Qualified Immunity in Taser Use of Force Suit" (January 2022); "Louisiana Supreme Court Denies Review of Officer's Liability Arising From 'Code 3' Car Crash" (February 2022); "Louisiana Deputies Arrested for Shooting Death of Unarmed Man – What Now?" (February 2022); "State Flips on No-Pursuit Policy: Is This a Sign of Things to Come?" (May 2022); "Jury Awards $100 Million in Excessive Force Suit" (September 2022); "Proposed Changes to the Louisiana Pursuit Law: A Glance at the Pros and Cons" (April 2023); "Does Kneeling on a Suspect's Back During an Arrest Automatically Constitute Excessive Force in a Post George Floyd Society? A Louisiana Jury Says, No" (January 2024); "Louisiana's 25-Foot Police Buffer Law Deemed Unconstitutional" (January 2025); "Felix v. Barnes: Impact of Use of Force Training for Louisiana Law Enforcement" (May 2025); and "Can You Shoot Back If There's a Hostage? The Fifth Circuit Just Weighed In" (June 2025).

## IV. FACTS AND DATA CONSIDERED

I have reviewed and/or utilized the following materials to form a factual basis for my opinions:

1) Amended Complaint;
2) Closed Incident Dispatch Report;
3) Criminal Case Minute Entry;
4) Incident Report and Related Documents;
5) Deposition of Alexander Clark;
6) Deposition of Jean Hotard;
7) Deposition of Calvin Bowden;
8) Deposition of Victor Bayonne;
9) Deposition of Marty Burkes;
10) Deposition of John Gillespie;
11) Deposition of Sydney McCullough;
12) Expert Report of Daniel J. Buskin;
13) Expert Report of Sarah Abraham;
14) Expert Report of Sierra Carter;
15) 14 Dash Camera Videos;
16) 15 Radio Recordings;
17) LPSO Operations Order Number 402 – Physical Arrest of Violators;
18) LPSO Operations Order Number 501-A – Use of Force; and
19) Affidavit of Jean Hotard (Exhibit "C").

## V. BASIS FOR OPINIONS

The opinions expressed in this report are based upon the facts and data as presented in the materials provided to date, which have been identified in Section "IV". I have relied upon my specialized knowledge, experience, education, and training in general police practices, use of force principles, and police training—acquired throughout my law enforcement career, enhanced by ongoing research and education, and applied in my work as a consultant and instructor on these topics.

### A. SUMMARY OF EVENTS[1]

On May 24, 2021, at about 11:28 p.m., Deputy Jean Hotard of the Livingston Parish Sheriff's Office ("LPSO") conducted a traffic stop on a 2002 Chevrolet pickup at 222 Florida Avenue, Denham Springs, LA. Deputy Hotard stated that he observed the truck turning onto Florida Avenue from Eugene Street without using a turn signal. Deputy Calvin Bowden arrived shortly thereafter (possibly about 4 minutes) as backup.

The driver of the truck was later identified as Alexander Clark and the passenger as Norwood Cobbs. Deputy Hotard's report notes that upon standing at the driver's door of the truck, he detected the obvious odor of marijuana emitting from the vehicle and observed an unlabeled bottle of pills in the cup holder. Deputy Bowden testified that he also smelled the odor of marijuana in the truck. Deputy Hotard had Mr. Clark exit the vehicle and sit on the tailgate as he checked the status of the driver's license and vehicle's registration.

According to his testimony, Deputy Hotard then advised Mr. Clark of his *Miranda* Rights and Mr. Clark stated he understood. Mr. Clark testified that he was not advised of his *Miranda* Rights. Deputy Hotard contends that Mr. Clark denied that there was contraband in the vehicle. Specific questioning was directed to the pill bottle and Mr. Clark explained that it contained his non-narcotic prescription pills. This was later verified as correct by Deputy Hotard.

Deputy Hotard and Deputy Bowden conducted a search of the truck and located what was described as "a small piece of copper scrubbing pad, which is commonly used as a filter when ingesting crack cocaine." Deputy Bowden described this as a piece of "brillo" and it was located in a cigarette pack.

According to Deputy Hotard, he then asked Mr. Clark if he would empty his pockets to be checked for illegal substances. Deputy Hotard contends that Mr. Clark consented and emptied his pockets voluntarily, but failed to empty a small coin pocket on his shorts. Mr. Clark stated that he denied consent to search his pockets. Deputies also searched Mr. Clark's pockets and removed a box cutter. Deputy Bowden also located what he described as "an improvised crack cocaine

[1] The "Summary of Events" is not an exhaustive recitation of every fact, but merely an overview of the case. In the event that there was a discrepancy in the testimony regarding the facts, I have avoided making credibility determinations. However, at times I have assumed certain facts to be true for my analysis and made note of same.

smoking device." Mr. Clark described the object as a quick connect for air hoses and denied that it was used for smoking.

Deputy Hotard searched the coin pocket and located a balled-up $20 bill. Deputy Hotard noted that drug users are known to conceal drugs inside of currency. Deputy Hotard unfolded the bill and observed what appeared to be crack cocaine residue inside. Deputy Hotard asked Mr. Clark to identify the substance because he believed it to be cocaine. Mr. Clark admitted that he snatched the $20.00 bill out of Deputy Hotard's hand and stated, "Man, give me my money." Deputies contend that at that point the residue was lost on the ground.

A review of the videos confirm Deputy Hotard's account that verbal commands were given for Mr. Clark to put his hands behind his back. Deputy Bowden took control of Mr. Clark's left wrist and elbow and positioned his arm behind his back to a handcuffing position. At the same time, Deputy Hotard stepped to the left and attempted to gain control of Mr. Clark's right arm. A back-and-forth motion of Mr. Clark's right arm can be observed in an apparent struggle. The right arm was forced behind Mr. Clark's back momentarily, but then can be seen moving forward out of Deputy Hotard's grip. During this time, Mr. Clark's body was bent forward at the waist and his face was toward the ground.

Deputy Hotard quickly gained control of the right wrist and was able to force the arm to Mr. Clark's back to a handcuffing position. As this was happening, Officer Sydney McCullough of the Denham Springs Police Department ("DSPD") walked into view and placed her left hand near Mr. Clark's upper back/shoulder area with her elbow near the back of his neck. Officer McCullough advised dispatch to "log a 108" but declined a "net" from dispatch. Deputy Hotard then detained Mr. Clark in handcuffs and he and Deputy Bowden completed a search of Mr. Clark's pockets.

During the handcuffing, Mr. Clark can be heard saying, "No, I'm good. I'm good bruh." He then said, "Now I just got that… hey, Norwood. I just got that twenty dollars [inaudible]." Once he was detained, deputies asked Mr. Clark about smoking crack cocaine out of something (perhaps the fitting or hose connector) because they found brillo in his cigarette pack. Mr. Clark denied smoking cocaine and cigarettes.

Mr. Clark was escorted to and sat in the rear of Deputy Hotard's unit. Mr. Clark can be observed scooting backwards on the seat behind the cage in a manner that would indicate that his hands were toward the center of the vehicle and not pressed against the seat. Mr. Clark testified that after about 10 minutes of being in the unit, he advised Deputy Hotard that the handcuffs were hurting his hand. In response, Deputy Hotard loosened the cuffs. Mr. Clark was transported to the LPSO jail and was later released with a summons for Resisting an Officer and Failure to Signal.

Mr. Clark subsequently claimed he suffered injuries during the arrest. In his deposition, Mr. Clark denied resisting arrest or pulling his arms away from Deputy Hotard and claimed that he was pushed into the bed of his truck during the incident. He further claimed that he was choked by Officer McCullough and that his right hand was injured when he was being grabbed during the handcuffing process.

### B. ADDITIONAL AUTHORITIES

1) *Graham v. Connor*, 490 U.S. 386 (1989);
2) La. C.Cr.P. art. 215.1;
3) La. R.S. 32:104;
4) La. R.S. 14:130.1;
5) La. R.S. 14:108;
6) La. R.S. 40:967;
7) La. R.S. 40:1021;
8) Strategic Self-Defense & Gunfighting Tactics – Level Two Student/Operator Program (2018); and
9) Human Factor Research Group, Inc. – Threat Pattern Recognition Use of Force Student Training Manual (2017).

## VI. OPINIONS AND ANALYSIS

### A. THE TRAFFIC STOP, SEARCH, AND ARREST OF MR. CLARK WERE CONSISTENT WITH GENERALLY ACCEPTED POLICE PRACTICES AND TRAINING

There has been an allegation made in this matter concerning racial profiling and discrimination of Mr. Clark. Whether that occurred is a question for the jury and in no way are my opinions directed to that ultimate question. However, an explanation of certain police training and practices may assist the jury in understanding how and when vehicle stops and searches are properly conducted—regardless of the race of the person stopped.

Police officers are trained that a traffic stop may be conducted on a vehicle in a public place as long as there is reasonable suspicion of criminal activity. Alternatively, an officer may make a stop based on probable cause of a traffic violation—even if the officer has a subjective motivation to look for evidence of another crime such as a drug violation. This is referred to as a pretext stop in police training.

Pretextual stops are a commonly used crime-detection technique and are frequently employed during high-saturation or criminal interdiction patrols. These patrols are sometimes initiated in response to increased crime statistics in a specific area or as a result of citizen complaints. The predominant race of the residents in such communities should not influence law enforcement decision-making, as the objective is to reduce crime—regardless of the race of the individual violator. However, officers are explicitly warned that profiling drivers based on race is impermissible and constitutes a violation of constitutional protections.

During high-saturation patrols focused on specific neighborhoods, the racial demographics of those stopped may not align with the overall racial distribution of the broader parish or city. This is often a reflection of the racial composition of the neighborhood being patrolled and the population that frequents it. Additionally, in patrols targeting drug or violent crime deterrence, officers typically do not issue citations or complete incident reports for every traffic stop. As a

result, any analysis based solely on citation or report data provides an incomplete picture of officer activity—particularly in relation to the race of all motorists stopped.

The expert report submitted by Sarah Abraham presents certain statistics derived from limited data provided by LPSO and DSPD. Specifically, Ms. Abraham's report: (1) analyzes LPSO traffic stop data from 2020 and 2021 and finds a disproportionate number of stops involving Black individuals relative to their proportion of the overall Livingston Parish population; and (2) analyzes police report data from the same period and similarly concludes that a disproportionate number of reports involved Black individuals.

However, Ms. Abraham's analysis fails to account for the broader operational context of the data. In particular, some of the data only reflects the activity of LPSO's Criminal Patrol Division. Her report does not consider the division's mandate, deployment strategies, or whether patrols were focused in certain areas due to crime trends or citizen-reported concerns. A proper bias analysis must evaluate not just outcomes, but also the rationale behind patrol patterns and enforcement strategies. Without considering why deputies focused their efforts in specific areas, any statistical inference regarding racial bias remains incomplete and potentially misleading.

Daniel J. Buskin, the plaintiff's police practices expert, agrees:

> While this information alone does not provide context to better understand the dynamics which may drive these figures, and this table alone is insufficient to prove any systemic bias, this finding is simply presented as a summation of facts which emerged from the analysis of the data that was provided…

Deputy Hotard stated that he observed the Chevrolet pickup traveling on a public roadway when it failed to use a turn signal. A traffic stop based on this direct observation of La. R.S. 32:104 would be consistent with generally accepted police practices and the aforementioned training—despite Deputy Hotard's subjective intent for the stop—assuming the jury finds that the stop was not racially motivated.

Police officers are trained that once a vehicle is stopped for a traffic offense, officers generally may only detain the motorist for the time it takes to complete the investigation and issue a citation. However, if reasonable suspicion or probable cause is established during that time, an officer may extend the stop for a reasonable period of time to investigate the criminal activity. This principle is codified in La. C.Cr.P. art. 215.1(D):

> During detention of an alleged violator of any provision of the motor vehicle laws of this state, an officer may not detain a motorist for a period of time longer than reasonably necessary to complete the investigation of the violation and issuance of a citation for the violation, absent reasonable suspicion of additional criminal activity.

Police officers are further trained that if they develop probable cause on a traffic stop that the vehicle contains contraband, a search may be conducted in the field without a warrant or the driver's consent. This is known as the automobile exception to the search warrant or the *Carroll*

Doctrine. Officers are permitted to search with the same scope and authority as if they had a warrant. This means they can search anywhere where the searched for object could be located and they can continue to search until they are satisfied the search was fully executed without a set time limit.

It is also taught that in Louisiana, the plain smell of marijuana generally gives officers probable cause to search vehicles during these stops. It is understood that marijuana not being located at the time of the search does not negate the probable cause that existed, nor does it indicate that the officer acted outside of their training or generally accepted police practices. Some searches are completely fruitless, while others produce other types of contraband altogether. Searches based on the plain smell of marijuana are particularly unique in that there may be a very strong odor of marijuana, but the evidence could have been completely consumed moments prior to the stop or discarded during a nighttime stop without detection.

In addition, police officers are trained that plain view observations of contraband located in a vehicle may also aid in developing probable cause. It is well-known that prescription pill bottles with the labels removed often are used to carry illegal drugs. An observation of such a bottle, coupled with other articulable facts, may lead to probable cause that there are drugs in a vehicle. All probable cause determinations are based on the totality of the circumstances and each case is different.

Deputy Hotard stated that he detected the obvious odor of marijuana coming from the vehicle. He also observed a prescription pill bottle without a label in the cup holder. Deputy Bowden also testified that he detected the odor of marijuana. Taking these accounts as true, based on police training and practices, these observations would generally be considered sufficient to conduct a search of the vehicle without a warrant or consent of Mr. Clark.

During the search of the vehicle, deputies located a small piece of copper scrubbing or "brillo" pad. This item is often used as drug paraphernalia to aid in smoking crack cocaine. Crack users frequently use small glass or metal tubes as pipes. Users roll pieces of copper scrubbing pads, such as Chore Boy, into small balls and place it into the pipe to serve as a filter or screen for the burning cocaine. These pads are often located in vehicles of crack users.

La. R.S. 40:1021 defines drug paraphernalia as:

(1) All equipment, products, and *materials of any kind which are used*, intended for use, or designed for use in planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packaging, repackaging, storing, containing, concealing, injecting, ingesting, *inhaling*, or otherwise introducing into the human body *a controlled substance* in violation of the Uniform Controlled Dangerous Substances Law, as scheduled in R.S. 40:964.

Having located apparent drug paraphernalia and combined with the plain smell of marijuana, it would be consistent with police practices and training to also search the occupants of the vehicle for contraband. This is because it would be impractical to apply for a warrant due to

the risk of escape or destruction of the evidence. This risk is known as an exigent circumstance. Deputy Hotard claims that he asked Mr. Clark to voluntarily empty out his pockets. Mr. Clark disputes this; however, an officer would understand from training because of the exigent circumstance, consent was not needed.

When Mr. Clark was emptying his pockets, deputies noticed that he failed to empty a small coin pocket. It is well-known that drug users frequently use these small coin pockets to conceal drugs and paraphernalia. Deputy Hotard searched the pocket and located a $20 bill. It is also well-known that drugs are often concealed in folded bills. Deputy Hotard located a white residue that he believed could be from crack cocaine. Based on the unique facts of this case, Deputy Hotard's conclusion would be consistent with police practices and training.

It was noted on the stop that some of the substance located in the $20 bill might have been sheetrock. Police officers are trained to make decisions based on probabilities, not mere possibilities. To that end, a seemingly innocent explanation does not, by itself, negate probable cause when sufficient facts support it. Deputy Bowden explained that based on his experience, the substance he observed differed in appearance from sheetrock. Coupled with the brillo filter located in the cigarette pack, Deputy Bowden's conclusion would be consistent with police practices and training.

The next step of this investigation would have been a field test of the residue with either a swab or reagent kit. If the test was positive, indicating that the residue had properties of cocaine, an arrest would have been an appropriate decision. However, in this case, the evidence was purportedly destroyed by Mr. Clark and the test could not be performed to either confirm or dispel the deputies' suspicion.

Mr. Clark admitted that he grabbed the $20 bill from Deputy Hotard. Deputy Hotard believed there was evidence of felony drug possession wrapped in the bill. Further, assuming that there was evidence present, Mr. Clark's actions of grabbing the bill could be interpreted by an officer to be an intentional attempt to destroy that evidence—a violation of La. R.S. 14:130.1, Obstruction of Justice.

Deputy Hotard claims Mr. Clark physically resisted while being detained in handcuffs. Mr. Clark denies this, although the video appears to debunk his account. Assuming that he did pull his arm away from Deputy Hotard in defiance of direct orders to place his hands behind his back during a lawful detention, it would be consistent with police practices to charge Mr. Clark with La. R.S. 14:108, Resisting an Officer, which states:

> Resisting an officer is the intentional interference with, opposition or resistance to, or obstruction of an individual acting in his official capacity and authorized by law to make a lawful arrest, lawful detention, or seizure of property or to serve any lawful process or court order when the offender knows or has reason to know that the person arresting, detaining, seizing property, or serving process is acting in his official capacity.

Accordingly, based upon my specialized knowledge, experience, education, and training and upon the unique and particular facts of this case, it is my opinion that the traffic stop, subsequent search of the truck and Mr. Clark's person, and arrest of Mr. Clark were consistent with generally accepted police practices and training.

**B. THE TECHNIQUES USED TO DETAIN MR. CLARK WERE CONSISTENT WITH GENERALLY ACCEPTED POLICE PRACTICES AND USE OF FORCE TRAINING**

The question for the jury to decide in this matter will be if the force used by deputies during the detention and arrest of Mr. Clark was objectively reasonable per *Graham v. Connor*. It should be noted that it is not my intent to usurp the role of the jury or make any legal conclusions through this expert opinion. However, it is imperative to analyze the use of force using the same *Graham* factors because police officers are trained to use them to evaluate the propriety of any use of force.

As discussed by *Graham* and as taught to all Louisiana police officers in the POST curriculum, the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation. I have taken careful effort to follow this directive during my expert evaluation of this matter.

Proper application of the *Graham* principles by police officers requires careful attention to the facts and circumstances of each particular case, including: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether he is actively resisting arrest or attempting to evade arrest by flight.

Applying the *Graham* factors to the current case, Mr. Clark was not placed under arrest until he grabbed the $20 bill from Deputy Hotard. It was believed in that moment that there was crack cocaine residue in the bill, a violation of 40:967(C)—a felony charge. As noted above, intentionally destroying that evidence also constituted the felony charge of Obstruction of Justice.

Mr. Clark's actions of destroying the evidence and pulling his arm away from Deputy Hotard, if assumed to be true, would be indicative of a suspect who intends to not comply with commands. A non-compliant suspect does not always pose an immediate risk of harm to officers, but certainly that non-compliance should be considered when evaluating the presence of a threat. In my review of the video, it does not appear that Mr. Clark intended to harm the deputies, although caution should always be used during arrest. This would preclude the need to use higher levels of force in self-defense, but would limit force to that necessary to overcome the physical resistance.

Finally, assuming Deputy Hotard's account is accurate and that Mr. Clark leaned forward and pulled his arm away during the handcuffing process, Mr. Clark's actions amounted to active resistance to arrest. Accordingly, evaluating the *Graham* factors from the police practices and training context, it is my opinion that there was a government interest in using some force to detain Mr. Clark. The amount or level of force used will now be discussed.

In addition to the *Graham* factors, officers are trained and certified in defensive tactics. Strategic Self-Defense & Gunfighting Tactics ("SSGT") is a commonly trained program in Louisiana and is utilized by LPSO. SSGT incorporates constitutional considerations, including *Graham*, and also provides "Levels of Resistance" and "Levels of Response" to apply to use of force situations. These levels are not a force continuum, but are designed to help officers understand concepts and generally accepted levels of proportionate force. In other words, they are not to be strictly construed as the only appropriate response to resistance as each case is unique and must be evaluated based on the facts and circumstances present.

Regarding levels of non-deadly resistance, SSGT identifies the following:

> Passive – may exist when a subject verbally and/or physically refuses to comply with the lawful direction of an officer.
>
> Active – may exist when a subject physically evades an officer's control by pushing, pulling or bracing.
>
> Aggressive – may exist when a subject physically attacks an officer in such a way as to possibly cause injury but not likely to case great bodily harm or death to the officer or others.

In response to these levels of resistance, SSGT identifies the following:

> Verbal commands – directions given by a criminal justice officer with the expectation of a motoric or verbal response from the subject. Verbal commands are not always successful in which case an officer may have to resort to the use of physical force to bring the subject into compliance.
>
> Physical control – involves the use of empty-hand techniques to gain control and compliance of a resistive and/or combative subject.
>
> Intermediate/Non-lethal weapons – is a weapon that, when used properly, is not intended or likely to case great bodily harm and/or death. Intermediate weapons should be used when empty hand techniques are not sufficient to gain control but when deadly force is not justified.

As noted above, there is a dispute as to whether Mr. Clark pulled his hand away or resisted Deputy Hotard's attempt to place him in handcuffs. However, assuming that Mr. Clark did, in fact, pull his right hand away from Deputy Hotard's control, this action would be considered active resistance. Despite the dispute in testimony, a review of the video supports Deputy Hotard's description of the resistance as Mr. Clark's right arm is clearly out of Deputy Hotard's grasp after first being moved to his back:


CH 01 LELLIS
0.0MPH A1
A +30.482727 -90.9542


CH 01 LELLIS
POLICE
0.0MPH A1
A +30.482727 -90.9542

In response to active resistance, officers are trained that they may generally apply physical empty-hand techniques to overcome the resistance and gain control of the suspect. Based on watching the video, it is my opinion that Deputy Hotard's actions of grabbing the right arm again and forcing it behind Mr. Clark's back is such a technique. Further, Deputy Hotard did not appear to use any pain compliance during the arrest, which likely would have also been allowed under generally accepted police training.

SSGT provides two different "two-on-one takedown" variations that are designed to be used in response to a subject pulling away from the escort position—generally the same position Mr. Clark was in when he began resisting. The first contemplates a subject escort and the second a handcuffing procedure. In either event, the technique calls for the officer to straighten out the arm that is already under control for the escort, to bend the suspect forward 90 degrees, then put weight on the suspect's back forcing him to flatten out onto the ground—all while maintaining control of the arm. The subject should be handcuffed at that time.






In addition to SSGT, another well-recognized defensive tactics program is Human Factor Research Group, Inc. – Threat Pattern Recognition ("HFRG") (formerly Pressure Points and Control Tactics or "PPCT"). HFRG also instructs two techniques to respond to resistance from the escort position. Both of those techniques involve a distraction knee strike and then a takedown of the suspect to the ground in order to be handcuffed.

[SPACE LEFT BLANK]




Police training notes that courts also use other factors to aid in the evaluation of the totality of the circumstances, including, but not limited to: the number of suspects and officers involved; the size, age, and physical condition of the officer and suspect; the duration of the action; whether the force applied resulted in injury; previous violent history of the suspect that is known to the officer at the time; the presence of innocent bystanders who could be harmed if force is not used; and the availability of less lethal weapons. Deputy Bowden testified that he considered officer versus suspect factors during the detention of Mr. Clark.

In this case, neither a distraction technique nor a takedown was performed. It is my opinion that the deputies appropriately applied the relevant factors described above in their use-of-force decision-making. Although they were trained in takedown techniques that applied in this exact situation, the deputies exercised restraint and instead employed strength-based techniques to overcome the physical resistance and to secure Mr. Clark in handcuffs—methods that are generally less likely to cause injury than a takedown.

It has also been alleged that Officer McCullough choked Mr. Clark. In law enforcement, there are generally two types of recognized neck restraints: (1) respiratory (choke hold) and (2) vascular. Respiratory restraints restrict air flow and, in contrast, vascular restraints restrict blow flow by compressing one or both sides of the neck. In either application, there must be pressure applied to the side of the neck or across the throat.

In my opinion, the video clearly refutes this allegation due to the position of Officer McCullough's arm in relation to Mr. Clark's body. There is simply no evidence that she grabbed his throat or applied pressure to the side of his neck or throat. Although possible to apply either type of neck restraint when a subject is bent over at the waist as Mr. Clark was positioned, it would require Officer McCullough's arm to be at a downward angle and on side of the neck. This did not happen as her elbow is near the back of his neck and her hand near his shoulder. In my experience, a choke simply cannot be performed from the back of the neck with one hand as alleged.

There has also been an allegation made in the Amended Complaint that an unconstitutional escalation was created by Officer McCullough notifying dispatch of a "108" because this means "office down/officer in danger." This interpretation of a "108" is incorrect. La. R.S. 14:108 is the criminal statute for Resisting an Officer. Officers regularly use the shortened term "108" to note suspect resistance—however slight. By notifying dispatch of a "108," an officer is documenting the time and occurrence of the activity.

In this case, once Officer McCullough notified dispatch, she was asked if she needed a "net." Officer McCullough declined the "net" immediately. A "net" is a term used that limits radio traffic to emergency traffic only due to an on-going situation. By declining the "net," it was clear that there was no active or on-going emergency that needed special attention and that the situation was under control. In my opinion, Officer McCullough's actions were consistent with generally accepted police practices and would not be considered a use of force in the police training context.

Police officers are also trained that a suspect should be handcuffed as quickly as possible. This limits the time for the suspect to formulate a plan and begin to resist. SSGT and HFRG both specifically provide training on handcuffing techniques. SSGT notes that handcuffing while standing may be used for handcuffing an apparently compliant subject and is performed with the suspect standing straight up. However, HFRG teaches that during handcuffing, the officer should direct the subject to bend over at the waist. Either variation is generally accepted within police practices.

There is a dispute of whether Mr. Clark was forced or his bending forward was a result of his attempt to resist arrest. In either event, whether voluntarily or physically forcing someone who is pulling away into this position in order to safely handcuff would be consistent with generally accepted police practices and training. A person in this position is less dangerous to the officer who is standing upright behind the suspect and the hands are easier to move into a cuffing position. The officer also can apply pressure point and joint locks for pain compliance more efficiently from this position, which may become necessary should the suspect continue to resist.

Regarding the additional steps to be performed during handcuffing, both SSGT and HFRG mandate double locking and checking for tightness. Deputy Hotard noted in his affidavit that he personally applied the handcuffs to Mr. Clark. He attested that he would have checked for tightness and double locked the handcuffs to ensure that they did not tighten following the application. Although he did not specifically recall Mr. Clark complain about the handcuffs being too tight, had he complained he would have checked for tightness and loosened them if appropriate. Deputy Hotard's actions—as described in his affidavit—would be consistent with generally accepted police practices and training.

In order to physically position a person to be handcuffed, there must be control of their hands. SSGT instructs taking control of the blade of the hand while HRFG instructs taking control of the thumb and pad of the hand. In any event, the hand must be firmly controlled so the cuff can be guided into the notch of the wrist and properly applied. There is pressure applied from the hand side and the cuff side at the same time to quickly apply the handcuffs. If too little pressure is used, the single strand of the cuff will not swing all the way around and sometimes will remain in an open position—which is extremely dangerous if swung toward the officer.

Mr. Clark contends that he was injured during the handcuffing process or when Deputy Hotard grabbed his hand. Whether his injury was causally related to this action is beyond the scope of my expertise; however, I have personally been handcuffed likely hundreds of times in training and participated in hundreds if not thousands of arrests in my career. I have never seen an injury arising in this manner. Based on my experience, an injury sustained in this stage of the handcuffing technique is not ordinary.

As a final note, Mr. Buskin's report states:

> Based upon my previous experience and according to generally accepted police standards and the training police officers should receive throughout their career it would have been appropriate for Deputy Hotard to position Mr. Clark in front of his police vehicle to check the handcuffs for proper fit and ensure the handcuffs were double-locked.

While I certainly agree that it would have been appropriate, the converse is not necessarily true—that is, the fact that it was not done does not make Deputy Hotard's actions inappropriate. Neither SSGT nor HFRG instruct that these steps should be performed in front of a police vehicle. Further, the case cited by Mr. Buskin, *Hughey v. Easlick*, No. 20-1804, (6th Cir. 2021), is both non-controlling law and not taught in Louisiana POST training.

If additional discovery, information, or evidence becomes available, I reserve the right to amend or supplement the foregoing opinions accordingly.

Respectfully submitted,

C. Scott Courrege
July 8, 2025