# Exhibit C

## DEPOSITION TRANSCRIPT OF C. SCOTT COURREGE

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA
CASE NO.: 22-326-JWD-RLB

ALEXANDER CLARK,

Plaintiff,

v.

LIVINGSTON PARISH SHERIFF'S OFFICE DEPUTY JEAN HOTARD; DEPUTY CALVIN TAYLOR BOWDEN; SHERIFF JASON ARD; DENHAM SPRINGS POLICE OFFICER SYDNEY MCCULLOUGH; CHIEF J. SHANNON WOMACK; and CITY OF DENHAM SPRINGS,

Defendant.

---

REMOTE DEPOSITION OF CHARLES SCOTT COURREGE

DATE TAKEN: 09/08/2025

TIME: 11:33 a.m. - 4:11 p.m.

(Based on Time Zone from Notice)

WITNESS APPEARED BY: VIDEO TELECONFERENCE

Reported By:
Vaughan Duncan, AAERT No. 3738

APPEARANCES

On behalf of ALEXANDER CLARK:
SOCIAL JUSTICE LEGAL FOUNDATION
BY: JOSHUA BEHRENS, ESQUIRE
523 West Sixth Street, Suite 450
Los Angeles, California 90013
jbehrens@socialjusticelaw.org
APPEARED VIA VIDEO TELECONFERENCE

On behalf of ALEXANDER CLARK:
SOCIAL JUSTICE LEGAL FOUNDATION
BY: MARJORIE MENZA, ESQUIRE
523 West Sixth Street, Suite 450
Los Angeles, California 90013
mmenza@socialjusticelaw.org
APPEARED VIA VIDEO TELECONFERENCE

On behalf of ALEXANDER CLARK:
SOUTHERN POVERTY LAW CENTRE
BY: EMMA DOUGLAS, ESQUIRE
400 Washington Avenue
Montgomery, Alabama 36104
emma.douglas@splcenter.org
APPEARED VIA VIDEO TELECONFERENCE

On behalf of Deputy Jean Hotard; Deputy Calvin Taylor Bowden; Sheriff Jason Ard:
LIVINGSTON PARISH SHERIFF'S OFFICE
BY: DRUIT GREMILLION JR., ESQUIRE
20300 Government Boulevard
Livingston, Louisiana 70754
dgremillion@lpso.org
APPEARED VIA VIDEO TELECONFERENCE

On behalf of Denham Springs Police Officer Sydney McCullough; Chief J. Shannon Womack:
GAUDRY, RANSON, HIGGINS & GREMILLION, L.L.C.
BY: JOHN DANNA, ESQUIRE
401 Whitney Avenue, Suite 500
Gretna, Louisiana 70056
jdanna@grhg.net
APPEARED VIA VIDEO TELECONFERENCE

INDEX TO EXAMINATION


| | |
|---|---|
| EXAMINATION OF Charles Scott Courrege | PAGE |
| BY MR. BEHRENS | 7 |
| CERTIFICATE OF REMOTE NOTARY FOR WITNESS | 169 |
| CERTIFICATE OF REPORTER | 170 |
| CERTIFICATE OF TRANSCRIPTIONIST | 171 |
| WITNESS NOTIFICATION LETTER | 172 |
| ERRATA SHEET | 173 |

INDEX TO EXHIBITS

PLAINTIFF'S EXHIBITS FOR IDENTIFICATION:

| MARKED | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Depo Notice | 14 |
| Exhibit 2 | Witness CV | 15 |
| Exhibit 3 | Louisiana Supreme Court Denies Review | 28 |
| Exhibit 4 | Louisiana Deputies Arrested | 33 |
| Exhibit 5 | Video LELLIS 23:48:00 | 105 |
| Exhibit 6 | Misdemeanor Summons | 117 |
| Exhibit 7 | Video LELLIS 23:28:36 | 133 |
| Exhibit 8 | Video CBOWDEN 00:09:48 | 155 |

DEPOSITION OFFICER: Okay. We're on the record at 9:34 a.m. Pacific on September 8th, 2025. My name is Vaughan Duncan, with U.S. Legal Support, with headquarters in Houston, Texas. I'm a notary public licensed in the state of California. I'm located in San Diego, and the oath will be administered to the witness remotely. The audio and video recording will continue to take place until all parties agree to go off the record. Private conversations and/or attorney-client interactions should be held outside the presence of the remote interface.

This is the video-recorded proceeding of Scott Courrege taken by the counsel of the Plaintiff in the matter of Alexander Clark v. Livingston Parish Sheriff's Office, filed in the United States District Court, Middle District of Louisiana. This proceeding is being conducted remotely via RemoteDepo Pro.

The parties agree that an oath would be administered to the witness, that I'll create an audio record of this proceeding, after which a transcriptionist will produce a final transcript if ordered. In accordance with applicable law, the transcript will be provided to the witness for review, correction, and signature.

Will the parties please state your agreement and appearances for the record, beginning with the Plaintiff's counsel?

MR. BEHRENS: I agree. This is Joshua Behrens, on

behalf of Plaintiff, Alexander Clark.

MS. MENZA: I also agree. It's Marjorie Menza, on behalf of Mr. Clark.

MR. GREMILLION: I agree. This is Druit Gremillion, on behalf of Sheriff Jason Ard, Deputy Hotard, and Deputy Bowden.

MR. DANNA: I also agree. This is John Danna, on behalf of former Chief Shannon J. -- J. Shannon Womack, as well as Sydney McCullough.

DEPOSITION OFFICER: Thank you.

Will the witness please state and spell your first and last name for the record?

MR. COURREGE: It's Charles Scott Courrege. The last name is C-O-U-R-R-E-G-E.

DEPOSITION OFFICER: And will our notary please swear in the witness.

THE NOTARY: Yes. Good morning. I'm a notary public licensed by the state of Florida. And Mr. Courrege did provide his Louisiana driver's license prior to recording.

And, sir, what city and state are you presently located in?

MR. COURREGE: Baton Rouge, Louisiana.

THE NOTARY: Thank you. And do you consent to be sworn in by me here in Florida?

MR. COURREGE: Yes, ma'am.

THE NOTARY: Great. Thank you. Please raise your right hand. Do you solemnly swear or affirm that the testimony you provide in this matter will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

CHARLES SCOTT COURREGE

was called as a witness and, after having been first duly sworn, testified as follows:

THE NOTARY: Great. Thank you so much.

DEPOSITION OFFICER: All right. Please be advised that during the course of this proceeding, I may be marking exhibits as they're presented on record. Kindly allow the necessary time to complete this task. Thank you.

You may -- you may proceed.

MR. BEHRENS: Thank you, Vaughan.

EXAMINATION

BY MR. BEHRENS:

Q. Good morning, sir. My name is Joshua Behrens. I am an attorney at the Social Justice Legal Foundation, and I represent Mr. Alexander Clark, the Plaintiff in this matter. I just want to start out with some deposition logistics. I know that you've been through this before, so I can make it quick. And I just want to make sure that we're all on the same page. First, your testimony is under oath, and any false testimony carries the penalty of perjury in the US; does that make sense?

A. Yes.
Q. And as you can see, this deposition is being recorded. This is so that both parties will have a clear record of what is said today. The court reporter is typing amazingly quickly, but she -- he will not have a clear record of what is said if we talk over each other, mumble, or say inaudible things such as uh-huh. So I'll be -- I'll do my best not to do that and not to interrupt you, and I ask that you do the same. This goes for all counsel in the room. Do we have that agreement?
A. Yes.
Q. Great. Are you represented by counsel here today?
A. Am I represented by counsel?
Q. Yes.
A. I was retained by counsel. I'm not represented by counsel.
Q. And who are you retained by?
A. Both Defendants retained me jointly.
Q. And who are the names of those attorneys?
A. Mr. Gremillion and -- and John.
Q. Great. So either lawyer at a time may object to my questions. They may do so after I've asked a question and state an objection. For nearly all of their objections, you'll still be under an obligation to answer my question. However, if I were to ask, you know, What did you and counsel talk about before you entered this room? Your attorney will object on the

basis of privilege and direct you not to answer. It is only on those objections that you are relieved of the obligation to answer. And I will tell you now and your counsel that it is not now nor in the future, my intention to ask any questions that seek privileged communications; do you understand?

A. I understand. Also, if you encroach into something else that's privileged due to another matter due to my attorney relationship with someone else, I'll assert that privilege on my own.

Q. I understand.

A. Yeah.

MR. BEHRENS: I'll also ask counsel now that, as we've had in past depositions, if we could simply agree to keep our objections to form or privilege, and we'll -- we will also agree that an objection by one party is an objection to all.

MR. GREMILLION: That's fine.

MR. DANNA: That's fine.

MR. BEHRENS: Great.

BY MR. BEHRENS:

Q. So I also want to make it clear that you are under the obligation to answer my question unless your attorney directs you not to answer. I will also want to make it clear that you may ask me at any time to clarify a question if you do not understand it, and I will do my best to clarify. Are there any questions so far?

A. No questions.
Q. Great. We'll be taking some breaks today, likely every hour. If you're getting tired, let me know. We can certainly take a break. I'll just ask that I wrap up my series of questions before we do.
A. Sure.
Q. And finally, because this is testimony, I just want to ask today, are you under the influence of any drugs, alcohol, or any other medication that would make it such that you cannot give your best, truthful testimony today?
A. No.
Q. Great. So, Mr. Courrege, have you ever been deposed before?
A. Yes.
Q. How many times have you been deposed?
A. Four. I believe four.
Q. And in what capacity were you deposed?
A. All of my depositions have been related to expert cases like this one?
Q. And how many of those four cases involved federal civil rights lawsuits?
A. Two.
Q. Two. So I assume the --
A. I believe. I believe they're two.
Q. Sorry.

A. I believe two. Yeah, I think two.
Q. And I assume the other two were state proceedings?
A. I'm sorry. Three other -- three other -- three other civil rights. Yeah. The other ones were -- so five times total, three civil rights. The other ones were state. Correct.
Q. Okay. So all of those were in your capacity as a consulting expert, correct?
A. Yes.
Q. None of those were in your capacity as a law enforcement officer?
A. No.
Q. And were all five of those use-of-force cases?
A. No. One is a pursuit case. One is a -- it's related to -- related to a use-of-force incident, but I'm the expert regarding policy and procedure, so just a different expertise.
Q. Okay. So let me get this straight. One of these cases involved a police pursuit, correct?
A. Yes. Correct.
Q. One of them was a use-of-force case, but you were opining specifically on the policy?
A. Correct.
Q. And then the other three were use-of-force, police practices cases, correct?
A. Yes. Correct.
Q. How did you prepare for today's deposition?

A. I -- I reviewed my report and reviewed a few of the items. I did have a very brief conversation with counsel on Friday or Thursday of last week.
Q. Did you meet with anyone else besides counsel?
A. No.
Q. You only met with counsel one time?
A. In regards to this deposition?
Q. Correct.
A. We spoke on the phone. Correct.
Q. And was anyone else present for that conversation?
A. Not on my end of the call.
Q. Did you review any documents with counsel?
A. No.
Q. So you said to prepare for today's deposition, you reviewed your report; is that correct?
A. Right.
Q. Were there any other materials that you prepared?
A. I had looked back just at -- were there any other materials that I prepared or reviewed?
Q. Let me clarify. Were there any other materials that you reviewed in preparation for today's deposition?
A. Got you. I just skimmed back over Mr. Buskin's (phonetic) report, but that was all.
Q. Great. Do you know what the complaint in this case alleges generally?

A. Yes.
Q. How would you summarize the claims that Mr. Clark makes in this case?
A. Oh, essentially, there's a -- a alleged racial component to it, that he was targeted, but due to his race, and excessive force was used on him when he was taken into custody, allegedly causing him an injury.
Q. Okay. And do you agree with those claims?
MR. GREMILLION: Object to the form of the question.
THE WITNESS: I don't know what that means. What does -- what does your question mean? Are you asking me for my opinions?
BY MR. BEHRENS:
Q. Do you agree -- do you agree factually with those allegations that have been made in this case?
MR. GREMILLION: Same objection.
THE WITNESS: Of my summary?
BY MR. BEHRENS:
Q. Of the claims that Mr. Clark has made in this case?
A. Are you asking me if I agree -- would you -- you said, the factual -- the factual allegations, or am I agreeing with what it was pled, or do I agree, as an opinion, that those claims have merit? What is your question?
Q. My question is, the claims that Mr. Clark is making in this case that you summarized, do you agree with the claims as

pled?

MR. GREMILLION: Same objection.

THE WITNESS: I don't know what the question is but I -- I do not believe that his claims have merit within the framework of the opinions that I've rendered.

BY MR. BEHRENS:

Q. Okay. I am pulling up the first exhibit.

A. Hang on, is it up?

Q. Not quite yet.

A. Okay. I'm sorry. I've never used this system before, so.

Q. Oh, no worries. It takes a little bit, but once I pull it up, you should be able to see it on your screen.

A. Okay.

Q. Okay. Did a document just pop up on your screen?

A. Yes, I have it now, yeah.

Q. Great.

MR. BEHRENS: I will enter this as Exhibit 1.

(Plaintiff's Exhibit 1 was marked for identification. Depo Notice)

MR. BEHRENS: Vaughan, are you able to stamp this?

DEPOSITION OFFICER: Yes. Sorry. Just a second.

MR. BEHRENS: Thank you.

DEPOSITION OFFICER: Sorry about that.

MR. BEHRENS: Great. Well --

DEPOSITION OFFICER: All good?
MR. BEHRENS: Yes. Vaughan, I saw the stamp appear and then disappear. Would you be able to make sure it's affixed? There we go. Thank you.
BY MR. BEHRENS:
Q. Mr. Courrege, is this the report you authored for this case?
A. Yes.
Q. Do you have any changes or updates to your report that you would like to make at this time?
A. No.
MR. BEHRENS: I will now enter this as Exhibit 2.
(Plaintiff's Exhibit 2 was marked for identification. Witness CV)
MR. BEHRENS: Vaughan, if you could stamp that as such.
BY MR. BEHRENS:
Q. Mr. Courrege, is this your CV as -- filed as Exhibit 1 to your report?
A. It appears to be so.
Q. Great. And is your education history accurately reflected in your CV?
A. Yes.
Q. And is the same true of your professional experience?
A. Yes.

Q. Is there anything missing from your CV that you would like to add at this time?
A. No.
Q. Great. Take that down. Mr. Courrege, how much are you being compensated as an expert in this case?
A. $250 an hour for this work, and then $300 an hour for testimony.
Q. And how many hours did you spend preparing your report?
A. Oh, I'd have to go back and look at my time sheet. Maybe 20 or so hours.
Q. And do you know how many of those hours are spent reviewing the records specifically?
A. No, I don't know.
Q. I'll bring back up Exhibit 1 and go to Page 4 of your report. I'll direct us there. Are you looking at Page 4 of your report right now?
A. Yes.
Q. And I'm going to direct us to look at Roman numeral 4, facts and data considered. These 19 items, are all of these materials the materials you relied on for your report?
A. To form the factual basis? Yes. Correct.
Q. Did you review anything else beyond these 19 listed documents, listed here, to prepare your report?
A. Not that I'm aware of.

Q. Did you take any notes while you reviewed these documents?

A. What I usually do is, as I'm creating my report in my Word document, I type out notes as I go, so then I can go back and incorporate it in the factual basis. It's just easier for me to do it that way.

Q. Understood. Did you speak with anyone else other than counsel in preparing your report?

A. No.

Q. What specific expertise do you have that you are offering this case?

A. I'm being proffered as a police training, use-of-force, and general police practices expert.

Q. Got you. Okay. Okay. So the record is clear, there are three specific expertise -- three specific elements of expertise that you are offering this case, police training, use-of-force, and general police practices, correct?

A. Yes.

Q. How did you obtain these three specific elements of expertise?

A. How did I obtain those -- how did I obtain the expertise?

Q. Correct.

MR. GREMILLION: Yeah. I'm going to object to the form of the question.

You can answer.
THE WITNESS: Yeah. I -- so I've -- I've got roughly 25 years of law enforcement experience. I own a law enforcement training company. I do an extensive amount of law enforcement training as it relates to use-of-force and other police practices. I'm the legal aspects instructor for two Louisiana POST academies. So it's based on my -- my training and life experience or professional experience.
BY MR. BEHRENS:
Q. Is it true that you are not offering any opinions in this case outside of the specific expertise you are qualified to opine on?
A. You have my report of -- of -- my opinions are in the report, so --
Q. And you are not offering any opinion outside of your expertise, correct?
A. No.
Q. Have you ever been qualified as an expert in the Fourth Amendment and how it relates to warrantless searches of automobiles?
A. No.
Q. Have you ever been qualified as an expert in handcuffing techniques?
A. No.
Q. Have you ever been qualified as an expert in how

reasonable law enforcement officer -- officers should act in a given situation?

A. I think that's where most of my cases have been, that general police behavior or response, so yes, I would say yes.

Q. Have you ever been qualified as an expert in the reasonableness of law enforcement during a traffic stop?

A. I'm just trying to remember the context here, so no.

Q. Have you ever been qualified as an expert in racial discrimination?

A. No.

Q. Have you ever been qualified as an expert in racial discrimination in policing?

A. No.

Q. How about an expert in racial profiling?

A. No.

Q. Have you ever been qualified as a medical expert?

A. No.

Q. Have you ever been qualified as an expert as to the potential injuries sustained by improper handcuffing techniques?

A. No.

Q. Have you ever been qualified as an expert in statistics?

A. No.

Q. Have you ever been qualified as an expert in the use of statistics in policing?

A. No.
Q. Have you ever been qualified as an expert in the use of statistics to combat racial discrimination in policing?
A. No.
Q. Have you ever been qualified as an expert in forensic video evidence?
A. No.
Q. Have you ever been qualified as an expert on pain?
A. On what?
Q. Pain.
A. No.
Q. Have you ever been qualified as an expert on whether a civilian felt like he was being choked during an arrest?
A. No.
Q. So turning now to your -- in your capacity as an expert witness consultant, what percentage of cases do you take on where you are defending law enforcement officers against allegations of wrongdoing?
A. I'd have to go through my -- my complete CV. It's mixed. The first two cases I testified in use-of-force were against police officers, where I was qualified as a use-of-force expert. A deposition I gave last Friday was against a police officer's conduct or a law enforcement officer's conduct. The other deposition I gave in White v. Taylor in Mobile was against a law enforcement officer. So most of my testimony has actually

been -- or my qualifications have been against a law enforcement officer, not defending.

Q. So it sounds to me, if I was counting right, you've had four cases where you are retained on behalf of a plaintiff that is alleging a case against a law enforcement officer, correct?

A. No. I'd have to go through my complete case list. Do you want me to go through the whole case list?

Q. That's okay. You mentioned that the first two cases that you did were against the police, correct?

A. The first two cases that I was qualified to testify in use-of-force in court was against police officers. Correct.

Q. Could you provide the -- a summary of the factual allegations for the first case?

A. Sure. I'm just -- and I just need a reference an order here.

Q. Absolutely.

A. Yeah. There was a -- police officers were attempting to take a person in custody who was allegedly resisting. They took him out of the car. They began to use force techniques on him. He began to resist those force techniques, and it was my opinion that the continued use of pain compliance was causally related to his resistance, so. And so we're trained to employ -- to plain -- pain compliance and then allow an opportunity for the person to comply. In this situation, they

were continuously using the pain compliance. And that subject was acquitted -- it was a criminal trial. He was acquitted of his charges for resisting.

Q. And what was the caption of the case?

A. It's Louisiana v. Larue, L-A-R-U-E, Number 20-727.

Q. How about the second case that you were qualified as a use-of-force consultant? Can you summarize the factual allegations of that case?

A. Sure. Some police officers responded to a large group loitering who were about to fight, potentially, at a gas station. One of the police officers pulled someone out of a vehicle. It wasn't really a traffic stop, but it was a -- a stationary vehicle. Pulled him out of the vehicle, allegedly used some racial slurs, and grabbed him by the neck -- or grabbed him by the throat. And my testimony was that that officer's actions and use of force was not consistent with training and police practices.

Q. And what is the caption on that case?

A. Louisiana v. Depew (phonetic), 21-CR-453.

Q. And how about this case that you -- were you deposed on Friday; is that correct?

A. Last Friday?

Q. Yeah.

A. Yes, yes.

Q. Could you provide a summary of the factual allegations

in that case?

A. A fire investigator, so a peace officer, a POST-certified fire investigator, shot an individual in the back who was trying to break into his unit that was parked outside of a barber shop.

Q. And what is the name of that caption?

A. Oh. I have to go pull up my CV. Hang on. It's -- it's Damon Williams v. the City of Baton Rouge.

Q. For the first case you were qualified in about this, the pain compliance techniques, what was the law enforcement agency that was the Defendant in that case or the agency that employed the Defendants?

A. Grant Parish Sheriff's Office in Louisiana.

Q. How about the Defendant department in the second case?

A. There were a few different agencies involved. It was the -- I'm trying to think if it was the Clinton Police Department, and I think the -- the marshall's office there in -- in Clinton or Jackson, maybe. And they're -- West Feliciana Parish is the parish that they're in.

Q. And how about for the Williams v. Baton Rouge case? Who were the departments involved in that one?

A. It's the -- the city of Baton Rouge Fire Department. The caption is Williams v. Sanders.

Q. Williams v. Sanders?

A. Yeah.

Q. So, as a consultant, you provide pro bono consultations for law enforcement officers, correct?
A. No, as an attorney, I do that.
Q. Okay. So, as -- in your capacity as an attorney, you provide consultations for law enforcement officers, correct?
A. Yes. Correct.
Q. Under what circumstances do you provide pro bono assistance?
A. Here in Louisiana, a lot of our sheriff's offices provide no legal services for their deputies if they're involved in an officer-involved shooting. A lot of these guys either can't afford to or have chose not to become members of FOP or some other, you know, program to give them legal counsel.
So in the event that they're involved in an officer-involved shooting or some significant use-of-force, and they come to me, I'll meet with them for free through our attorney-client privilege and discuss the facts of their case and help them with their -- prepare them for their interview -- upcoming interview with whatever agency is going to conduct that interview.
Q. And what scope does your pro bono services encompass?
A. I usually talk to them about the -- the incident itself. We discuss the facts. I tell them if I think they need a criminal lawyer, because I don't do any criminal defense, refer them to a criminal defense lawyer if I think they need

that, and otherwise explain to them what's going to transpire in the -- in the interview with the incoming agency and what to expect in the investigation moving forward.

Q. Do you ever expand your pro bono services to testify as a -- as an expert witness in the case?

A. No.

Q. Have you ever provided pro bono assistance to a Livingston Parish Sheriff's Office deputy?

A. I don't recall. I'm not sure.

Q. Have you ever provided pro bono assistance to a Denham Springs Police Department deputy?

A. I did speak with one officer after a shooting, although it wasn't very extensive. He didn't come into the office, and -- and we just spoke on the phone, more -- more as, like, a peer support situation, I guess, but we did discuss the facts of the shooting, so.

Q. Approximately what year did this occur?

A. It's been two -- two or three years ago.

Q. Have you ever provided pro bono assistance to an officer accused of negligent -- negligent handcuffing?

A. No.

Q. Have you ever provided pro bono assistance to an officer or department accused of racial profiling?

A. No.

Q. Have you ever provided a pro bono consultation to

civilians who have experienced alleged police misconduct?

A. I've had some attorney discussions with -- with people who've come to me. I don't handle 1983 cases as an attorney, but I've referred those cases to people that I thought could handle those cases. So I've -- I've taken in a few of those cases but then directed them out.

Q. So it's fair to say that you gave a consultation to a handful of civilians who've experienced alleged police misconduct, but that you, yourself as a lawyer, did not take on that case?

A. Yeah, just because we don't practice that in our -- our practice area.

Q. As an attorney, what types of cases do you take on?

A. Our -- our primary practice is personal injury.

Q. And as an attorney, how do you handle conflicts in your work?

A. If we have a conflict, we -- we follow the rules of professional responsibility.

Q. Have you ever taken on a matter against the Livingston Parish Sheriff's Office?

A. No.

Q. How about against the Denham Springs Police Department?

A. No.

Q. Have you ever turned down a client seeking to litigate

against Livingston Parish Sheriff's Office?
A. Not that I recall.
Q. Have you ever turned down a client seeking to litigate against Denham Springs Police Department?
A. I did get a call over maybe a year ago about a case involving Denham Springs, and this case was active, so I didn't even discuss any facts related to the case. I -- I turned it down because of this active case.
Q. Have you ever represented a law enforcement agency in your capacity as a lawyer?
A. No.
Q. Do you remember when you were retained for this case?
A. I don't. I'd have to go back and look at emails or something.
Q. Can you give a rough approximation?
A. I really can't. I'd just have to go back. I have -- I have a lot of moving parts. I'd have to go back and try to find an email, an engagement letter, or something.
Q. In how many cases have you been an expert witness?
A. How many I've been retained on or actually qualified for?
Q. How many cases have you been retained as an expert witness?
A. It's in my CV, so, I don't know, whatever that is -- whatever that number is.

Q. Have you ever had your testimony excluded from a case?
A. No.
Q. You've never had your testimony excluded from a case?
A. Excluded?
Q. Excluded.
A. No.
Q. Have you ever had your testimony excluded as -- in your capacity as a law enforcement officer?
A. No.
Q. Have you ever been disciplined in your capacity as an attorney?
A. No.
Q. Okay. I'm going to pull up the next exhibit. Mr. Courrege, do you publish writing on the website courregeconsulting.com?
A. Yeah. Just blog posts, yeah.
Q. Great. I will share this next exhibit and mark it as Exhibit 3.
(Plaintiff's Exhibit 3 was marked for identification. Louisiana Supreme Court Denies Review)
BY MR. BEHRENS:
Q. Did you offer this -- author this blog post entitled Louisiana Supreme Court Denies Review of Officers Liability Arising from Code 3 Car Crash from February 4th, 2022?
A. Yes.

Q. Great. I will direct us down to Page 2, and you can use the little plus and minus to zoom in. And I will direct your attention to Paragraph 2, beginning with Courrege Consulting Group's founder, and if you could please read the sentence beginning with the decision to proceed.

A. The decision to proceed against the law enforcement officer seemingly goes against Scott's principles. However, in this case, there was clear evidence that the officer did not follow his training and well-known police practices on safely clearing intersections.

Q. What do you mean there when you write the decision to proceed against the law enforcement officer seemingly goes against Scott's principles?

A. Well, I'm still a police officer today. I'm still a POST-certified officer. So I think common sense would say someone who's in law enforcement wouldn't be very prone to just go to sue a law enforcement agency. It might be against some of their principles. So in this case, I teach pursuit liability to police officers. I -- I train them in this -- in this subject. So taking on a case like this might -- would strike someone in the -- as odd, but it was a righteous case and they violated their training and they were found liable, so.

Q. Do you only take on cases that you feel are righteous?

A. In my -- my -- yeah. Sure.

Q. And do you normally hesitate to proceed against a law

enforcement officer?

A. In what capacity?

Q. In your capacity as a -- an attorney?

A. I -- there's -- there's a -- there's a business component to that. So I do a lot of training on law enforcement. So locally, within our state, I do a lot of training. And so yes, there's a thought, just from the business side of it, What case do I want to take? If it's a -- if it's a -- if it's a case that is really a stretch, you know, I don't want to put myself in a position to alienate my other clients, so I really try to evaluate cases and take those cases that I assume are -- are straightforward and clear.

Q. Have you ever trained Livingston -- at -- have you ever trained at Livingston Parish Sheriff's Office?

A. Ever -- ever trained at their office?

Q. Have you ever trained the department or their deputies?

A. Their deputies used to come to our police academy, so I've trained many of their -- their deputies through the years. But now they have their own standalone academy, so they don't come through there. I've also trained some of their officers or deputies in our -- in my consulting company's courses through the years. Most of those were narcotics courses, so yes.

Q. And when a deputy comes and is trained in one of your courses that you put them on as your -- in your capacity as a

consultant, would the department be paying for that training?
A. It depends, though. So sometimes, we have people pay out of pocket because they just want to come to the training, so they'll pay for it themselves. But, yes, other times, the agency pays for it.
Q. Have you ever trained officers or deputies from Denham Springs Police Department?
A. Yes. Same answer.
Q. Do your concerns about hurting your consulting training business and -- and your law enforcement clients, does that extend to your -- to the cases you take on as an expert consultant -- consultant?
A. I -- I think how everything's interwoven, if I have an -- a case with an agency or if I'm doing something with an agency, it's all a consideration. But at the end of the day, if I see a plaintiff's case and I believe someone is wrong and there's no conflict with me taking that case, I'll take that case. And like I said, the first two cases were -- or the -- at least the second case was fairly high profile and was very local, and I believed the officer was wrong, so I was very happy to take on that case.
Q. Have you ever testified on behalf of an elderly motorist in excessive force action against the officers who arrested and charged her?
A. I have a case involving an older lady. I don't know

if she's elderly, but I guess that's what you're talking about, yeah.

Q. Yeah. Yeah. I guess I'll stop hiding the ball. You testified as an expert witness in White v. Taylor, et al., correct?

A. Yeah. I said that earlier, Mobile. Yeah.

Q. Great. And what, in your memory today, were the facts of White v. Taylor?

A. That was a -- that was a purported pursuit with this Plaintiff, and when they reached the end of the pursuit, they used force and dragged her out of the vehicle onto the ground, and that caused her significant shoulder and arm injuries, so that was the facts.

Q. And the woman herself was 73 years old -- years old, correct?

A. I don't recall.

Q. But it -- it's fair to say she was an older woman.

A. Yeah.

Q. And do you recall whether she was accused of narcotic possession?

A. She was.

Q. So is it fair to say that White v. Taylor concerned alleged excessive force against an older motorist who was accused of narcotic possession?

A. Sure.

Q. So it's fair to say, then, that there are some similarities between Mr. Clark's situation in this matter and the factual situation in White v. Taylor?
A. Actually, they're very different cases, but if you just mean there's someone that was in a traffic stop that was accused of drug possession, then sure.
Q. I will now move us to the next exhibit.
A. All right.
Q. I think this makes it Exhibit 4. This is a blog post from Courrege Consulting Group dated, let's see here, February 24th, 2022. Did you write this article?
(Plaintiff's Exhibit 4 was marked for identification. Louisiana Deputies Arrested)
THE WITNESS: Yes.
BY MR. BEHRENS:
Q. Now I will direct us to the last paragraph on -- on Page 4. I'll direct us here. Page 3 of the article, with the paragraph that begins notwithstanding this case and these arrests, can you begin reading at there is a bigger movement afoot?
A. There's a bigger movement afoot that brings about a more difficult question, what does society want and expect from law enforcement? Keep going?
Q. Yes, please, if you could just finish the paragraph.
A. If the answer is perfection, we are destined for rapid

disappointment and, in my opinion, unprecedented crime, as the few officers who will remain will certainly operate in fear of making any mistake. Law enforcement simply cannot be effective if performed in this manner. We do not hold any other profession accountable to this standard, even if death results from bad decisions. But is it the fate of law enforcement moving forward? Only time will tell.

Q. What do you mean when you write there's a bigger movement afoot?

A. I wrote this over -- almost two years ago, so I'd have to just kind of reflect on the context of what was going on. We did see a lot of indictments moving into the early 2020s and, you know, into that era of law enforcement officers, for the first time, being criminally charged for certain actions. That was an interesting shift in what was going on. Some of those cases, I believe, were absolutely politically motivated, were absolutely incorrect, and I think a lot of those officers have been exonerated.

So there was -- there was a -- a political pendulum that swings back and forth, and sometimes -- I became a cop in 2000, 2001, and right around that time, 9/11 happened, and everywhere we went and everything we did, everyone thanked us for our service because we were really appreciated. Then, somewhere around 2016, everyone hated everything we did, or at least on social media. And everywhere you went and everything

you did was scrutinized to a level that was quite frankly unrealistic.

And so that's what I was talking about, the pendulum swings back and forth. And as the Supreme Court notes in many of its Fourth Amendment -- Fourth Amendment decisions, it's the limits of what society's willing to accept as reasonable determines what is the path moving forward for law enforcement decisions. So, you know, again, that's almost two years old, but that's what I think I was thinking.

Q. Do you think that law enforcement is held to too high of a standard?

A. At times, yes.

Q. Do you believe that juries hold law enforcement to too high of a standard?

A. I would hope the juries follow the jury instructions in the law is what I would hope.

Q. Do you believe that juries ever get it wrong?

A. Sure.

Q. What did you mean when you wrote even if death results from bad decisions?

A. It means sometimes there's bad outcomes in law enforcement. Sometimes people die, and it's not -- that's not good. We never want someone to -- to die as a result of our actions. But just because someone dies doesn't mean -- we -- we can't be perfect human -- you know, based on a human performance

aspect, doctors kill people very regularly through medical malpractice, and there's a lot of law and a lot of protection for those doctors.

And, you know, so my point is even if it's the most egregious thing, someone dies, it doesn't change the ability or the capability for someone to act within their human limits. So we -- we just have to be cognizant of that. Some of these -- some of these cases aren't pretty and the outcomes aren't pretty, but we still have to be realistic about how they occurred and could it have been prevented, those type of things.

Q. Do you believe that law enforcement officers should have more legal protections?

A. I don't know what that means. What do you mean?

Q. You mentioned that doctors have many legal protections despite the fact that they kill many people --

A. They do.

Q. -- in medical malpractice. So I'm wondering if you believe that officers need more legal protection like doctors?

A. I don't know that they need more legal protections so much, but unfortunately, law enforcement gets dragged into the political pendulum, and at times, the goals -- the goalposts move. So what's seemingly okay one week in -- in -- within society's expectations isn't acceptable very quickly, and that's hard to change through years of training and repetition, so it's difficult. You would just ask that the -- that the playing

field stays -- stay the same and officers have notice of their -- their expectations, that's all. So it's a -- it's a very -- very difficult job when the goalposts move.

Q. Do you see it as part of your job as a law enforcement officer, lawyer, and expert consultant to help bring the pendulum back to a reasonable standard?

A. I can't control what society does, but what I can try to do is influence the people that I train. And I can urge them to educate themselves. And I can urge them to follow the law. And I can urge them to use discretion and de-escalation and all the things that help mitigate bad outcomes. But we're one high-profile incident from the pendulum swinging either way, good or bad.

If we have another terrorist attack, I promise you, police and fire will be back on the thank-you-for-your-service list. If we have another George Floyd incident that goes public, it'll be the opposite. So that's not my job. I have no control over that, but I would certainly like to help officers understand the constitutional limitations and what they can and can't do to help protect themselves and their agencies and the public.

Q. Have you ever met any of the Defendants in this matter?

A. I don't know. I do -- I've done so much, like I say, academy training through the years. For all I know, the --

every one of these people could have come through my CARTA classes. I have no idea. I'm not sure. I -- I teach a lot of people every year. I don't know --

Q. So --

A. -- any of them personally. I don't have a relation with any of them.

Q. So you don't have a specific memory of meeting Deputy Hotard?

A. No, I don't.

Q. Or Deputy Bowden?

A. I don't. And I think there's --

Q. Or?

A. -- more than one Bowden there, even. I'm not -- so, yeah, I'm not sure.

Q. And Deputy McCullough?

A. I've seen McCullough. I've just -- there -- there's so few females in law enforcement in our area. I've seen her at a training before. I just remember seeing a Denham female officer, but I don't know her.

Q. Yeah. And that should have been Sergeant McCullough. I will correct that for the record.

A. Okay.

Q. Do you know Sheriff Ard?

A. No.

Q. Do you know former DSPD Chief Womack?

A. I'm sure I've met him, but I don't know him.

Q. Great. We've been going just under an hour. How are you doing? Would you like a break, keep going?

A. I'd love to grab a bottle of water, and it'll take about 30 seconds.

Q. Great. Let -- let's take a five-minute break. We'll -- let -- let's do it around seven so we'll be back at the half hour.

A. Perfect.

DEPOSITION OFFICER: Okay. Taking us off the record.

(Off the record at 10.23 a.m.)

(On the record at 10.32 a.m.)

DEPOSITION OFFICER: Okay. We're back on the record. Thank you.

BY MR. BEHRENS:

Q. Mr. Courrege, I'd love to circle back to some questions about the training that you conduct. So it's true that you work for the Louisiana POST Academy?

A. No. I train at two different POST academies. They are regional academies -- or they're police academies that train the POST curriculum.

Q. I see. So you work at two different training centers; is that correct?

A. Yes. Correct.

Q. What are those two training centers?

A. The Capital Area Regional Training Academy, which is a regional training academy in Baton Rouge and -- well, really three. There's Louisiana State Probation and Parole Academy and Louisiana Department of Wildlife and Fisheries Academy.

Q. And what are the subjects that you train in at these three academies?

A. I'm the legal aspects instructor, so I teach the constitutional legal aspects. I teach constitutional use-of-force. And at the CARTA Academy, I teach introduction to drug identification and drug investigations. And I used to teach standardized field sobriety, but I haven't done that over the past few years. I also -- I also do some smaller classes for the Kenner Police Department Police Academy. I teach a First Amendment auditor class for them. So four POST academies.

Q. Okay. So if I heard you right, you train on legal aspects, correct?

A. Correct.

Q. The constitutional use of force?

A. Correct.

Q. You used to feel -- you used to teach field sobriety?

A. Correct.

Q. Do you currently teach narcotics investigation?

A. Correct.

Q. And you do some small classes for the Kenner Department?

A. Kenner Police Department. Correct.
Q. As a First Amendment auditor?
A. Yeah. I have a two-hour First Amendment auditor -- so first, know your First Amendment rights type of class, and on -- so teaching them First and Second Amendment constitutional rights.
Q. And when you mentioned that LPSO recently trained -- or in the past had trained with you, was that at CARTA?
A. Correct.
Q. And do you know what year they ended their training at CARTA?
A. I don't.
Q. Would you approximate this happened in the last five years?
A. Been two or three years.
Q. And I also want to circle back to, you stated earlier that you've never had your testimony excluded from a case; is that correct?
A. Correct, to my knowledge.
Q. Perhaps you can correct me then, because I -- I'd read a opinion in a case that you were an expert witness in, the caption is Franklin v. Louisiana or Louisiana v. Franklin, where the 5th Circuit Court of Appeal -- State Court of Appeal in Louisiana had ruled that the trial court erred in ruling that some of your testimony was admissible. Am I mistaken in that

understanding?
A. That's not an exclusion. I'm testifying in that trial tomorrow. It -- my -- my testimony was limited in that case due to a 704 issue, not a Daubert issue or qualifications issue. But the trial court said I could testify to certain threat factors that would tie into the reasonableness of the self-defense claim. The State 5th Circuit said, Nope, you can't go that far. Here's where you have to stop, but I wasn't excluded from testimony. The trial starts tomorrow.
Q. I see. So it is correct, though, that your testimony was limited in the case?
A. Correct, based -- just based on the Court's interpretation of how far can an expert testify into 704 in a criminal trial. So I wasn't given a he's guilty or he's innocent opinion, but the trial court -- the 5th Circuit differed from the trial court on how far I could testify regards to the Self Defense Statute.
Q. Do you disagree with the 5th Circuit's ruling there?
A. I could -- that's -- it's a legal issue. I'll -- I'll testify to what the Court says I can testify to, so, again, it didn't affect -- it did -- it didn't attack my qualifications or credibility or Daubert or methodology, so every court's going to decide the parameters of an expert's scope. This is an -- this is kind of an untested area. We -- we understand the scope a little better in federal court. It's a little better laid out.

For a state court, it's all over the place. So that's -- that's all that issue was, but it was not -- not an exclusion.

Q. Have you had your testimony limited in any other case?

A. Other than what we're talking about right now? No.

Q. What is your opinion regarding Mr. Clark's claim in this matter, that LPSO engages in racial discriminatory policing?

A. I don't think there's sufficient data that was presented in this case to make -- to make an evaluation in either direction. You know, it's -- for the purposes of my report, I me-tooed Mr. Buskin, and said, you know, If -- if we were to truly objectively look at the data and decide if they're truly were racially based practices afoot, we would need the context of all the data. We would need to be -- know -- know what's going on with that data, how it's being reviewed by supervisors, and we didn't -- we didn't have any of that in this case, so I don't think there's -- I don't think there's enough data to -- to even evaluate the claim at this point.

Q. So it's fair to say that your opinion is that there is not sufficient data in this case to evaluate whether LPSO engages in racially discriminatory policing?

A. Yeah. Based on what I've been presented, there's no evidence that there is, but, again, that that -- that that is occurring or that did occur in this case, there was -- I went in through my narrative and talked about the pretext stop and --

and the procedural parts of the traffic stop. I don't think there's any information that supports the Plaintiff's claim based on what I was provided to date.

Q. And on what expertise are you basing your opinion that there's not sufficient data to determine whether LPSO engages in racially discriminatory policing?

A. Yeah. So I -- I was a supervisor in the narcotics unit here and we reviewed cases and we reviewed our policies. And we had to make sure that our officers weren't engaged in unconstitutional, or you know, profiling or targeting based on any protected class. And so there's policies in -- in place for that, and there's -- from the supervisor's standpoint, you have to look at the context of everything.

We understand that certain policing practices in certain neighborhoods that have certain demographics are going to skew a statistic one way or another, if you just look at the race of maybe the person arrested or stopped. But the context of the investigations, the context of the entirety of the unit or the entirety of the office, all has to be taken to account. So in our little microcosm of unit-by-unit evaluations, that's what we would look at. We would look at the overall context.

So I -- I just didn't have -- just from what I understand, the data was limited to a certain range of traffic stops to a certain just specialized division, not even the entire agency. So it just -- there was a lot of holes there

that I, as a supervisor, wouldn't really be able to sort through that information and give you a valid analysis.

Q. Are those holes that you would wish to plug as a supervisor if you were evaluating that data?

A. (Indiscernible) --

MR. GREMILLION: Object to the form -- object to the form of the question.

MR. BEHRENS: Sorry. What was your -- what was your answer?

THE WITNESS: I'm not a supervisor in their agency, so I don't have access to everything that they would have. So a supervisor in their agency might have access to tons of different information that I didn't have. All we -- we just got this little just one report of some -- some data or statistics that were compiled, and it's definitely -- sure there's some data there, but it doesn't -- everything has to be looked at in context, and there's no context to that information to -- to give any sort of real examination in my opinion.

BY MR. BEHRENS:

Q. So it sounds like what you are saying is, in order to better evaluate LPSO for racial discrimination in their policing practices, we would need to look at a larger data set; is that correct?

MR. GREMILLION: Object to the form of the question.

THE WITNESS: Yeah. I'm saying there's -- there's no

evidence that there -- this -- that -- that -- that is going on in this case. And based on the information that was provided, there's -- I can't tell you. I can't do a complete analysis, so.

BY MR. BEHRENS:

Q. What would sufficient data in this case look like?

A. Well, just what I said. You -- you really need the context of everything as far as -- you know, I -- if this was -- these -- these deputies are involved in proactive patrols, and they're stopping vehicles, and, you know, what -- what maybe could be a high-crime area, what could be based on citizen complaints.

So if they're in response to specific citizen complaints or they're working a specific operation, or if that is part of an overall crime strategy for the sheriff's office, I don't know. I don't -- I don't have any of that information or -- or the city -- or the city. I -- I don't know what was received. I just -- this is just some random stats in the void, and you can't put any context to it based on what I have.

Q. So do you have any information in this case that this stop of Mr. Clark was done due to a citizen complaint?

A. No. I don't -- I don't -- I don't have any information other than it was a stop based -- based on a probable cause observation of a traffic infraction, which is perfectly reasonable under police training auspice.

Q. So you're saying that sometimes police practices are informed by citizen complaints and citizen requests; is that correct?
A. Yeah. If we receive specific complaints about certain crimes in a certain area, sometimes strategies are derived to address those -- those crime problems. Sometimes it's just the area -- officers in an area responding to their understanding of crime trends or crime problems in an area.
So there's -- there's a whole -- again, there's a whole context -- and I don't -- I don't know any of that information. I haven't been provided anything other than a very specific set of traffic stops that were conducted for a certain set of traffic violations, and I believe it was limited to their criminal patrol unit, LPSO criminal patrol unit.
So, again, it just -- it's -- with what we have? No. There's no evidence that anything inappropriate occurred based on race. If there's other data to review, then sure, we can review it.
Q. So I want to go to your experience as a supervisor in narcotics. When you talked about reviewing the actions of your supervisees to ensure that no discrimination was occurring, is that an accurate representation of what you described?
A. Well, you have to make sure that they're following all policy and procedure. And in the narcotics world, we're doing interdiction stops. We're doing a lot of high-profile -- or

excuse me.
We're doing a lot of high-crime enforcement with pretext patrols and narcotics enforcement. And, you know, part of our policies, at least at my agency, were -- you know, we had a non-discrimination and a non-profiling policies and procedures that we were responsible to make sure were adhered to.
So, you know, that -- that just really takes getting into the weeds on each investigation and understanding why we're -- why we're there, what we're doing in those situations, and that -- that actually is following policy and procedure.
Q. As a narcotics supervisor, did you ever investigate an action of your -- a supervisee that you believed was an incident of racial discrimination?
A. No.
Q. So that's a zero percent racial discrimination rate among your supervisees?
A. In -- in my experience, I've not -- I've not had that finding.
Q. When you were evaluating your supervisees about whether they engaged in racial discrimination, did you look at the data in your department?
A. Yeah. So when -- when -- in the -- it's -- so as the supervisor, I wasn't over the entire department. So just -- we -- I was in the narcotics division. I was a sergeant just in our narcotics division.

So it wouldn't be my job to look at the data of everything. There's other people usually in the agency that do that complete data analysis or statistical analysis, which wasn't my role, necessarily.

But what you're looking at is, what actions are your officers involved in? Are those actions lawful? Are those actions targeting -- targeting certain individuals for other motives or reasons? Are there legal basis for what they're doing? So, again, it's just, you know, everything has to be big-picture context.

Q. So it's fair to say that you've never done any data analysis regarding racial discrimination as a law enforcement officer?

A. I wouldn't say that. I just said in my -- our units, we deal with -- we have to deal with the data inside of our units. When you're talking about the agency whole as a -- I thought your question was agency-wide.

So what we would -- me as a sergeant in our narcotics division -- I'm -- I'm responsible for my division or the guys under me and my division to make sure --

Q. So you --

A. -- that they're following the policies.

Q. So you do have experience reviewing your division-wide data for --

A. True.

Q. -- evidence of racial discrimination; is that true?
A. Yeah. You have to review it all to make sure everyone's following all the policy, so.
Q. And when you were evaluating this data, you never stumbled across any data that made you wonder, Hey, this might be racial discrimination?
A. We would receive complaints here and there, or as a division, we receive complaints here and there about, you know, alleged racial, you know, targeting or -- in my experience, that's never came -- panned out to be correct.
But if it was -- if it -- if there were any true considerations or concerns, in most agencies, that's sent over to the Internal Affairs division to look into a little further. What we would do is look at those cases to see if the cases were valid, if the person had a lawful reason to be -- the -- the deputy had a lawful reason to be doing what he was doing, speak to the deputy about it, and say, Hey, what's going on? What -- tell me the -- tell me the back story of the case. Let's look -- let's look at the facts. And so, you know, it's -- no, I've not found that a deputy has racially targeted or profiled or -- or taken action based on those bases.
Q. Do you believe that racial discrimination can ever be a potential problem in policing?
A. Sure. Yeah.
Q. When you mentioned that someone in the departments

does the data evaluation for the entire department, who are the individuals doing that data evaluation?

A. I don't know for LPSO. I'm not sure. I was talking about the agency that I worked for.

Q. Yeah. Yeah. My question is directed at your experience. Is this at EBRSO?

A. Yeah. Correct.

Q. Do you --

MR. GREMILLION: I'm going to object to the form of the question.

You can answer.

THE WITNESS: Yeah. I'd have to go back. And that's been -- I've -- I've been gone seven years from full time from the sergeant role. So I -- I would really have to think about who -- who that would go to. Ultimately, IA makes the decisions on an individual complaint-by-complaint basis, but at EBR, they have an entire -- they have an entire crime stats division, and they -- they follow the CompStat model, and they -- you know, they -- but I -- I was not involved in that side.

BY MR. BEHRENS:

Q. And when -- you have been a supervisor in the past reviewing your supervisees' actions for racial discrimination. Do you ever look at trends, or are you just looking at each case on a case-by-case basis?

A. You're looking at -- we -- we do continuous stats,

which show trends, show arrest trends, show trafficking trends, show violations. And so all that -- all that is looked at, you know, really probably in a monthly -- month-to-month basis because stats were put out monthly.

Q. And do you look at those stats? Are they broken down by race?

A. Again, I'd have to go back and look. I know we had some -- we had some big changes through my career there when I was there. Sometimes, yes, it would break everything completely, all the way down, at one point.

At some point, the stats were just the arrest stats and seizures, but that changed at some point. So I -- again, it's just been -- just been a little bit of time. And I don't know what LPSO does because I've not been provided that information.

Q. Okay. So you have no knowledge as to LPSO's policies or procedures regarding the collection and analysis of data related to racial discrimination?

MR. GREMILLION: Object to the form of the question.

THE WITNESS: I know they have policies on the issue, but what they do with that information, I'm not -- I'm unaware of.

BY MR. BEHRENS:

Q. Did you ask for that information?

A. I did not.

Q. Are you aware of where most Black people live within Livingston Parish?
A. No.
Q. Do you believe that police departments have an affirmative duty to identify and mitigate potential discrimination, racially or otherwise, among their employees?
MR. GREMILLION: Objection to the form of the question.
THE WITNESS: I didn't understand. Say it again.
BY MR. BEHRENS:
Q. Do you believe that police departments have an affirmative duty to mitigate potential racial discrimination among their employees?
A. I feel like we have an affirmative duty to make sure our officers are trained, and we have policy and procedure in place, and to make sure that they're following those policies and procedures.
Q. So you would not agree that police departments have an affirmative duty to combat potential racial discrimination?
MR. GREMILLION: Object to the form of the question.
THE WITNESS: Yeah. I'm telling you that we have a duty to train our officers to not engage in this behavior, to implement policies and procedures, and to make sure the policies and procedures are being followed.
When you talk about affirmative duty, you're kind of

dragging me into -- maybe there's a court opinion talking about an affirmative duty, and then we kind of get into, like, a legal context.

I'm telling you from a police practice standpoint, we train our officers, we implement policy and procedure, and then we, as supervisors, make sure -- do our best to make sure that that's being followed. So that's -- that's the practice.

BY MR. BEHRENS:

Q. I see. Yeah. I had missed that from your initial answer about training officers to combat that practice. So it sounds like you are in agreement that -- I'll leave aside the legalese of affirmative duty, but that departments have -- should -- I'll rephrase, that departments should train their employees to combat potential racial discrimination.

A. Yeah. I don't know what combat racial discrimination necessarily means. What we want to do is to train them not to do it. I'm not sure what you mean -- what you mean by combat it, but we'll train officers on biased-based policing and discrimination-based policing.

And we will then implement policies that prohibit the same. And our supervisors are to ensure that the policies, all policies, are being followed. So I don't know what combat means. I -- but that's my answer.

Q. So you said initiate policy and procedure to prevent racial discrimination; do you agree with that phrasing?

A. The policy and procedure is in -- in -- in place to give guidance and support the prevention of that discrimination. Yeah.

Q. Okay. Support the prevention of discrimination. What does that mean?

A. It means we're going to train our officers that they're not allowed to engage in racially based enforcement activities. We give a policy and procedure based on the same.

Usually, there's POST training that comes around periodically that says you have to take bias training -- I -- I believe it's yearly, the bias training. And, again, it's our job then to ensure -- the supervisors ensure that the officers or deputies aren't engaging in that activity. So, I don't know, that's what it means.

Q. I understand that there were a number of policies and training mentioned as a part of that answer. Can you point me to what specific procedures a department should do to support the prevention of racial discrimination?

A. Well, I think -- I think it's an -- an agency. It's -- all agencies are so diverse. So if you go to some huge agency where there's thousands and thousands of officers, they may need more detailed policy to lead their supervisors in the right path to how to actually review and evaluate because it's just so many moving parts. We have agencies in Louisiana with the chief, or two officers, or three officers.

So the procedure -- the procedure part might -- may not be as extensive because the chief reviews everything that comes across his desk. So it's -- it's the context matters. I mean, it just depends on -- we have a lot of that type -- those types of officers in our state of village, police departments, things like that.

So their procedure might be slightly different. But again, it's making sure that these practices aren't being used on the streets, in that the officers have a legal basis for the actions that they are involved in.

Q. How about to -- in regards to LPSO specifically? What procedures do they have in place to support the prevention of racial discrimination?

A. I'm not sure. I -- I don't have a discovery on that -- to my knowledge, I don't have pointed discovery answering that question.

Q. And you did not ask for that?

A. I (indiscernible).

Q. Understood. Have you ever had any training regarding racial discrimination in your capacity as a law enforcement officer?

A. Yeah. Like I said, we -- I -- POST continuously puts out non-biased policing training and racial discrimination policies. And so I -- I would say since the beginning of my career.

Q. How many times would you approximate you've gotten racial discrimination training?

A. Like probably yearly since I've been in -- in Louisiana. Before then, I can't -- I can't recall. I worked for the federal government for a few years, and you're going back to an era of -- wasn't quite as digital and electronic training modules, so I don't recall that far back. But through POST, I mean we -- we touched non-biased policing and racial policies yearly.

Q. Okay. When was the last time you received this type of training?

A. This past year we go to -- oh gosh, what do they call it now? We have a term for it that -- that is the training platform for all this, and we do it every year at our agency.

So it's -- it's non-biased in -- in profiling and -- and all the things that we're talking about. Gosh, I can't remember what it's called, but we do that yearly at our agency.

Q. What do you remember the training consisting of in regards specifically to racial discrimination?

A. Yeah. I mean, so the -- the ultimate rule is we -- we cannot target people based on their race and/or race can't be a factor in -- in arrest or -- arrest decision or any other decision-making. Race shouldn't be part of the equation.

So our goal is to -- procedural justice is what it's called. Our goal is to go out and fairly and equally do our

jobs, and -- and, you know, race isn't -- isn't a thought of that, or shouldn't be a thought of that process.

Q. Do you think all sheriffs' departments and police departments should conduct training and racial profiling?

A. Yeah. I think in Louisiana they do through POST.

Q. That -- that wasn't quite my question. Do you think that all sheriff's departments and police departments should conduct training in racial profiling?

MR. GREMILLION: Object to form of the question.

THE WITNESS: I -- you're talking about nationwide?

BY MR. BEHRENS:

Q. Yes, sir.

A. Okay. Sure. Yeah. I think that's a -- a best practice to educate your employees. Now, if that occurs yearly or every other year or every -- what -- you know, different budgets call for different training allocations and what's available, so. But I think everyone does, at this point, get it at least through their training academy, their POST training academy.

Q. In your opinion, leaving aside the budget, how often should this training occur?

A. Yeah. Again, I mean, if -- in a perfect world, everyone could get all the training every year, but that's just not realistic for a lot of agencies. They just don't have the money. So, you know, there's certain things that were -- or

POST mandated that we do every single year, and, you know, that's the standard.

So a lot of agencies are just going to follow that standard because that's all they can afford to follow. I would love for a -- I -- look, I have a police training company. I'd love for all the officers to get all the training all the time. I would, but it's -- we just know that's not feasible, right?

Q. Do you teach racial discrimination training?

A. I do not.

Q. As -- in your career as a law enforcement officer, have you ever witnessed a fellow law enforcement officer engage in acts that you considered racially discriminatory?

A. I've not. I've not.

Q. In your capacity as a police practices expert consultant, have you ever written an opinion involving an officer who is accused of discriminating against someone on the basis of race?

A. No. Well, yes. Yes. Yes. Yes. So -- I'm sorry. Yes. So the DePuy case was -- the officer was allegedly racially based or racially motivated. He grabbed the kid by the throat and allegedly used a racial slur, which was a big part of the question for the Jury, was, was that part of what led to this criminal act? So yes. I mean it to that context.

Q. And you're retained by Plaintiff in that matter, correct?

A. I worked for the -- they prosecuted the police officer. I worked for the prosecutor.
Q. Oh, I see. Understood. And what was your opinion on the racial discrimination component of the fact pattern?
A. So the -- the question posed to me in that case wasn't necessarily directed at it, that issue on point, but it certainly was part of the analysis that if this officer uttered a racial slur, that might then go toward his mal-intent of the actions that he was trying to say were reasonable.
And if the Jury were to find that that were punitive force, then we train that punitive force is always illegal. So it can never be reasonable. So that was part of the analysis.
Q. And in your capacity as a consultant lawyer, or law enforcement officer, have you ever worked with a department in order to come into compliance with anti-racial profiling directives?
A. No.
Q. As a consultant, lawyer, or law enforcement officer, have you ever been involved in the investigation of a colleague who allegedly acted in a racially discriminatory manner?
A. As a supervisor, we would receive complaints -- like I said, we'd receive complaints through the years, usually for a very individualized complaint that's passed off to Internal Affairs. So I was a supervisor at times when some of those complaints came in that were handled -- they would usually be

handled by our lieutenant level.

So it would come into us, but then go up to the next -- the next step up to be ultimately handled. But if there were any signs of wrongdoing, it was sent to Internal Affairs.

Q. How many supervisees do you remember having complaints against them that alleged racial discrimination?

A. Oof. It's hard to say. When I was in street crimes and narcotics, people would oftentimes say that it was racially based, a -- a stop was racially based, and throw that out there. A lot of times there's just no merit to it. It was just a random traffic stop at night or whatever it was. There was just nothing to support that fact.

So usually those -- those cases -- unless they wanted to go make a formal complaint to IA, those cases were -- I've never found one that was valid.

Q. Have you ever been a defendant in a suit alleging racial discrimination?

A. No.

Q. And your capacity as a consultant, lawyer, or law enforcement officer, have you ever evaluated a department for racial discrimination in policing?

A. No.

Q. Were there any materials you reviewed for this case where you identified a potential act or statement that, in your opinion, constituted potential racial discrimination?

A. I don't think there is any evidence here objectively. I mean, of course, there was a statement made by Mr. Clark that, you know, he believed -- and that's his allegation -- that it was racially based. But, you know, people make those statements all the time. I've been accused of being a racist many, many times, and so have my partners and the people around me, but that doesn't mean it's true just because someone feels that way.
Q. How many times have you been accused of being racist?
A. Oh, many. Many.
Q. In your capacity as a law enforcement officer or otherwise?
A. Yeah. Yeah. As a law enforcement officer. Yeah. Yeah.
Q. And could you approximate how many times this occurred?
A. I -- I don't know. Maybe 20 or 25 times through my career, someone that I've arrested accused me of doing it because of their race. You know, I don't -- I don't -- it obviously has no merit. So it's -- I can just tell you that it's occurred.
Q. Why does it obviously have no merit?
A. My wife is Black, and my children are Black. So I think that obviously has no merit.
Q. You believe that someone married to someone of a different race cannot be racist?

MR. GREMILLION: Object to the form of the question.
THE WITNESS: Yeah. I -- look, you want to go down this path? What I'm telling you is, in my situation, I, from my perspective, am obviously not a racist person. I have Black family members, and so I'm not racist. So it's obvious to me that I'm not racist. So I don't -- I don't know what people could do, if you'd like to know.
BY MR. BEHRENS:
Q. Have you ever received any written complaints alleging that you have engaged in a racist act?
A. No.
Q. Are you offering an opinion of whether LPSO racially profiles when enforcing traffic laws in the state or in this case?
A. I don't -- I don't think there's sufficient data to review that.
Q. Okay. So your opinion, again, is that there's not sufficient data to determine whether LPSO racially profiles when enforcing traffic laws?
A. I would agree with that.
Q. So your opinion is that you cannot evaluate, one way or another, whether LPSO is racially profiling when it is enforcing traffic laws?
MR. GREMILLION: Object to the form of the question.
THE WITNESS: Based on the evidence we have at hand,

there's no evidence of that. There's no objective evidence of that other than a one-off accusation in some statistics that have no context to them.

So based on what we have, no, there's no evidence of that. If other evidence arises, that would lead to that, a different conclusion. But I just don't think that there's any evidence here that would support that evaluation or -- or that assertion.

BY MR. BEHRENS:

Q. You relied on Dr. Sabra -- Sarah Abraham's expert report in drafting your report, correct?

A. I did. I looked at her -- her report.

Q. Did you review the underlying traffic stop data that Dr. Abraham analyzed in her report?

A. I did. It was limited to a particular offenses, again, by a particular group of people, not the entire agency, I believe.

Q. So you went through and reviewed all of the traffic tickets and police reports?

A. No. I reviewed her summary.

Q. I see. So it is correct to say that you reviewed the summary of the data that Dr. Abraham provided?

A. Correct. Yes.

Q. But you did not actually analyze yourself the underlying data that she analyzed?

A. No. I assumed her summary was correct.

Q. Why did you not look through the reports that Dr. Sarah Abraham analyzed?

A. Well, I, along with Mr. -- Mr. Busken (phonetic), both said these are a summation of facts that didn't provide context based on -- she was given an opinion on this, a statistical analysis, and there was no context to understand the dynamics that were leading to those figures. So we both came to the same place on that.

Q. What do you understand Dr. Abraham's analysis to show?

A. Well, I mean, essentially, it was -- the way I understand it was being used to look at what -- she said, exactly, I'll tell you, Analyze traffic stop data from 2020 to 2021 and finds disproportionate number of stops involving Black individuals relative to their proportionate overall population and analyzes the police report data from the same period, and similarly concludes disproportionate number of reports involve Black individuals. So that's -- that's her -- her report.

Q. Are you reading off of her report right now?

A. Reading off of my report.

Q. I see. Do you have your report in front of you?

A. Yes.

Q. Do you have any other documents in front of you?

A. Nope.

Q. Do you have any other tabs open on your computer right

now?

A. I've got some -- I -- I have my other work stuff open. Yeah.

Q. Okay. But you're not referencing anything else while we're doing this deposition, correct?

A. (Indiscernible) looking at my report right here.

Q. Great. So what specific data do you understand Dr. Abraham to have based her report on?

A. Yeah. It was just -- again, it was -- it was this limited slither of time, and it involved traffic stops for certain traffic violations. And the -- the thing about -- the thing about her data is it -- it doesn't mean that was all the traffic stops. It had to deal with tickets issued for those violations.

It didn't account for all the stop and releases, the warnings, the -- all these other factors. So tickets issued for a certain traffic offense doesn't reflect the overall activity of what's going on by a particular unit or a particular group of deputies.

Q. Are you aware of whether LPSO tracks the -- the data that you just mentioned there of warnings, tickets, you know, issued but not documented?

A. I -- you know, they -- I don't know. They -- when officers make a traffic stop, they usually log in on the CAD with -- or with the dispatcher. It's logged into a system. And

then how they disposition off of that stop, I'm not exactly sure of the mechanics of how that agency does it.

Some agency issues warning tickets. Some just dispo it as a warning in the actual CAD. But the CAD wouldn't reflect the reason for the stop. So if an officer just went out with a traffic stop and gave a verbal warning, they don't usually tell dispatch what the stop -- the purpose of the stop was.

They just say, Hey, there was a -- you know, a verbal warning issued, and then they go on their way. So what -- how they corral that information I'm not really sure.

Q. So you have no understanding of how LPSO gathers their data?

A. I know they used the CAD system. I'm familiar with their CAD system. Their computer-aided dispatch. And I know they use a disposition system just like I'm talking about. And so when an officer makes a traffic stop, he logs the traffic stop its location, you know, the license plate number, whatever. He may just go off of that as a warning or no further action taken, and the underlying offense or what actually occurred is not logged.

There's not going to be a report in that type of situation because there's no violation. So that's -- all law enforcement agencies, as you know -- in my experience, at least locally, we don't get into the CAD and log the reason of the stop, the exact -- it's -- it's just not practices here to do

that.

Q. But you're saying that it would be helpful to have that additional CAD data to have a fuller context of this data; is that correct?

MR. GREMILLION: Object to the form of the question.

THE WITNESS: I don't know if that CAD data would lead you anywhere, depending on how it's documented.

BY MR. BEHRENS:

Q. Okay. I guess I'm trying to understand because you're saying that the data as given, as analyzed by Dr. Abraham, was not sufficient. So I'm wondering what other data was missing from her data set that you wished she would have included in her analysis.

A. Well, I think --

MR. GREMILLION: Object to the form of the question.

THE WITNESS: Yeah. I think that's what I was saying earlier, is the operational context and the context -- the context of what was going on in these encounters would help you understand. But I just -- a -- a -- a statistic without the ability, from my point of view, if a -- if a complaint comes in and they say, A White officer arrested a Black person, then okay. Let's -- the -- We believe it was racially motivated. Well, then it -- it becomes an interview with that officer and understanding what the context was, and then maybe -- then an examination of that officer stats, and then what's going on in

the unit.

And you can kind of start looking at a global understanding, but a stat without any other context of, Why were you there? What were you up to? You know, I don't -- you know, Was there street racing in the area that you guys were combatting, particularly on weekends? Was there, you know, a -- a grant that you were working that -- that targeted seat belts alone, that -- the -- the grant -- there's just so many questions of the context, and I just don't have any of that in this case.

BY MR. BEHRENS:

Q. Do you believe you're qualified to assess the sufficiency of the data in this matter?

A. From the police practices side, yes. I'm not -- I'm not -- from -- yeah, from the police side, yes.

Q. How are you qualified to evaluate whether evidence is sufficient or not to establish racial discrimination in a police department as a police practices expert?

A. We just -- all the same things we've just been talking about, like, through this entire section. You -- you have to -- you have to look at these things in context. And we just don't have all those particulars of these cases. So, you know, yes, that is -- if it's a disproportionate number of -- of one race versus another, okay, let's look at that data and see. I don't know what LPSO did with that data, or what was done. I don't

know. I have no idea.

Q. So --

A. If you came in and said, Hey, they've received X amount of complaints that based on this, this, and this, and this disproportionate number based on the -- okay. Then we could start actually looking at to see, All right. This -- this is starting to get us somewhere. But, okay, there's a disproportionate number of people in a very particular small time frame on a very particular violation that doesn't even reflect the total number of violations occurred, I -- I don't know how anyone really does an analysis with that.

Q. So you mentioned the CAD system as a potential other bank of information. Does it -- a typical CAD report reflect the race of the subject that is being stopped or detained?

A. If they run the information, it's usually put in there. It'll have the license plate number, usually. And then oftentimes if they run the driver's license, so it's obtainable.

Q. So the CAD information -- the CAD report will sometimes have the race of the subject, but sometimes will not; is that correct?

A. That's fair, yeah. But -- but if the -- if a traffic stop is made, the license plate is given, and then usually the drivers run just like in the CAD report and this case here. If you go look at -- if we look at that CAD report, it has the 28's and then the -- the 27's, the DL's, and the license plate. So

you know at that point who was encountered.

Q. So you're saying that in order to fully understand this data that Dr. Abraham is analyzing, you need to go on a case-by-case basis. You need to look at every situation to determine whether or not racial discrimination was occurring, correct?

A. Yeah. I'm -- I'm saying that that's the place to start. That's the place where it would start. But if you want to look at a whole of the context of the whole, a whole division, a whole agency, then we got to really look at the broader picture.

And this is -- it's a tiny, little slider of information that doesn't reflect necessarily what happened in this case. It's similar -- it's similar violations, and it's a similar outcome as far as a citation for that violation or whatever or a charge, but it doesn't account for all the other stuff I've talked about.

Q. Do you know how to conduct statistical analysis?

A. Not necessarily. No.

Q. Do you understand what it means for something to be statistically significant?

A. From a scientific definition, not necessarily. That's not my area of expertise. My area of expertise would be, how is this handled on a -- on a day-to-day police policy standpoint?

Q. So you did not ask for any additional data to help

provide a fuller picture of the data analyzed by Dr. Abraham, correct?

A. I think you've asked that a few times. No.

Q. Are you aware that LPSO claimed it was too burdensome to examine all the data and negotiated to only produce data related to criminal patrol?

A. The discovery process is out of my control. I'm looking at the evidence that's given to me or the -- the discovery given to me. So what you guys discussed amongst yourselves or -- it's -- it's out of my control.

Q. Are you aware of any mathematical errors that Dr. Abraham made in her calculations?

A. I didn't evaluate any mathematical.

Q. All right. And you're saying that it is necessary to evaluate this data kind of on a case-by-case basis; is that correct?

A. I'm saying, yeah, if you -- if you -- you get a complaint, you start with that case, and it's going to lead you down this path. But, again, to evaluate whether there's a overall culture or an overall custom of a unit or a -- a shift or an -- or a particular deputy, you know, you'd then need to start looking at that bigger context.

You know, I think for law enforcement agencies, a lot of that comes through -- a lot of that is started through individualized complaints. And when that -- if that complaint

is found to be valid, or there's a systematic, or there's -- routinely, one officer receives a lot of complaints or -- you know, now the world's changed with body cameras, for instance.

We now have supervisors having the benefit of reviewing body camera footage, auditing body camera footage, things like that. But that, you know, didn't necessarily exist before. So, you know, it's just -- agencies have different things at their disposal, and there's -- it just has to be looked into.

Q. Is -- a statistical trend showing racial discrimination in enforcement practices, is that relevant to the inquiry of whether an department engages in racial discrimination even if you do have to do a case-by-case analysis of every case?

A. Yeah. I think that would be a factor that -- that would certainly be -- assist you. You know, most law enforcement officers aren't trained in -- in statistical analysis. So you're going to defer to the person that -- to put those statistics together. But it would certainly -- we do that in all crime evaluations. We look at spikes and crime or anomalies in crime statistics to prevent and sometime predict future behavior. So statistical data that is reliable is certainly helpful.

Q. So you say that it's helpful to defer to statistical experts when evaluating these trends. Why did you not defer to

Dr. Abraham in this case?

A. I said it's a --

MR. GREMILLION: Object to the form of the question.

THE WITNESS: I did defer to her. The stats that she pulled -- the numbers that she pulled, I did defer to her. I didn't -- I -- I don't claim to know -- to go back and recalculate all of her math and -- and where she got her numbers from. I did defer to her. What I'm saying is her conclusion with what she decided, or the inferred conclusion based on that data was insufficient to determine that -- you know, that the -- the allegation made by Mr. Clark was supported based on --

BY MR. BEHRENS:

Q. Do you understand Dr. Abraham to say her conclusion to be that Mr. Clark's specific allegation of racial discrimination was true?

A. She's saying --

MR. GREMILLION: Object to the form of the question.

THE WITNESS: Yeah. The way I appreciate her report was that she evaluated certain statistics provided by those two agencies. And she found that there were a disproportionate number of Black people stopped and cited for those violations as compared to the overall population of that government entity, so, or that -- that geographical entity.

So, you know, I would certainly assume you guys would like to use that evidence to support your burden of proof in

this matter. So what you do with that, you know, is up to you guys. But I'm just telling you from -- I think it lacks context to understand what those numbers mean.

BY MR. BEHRENS:

Q. So you do not fundamentally disagree with the mathematical conclusion that Dr. Abraham comes to where she establishes that Black people are disproportionately stopped for traffic stops by LPSO --

MR. GREMILLION: Object to the form of the question.

BY MR. BEHRENS:

Q. -- compared to their demographics?

MR. GREMILLION: Object to the form of the question. That was not her conclusion.

THE WITNESS: Yeah. I don't think that was her conclusion at all. I think she evaluated -- again, I've said this: I don't -- the -- maybe six times. She looked at a very limited time frame from a very small number of deputies in an agency, and she looked at certain violations that were ticketed.

What I'm telling you is that does not tell the full story about what is going on in any agency. So, you know, that's -- that's what it is. There's -- there just needs to be -- again, I'll just refer to Mr. Busken's report and say he agrees too.

BY MR. BEHRENS:

Q. Are you offering the fuller context here that

Dr. Abraham is lacking?

A. Say it again.

Q. Is your role in this case to offer a fuller context that Dr. Abraham is lacking?

MR. GREMILLION: Object to the form of the question.

THE WITNESS: I don't know what the question means. I'm -- I'm -- I'm sorry.

BY MR. BEHRENS:

Q. Yeah. Yeah. So you've said as -- as you said, perhaps six times now, that Dr. Abraham's data is missing context; is that correct?

A. Yes.

Q. Is your role in this case to provide the context that you say is missing from Dr. Abraham's report?

MR. GREMILLION: Object to the form of the question.

THE WITNESS: The context are the factual basis. I don't -- I'm not providing any factual basis. If there is a sufficient factual basis to process and analyze, and I'm asked to do that with that information, new information, if you would like to provide additional factual basis, then sure, we can look at it. But my job is not to create the facts.

The facts are the facts. All I'm doing in this case is saying based on what's alleged, this information doesn't support that -- that conclusion that this activity is occurring within these agencies, based on this alone.

BY MR. BEHRENS:

Q. I see. So your opinion is that LPSO is not engaging in racial discrimination?

A. Based on the facts presented to us, I don't -- there's no evidence of that. But again, the -- and then the evidence that is purported to support that allegation is not enough. There's not enough context to evaluate that particular information. So operating on one stop, one allegation made by Mr. Clark, a -- a very small slither of certain statistics. And I don't think these statistics support a finding that there's rational discriminatory practices based on this. But again, it lacks context.

Q. Are you aware of what percentage of the Livingston Parish population is Black?

A. I don't recall off the top of my head.

Q. I'll represent to you. It's 7.9 percent as stated in Dr. Abraham's report. And are you aware of what percentage of the Livingston Parish population -- adult population is Black?

A. Again, I'd -- I'd -- I'd defer to her report, whatever it says.

Q. Yeah. Her report says 7.3 percent.

A. Okay.

Q. And are you aware of what percentage of traffic stops, as examined by Dr. Abraham, were of Black people for LPSO?

A. I'd have to -- I mean, I think our report speaks for

itself, and we want to pull it up, and we can read it through the -- I didn't go memorize all the numbers for this deposition. So if we'd like to pull it up, we can review it.

Q. But you would agree with me -- and you said that you would defer to Dr. Abraham on the statistics, even if you have qualms with the data set; is that correct?

A. Yeah. I'm -- I'm not -- I'm not in a position to recreate the statistical -- the numbers. I'm not. So as we stand here today, I'll defer to her numbers. But again, those numbers are a factor that need to be looked at in the totality of the context.

Q. So you would -- so you agree with Dr. Abraham's numbers, correct?

A. I -- I defer.

MR. GREMILLION: Sure.

THE WITNESS: I defer to her numbers. I don't agree necessarily because I've -- I've not evaluated all the numbers. I'll defer to them for these purposes. But I don't agree with the conclusion that is made or attempting to be made with those numbers.

BY MR. BEHRENS:

Q. Can you point specifically to where in her report you disagree with her conclusion?

MR. GREMILLION: I would object again. He just said he didn't have his report -- her report in front of him, and you

asked him to point to it an area of his report -- of the report. If you want to show it to him, that's fine, but he doesn't have the report in front of him.

BY MR. BEHRENS:

Q. We'll take, and I'll withdraw the question.

So deferring to Dr. Abraham's numbers, you would agree that Dr. Abraham's numbers show that a disproportionate number of Livingston Parish, Black people are pulled over compared to their population within the Parish?

MR. GREMILLION: Object to the form of the question.

THE WITNESS: No. I don't -- I don't agree with that assertion. I agree -- if you say 7.9, 7.3 percent, and then X percent of people were cited for that particular violation, I'll agree with those numbers. What I've been saying the whole time is that does not accurately reflect who all was stopped, what they were stopped for, all the people they were not cited and released. So you can't jump to that conclusion based on this -- these numbers.

BY MR. BEHRENS:

Q. Yeah. Yeah. That was not my question. So let's step through this. So we established before that the percentage of Livingston Parish adults that are Black is 7.3 percent, correct?

A. That's what you say. Yes.

Q. And the percentage of traffic stops of Black people by Livingston Parish that were -- Black people were 26.8 percent,

correct?

MR. GREMILLION: Object to the form of the question. That's not what her report says.

THE WITNESS: Yeah. I think it's -- I think her report reflects a very narrow number of people who were ticketed, not stopped. And that's -- we're back to where we -- I just come back to this. Again, the context is missing, and it doesn't fully reflect all the other people who were released with a warning, the other people who -- so I don't -- I don't have that information.

So I'm not -- I -- I -- I -- I agree -- what I'll agree to is if she says 7.9 and 7.3 and 26 percent, whatever, of those people that were stopped in this particular time period by this particular small group of deputies was issued a citation for whatever the violation was, I'll defer to those numbers. But that's it. That's -- that's all I can do with that. That's all anybody can do with it. Busken included.

BY MR. BEHRENS:

Q. So we can agree that a disproportionate number of Black people were ticketed by a specific number of Livingston Parish deputies from 2020 to 2021, correct?

MR. GREMILLION: Again, object to the form of the question.

It does not at all take into the context of the data she reviewed or the conclusions she reached.

MR. BEHRENS: Mr. Gremillion, I appreciate your speaking objection. I'm not aware that speaking objections are valid in the Middle District of Louisiana, but please provide authority to the contrary.

MR. GREMILLION: You can answer.

THE WITNESS: Ask your question again.

BY MR. BEHRENS:

Q. Yeah. So -- I guess I'm trying to get us to a point of agreement here so then we can work from there. I --

A. Well, we're not -- we're not going -- we're not going to agree. I'm not going to agree with you that these numbers -- I'm deferring to her statistical calculation of the specific data that she was provided. We are not going to agree that those numbers then lead to something that isn't included in the context of these numbers, or that's outside of it.

So you -- can we can stay here till -- till next week. I have another trial to go to, but I'm not going to agree to that. And you've asked the same point ten times. It's ten times. You -- I make the point, or let's move to a different topic.

Q. Yeah. Yeah. I -- when I'm saying we can reach an agreement, it's an agreement about the numbers. It's not necessarily about the meaning of those numbers.

A. I defer to her math. And I defer to the 7.9 and 7.3 and 26 based on the qualification of what those numbers are. I

defer to those numbers. I didn't know -- go count those -- those tickets up and do the -- the math. I didn't do that. So I'll defer to that. There's no other context to take these numbers and do much with them without doing a lot of other analysis of a lot of other facts in context.

Q. We can agree just basically that their -- Dr. Abraham's numbers show, with a limited data set, that a disproportionate number of traffic tickets were issued by a certain number of LSPO -- LPSO deputies in 2020 and 2021, correct?

MR. GREMILLION: Object to the form of the question.

THE WITNESS: I -- I think the numbers speak for themselves. Once again, I think that the number based on this tiny, little slither for this tiny, little area seems high. But again, in the context, I don't know anything else. So it would --

BY MR. BEHRENS:

Q. Okay.

A. -- be a factor. I'll come -- I'll agree with you with this -- how about this? I'll agree that these numbers, if true and correct, would be a factor that one would want to look at in the context of everything else. But I think we've been saying that for close to an hour. So let's do a break, and let me get another water.

Q. Great. I just have one more question. So you say --

A. (Indiscernible) lawyer when they say, I have one more question.

Q. Hey, it takes one to know one, huh?

A. It does.

Q. So you're saying that, okay, if true these numbers are a bit high, what could justify such a high number, in your words?

A. We -- we -- we talked about this earlier. I don't know the context of what this criminal patrol unit was doing. I don't know if they were in there working in response to the specific complaints that -- at that time. I don't know if these were pretext stops in -- in relation to a larger drug investigation. I don't know if this was -- was -- I'm sorry. Was there an objection?

Q. No. I think Mr. Danna, you have your car -- your audio on.

THE WITNESS: I'm sorry.

MR. DANNA: Yeah. I apologize.

THE WITNESS: I don't know. You know, so I -- I just don't know -- I don't know how this information fits with what's going on in the ground with these guys. You know I -- I -- you can come into Baton Rouge and pull our crime statistics and pull our enforcement statistics, and our enforcement largely follows the crime trends.

And so there's going to be, you know, sometimes,

disproportionate numbers based on the total population of the Parish, but that doesn't account for high crime area's specific response to citizens' complaints. It just doesn't -- it doesn't take in the context of it all. And that's it. That's all I'm saying for this.

Based on what we have, there's no evidence of this. Based on these numbers, it's a factor that we could consider if we had more context, but neither me nor your expert has that information, and here's where we are, so.

BY MR. BEHRENS:

Q. Great. Let's take a break. Would you like to take a bit of a longer break?

A. No. No. I just want to grab a bottle of water. And --

Q. Okay. Great.

A. -- so (indiscernible) we did a minute ago, if you want to --

Q. Let's --

A. -- do six minutes and come back at 40.

Q. Perfect.

A. Right?

DEPOSITION OFFICER: All right. Taking us off the record.

(Off the record at 11:34 a.m.)

(On the record at 11:42 a.m.)

DEPOSITION OFFICER: We're back on the record.
BY MR. BEHRENS:
Q. Mr. Courrege, should police departments keep track of their by-race statistics of their conduct?
A. In the best practices scenario, that certainly helps evaluate if there are improper actions going on. Logistically, like we were talking about earlier, I'm not sure that it's always a possible to account for the race of every single contact and every situation. So --
Q. What --
A. -- again, the -- the -- as a -- as a general rule, if we could document everything and every -- every way, that helps us give us that context of -- of everything, but the reality is it's not just always -- it's not always possible.
Q. Should police departments evaluate these statistics for potential evidence of racial discrimination?
A. Yeah. I think they should.
Q. And what should a department do if it identifies potential discrimination in its statistics of enforcement actions?
A. I think they should take action. Whatever their policy dictates for the action that they're supposed to take, they should take action and investigate.
Q. Do you understand Dr. Abraham's report to be geographically specific?

A. Yes. I believe it -- it had encountered -- well, yes. It focuses on Livingston Parish, and then the city itself, so yes.

Q. So you understand that her report looked at tickets Parish-wide?

A. Yeah. I believe it did. I believe it did Parish-wide. But, you know what? I could be wrong. And -- and if I -- you could pull a report up and let me double-check, I know there was some talk about one specific area, but I believe the report was Parish-wide for the tickets, Parish-wide, but again, limited to the time period in the particular group, the criminal -- criminal patrol group.

Q. Are you aware of any crime trends in Livingston Parish in 2020 and 2021 that would have explained the findings in Dr. Abraham's report?

A. Are you asking me is it -- am I aware of -- is possible prime trends that could explain it or particular crime trends related to this?

Q. Particular crime trends. Crime trends related to this case.

A. No. I don't have that information.

Q. Are you aware of any citizen reported concerns in 2020 or 2021 that could have provided a basis for the findings in Dr. Abraham's report?

A. I don't have that information.

Q. Do you know whether LPSO compiles by-race statistics of its enforcement conduct?
A. To some degree because we know that they were able to pull data -- some data for it. But how they -- how exactly they compile all of their data, I'm unsure. I'm -- I don't have that fact.
Q. Is it possible for a department to claim it is not discriminating on the basis of race if it does not compile race-based information?
A. Ask the question again. I'm sorry.
Q. So -- let me rephrase it.
It is -- scratch it. It's not a -- one of those ones I wrote late at night.
Let's see. Is it possible for a department to have discriminatory outcomes in their enforcement even if a particular officer does not have the subjective conscious intent to discriminate on the basis of race?
MR. GREMILLION: Object to the form of the question.
THE WITNESS: Ooh. That sounds like another late-night question. Give it to me again.
BY MR. BEHRENS:
Q. Oh, okay. I'll take it slow.
A. Go ahead.
Q. Is it possible for a department to have racially discriminatory outcomes in their enforcement actions even if a

particular officer does not have the subjective conscious intent to discriminate on the basis of race?

MR. GREMILLION: Object to the form of the question.

THE WITNESS: There are -- it's certainly possible that all of the deputies can be -- is it -- let me make sure I understand your question. Is it possible that you have a -- a disproportionate number in the statistics based on race even if all of the deputies subjectively were not racially targeting people; is that the question?

BY MR. BEHRENS:

Q. I guess I'll clarify. Is it possible to have problems with racial discrimination within a department and have those problems, you know, arise in enforcement actions, even if, in a particular instance, a deputy does not have a subjective intent to discriminate?

MR. GREMILLION: Object to the form of the question.

THE WITNESS: In the realm of possibilities, I think we opened Pandora's box when we open -- when we go down the possibility route. So this is 0.000001 percent possible. So it's hard to answer a possibility question. In fact, I usually refuse to answer a possibility question because, what's possible? What I would say is, if all of the deputies seem in good faith and they're responding to crime trends and they're responding to citizens' complaints, that may lead to some sort of spike in a racial -- particular racial group that looks at

disproportionate based on the population. However, that doesn't mean that there's a racial policing problem within that agency. It just means they're responding -- if they're properly responding -- subjectively, properly responding to crime -- I guess -- I guess the question would be, should we ignore all crime in neighborhoods that are racially different than the general population of the rest of the parish? That's your question framed a different way.

BY MR. BEHRENS:

Q. Mr. Courrege, what is your opinion regarding the legality of the initial stop of Mr. Clark?

MR. GREMILLION: Object to the form of the question.

THE WITNESS: I think -- I think that's a -- a legal question calling for a legal opinion, but I will tell you that police officers are trained that if they observe a traffic violation and they have personal observation that is probable cause to make a traffic stop and that appears to be -- if you believe the deputy's testimony of what happened in here. So we would follow with the training and procedures.

BY MR. BEHRENS:

Q. Okay. So your opinion is if we believe Defendant Hotard's testimony that he pulled Mr. Clark over for failure to use a turn signal, that the initial stop of Mr. Clark was proper?

A. Right.

Q. Is it your opinion that Defendant Hotard's subjective intent had no basis on the legality of the initial stop of Mr. Clark?

A. Assuming it was not racially motivated, and I said that in my report. Otherwise, if it's not, say, a racially-based factor, if an officer has a subjective belief or subjective intention to look for evidence of a different crime such as a drug violation, that pretext stop within the US Fed Circuit is perfectly well within an officer's training and procedures to make.

Q. What is your definition of a pretextual stop?

A. Just what I said. An officer has a subjective intention to look for evidence of other crime outside of the scope of the initial probable cause traffic infraction.

Q. Are you aware whether Defendant Hotard's stop of Mr. Clark was a pretextual stop?

A. I don't necessarily know if it was or it wasn't, but if he subjectively wished to look for other evidence of another crime, as long as he didn't unlawfully prolong the length of that traffic stop under -- for that purpose, that would be consistent with police training.

Q. Are you aware whether Mr. Clark was ultimately convicted of the failure to use a turn signal charge?

A. You know what? I'd have to go back and look at -- if you can pull up his DA file, I can look at it and see. What

ultimately happens in convictions is -- doesn't make it proper or improper, the police action that I was asked to look at.

Q. Taking Mr. Clark's version of the facts as true that he did activate his turn signal, would there have been sufficient basis for a traffic stop by Defendant Hotard?

MR. GREMILLION: Object to the form of the question.

THE WITNESS: I believe the only articulation from Deputy Hotard was the observation of the turn signal violation in this case. So if we take that away, then there's no other probable cause at that point.

BY MR. BEHRENS:

Q. What is your opinion in this case regarding the warrantless search of Mr. Clark's vehicle?

MR. GREMILLION: Object to the form of the question. I'm going to just lodge a continuing objection here. The Court has dismissed any claim related to illegal search, and I could have made it previously, too, regarding the legal stop. So the relevancy of this is questionable. So I'm just going to -- instead of interrupting you every time, both to the extent that it asks him legal conclusions and to the extent it's related to claims that have been dismissed, I'm lodging a continuing objection here.

THE WITNESS: Okay. Based on their testimony, the -- the obvious smell of marijuana in the truck and everything we -- in the observation of the pill bottle, I believed that a

reasonably trained officer would believe that they had probable cause to search that vehicle at that time without a warrant due to the Carroll doctrine.

BY MR. BEHRENS:

Q. I want to return a moment to questions about the pretextual stop. If -- so you say the definition of, you know, a pretextual stop is that the officer had, you know, a subjective intent to find potential evidence of illegal activity other than a traffic violation, correct?

A. Correct.

Q. And is there a -- is it possible for a pretextual stop searching for evidence of, you know, narcotics crime or other illegal activity, is it possible that the subjective intent is racial and discriminatory?

MR. GREMILLION: Object to the form of the question.

THE WITNESS: I -- certainly an officer could have some racial-based motivation and make a traffic stop, if that's your question. Yes, that could be possible. I don't think there's any evidence of that in this case but in the world of possibilities, an officer could have a racially-based motive to stop a vehicle.

BY MR. BEHRENS:

Q. Would the alleged smell of marijuana alone be sufficient to justify a warrantless search of Mr. Clark's vehicle?

A. In Louisiana, yes, with the caveat that -- we have to look at time and place in the current state of the law. We do have medical marijuana in Louisiana. However, it's still illegal to smoke medical marijuana inside of a vehicle. So that is another -- that's a crime in and of itself. But the training is very clear based on the state of the case law in Louisiana, plain smell of marijuana is sufficient to search the vehicle without a warrant.

Q. How about only seeing an unlabeled pill bottle? Is that sufficient basis for a warrantless search of a vehicle?

A. I'd say that's reasonable suspicion, so I think we would need a little bit more. So you're just asking me in a vacuum. If there were other factors that we could tap on with that reasonable suspicion, we might get closer to a probable cause, but in a vacuum with no other facts, I would say that alone is probably not probable cause. But, certainly, there's some good Louisiana case law on that fact, and it's certainly a strong factor in supporting reasonable suspicion to detain the person longer.

Q. Yeah. It seems like an evolving area of the law. I know you wrote that law review article on the -- the DWI law under, you know -- with cannabis and whatnot, so.

A. It's interesting. Our -- our state -- our state was, at the time, really relying on inaccurate THC crime lab analysis to support THC -- or could, to support THC driving impairment,

but there was no causal connection because it wasn't active THC. So it was kind of interesting at the time. So I was advocating for -- state's got to get on board and -- and test for the right substance or we can't have this. But yeah, so it is constantly evolving. And again, we just passed, a couple of years ago, smoking marijuana in a motor vehicle on it -- by itself is illegal. So even though you may have the influx of medical marijuana in our state, it's still illegal to have in a car, or smoke in a car.

Q. What evidence is there in the case that Mr. Clark's vehicle allegedly smelled of marijuana?

A. It's the officer's testimony.

Q. Is there any contrary evidence to the allegation that his truck smelled of marijuana?

A. Mr. Clark said that he didn't smoke or -- smoke marijuana.

Q. Have you ever smoked marijuana, Mr. Courrege?

A. I've not.

MR. GREMILLION: Object to the form of the question.

BY MR. BEHRENS:

Q. Are you otherwise familiar with the drug marijuana?

A. Yes.

Q. How so?

A. Well, I mean, what's your definition of familiar? I don't know what -- what do you mean?

Q. Would you call yourself an expert in the drug marijuana?
A. I have been qualified as a drug practices expert before. I've investigated narcotics for a very long time. I know what marijuana is, generally, and what it smells like -- or I know what marijuana is, and, generally, what it smells and looks like.
Q. How long after smoking marijuana does the scent linger?
A. You can't answer that question. It depends.
Q. A strong smell of marijuana emanating from a vehicle would suggest one of two things, correct? A large amount of marijuana is being transported, or marijuana was recently burned and consumed.
A. No, I think burnt marijuana and raw or crude marijuana have different smells. You're going to have a burnt smell versus a -- a raw smell. I teach officers on this topic regularly, that it all has to be in context. So if it's a strong smell of marijuana and it's raw, then it's reasonable to believe that it's -- it's more probable than not, which is our probable cause standard, that it's -- it's -- it's there. A -- a faint smell of old burnt marijuana, I don't -- I don't like that necessarily as probable cause alone. I like plain smell plus something else. But, again, it's -- I can't -- we have no way to quantify how strong that smell was other than the

officer's testimony. I think he used the word obvious smell of marijuana coming from the vehicle. And in that case, would it lead a reasonable officer to believe that more probable than not, that marijuana is in that vehicle at that time? I would say the training says yes, and that's based on Louisiana -- state of Louisiana case law.

Q. Is it reasonable to assume that if there is an obvious smell of marijuana emanating from a vehicle, that marijuana was likely recently consumed in that vehicle?

A. Say it again. I'm sorry. You -- you --

Q. So -- yeah. Yeah. So in this case, we have Defendant Hotard's allegation that there was a obvious smell of marijuana emanating from Mr. Clark's truck, correct?

A. Yes.

Q. And when you have a strong smell of marijuana emanating from a vehicle, is it reasonable to assume that marijuana was recently consumed in that vehicle?

A. Strong would -- qualify the smell.

Q. Sorry?

A. Qualify the smell. I just -- I just said that raw marijuana and smoke marijuana have different smells.

Q. I see. So this strong smell of burnt marijuana would suggest that marijuana was recently consumed by the inhabitants of the vehicle, correct?

A. It -- it is. And it also supports the conclusion that

there would still be residue, paraphernalia, a smoking device, the baggie, maybe a grinder, or additional evidence of using that marijuana. So, yes, I would agree with it.

Q. What percentage of stops have you done as a narcotics officer where you've smelled marijuana but no marijuana is found?

A. I couldn't even begin to answer that, truthfully. It certainly happens. And usually -- or not usually. Sometimes you can get the person to tell you that they threw it out while they were being stopped or they had just finished it, but that is -- my friend, Megan Matt (phonetic) and I have had a lot of discussions about this. I think she wrote her law review article on that. You should go read that. It's a good read. The reasonableness of marijuana as probable cause and, you know, with marijuana, it's -- it can be -- it can be discarded, but we don't work on this possibility scale. We work on the probability scale. So if it's freshly consumed in there, would a reasonable officer believe that it's probable that there's additional evidence in the car? And I would say yes.

And part of my reasoning is, in our local area, there's -- I don't know of anywhere -- there might be somewhere, but where you go buy a pre-licked blunt. Someone rolled your blunt for you and sold it to you as a single blunt. So, typically, what we see is, people have a bag of marijuana they have (indiscernible), they got their cigar, they roll it and

lick it themselves, and then they smoke it. So oftentimes, you have the smell of marijuana. The blunt might be gone, but you have the bag with the residue or the grinder or any additional paraphernalia. So it all -- it all ties together. I can't answer your original question. It's happened -- it's happened through my career, though.

Q. Yeah, and if, you know, there's any question, going forward in this deposition, that you cannot truthfully answer, please, you can -- you can refrain from answering.

A. Yeah. That's -- I mean, I've -- I've participated in street crimes and narcotics for several years, and we made hundreds and hundreds of stops, so I -- I just can't answer the question.

Q. Do you know if any drug paraphernalia related to marijuana was found in this case?

A. No. I think there was some -- a potential smoking device that was located, but the -- the officers concluded that that was more probably used for crack cocaine than marijuana.

Q. Have you ever witnessed a situation where a fellow officer claimed they smelled marijuana when you did not perceive that odor?

A. I've never had that happen. I've had situations where I was unsure if I could smell and needed other officers to say, Hey, you know, no, there's not this. But, again, through the years -- that was early in my career, but through the years, I

train my officers if that's the question you're having, you don't have probable cause. So it's -- you need to move on to something else.

Q. Are you aware of any evidence of Mr. Clark or his passenger having consumed marijuana before Mr. Clark's traffic stop?

A. I'm not -- I'm not aware.

Q. Are you aware of any evidence that marijuana, in this case, was completely consumed moments prior to the stop or discarded during a nighttime stop without detection?

A. I -- I don't have evidence, but it is something that frequently occurs when you smell the marijuana, fresh smell of marijuana, and it's not found in the vehicle.

Q. Are you aware of whether Defendant Hotard having -- had any training about whether it is common to not find marijuana despite smelling it?

A. I don't know all of the training that he had. I'm not sure.

Q. Are you aware of whether Defendant Hotard or Bowden conducted a field sobriety test on Mr. Clark?

A. Not that I'm aware of.

Q. Are you aware of whether they conducted a field sobriety test on Mr. Clark's passenger?

A. Not that I'm aware of.

Q. Is it reasonable for an officer to assume that people

in a car they just pulled over are sober if there was a strong smell of burnt marijuana and they cannot find any marijuana in the car?

MR. GREMILLION: Object to the form of the question.

THE WITNESS: Is it reasonable to assume that they are sober? Is that what you said?

BY MR. BEHRENS:

Q. Yes.

A. We don't use -- sober is a -- is a non-technical term that people generally would say for alcohol impairment. The state of our law is we -- we look for a -- we -- we look for impairment, is our -- our statute. That's our -- that's our basis. So is your question -- could you frame it with -- because I don't know what sober means. Impairment has some legal parameters that I can apply to your question. Sober, I don't know what it even means.

Q. Is it reasonable for an officer to assume the people in the car they just pulled over are impaired if there is a strong smell of burnt marijuana, and when they do a search of the car, there is no marijuana to be found?

MR. GREMILLION: Object to the form of the question.

THE WITNESS: Probable cause rarely in a situation like that is based on a single factor. So under our law, you can have alcohol in your breath, admit to drinking, but if you're not impaired, you're not violating our law as long as you

don't have an open container. So when we're looking at DWI context, we're looking for impairment, and we have to look at the totality of all the facts and circumstances.

So, based on your very straight narrow question, I can't really answer. It depends on the particular stop, what the officer is trying to investigate, you know, what -- what evidence they see manifesting on the person. So it just -- it really depends. And in this case, there was a passenger and a driver. So the passenger generally wouldn't be screened for impairment because he wasn't driving the car. That's not necessarily illegal, to ride in a car and be impaired. So I don't -- I don't know how to answer your question.

BY MR. BEHRENS:

Q. Are you aware the Defendants handed the keys to Mr. Clark's truck to his passenger after Mr. Clark's arrest?

A. I know they turned the truck over.

Q. Would you assume the Defendants would hand over the keys to Mr. Clark's truck to his passenger if they suspected his passenger was impaired on marijuana?

MR. GREMILLION: Object to the form of the question.

THE WITNESS: They stood and spoke with him for an extended period of time inside the truck. Deputy Bowden was interviewing him. They were in close proximity. So if they didn't see any other signs of impairment that would lead them to believe that he was impaired, I would have no issue with that.

BY MR. BEHRENS:
Q. If Defendants smelled marijuana but did not find any residue, rolling papers, or any other drug paraphernalia related to marijuana, the alleged marijuana must have been recently consumed, right?
MR. GREMILLION: Object to the form of the question.
THE WITNESS: Or thrown out of the truck, or -- sometimes what you have is you have someone smoke marijuana at -- at a place, at a home, and then get in a car and start driving, and you stop them five minutes later and they smell very strongly of marijuana. Their clothes smell of burnt marijuana, and it smells like it's in the car, but it's really on their person. So there's just -- there's just a lot of factors there. To give a broad rule doesn't really work.
BY MR. BEHRENS:
Q. Is it proper police practices to hand the keys to a passenger in a car that smelled strongly of burnt marijuana?
MR. GREMILLION: Object to the form of the question.
THE WITNESS: It depends.
BY MR. BEHRENS:
Q. On what?
A. The same things we just talked about. If there is no evidence that the passenger was impaired or they had no reason to believe that he was impaired to drive or he was -- he was okay to drive, then that's their discretion to make that

decision.

Q. Do you know whether Defendants evaluated Mr. Clark for marijuana impairment?

A. I don't know that they're -- that they did field sobriety, but standardized field sobriety is not always necessary if you can -- you can evaluate someone based on their interactions. They -- he was standing there for a period of time. They were speaking with him, so, obviously, they felt comfortable that he wasn't impaired to drive. If that's -- if that's what they did, yeah.

Q. Did you see any evidence in the record for the belief that the alleged marijuana was disposed of?

A. No. But it's certainly something that can happen, and there will be no evidence because it was disposed of.

Q. Do you know at what point in the stop Defendant Hotard claimed to have seen the allegedly unlabeled bottle of pills?

A. I -- I believe -- if I can look back at his report and -- and clarify exactly, but he said he approached, smelled the odor of marijuana, and observed the pill bottle pretty early on, and then there was some discussion later about what was in it, and he did some due diligence to make sure that that was a lawfully-prescribed pill.

Q. Do you know where Defendant Hotard claimed he located the unlabeled bottle of pills?

A. Yeah. I think it was in the console, the center

console, but I'd have to go back and look and see exactly where he said he saw it.

Q. Were you able to confirm on the video whether or not the bottle of pills was labeled?

A. I couldn't tell. I never saw it.

Q. Okay. Going to enter an exhibit. Now these are video and audio files, so I think the easiest thing would be to share my screen. I'll still share it in the platform for the court reporter's benefit. Let's see.

DEPOSITION OFFICER: I don't think you'll be able to upload them in the platform. You'll just have to share the screen --

MR. BEHRENS: Oh, yes.

DEPOSITION OFFICER: -- and then you can email them to me later if you need to.

MR. BEHRENS: Great. Yeah. It says I'm not able to share them here, so I will email them to you after, and to Counsel.

BY MR. BEHRENS:

Q. Okay. Mr. Courrege, are you able to see my screen?

A. It's really small, but yeah.

Q. Let's see. Are you able to make it full screen?

A. Oh, yeah. I can pop it out here.

Q. Great.

A. There we go. All right.

Q. So this is dashcam footage from Deputy Hotard's vehicle at the incident. The file name is 1_2021-05-24_23-43-00_LELLIS, L-E-L-L-I-S, and we are beginning at the 24-second mark in the video. Timestamp, 23:48:26.

(Plaintiff's Exhibit 5 was marked for identification. Video LELLIS 23:48:00)

BY MR. BEHRENS:

Q. So, Mike, I'll ask you the question and then play the footage and then get your response. The question is, can you tell from this footage whether this pill bottle was labeled or not?

A. Okay. Yeah. You can see -- you can see it's torn. It's partially torn off.

Q. Okay. So you can say with 100 percent certainty that this label was torn off?

A. It's -- it's partially removed. It's -- it's at an angle, and it looks like there's no writing there. At least on what we decide we can see here.

Q. Okay. I'm now going to pull up your report, which is Exhibit 1, direct us to Page 9. I think my highlighting made it in here, so we'll have some colors to help us. So we're going to -- I'm going to have you read this paragraph that is third to the end right above the law code against the drug paraphernalia. If you could read this -- the paragraph starting with, During the search?

A. In the search of the vehicle, deputies located a small piece of copper scrubbing or 'Brillo pad.' This item is often used as drug paraphernalia to aid in smoking crack cocaine. Crack users would frequently use small glass or metal pipes as -- tubes as pipes. Users roll pieces of copper scrubbing pads, such as Chore Boy into small balls and place it into the pipe to serve as a filter or screen for burning cocaine. These pads are often located in vehicles of crack users.
Q. So my question is, how do you know the fact that deputies located a small piece of copper scrubbing or Brillo pad to be true?
A. They testified to it.
Q. And where in the record does it say that the Brillo pad was a small piece of copper scrubbing?
A. In Deputy Bowden's deposition, I believe, he -- he just described it in a little more detail.
Q. Did you ever see the Brillo pad on the videos?
A. Not that I recall.
Q. Have you ever owned a Brillo pad?
A. Sure. Yes.
Q. Have you ever installed drywall?
A. Yes.
Q. Have you ever worked in construction?
A. My dad has rebuilt houses when I was a kid, and we would work with my dad, yeah.

Q. Are you aware of what other items were located in Mr. Clark's truck?

A. There were these -- some other tools and, you know, there's certainly his statement that he was working construction and using sheet -- or doing sheetrock work.

Q. Is it your opinion that the Brillo pad found in Mr. Clark's truck was drug paraphernalia?

MR. GREMILLION: Object to the form of the question.

THE WITNESS: As described by Deputy -- Deputy Bowden in -- in the full context of this situation, it certainly is consistent with what we see used as a filter in a crack pipe.

BY MR. BEHRENS:

Q. What is the basis for that opinion?

A. Hundreds and hundreds of crack cocaine arrests.

Q. In your opinion as a police practices expert, is there a chance that the Brillo pad found in Mr. Clark's truck was used for cleaning and not smoking crack cocaine?

MR. GREMILLION: Object to the form of the question.

THE WITNESS: That's a possibilities question. Many things are possible. However, based on the way it was described, rolled -- rolled up in a small ball, in this context, it seems consistent with that that is used for a filter for smoking crack. So it's a small ball about this size that gets rolled in, and it'll have burn marks on it and, oftentimes, have little pieces of cocaine on it, or little white marks on it. I

don't know how you would really effectively clean with something that you could barely hold between your hands. It's not a big piece of Chore Boy. But I can just tell you based on a lot of years of experience in doing street crimes works, that's the only -- the only way I've ever seen a Brillo pad in that mannerism had been used or was being used for smoking crack cocaine, in my experience.

BY MR. BEHRENS:

Q. Do you know if Defendants made the determination that this Brillo pad was used for smoking crack versus used for cleaning?

A. I think they made an observation and an inference based on their observations, but I don't know that a crime lab was tested, or -- crime lab testing was done on it, or anything of that nature.

Q. Do you know if this Brillo pad was ever entered into evidence?

A. Not to my knowledge.

Q. Do you know if there's ever a photograph taken of this Brillo pad?

A. Not to my knowledge.

Q. Do you know why this Brillo Pad was not entered into evidence or photographed?

A. You'd have to ask those deputies.

Q. Is it common police practices to not document or place

into evidence drug paraphernalia recovered in a traffic stop?

A. I got to tell you, it's not the best practice, and I teach narcotics investigations, and a lot of it, but what I find is a lot of officers get distracted with other parts of their investigation, and they miss the small details. It's one of the things that I really drive home in my training is, you've got to document the small details that you think are not important because they become important, just like today. So do -- is it best practices? No. Do I see it? Yes, all of the time, particularly with younger officers. I see them miss that evidence.

Q. So you would agree here that details were missed in Mr. Clark's case?

MR. GREMILLION: Object to the form of the question.

THE WITNESS: I'm saying a better practice would have been to take that evidence and put it -- or take those -- those items and put it in evidence. They didn't do that, and so they -- they did something else, so.

BY MR. BEHRENS:

Q. What is your understanding of what a Brillo pad is made of?

A. There's -- look, there's all sorts of different ones. The way he described it was consistent with the Chore Boy. So like the copper-colored, and it's little pieces of wire that are all woven together, and they normally are in a larger pad, but

in this context, they pull off pieces of it and roll it into small compact balls. They're little balls.
     Q. Yeah. The -- that was going to be my question because my understanding is a Brillo pad is infused with soap, correct?
     A. The Chore Boy ones are copper. They're just like a copper covering. They're not -- they're not soapy like you would think about like you use to wash the dishes.
     Q. So --
     A. So when they -- when they do that, when they take those off, it's more just metal. It's -- it's a copper-colored metal.
     Q. So it seems like in this case, a possible Chore Boy was found instead of a Brillo?
     A. It's -- it's -- that's being used as one and the same. I don't know if Brillo was the brand, but I -- I didn't call it Brillo as a -- a brand. But you see, also, people -- they'll take copper wiring sometimes to just strip copper wiring down, so they have the copper, and they'll roll that into a ball. And it's just a piece of copper wire that's rolled into a ball. So any -- any sort of metal filter that can mesh in there, but still allow the smoke to come in, they'll use. But Chore Boy is just the name brand that, you see, I've experienced the most.
     Q. Do you know where this Brillo pad or Chore Boy was allegedly located?
     A. There was a -- the report, I believe, said in the

vehicle, but I believe the testimony was a little more clear, that it was in a cigarette pack, or vice versa. It was a little vague. One -- at one -- one spot and the other clarified it was a cigarette pack.
Q. Was the cigarette pack ever entered into evidence in any way in this case?
A. Not to my knowledge.
Q. Did you ever see a cigarette pack in the video?
A. You can see -- you can see Deputy Bowden examining some things with his hands. I'm not -- I -- I couldn't tell from the videos that I had what exactly he was looking at. I -- it could have been the pipe, it could have been the -- the pad. I'm not sure.
Q. Does it -- did it affect your expert opinion that Mr. Clark denied being a smoker of both crack cocaine and cigarettes?
A. What part of my opinion?
Q. Any of your opinion.
A. It's -- it's a fact. It's a fact of the case, but if we -- lots of people deny things all the way up until the point that you find them in their car, and then they deny that they're theirs. So some people will deny things. That doesn't change the fact that they have illegal items or drugs in their car. Sometimes, you know, some people just deny, and there's clear evidence that they were engaged in a certain activity. So it's

just a factor, but it's certainly isn't -- isn't determinative to the use of force, and it's non-determinative to the search itself, because in the search, you're looking for evidence inside of the vehicle, and then that extends to the passengers due to the exigent circumstance. So the fact that he's denying it, no, doesn't really change my opinions.

Q. Do you know if there was any field tests done for crack cocaine?

A. Done in this case?

Q. Correct.

A. On what? There was none, but, I mean, from my understanding -- my appreciation is the residue that was inside of the dollar -- or the $20 bill was lost on the ground, so it would be very difficult to test that if you could find it.

Q. Do you know if Defendants had the ability to test for crack cocaine the day of the incident?

A. The LPSO, I'm -- certainly had someone with the ability to test for crack cocaine.

Q. What is the typical field test for crack cocaine?

A. There's generally -- there's one or two. You can use a reagent kit, a chemical reagent kit, where you bust the ampules -- you put a small amount in the ampules and you bust them, and it turns a certain color. It's not very feasible if it's just more small amounts of residue, because then you lose your testable amount. They also make a -- swabs where you touch

it and it'll -- it'll turn colors. There's different brands of swabs. Normally, you're -- you're dealing with Nik, N-I-K, kits. Those are the two presumptive field tests, but, at the end of the day, those are presumptive, and the evidence always is sent to the crime lab to be, you know, analyzed proper -- completely. So you can make an arrest without a presumptive field test under some circumstances, certainly.

Q. Did you read Defendant Hotard's deposition where he testified that they had the ability to test for crack cocaine with a wipe? Perhaps it's that second type of test that you mentioned?

A. That's the swab. Yeah. Yeah, that's what I'm talking about. They -- some of them are cotton balls, like on a stick. Some of them are like a -- a -- picture, like, a wet wipe, that you unfold, you know, like, that you would clean with. Like, a Clorox wipe. Some of them look like that, or just small, and they turn blue when they touch cocaine or -- or -- again, it's a presumptive test, but you have to have the substances to test. So if someone -- oftentimes, what we would encounter is users crumble up -- crumble up drugs or they have heroin and they throw it onto the concrete and it dissipates in the concrete, the porous concrete, the rocks, and everything, and it -- you can't find it to test it. You have to be able to get it to test it. So it becomes -- becomes an impossible task at times.

Q. Couldn't the $20 dollar bill that allegedly contained

the crack cocaine have been tested?

A. Yeah, I think it could have been tested, but I'm not sure -- you know, the -- the question is, do you want to charge him with possession of crack cocaine, or stick with the resisting and/or obstruction charge? So if you're not going to pursue a crack cocaine charge, then I'm not sure that you would need to.

Q. So the $20 dollar bill could have been tested for crack cocaine residue?

A. I didn't see it up-close to -- to examine it. Is it possible that the crime lab could have detected crack cocaine? Potentially, yeah, that's a possibility. But if you're not pursuing a drug charge, we don't submit -- we don't submit evidence to the crime lab if we're not pursuing that charge.

Q. Do you know whether the purported copper crack pipe was ever taken into evidence?

A. Not to my knowledge.

Q. Do you know if Defendants ever asked Mr. Clark for the $20 dollar bill back?

A. I'm sorry. Say it again.

Q. Do you know if Defendants ever asked Mr. Clark for the $20 dollar bill back?

A. I don't understand your question. Give me -- at what point? Give me some context.

Q. Yeah. So this case revolves around an incident where

Mr. Clark grabbed back a $20 dollar bill that Defendant Hotard had in his hand and --
A. Yeah.
Q. -- my question is whether you know if Defendants asked Mr. Clark for that $20 back at any point?
A. Okay. So after he snatched it out of the Deputy's hands, that's what you're talking about?
Q. Correct.
A. That -- from that -- so he snatches it from the Deputy, and then they take him -- because, I mean, they're telling him -- they're telling him to give his hands and they're -- they're doing as I would expect them to do when someone attempts to destroy evidence, is to detain that person as quickly as possible in handcuffs to avoid a foot pursuit, to avoid an escalation, a use of force. So at that point, the focus is, get the person detained as quickly as possible.
Q. If Mr. Clark were your client, as a lawyer, would you have wondered why these deputies never followed through on any of their felony narcotics suspicions?
MR. GREMILLION: Object to the form of the question.
THE WITNESS: I'm not here as a lawyer. I -- I don't -- I'm not going to -- I'm a personal injury lawyer.
BY MR. BEHRENS:
Q. Do you know what Mr. Clark was charged with after his arrest?

A. Yeah. He was charged with resisting, drug paraphernalia, and -- I have to look at the exact charges. And I think it was obstruction. The turn signal and obstruction.
Q. Okay. So you're saying he was charged with resisting an officer, one, correct?
A. Yeah.
Q. Drug paraphernalia, two?
A. I believe so. Yeah. We can look at the report and see exactly what they charged him with. If you want to pull up the report, I'll look at it.
Q. Yeah. So in regards to the resisting an officer charge, do you know whether Mr. Clark was ultimately found guilty of this charge?
A. I don't believe he was.
Q. Do you know why he was not found guilty?
A. I have no involvement in the -- I mentioned earlier, the propriety of what an officer does in the field isn't based on what the DA does, necessarily. So DAs make deals, reduce -- reduce charges, alter charges all the time.
Q. Are you aware that the case went to trial?
A. Yes.
Q. Did you read the minutes from that trial?
A. I -- I don't believe I got the minutes from the trial.
Q. Are you aware that the judge ultimately found Mr. Clark not guilty of the resisting an officer charge?

A. I believe that's correct.

Q. Is it your opinion that Mr. Clark should have been found guilty of the resisting an officer charge?

A. I believe -- I believe Mr. Clark's actions fit the way we would train an officer on resisting. I believe his actions fit the definition of resisting an officer. We -- we -- it's a resisting an officer, not a -- a resisting arrest statute in Louisiana. And if someone resists a lawful detention or arrest physically, and the officer has to use force to overcome that, that is the way we train resisting arrest. So what the judge does with it is what the judge does with it.

Q. So you believe the judge was wrong in finding that Mr. Clark was not guilty of this charge?

MR. GREMILLION: Object to the form of the question.

THE WITNESS: I -- I wasn't present for the whole case or saw the way the evidence was presented. As we both know, trials sometimes reflect the way things happened. Sometimes evidence is excluded or limited. I have no idea, so I don't -- I don't wish to give an opinion about what the judge did being proper or not.

BY MR. BEHRENS:

Q. I'm going to pull up the next exhibit, which should be Exhibit 5. This has Bates number LPSO50.

(Plaintiff's Exhibit 6 was marked for identification. Misdemeanor Summons)

DEPOSITION OFFICER: Sorry to interrupt here. It's going to be Exhibit 6. The video was Exhibit 5.
MR. BEHRENS: Oh, yes. Thank you. Keeping me honest.
BY MR. BEHRENS:
Q. This is the summons that Mr. Clark received.
A. Okay.
Q. And do you see the charges that he was charged with on May 27th, 2021?
A. There we go. Yeah. So failure to signal and resisting.
Q. So is it correct to say that Mr. Clark was not arrested for the obstruction of justice charge, but rather the resisting an officer charge and the failure to signal?
A. That's what the officers charged him with, correct.
Q. So he was only charged with obstruction of justice later down the line, right?
A. Correct.
Q. Are you aware of Mr. Clark's height and weight at the time of his arrest?
A. Yeah. He was -- well, according to the documents, he was, you know, 5'10, 5'11-ish, 200 pounds, something like that.
Q. How about the height and weight of Defendant Hotard?
A. They got into that in their deposition. They were -- those are bigger guys. Their exact weights -- we can look at their deposition and get their exact weight, but they were over

200 pounds, both of them.

Q. Yeah. Yeah. Fair to say both of them are bigger?

A. Yeah. Yeah. That's a fair statement.

Q. You analyze the Graham factors in your report, correct?

A. Yes.

Q. Can you tell me what the Graham factors are?

A. Literally, the factors, or how they're used?

Q. If you could just list the three factors.

A. Yes, sure. So we looked for the severity of the crime, and we looked for the immediacy, the threat to the officer or anyone else, and then we look to whether the subject's actively resisting or trying to escape.

Q. So are the Graham factors questions of law or questions of fact?

A. Well, so the Graham factors -- the Graham factors are part of police training, okay? So the only reason we get into an analysis of Graham is because we teach police officers, This is the -- the systematic process to evaluate the propriety of use of force. It so happens that it's a legal standard set by -- that the Court is going to give instructions on also.

When I go through the Graham factors, the only reason we do is because it is the way officers are trained, and it is the way that we evaluate, in the police training and practices context, uses of force. So that's why I didn't get into the

conclusion on Graham, whether something was objectively reasonable. We -- we all know here that that is absolutely the role of a jury. But Graham is part and parcel into the constitutional use of force foundation that all police officers in Louisiana and everywhere are trained on, so.

Q. So your expertise -- your expert opinion in this case regarding the Graham factors is only related to how the Defendants would have been trained on the Graham factors; is that correct?

A. Yeah. It's -- it is -- it is the training. It is -- it's their -- it's -- they are trained to go through this process that involve the Graham factors. And in addition, tied in with those Graham factors, there's other factors that we also instruct. Officer versus threat factors, environmental factors, and all of that is -- all that's instructed together.

Q. How does your expertise on the Graham factors help the trier of fact in this case?

A. Well, in my opinion, it establishes what police officers are trained to do, so it -- there's no wondering of whether they're given these Graham factors. And then there's -- the Graham factors themselves could be a little ambiguous. What is resistance? What is the immediacy of a threat. How do we -- how are officers trained to evaluate the government interest and taking someone in custody versus the need to use certain levels of force? So all that comes -- all that's wrapped into what an

officer is trained to do, and how they're trained to process a use of force incident. So the Jury, I believe, is more than welcome to, and will be instructed by the judge on the legal standards, and how they should be applied. But what I do is, multiple times a year, teach hundreds of officers how to apply these in the real-world setting based on -- based on our training, so.

Q. Going to pull up your report again. Exhibit 1. The Graham section. So you write that the Graham factors are -- and I'll direct us to this page. It's Page 11 of your report. The Graham factors are the calculus of reasonableness, must embody allowance for the fact that police officers are often forced to make split-second judgments; is that correct?

A. Yes. That's part of -- that's part of the training that we -- we give officers the foundation of -- that -- that base is established in Graham.

Q. So is it true that the Graham factors are in essence a calculus of reasonableness of an officer's given use of force?

MR. GREMILLION: Object to the form of the question.

THE WITNESS: Say it again, Druit?

MR. GREMILLION: I object -- I'm just objecting to the form of the question.

THE WITNESS: Oh, form of the -- I'm sorry.

So as applied by the Jury, the Jury's question in these cases is to determine if that -- those actions were

objectively reasonable, and Graham is the road map to get there. What we do is, we train officers what -- about these facts and how to apply them in real-world situations, embodied with the -- the framework of Graham, saying, Hey, look -- this is kind of almost once we get -- one of your original questions when we started earlier today was, how perfect do you need to be? And Graham says you don't have to be perfect because mistakes will happen. We -- we don't get the luxury of that 20/20 hindsight. So this is -- this is -- and from an evaluation standpoint from my side, I can't sit here and parse this thing apart at such minute detail that would be unfair to the person involved in the case. It defies human performance capabilities, and -- and, you know, human factors if you will, so. But that's part of the training also.

BY MR. BEHRENS:

Q. Is the only fairness at issue of the Graham factors to consider the fairness to the officer?

A. Wait, say it again. I didn't -- I didn't --

Q. Yeah. Yeah. You mentioned that we need to be careful not to overanalyze an officer's actions under the Graham factors because that would be unfair, correct?

A. Well, what I said was what we don't want to do is to evaluate in a -- an officer's decisions in a stressful and chaotic environment in a calm setting to where we break apart every little split-second decision into a way that would defy

human performance. So humans -- like, for instance, there's a decision-making process, and it takes time to perceive a threat, orient yourself to a threat, decide what to do, and then the delay in the motor function of carrying out an action. So to say that every officer should be able to instantly pull the trigger, or stop pulling the trigger, or do whatever, sometimes defies human performance capabilities.

So, you know -- so, in hindsight, it's easy to see a bad outcome. We talked about that earlier. Sometimes there's bad outcomes, but it doesn't mean that bad decisions were made. There was a bad outcome. And this is -- I'm just mentioning this in here that I have taken those steps under the instruction of Graham from my point of view, not to overly analyze this in a -- in a way that would be impossible.

Q. So was the situation in Mr. Clark's case a stressful and chaotic environment?

MR. GREMILLION: Object to the form of the question.

THE WITNESS: You're -- you're getting into their -- the officer's subjective beliefs of what was going on. I think by their reactions, evaluating their action -- their reaction to Mr. Clark's actions, they didn't overreact. They kept their heads, and it -- it would appear to me that they didn't respond in an out-of-control manner, or some sort of, you know, chaotic response. It seemed like they were well-reasoned in what they did as far as what we would expect as far as the application of

different force techniques. So whether they perceived it as stressful, I'm not sure. Different officers have different experience levels, so you'd have to -- you'd have to really ask them.

BY MR. BEHRENS:

Q. Were the officers forced to make split-second judgments in this case?

A. They were. They had to respond very quickly to Mr. Clark's -- their actions were very quick in response to Mr. Clark's action.

Q. And in what moment were the Defendants forced to make a split-second decision?

A. When Mr. Clark snatched the $20 bill out of the Deputy's hand, they perceived that that $20 bill had evidence of a felony crime, and they -- they had -- they had lots of force options in that moment, and they could have taken him to the ground. They could have done other things. You know, there's -- there was a lot of different force options, but they chose to take the force options that they did, which were, quite frankly, some of the least amount of force that you could apply based on the training protocols. The defensive tactic protocols.

Q. So it's your opinion in this case that Defendants -- it would have been reasonable for Defendants to take down Mr. Clark to the pavement?

A. Under -- under the PPCT, or what's now rebranded in SSGT, when people pull their arms in and start to resist, physically resist being in escort or a handcuff, both defensive tactic systems teach a -- a takedown. A one -- a two-on-one takedown where you take the person down to the ground. Because in responding to a subject's resistance, we're allowed to go slightly beyond their physical resistance, or otherwise we'd always be at a stalemate. And what the use of force training dictates is to use more force quickly often eliminates the need for a prolonged or additional force later because we're quickly getting this situation under control.

So these -- both -- both DT programs would teach when someone takes their arm and snatches, it wouldn't be inappropriate to take that person to the ground. Now, both of those systems also show that in a one-on-one situation. In this case, they had two officers, and officer -- Deputy Bowden testified that they considered the size strength differences, and neither one of them even attempted to take down. They just simply worked the arms back -- towards the back. In fact, Deputy Bowden barely moves in the video. You know, he might turn left and right, but he never put weight on the guy, or anything like that, that you can observe in the video. So I think, in context, a one-on-one situation, the book would say you could take this person onto the ground, onto their face, as a general rule, but these officers held way short of that, and

then just did some strength techniques to get his hands behind his back.

Q. Would it have been inappropriate for the Defendants to say, Mr. Clark, please give us back that 20, we're going to arrest you now?

A. So whether it was appropriate or inappropriate is not really the question. So lots of things could have been appropriate, but the training dictates that we're not required to go to the least amount of force or the least amount of appropriateness. We just can't exceed that amount that is necessary. So they could have -- could they have asked questions and attempted to negotiate with him? They could have, but that doesn't -- that's not the question in these cases. The question is, is what they did appropriate? Did it follow in the training? And it did.

They're not required to attempt to discuss with someone who's actively destroying evidence in front of them and ask them politely to stop doing so. If that would have had fentanyl, Mr. Clark would have popped it into his mouth as they were negotiating with him and he'd have drop dead, we'd be here in a different lawsuit but we'd still -- still be here in a lawsuit because they allowed him to ingest fentanyl, and they should have known, and they should have taken it from his hands.

So that's the dammed if you do, and dammed if you don't. What these guys did is make it a quick response, a quick

decision, and quickly got this guy into custody without ever putting him on the ground, without ever using a weapon, without ever striking him, anything. A strength technique. It's literally at the very, very bottom of what we train as, beyond verbal, strength techniques are right there at -- at the lowest form of force that police officers are trained in.

Q. Was there urgency in this situation?

A. Yes, I think so. Yeah.

Q. What was that urgency?

A. Mr. Clark was taking evidence from the deputy forcefully, and you don't know what a subject's going to do in that case. I don't think Mr. Clark posed an imminent threat of physical harm as -- because these officers got this under control so fast. They got -- they got him -- they got him wrapped up so fast. So they -- because of their quick response, it just really wasn't a threat of someone catching an elbow or getting punched or kicked. So when someone's showing or manifesting their intent to resist arrest or destroy the evidence, felony evidence in this case, you act. You act in that moment. You act. They were close. They were hands-on, and they responded -- and they responded exactly as I would expect they would respond based on their training.

Q. What is your opinion regarding the first Graham factor in this case?

A. It's the -- it's -- it's more of a factual

determination in this case. What -- what would a reasonable officer perceive the crimes to be that led to the use of force? And in this case, I think obstruction of justice is a perfectly reasonable belief. The resisting is a perfectly reasonable belief, and the possession -- potentially, you know, if they would have seized the $20 bill and it actually had crack cocaine in it, which they never got a chance to figure out, he might have been under arrest for felony possession of drugs. So you're looking at a couple of felony charges, and, generally, we train officers that felonies are going to be more important or more severe than the run-of-the-mill misdemeanor crime. So the interest in using force becomes a little more apparent versus the lower-level crime.

Q. So in your report, you cite the obstruction of justice charge as the relevant charge for the first Graham factor analysis, but we had previously agreed that Mr. Clark was arrested for resisting an officer, not obstruction of justice, right?

A. What the officers chose to charge him with versus what actually occurred out there doesn't necessarily have to align. So they said, We're going to choose him with this. But as I said in my report, his actions of destroying evidence would be indicative of a suspect who did not intend to comply, et cetera, and, because of that evidence, it would mean it would be reasonable to charge him with obstruction from the jump. The

fact that they didn't do that is on them, but -- but also, they had a belief that he had crack cocaine, but the evidence was destroyed. So you're talking about felony crimes which justify -- or supports the analysis of using some force to arrest this person.

Q. Is the first Graham factor essentially a light switch of, you know, if it's a felony, it's a severe crime, if it's a misdemeanor, it's a not severe crime?

A. No, the Graham factors are always looking at the totality of the circumstances. It's got to be taken together case-by-case basis. It's just a factor. What I would say is if we detain someone for stealing a pack a gum and they -- they begin to run or resist arrest but they weren't a threat to us, then the government interest was recovering a pack of gum and the business owner didn't want to press charges or whatever the case. So you look at that and you say, Well, this person might get hurt in this use of force, and it's a very low level crime. And I picked that -- I'm just picking some very low level misdemeanor. Yeah. Maybe it doesn't -- maybe it doesn't make sense. The government interest isn't so significant. But when we look at crimes -- I teach a lot of Fifth Circuit case law to officers in my use of force trainings, or at least I -- I don't teach them, but I -- I -- I try to have them on the tips of my tongue. And, you know, even in crimes like DWI have been talked about by the Fifth Circuit as being severe crimes, even though

they're a misdemeanor. So, you know, it's just a factor. It's just a factor. But a felony is -- is -- is more than a misdemeanor, we'll say it that way.

Q. What's your opinion regarding the second Graham factor in this case?

A. Yeah. So like I said earlier I think the officer versus threat factors weighed in the officer's favor of being -- not being in an immediate threat of -- of danger. But when a person manifests their physical intent to resist what you're -- what they're trained to do is get control of that situation as quickly as possible to keep it from escalating. The fact that there was two bigger deputies doesn't necessarily mean that Mr. Clark wasn't a danger to them or a threat to them. You know, it -- it's -- it's -- so it's not -- it's not just an on off, like you said earlier, like a -- like an on off switch. It's just a factor. And I think because that immediate threat wasn't so great that really shows how reasoned that their decision making was in not doing that take down to the ground, not using some sort of other technique, but simply resorting to a strength technique to overpower the resistance.

Q. So you would agree that the second Graham factor appears to militate against the use of force in this case?

A. It's -- it -- it -- it -- because there's physical resistance, force is allowed to be used. The second factor, because the immediacy of the threat isn't very high, it would --

I would expect these officers to use a lower level of physical force to overcome the -- the resistance. So resistance and threats can -- you know, resistance is the next factor, which is really more applicable than the number 2.

Q. Do you remember seeing Mr. Clark exit his truck upon being asked to exit?

A. Yeah I -- I mean, I don't remember anything specifically about -- but he came and he dropped his tailgate and sat on his tailgate at some point.

Q. Do you remember how he walked?

A. Walked like walk? I don't remember anything particular jumping out at me.

Q. Okay. I'll pull up the next exhibit.

MR. DANNA: Hey, Joshua, before we get into the next exhibit, is this -- would this be an okay stopping point for -- to take a maybe a five or ten minute break just to use the restroom and --

MR. BEHRENS: Yeah, I was about saying maybe I could set that up for after the break. How do we feel about a 30 minute longer break? It's about lunchtime for us. I understand it's a little bit later for you guys, but.

MR. GREMILLION: How much longer -- how much longer do you think you have?

THE WITNESS: Yeah, that's my question because I'm already deep into the day, and I got to travel, so.

MR. BEHRENS: I probably --

THE WITNESS: I mean, we -- we all missed lunch.

MR. BEHRENS: Let's do a couple of hours -- or I probably have a couple of hours left. Let's -- would 20 minutes be sufficient?

MR. GREMILLION: I mean, you're thinking you got two hours left here?

MR. BEHRENS: I don't like to pin myself in.

MR. GREMILLION: Gee.

MR. BEHRENS: I mean, well, I have some pages left. Two hours might be pushing it, but we'll see.

MR. GREMILLION: I'm in favor of as short as possible right here. I mean, I don't want to deprive you all of lunch, but, I mean, we've been --

THE WITNESS: Yeah I didn't eat lunch either. So I'm -- I'm let's shake and bake.

MR. BEHRENS: Okay. Let's do 15.

MR. DANNA: All right.

DEPOSITION OFFICER: Off the record.

(Off the record at 12:51 p.m.)

(On the record at 01:15 p.m.)

DEPOSITION OFFICER: We're back on the record.

BY MR. BEHRENS:

Q. Great. Mr. Courrege. I will do this the same thing I did the last time I played a video exhibit. This is a new

exhibit. The court reporter can let me know the number.

(Plaintiff's Exhibit 7 was marked for identification. Video LELLIS 23:28:36)

BY MR. BEHRENS:

Q. But the file name is 1_ 2021-05-24_ 23-28-36_LELLIS at time stamp 2:58 in the video. And Mr. Courrege all my question is, how do you describe how Mr. Clark is moving here?

(Video recording was played.)

(Video recording was stopped.)

THE WITNESS: Yeah. So he -- he -- he walks with a little bit of a -- a noticeable limp.

BY MR. BEHRENS:

Q. A noticeable limp. And does this limp impact the second Graham factor analysis?

A. It could. It's an officer versus a threat factor. And that's what I mentioned earlier that Deputy Bowden specifically mentioned that in his deposition that they considered the officer versus threat factors so, you know, again, I didn't believe -- and I think in my report I said that I didn't believe he was so much of a physical threat as was -- he was destroying evidence and resisting arrest physically so.

Q. Is there a reason you did not include any analysis about the officer versus arrestee calculation?

A. I did.

Q. Did you yourself analyze the relative size of the

officers versus Mr. Clark?
A. Yeah. I mean, that was -- that was part of looking at them. And I even mentioned it in -- I could find it in here if need be, I mentioned the officer versus threat factors. And that's why I say they -- they -- the training would have allowed for more -- or more of -- a more aggressive, if you will, use of force in response to his resistance, but they exercised a restraint and just simply wrestled the arm back behind the back or overpowered the arm behind his back. So to me I think they pretty much did the lowest physical level of force that is trained, a strength technique.
Q. Wouldn't you agree that the lowest possible force would have been no force?
A. No I don't agree with that. I said the lowest amount of physical force that we train is a strength technique.
Q. Understood. In reading over your report I did notice that you mentioned the factors of the, you know, officer versus arrestee analysis, but you did not conduct that analysis yourself; am I mistaken in that?
A. No. I observed -- I observed what was going on here. And that's why I said I think the officers -- so ordinarily when you're going to -- say, we escalated force to a much higher level due to officer threat, meaning the threat, the person, the suspect was a threat to us which then that's why we tried to escalate it. For instance, my -- my partner in narcotics for

years and now my business partner is 255 pound Brazilian black belt -- Brazilian jiu-jitsu black belt. You don't want to fight him at all with your hands. You might. I don't want to. I have and it's not (indiscernible). So, you know, if you have someone with that physical -- those physical characteristics, that -- that known ability to -- in perform martial arts, I might escalate force much quicker or go to a weapon with him due to that. So when the officer stayed at the bottom rung, there's no real deep analysis of, Well, why did they escalate higher, because it -- it has the counter effect. So in this case, they didn't escalate higher. So there -- that wasn't -- that wasn't a justification for them to do so.

Q. Approximately how long was Mr. Clark detained in the gas station before he was arrested?

A. How long was he detained in the gas station? Do you just meet on the traffic stop in general?

Q. Correct.

A. We can go back and look at the exact time, and it was 15, 20 minutes or something like that.

Q. Okay. So we can agree to say it's about 20 minutes?

A. Yeah. Something around that -- that time frame.

Q. And during this approximately 20 minutes does Mr. Clark show any signs of non-compliance up until when he grabs the $20 bill?

A. Well, when they're patting down, they -- or checking

his pockets or when he's emptying his pockets, one of the officers noted that he believed he intentionally, you know, was trying to discourage them or -- or skip the coin pocket where the $20 bill was found. But physically, no. That's the only point that you see any physical resistance.

Q. So it's fair to say that Mr. Clark was compliant before his arrest for about the 20 minutes that Defendants had him detained?

A. Yeah, I think that's fair conclusory statement about his actions.

Q. So it's fair to say that based on the fact that Mr. Clark was smaller and older than Defendants, had a limp, a noticeable limp, and potential mobility issues, had been compliant for at least 20 minutes before the arrest and had no apparent subjective intent to harm Defendants, so the second Graham factor weighs against the use of force in the circumstance?

A. I would say yeah. And I said that in my report.

Q. And what is your opinion on the third Graham factor?

A. I think that he was actively resisting arrest the way we described, or the way we define active resistance of pulling away from an officer's control, trying to prevent from being handcuffed, that's all considered active resistance.

Q. Is the third Graham factor an on off switch of resistance, you know, equals force? Any resistance equals

force?
A. No. None of it's an on off switch. Again, it's a totality of circumstances test. But physical resistance is allowed to be met with physical resistant -- or physical force to overcome that resistance as a general rule. So it certainly puts force on the table, but it's depends on all the factors, and they have to be taken all together.
Q. So the degree of resistance would be relative to the degree of the use of force that could be reasonably applied?
A. Yes.
Q. Was Mr. Clark attempting to evade arrest by flight?
A. It didn't appear like he was trying to flee.
Q. Okay. So that part of the third Graham factor, we can kind of ignore; is that correct?
A. I -- I wouldn't ignore it, but I'd say it's not applicable to this case.
Q. So it's your opinion that, Mr. Clark was actively resisting arrest?
A. That's correct.
Q. And this is displayed -- go ahead.
A. Sorry. As -- as we train the definition of active resistance. So in the defensive tactics models and in Louisiana POST we -- we give these terms, definitions for police training purposes. So based on the police training definition, yes.
Q. So the fact that a Judge found Mr. Clark not guilty of

resisting an officer isn't relevant at all here.

A. It's -- it's -- it may -- look, it's certainly -- maybe it could -- maybe is a relevant fact if it gets in front of a jury. But, again, what -- what happens in court? I can't make a decision always based on what happens in court. They've -- you know, again, we can look at lots of -- lots of cases that go either way. We just have to look at it for what it is on it's face. Now if -- yeah, yeah, it's -- it's just case by case.

Q. What specific actions in this case did Mr. Clark take to actively resist arrest?

A. You can see him take his right hand for -- well, what started this was obviously him, and I don't think there's any dispute. He snatched the $20 bill which started this chain of events. And so people can be compliant for two hours, but if they then turn and become not compliant and then begin to take actions to destroy evidence then all that prior non-compliance is not important in the moment. We -- we still have to overcome that resistance. So the officer's turning, got his arm, right arm, behind his back. You can see in the video. It appears that and consistent with Deputy Hotard's testimony that Mr. Clark pulled his right hand down, you see it clearly come down in front of him in the video. It's no longer in Deputy Hotard's control. Deputy Hotard simply reached up, got re-control of the wrist and pulled his arm back again behind his

back. So all that would consist of pulling, bracing, attempting to prevent being detained in handcuffs. And that's active resistance.

Q. So your opinion in this case is that Mr. Clark's resistance was in the form of moving his arm down briefly before it was captured again by Deputy Hotard's hands and put behind his back again?

A. He's physically pulling his arm and hand out of Deputy Hotard's control and moving it toward the front of his body. So it's not that just hand just happened to swing down in front of him. That's not -- he had to pull it out of Deputy Hotard's control and it's going forward, and at which point Deputy Hotard again grabs it and pulls it behind his back.

Q. Do you know if Mr. Clark was engaging in conscious resistance?

A. I -- I don't know why he resisted. I can't answer that question.

Q. Is it common for arrestees to make unconscious reactions when they are suddenly grabbed by law enforcement?

A. It can be -- it can be a reaction -- these deputies gave -- again, he wasn't suddenly grabbed by law enforcement. He suddenly snatched something out of the law enforcement officers hand and set this chain of events in motion. They didn't just grab him off the tailgate and spin him around and handcuffed him. This event was set into motion by his conscious

decision if you will. Just take the evidence from the deputies. So I don't think in that situation you should be real surprised when you snapped something out of the police officer's hands that they are going to detain you in handcuffs. And they continue to give verbal commands, you can hear them on the video, for him not to engage in that activity.

Q. Yeah. And we'll get into that in a second. Wouldn't you agree, though, that subjects very often have some reaction to the application of force and such a response should be expected? And this is why it is critical for an officer to give clear and concise commands and allow the subject time to comply in situations where there is minimal threat to the officer?

MR. GREMILLION: Object to the form of the question.

THE WITNESS: Yeah. I don't know if I can agree with the question, but or -- or -- or the statement you're making, but the -- I -- I mean earlier, in this case, there's a belief that felony evidence is getting destroyed and these officers would be trained to get him in custody as quickly as possible. This isn't -- this isn't a moment to de-escalate and have a conversation as this felony evidence is being destroyed and you just don't know what Mr. Clark's next move is going to be because his first move was so irrational and unexpected. So from there on you gain compliance as quickly as possible, you use the force that you deem is appropriate as based on your training. And that's what I believe they did here.

BY MR. BEHRENS:

Q. You said initially to my question that you would not agree with the statement that I gave in my question; is that correct?

A. It kind of got convoluted and I -- I just was explaining to you what -- what I believe there, so.

Q. Okay, I'll put the statement to you again.

A. Okay.

Q. Just so we're clear.

A. Okay. Go ahead.

Q. Subjects very often have some reaction to the application of force, and such a response should be expected; do you --

A. Yeah.

Q. -- agree with that?

A. Yeah, so -- so that is -- that is a response, but what you shouldn't have is a person then physically -- so if I grab someone, I do expect some sort of response but it -- that's if you don't give a person time to -- to respond, if you unexpectedly grab someone in a situation. Again, in this situation -- and I know where you're reading this from, in this situation is a much different situation. This -- Mr. Clark initiated the grab. He initiated the snatch. He set this into motion. And so that's a completely different set of facts from where you're trying to take this report or this other report

that I wrote because this lady was not given time to comply, was not given an order, and was snatched from her vehicle by someone much larger than her onto the concrete. And in that situation, she was falling uncontrollably, and she tried to pull herself back in her car. In this case, Mr. Clark aggressively snatches something out of a deputy's hand, and then yes, you're going to get hands put on you. That's going to be a response.

But guess what? You still, when you have that response -- let's assume Mr. Clark's response was reflexive. I'll -- I'll accept that as true for this moment. Let's say his response was reflexive. The deputy still then just reached forward and got control of his hand and then put it back behind his back. He didn't strike him. He didn't take him to the ground. So that's why I say the force was measured in that situation. So yes. Is it -- is it -- if you unexpectedly put hands on someone, can you expect them to jump or startle or pull away? Yes. But it's also just like the first case I testified in, if you continue to apply pain compliance but then not give a person an opportunity to comply they're going to continue to resist. So, again, case by case, but that case that you're reading from is a very different set of circumstances in application of force than this case.

Q. How long is sufficient time to give an arrestee to comply with your command?

A. It depends.

Q. On what?
A. It depends on all the factors and circumstances leading up to the arrest. What is the arrest for? Is there a need to immediately get this person detained? Are they at danger? Are they actively resisting? Are they -- you know, it's -- it just depends. In this case, are they actively destroying potential felony evidence? In those types of cases I would say you immediately detain that type of person. So you got to look at a case by case situation. Sometimes you slow down and you de-escalate because the situation calls for it due to the totality of the circumstances. Sometimes you immediately grab someone and apply force, but that force then still -- it just has to be reasonable, so.
Q. Do you believe in this case that Defendants gave Mr. Clark sufficient time to comply with their command to get your hands behind your back?
A. Yeah, again, this is all predicated on Mr. Clark's actions. If they would have just -- if the -- if the snatch wouldn't have happened, let's assume the snatch didn't happen, and they grabbed him and spun him around and started trying to put him in handcuffs and he pulled away, I'd say, Whoa, whoa, hold on. You never told him why he was being arrested. He had no notice of what he was being arrested for. You grabbed him suddenly. I would have -- I would expect a response. But he knew -- he knows what he did because he did it, and that set

this chain of events into motion. So if someone slapped you in the line of duty or punches you in the face, you're not going to step back and say, Sir, please put your hands by -- no, you're going to engage in defending yourself at that point. So every case is different. In this case, the trigger is Mr. Clark's actions.

Q. Was he given sufficient time to comply with the law enforcement officer's commands?

A. In this situation, absolutely. He -- he -- they and -- and the officer -- again, the officer did nothing but reach forward and use a physical strength to overpower and take control back over the hand. That's -- it's -- it's literally one of the lowest levels of force. So he -- he did -- and the hand's going forward, Mr. Clark's bending over, you don't -- you know, I mean, it's just -- there's a lot going there. You don't -- again, I mentioned earlier, you don't know if he's trying to ingest something. You don't know if he's trying to destroy more evidence. So this officer used a very low level of force to overcome the resistance and -- as trained.

Q. In your review off the record, did Defendants give Mr. Clark the command to put his hands behind his back before they began applying force?

A. We -- we can go back and watch it frame by frame if you want to watch it and see exactly when everything was said, but they -- when he snatched -- again, once again when he

snatched the -- the $20 bill, they're allowed to respond to that and react to that. And if they're simultaneously giving the commands to tell him put his hands behind his back, to stop -- that's going to happen in a fluid motion. There's no requirement to stop, Take your hands off, sir. Please now put your hands behind your back, sir. Now this is all fluid and they reacted quickly. They got control of the hands and they lost control. And then they gained control back without any other unnecessary strikes, punches, kicks, takedowns, or anything of the sort.

Q. Is it possible for someone to resist a command if they're not given the opportunity to comply with that command?

A. Again, case by case basis, it all -- it all -- it matters the context of the -- it matters the context of the case. So in this case, once again, this use of force, as minimal as it was, was predicated on someone actively committing another crime obstructing justice and are actively engaged in that in the moment. So de-escalation isn't proper for every situation. It's just not. It's -- it's --

Q. And --

A. -- preferred. It's certainly based on the totality of the circumstances, it's certainly good to try, but every circumstance doesn't allow it.

Q. Do you think that de-escalation was inappropriate in this situation?

A. I think the officers did de-escalate by not taking Mr. Clark to the ground on his face. I think they lowered their use of force. They slowed it down. They simply got him in cuffs. They never yelled at him. They never tackled him, and, again, they didn't knee strike him like it's shown in the book here. So that -- by using those lower levels of force quickly, that is essentially a form of de-escalation. De-escalation is an attempt to prevent from using more force later on. So they -- they -- they just did it quickly. They responded to his actions. This whole case would be very different if he hadn't snatched the $20 bill, but that's what started this whole -- whole chain of events.
Q. Didn't the chain of events begin with a traffic stop?
A. Sure. Yes.
Q. So I guess we could play this game and go all the way back to Garden of Eden --
A. We can butterfly -- and the butterfly affect if you want, but yes. I don't have any reason to believe that Mr. Clark would have been arrested in the manner he was arrested without him snatching the $20 bill out of the deputy's hand. How about that?
Q. So just to be clear in your expert opinion, it would have been reasonable for Defendants to force Mr. Clark onto the pavement to effectuate the arrest because he was resisting arrest by momentarily shifting his right hand down?

MR. GREMILLION: Object to the form of the question.
THE WITNESS: Yeah. I don't think he was momentarily shifting his hand out. I think he was forcefully pulling his arm away to prevent getting arrested. And to take someone to the ground in a controlled technique as taught by the two defensive tactics protocols is not unreasonable because they would have -- could have taken him down -- down to control him and then handcuff him from a prone position. The training. They decided not to do that I believe because they had a situational awareness and control of their emotions and they said, Hey, look, we're big guys. We can just simply get this guy under control. And that's what they did. They didn't slam him on the truck. They didn't spin him, they didn't do anything except get control of his arm again.
BY MR. BEHRENS:
Q. You state in your report that you've been handcuffed likely hundreds of times in training and participated in hundreds, if not thousands of arrests in your career, correct?
A. I'd say that's true yeah.
Q. Have you ever been arrested?
A. No. But in training, you handcuff each other. And I've been to four police academies and -- and yearly training, we handcuff each other. We use each other as the -- the resistive subject. I can't even tell you how many times I've been handcuffed. It's -- it -- it's -- I don't even know. A

lot.

Q. So you've never been handcuffed outside of training?

A. No, I've not. Always in training.

Q. Have you ever been handcuffed suddenly when you were not expecting it?

A. I've been the perpetrator in use of force scenarios or the suspect in use of force scenarios, real -- you know, hands on practical scenarios where I've been tackled. I've been resisted on purpose, fought on purpose, so I've been in handcuffs in a lot of different ways. So I -- I don't really know to answer your question truthfully. I've just -- I can tell you I've been handcuffed a lot of different ways and by a lot of different people.

Q. So on what basis would your being handcuffed inside of training impact your expertise to know what injuries may result from being handcuffed during an arrest?

A. Well it's the -- it's the in-training and in my experience of arresting people. So it's a combination thereof. I've personally been handcuffed hundreds of times, and I have arrested hundreds, if not thousands of people in my career or been on scenes when all these people are arrested. And you -- you just know what the result of that is. You -- you -- you know, so based on those combined that's my opinion.

Q. Is it your contention today that you have never caused anyone injury because of how you have handcuffed them?

A. Say it again.

Q. Is it your allegation today that you have never caused anyone injury because of how you handcuffed them?

A. I don't know if I've never caused anyone injury on how I've handcuffed them. I actually had a complaint. My -- maybe my only real IA complaint when I was in Mississippi was a guy claimed that I had handcuffed him improperly and everything was reviewed and I was cleared. The handcuffs naturally, depending on what -- how the person sits on -- in the car, on how the cages or the seat is manufactured, handcuffs are uncomfortable. And a lot of people along the way will say, Hey, my wrist hurts. It's in the notch. It's turned sideways. But, you know, to grab someone by the hand and simply put them into handcuffs even when they're resisting like that, I've not experienced injuries beyond someone saying, Hey it's a little too tight, or, I was sitting on it and I -- and now my hand's going numb. And we double-check it, we make sure it's adjusted properly, and move on. So I'm only aware of one incident ever in 25 years where someone has tried to complain the way I've handcuffed them formally.

Q. Have you ever been the subject of a 1983 complaint regarding excessive force?

A. No.

Q. Have you ever been the subject of a tort action as a law enforcement officer?

A. No.
Q. Do you believe it's possible for an arrestee to have -- to be injured due to improper handcuffing techniques?
A. It's -- is it possible that someone be injured due to improper handcuffing techniques? Yes.
Q. Do you have any expertise in the kinds of injuries that can ensue from handcuffing an elderly man?
A. I -- I'm not a medical doctor if you're asking me to -- a medical causation question.
Q. Okay. So on what basis do you make the claim in your report that an injury sustained in this stage of the handcuffing technique is not ordinary?
A. That's based on my training and experience of being handcuffed and handcuffing all these people. Based on my experience. Now, if it's medically possible it's not a question for me. What I'm telling you is in my experience with these handcuffing techniques, that's not common.
Q. So it sounds like you have arrested someone before and they complained about the tightness of their handcuffs, correct?
A. Yeah. I had a guy resist arrest and he said that the handcuffs were too tight and made an IA complaint. It was all documented, investigated, and cleared. This was real early in my career, maybe 25 years ago.
Q. Have you ever arrested anyone else and they complained about the tightness of their handcuffs at any point in the

arrest?

A. Yeah. That -- that's fairly common where -- again, where people complain that they're too tight. They're usually not too tight. It's usually the way they're siting on the cuffs. The cuffs -- the cuffs go in this groove on your wrist and dependent on people's physical build some people's wrists don't go back very well. So if it naturally pulls against them, their shoulders are broader. So often enough you'll have someone complain. But the only thing I can do is sometimes -- we'll add two sets of cuffs if it's a larger person, if they're physically can't get to the back. But you check them for tightness, make sure they're double locked. Sometimes you try to readjust them for the folks, but generally that comes from their positioning, sitting in the car, or them leaning on it or pulling on it. So that's -- the protocol would be to check it for tightness and make sure it's double locked and there's not much else we can do with it.

Q. Did you ever follow up with any of the individuals you've arrested to determine whether they have sustained injuries from your handcuffing?

A. Have I followed up with anyone?

Q. Correct.

A. No, but I've not been sued for it. And barring one complaint, I've not received any other complaints.

Q. So you haven't followed up with every single person

you've arrested to see if they endured an injury from your handcuffing?

A. Correct.

Q. So on what basis can you say that you've never seen an injury like Mr. Clark's before due to your handcuffing?

A. I've never seen it. I don't have any personal knowledge of that. If someone was injured during my handcuffing techniques I would suspect that they call and make a complaint or file a lawsuit, and that's not happened to me.

Q. Do you know what gout is?

A. I'm sorry.

Q. Do you know what gout is?

A. Kind of. How should I say that?

Q. What is your -- what is your understanding?

A. A buildup of some sort of -- some sort of acid or calcium or something in joints that causes a joint pain. And the cause is unknown, I think.

Q. Have you ever had an old man that you arrested who had gout complain of pain from handcuffing?

A. I don't know.

Q. Do you know if a man with osteoporosis can suffer injury from handcuffing?

A. Again, that's medical causation. I -- I don't know about -- I'm not here to testify about medical causation. I'm testifying based on my years of experience and training. I've

not experienced a handcuff injury in the mannerism in which he was handcuffed. I think -- I think that's a great question for his doctor, he's treating doc. I'm sure he'll gladly give you causation.

Q. So when you initially make an arrest and you have someone in cuffs, what do you do to check for tightness?

A. We just -- we just use a finger test where we slide our finger. Depending on the -- some training says to put the two fingers inside of the cup there. Some deputies are just much larger than sales, but we always put it -- make sure there's a finger gap in the cuff, then we do the double lock there. So it -- you want to make sure it's positioned in the groove of the wrist, so right above the hand where the bone comes down on the arm. And then again, do that finger test to make sure it's locked. And that's all we can do. They're -- they're rigid -- excuse me. They're rigid steel devices, so they're generally not comfortable.

Q. When should this check for fitness occur?

A. When you put the handcuffs on. When you first apply the handcuffs, before you sit the person down or do whatever, you -- you generally do it right then. Because you don't want them sitting too tight for 20 minutes or 30 minutes, and then, you know -- because that, you know -- if you compress that nerve. There's a few studies on that, but if you compress that nerve long enough, you could certainly cause nerve damage so

you -- you do it right away.

Q. Do you know if the check for fitness was -- check for tightness was done in this case immediately?

A. Deputy Hotard wrote an affidavit that said it would have been his practice to -- to check it for tightness and double lock it, and then if complained, to double check it again.

Q. So you just have the belief of Deputy Hotard that he -- it was his general practice to do so, but he does not have a specific memory of doing it in this case, correct?

A. That's the evidence in this case.

Q. Could you tell from the video whether this was done?

A. No.

Q. Did you review all the audio from Mr. Clark's arrest?

A. Yeah. Some of what's inaudible, but I -- you know, you try -- I tried to listen through it. Yeah.

Q. Do you listen to hip-hop music, Mr. Courrege?

A. My kids do. Sometimes.

Q. Are you aware of the artists 2 Chainz?

A. I know who 2 Chainz is.

Q. And how about the artist Gucci Mane?

A. I think it's Gucci Mane.

Q. Yes, sir. Yeah.

A. All right. All right.

Q. Are you -- yeah, I'm going to pull up this. Again

lost track of the exhibit number.

(Plaintiff's Exhibit 8 was marked for identification. Video CBOWDEN 00:09:48)

BY MR. BEHRENS:

Q. Let's see if this will work for us. Okay. Let me share my screen. Let's see if the audio will work. Here. Okay. What we're looking for here is the audio from Defendant Bowden's dashcam which did not really capture the incident itself, but did capture Defendant Bowden's audio. This is the file 1_2021-5-25_ 00-09-48_CBowden at timestamp 14:00. Make sure the audio is up.

(Audio recording was played.)

(Audio recording was stopped.)

BY MR. BEHRENS:

Q. Did the audio come through there?

A. I'm not here in anything.

Q. Well, I will represent to you -- we'll just speed this along. I'll represent to you that the audio says something to the effect of, Give me the crack, or, Where's the crack? Do you remember listening to that?

A. Yeah. You can hear in the back background some -- some reference by Deputy Bowden. Yeah.

Q. What's your opinion as to what Defendant Bowden is saying there?

A. I think he testified to what he was saying. I

don't -- I don't have an opinion. I mean he -- you can hear the auto -- the audio and then you can hear his explanation of it.

Q. Is it common for officers to demand, Where's the crack??

A. You know what, if -- if I had a chore boy, a crack filter, and a vehicle, I might say something like, Where is the crack? Because if I know what that is, and based on my training, that's what it is, I might say something like, Hey, where's -- because that goes with that drug paraphernalia.

Q. Is it common to smell marijuana, but ask that passengers give me the crack?

A. I'm sorry?

Q. Is it common to smell marijuana but then ask the passengers of a vehicle, Where's the crack??

A. I -- I -- are you asking for this case or just in general?

Q. In general.

A. I mean, that has no context in general, so I -- I can't answer that question. It has to be in context.

Q. Are you aware of Defendant Bowden's explanation for what he was saying?

A. Yeah, he said he was singing a song.

Q. Is it common to sing songs at suspects as you're searching their vehicle without a warrant?

MR. GREMILLION: Object to the form of the question.

THE WITNESS: Yeah. I again, I -- look, how each deputy carries or handles himself, what I know -- what I know from my time in street crimes is sometimes being cooler or joking with people or making them steam -- you know, make a little bit lighter of the situation sometimes actually makes the situation better. Whether that was within his policy or he acted -- that was unbecoming conduct, that's -- that's a question for his agency to deal with. It has no bearing on the -- on the use of force portion, certainly, in my opinion. You know, I'm looking at it from a what-happened standpoint. So, you know, how that deputy carries himself is -- is not of my concern in the use of force context. Does that make sense? I mean ask -- depose the supervisor and see if the he violated their policy, I guess.

BY MR. BEHRENS:

Q. Do you believe it was courteous for Defendant Bowden to be rapping this Gucci Mane song?

MR. GREMILLION: Object to the form of the question.

THE WITNESS: I don't know that it's discourteous. He wasn't cursing or yelling at the -- at the -- you know, the -- the people stopped in the stop. Again, I -- it's what he chose to do, so if -- if he violated a policy or something like that, I think his supervisors would let you know.

BY MR. BEHRENS:

Q. So you have no opinion as to whether it's becoming of

an officer to rap a Gucci Mane song while you are doing the warrantless search of to older black men?

MR. GREMILLION: Object to the form of the question.

THE WITNESS: I -- I just don't know what bearing it has on the issue that I'm here for.

BY MR. BEHRENS:

Q. So your opinion is solely related to the use of force in this case, correct?

A. No. We -- we've gone through four hours of what my opinions have been. What I'm saying is the deputy's verbal or what he was singing or saying or how he said it in the related -- are completely removed from the stop, the search, the response to the resistance behavior, the premise of the stop. I mean, all of those seem within my purview. I -- I can barely hear what he says. He says something about crack. He said he was singing. You can barely kind of hear it in the background. If the indication is that was -- he's -- crack was related just because these gentlemen were black, I think that's -- that's an absurd statement. We see crack here in South Louisiana. In Livingston Parish, I'd say you'd -- you would make just as -- or you'd see it just as common in white and black neighborhoods. It's everywhere. So I saw the line of questioning in the depositions. I think that's -- I think it's a stretch, but y'all can make that argument certainly.

Q. Do you believe that deputy's statements during a

traffic stop can help a trier of fact understand their subject intent in making that traffic stop?

A. It could. It's possible.

Q. So you're claiming that Defendant Bowden's singing this rap song, Where's the crack, has no bearing on the claims in this case; is that correct?

A. He didn't make the stop. Hotard made the stop. So I -- is there evidence that they colluded or they -- well, I don't -- he didn't make the stop.

Q. You're -- you were basically saying -- do you have any opinion on whether Defendant Bowden's comments and actions satisfied LSPO's -- LPSO's policies regarding courteousness?

MR. GREMILLION: Object to the form of the question.

THE WITNESS: I didn't -- I don't know what their policy says on it. I wasn't asked to look at that and give an opinion on that particular statement.

BY MR. BEHRENS:

Q. Have you ever listened to the song Crack by 2 Chainz?

A. I -- I have no idea.

Q. Do you believe that -- withdrawn.

Do you know whether 2 Chainz uses the n-word in his rap music?

A. I don't know. I would assume.

Q. So it's true that Defendant Bowden did not do the stop but he did help take part in the search, correct?

A. Yes.
Q. And he was the individual who claimed to have found drug paraphernalia; is that correct?
A. Yes.
Q. And he also testified in the criminal case, correct?
A. I -- I didn't get the minutes for the criminal case, but I -- I would assume so.
Q. You write in a footnote in your report that you're not making any credibility determinations when coming to your opinions; is that correct?
A. Yes. Correct.
Q. You also claim in your report that the video, the dashcam video of the incident, discredits Mr. Clark's account of what happened; is that correct?
A. Part of it. Yes.
Q. So is Mr. Clark a credible witness in this case if the video discredits his account?
A. The credibility is a question for the Jury, but if something is apparent on video that did or did not happen, I would assume that lawyers would ask me to assume those facts to be true and give opinions based on that. So the Jury can credit or discredit anything they want.
Q. What opinions are you offering regarding the dashcam video in this incident?
A. I don't understand that. None of my opinions are

directly related to the dashcam. The dashcam is a piece of evidence that I used to form the factual basis of my opinions.

Q. What factual bases did you draw from the video in this matter?

A. You can see -- well, I mean, it shows -- it shows the -- the snatch of the money. It shows the search of the vehicle, it shows the -- it shows the arrest and detention in the handcuffs, it shows Sergeant McCullough walk by, put her arm on his shoulders or -- or back. It shows him putting -- being put in the car. I mean, it really shows most of the case, so.

Q. Thank you. So you would agree that you were offering the opinion that the dashcam video demonstrates that Mr. Clark resisted arrest?

A. It -- it's a fact taken together with the other facts that he -- his arm came down forward out of Deputy Hotard's hand, and Deputy Hotard had to then pull that arm back behind his back.

Q. Are you also offering the opinion that the video supports Defendant's narrative of whether Mr. Clark was choked during his arrest as to Sergeant McCullough?

A. I -- I see no evidence in that video that Mr. Clark was choked based on the way chokes are performed.

Q. What specific expertise in video analysis are you bringing to bear on these opinions?

A. You don't have to be an expert to watch a video and

see what you see. So it's -- it's -- I've -- I've based common sense observations on my personal perception of a piece of evidence and drawn certain factual (indiscernible) from that piece of evidence. You don't have to be an expert to do that.

Q. How many times did you watched -- watch the dashcam videos?

A. I watched them a -- a few times through. Just like I said before, what I do is I take a Word document, I start making notes in my report as I'm watching. So once I established my fact pattern, so I could then move into the rest of my report. I probably went back and watched as I was -- I was doing my analysis, but I don't know. So a handful of times each one. And then I was -- I spent a lot of time trying to hear the audio on Deputy Bowden's dashcam. That was a little more difficult for me to hear. Just having trouble interpreting what was said, so.

Q. You said earlier that lawyers can ask you to assume a set of facts to be true. Was there a set of facts that you were asked to be assumed to be true in this matter?

A. No, not necessarily. I just -- what I did in this case is put together the -- the facts as I observed them with all the evidence of the matter. If you -- if you want to ask me a hypothetical right now, we -- we can -- we did it earlier. We -- we kind of threw out a hypothetical. If you'd like me to assume that it was a reflexive movement. We talked about that.

That's a hypothetical. I can assume that to be true and then give you a response, so that's the role of an expert.

Q. Did you put the dashcam videos through any special software to analyze them?

A. No. I just -- I just used media player just to pause and -- and -- and slow down to listen and stuff, but nothing special.

Q. Did you alter or otherwise modify the videos in any way in order to understand more about them?

A. No.

Q. Did you look at the video's metadata?

A. No.

Q. Did you ever zoom in while viewing the videos?

A. No, I don't think so.

Q. Did you take notes of whether the dashcam video had discrepancy in the time listed?

A. I mean, there was some discrepancy about the deputy name. It wasn't -- it was a backup unit, and the names were different. And I think there was -- the times were off based on the reports. But I think that's because it was a backup unit and the camera wasn't calibrated with that computer or whatever it was.

Q. Would you classify these videos as -- as blurry?

A. Well, one of them -- I mean, they're -- they're different angles completely. So one of them, you don't see

anything but the passenger side of the truck. The other one you see head on. They're not 4K quality but, I mean, I still think you can appreciate what's happening in the video, at least to the point -- the -- the issues -- the -- the facts at issue in this case, I think you can see.

Q. Have you ever rendered an expert opinion regarding the reasonableness of officers' actions based on your review of video footage before this matter?

A. Yeah. I mean, these other use of force cases, of course. So a couple of these use of force cases were in State Court, and you could actually testify to the reasonableness of the matter. That was different. But, yeah, I mean, these -- all of these cases have to be vetted and reviewed and opinion rendered.

Q. And in those cases you render your expert opinion based on the video footage?

A. Oh, based on the video footage? Some, not all of them. Some of them, yes.

Q. Is it the --

A. I'm -- sorry.

Q. Is it the job of the Jury to evaluate evidence?

A. It's the job of the Jury to weigh the evidence and -- and use it. Yeah.

Q. Is it a duty for law enforcement officers to de-escalate situations where possible?

A. Yeah. Where -- where possible. So we've really gotten into this era of de-escalate when possible. But, again when you're responding to someone's actions it's not always feasible in the situation.

Q. Got it. You would agree that de-escalation is a -- is a natural -- national standard in law enforcement?

A. Yeah. Yes.

Q. And it's your opinion that Defendants actually de-escalated the situation?

A. Yeah. So I mean when you say de-escalation it can mean a lot of things. De-escalation can mean creating space. It can mean trying to verbally diffuse the situation. It can mean slowing the use of force down and getting things under control without escalating. So this, again, I think they could have used a more aggressive technique that would have likely caused more injury. By de-escalating the choice of force, yeah, that would fall into that general de-escalation definition.

Q. Did you review Mr. Clark's complaints to LPSO in forming your opinion? And I'll just clarify it's the -- the civilian complaint he did, not the complaint of this lawsuit.

A. Got you. Yes. I looked at that.

Q. How did his complaint affect your opinion, if at all?

A. It's -- it's a -- it -- it was just a fact. You know, it started -- started the investigation and looking into it. I don't recall what it says verbatim at this point because, you

know, we do have the video footage that can refute some of that stuff. So when there's video evidence or it's clear that the story's inconsistent, I'm going to usually defer to the video. It's not a credibility call if the video refutes it, even the federal courts are now allowing videos to come in early in 12(b)(6) proceedings because the video is the video.

Q. Okay are you aware of any action was taken on Mr. Clark's civilian complaint?

A. I mean, they began -- they began to look into the matter, but I don't know if there was -- do you mean like a disciplinary action or what do you mean?

Q. An investigation action.

A. I don't know what all they actually did with it. I mean, I know they looked into it and because then the -- if -- you know, they -- they actually looked at the footage and everything. So what they actually did with all that, I don't know.

Q. If a police department does not act, does not investigate civilian complaints, is that an indication of a department's culture or procedures?

A. That's a broad question.

MR. GREMILLION: Object to the -- yeah. Object to the form of the question.

THE WITNESS: Maybe. It's -- potentially.

BY MR. BEHRENS:

Q. We touched on this a bit earlier, but I'm just going to circle back to it. Would it have been possible for Defendant Hotard to have asked for the $20 bill back?

A. It would have been possible. But I don't think that would have been a reasonable police response in that situation. It's not about the $20 bill. He didn't take his money. He's destroyed drug evidence that was wrapped inside that $20 bill that's going to be falling onto the ground. So it's not -- this isn't a schoolyard spat over the ball and where, Can I please have my ball back? So, it's not feasible under the circumstances.

MR. BEHRENS: Well, I may have one or two more. Let me just take a five minute break to collect my notes.

THE WITNESS: All right.

DEPOSITION OFFICER: Okay. Taking us off the record.

(Off the record at 02:07 p.m.)

(On the record at 02:10 p.m.)

DEPOSITION OFFICER: We're back on the record.

BY MR. BEHRENS:

Q. Okay. Thank you for your patience today, Mr. Courrege.

And my final question today is, in your opinion as a police practices expert, was Mr. Clark treated respectfully by the Defendants in this case?

MR. GREMILLION: Object to the form of the question.

THE WITNESS: Yes. I think he was.

MR. BEHRENS: Great. I have no further questions.

THE WITNESS: All right. I'll read it and sign, and it can be all e-trans or whatever you guys send.

MR. GREMILLION: I don't have any questions.

MR. DANNA: Yeah. I don't have any questions either.

MR. COURREGE: Oh, I'm sorry. I forgot about you two sitting over there.

DEPOSITION OFFICER: So I'd also like to just check, Mr. Gremillion. Did you want to or a copy of the transcript?

MR. GREMILLION: Yeah. Please.

DEPOSITION OFFICER: And Mr. Danna?

MR. DANNA: Yes. Please.

DEPOSITION OFFICER: Okay. Great. I'll take us off the record.

(Remote proceedings concluded at 4:11 p.m.)

(Reading and Signing of the Deposition Transcript was requested by the witness and all parties.)

CERTIFICATE OF REMOTE NOTARY FOR WITNESS

PLACEHOLDER

CERTIFICATE OF REPORTER

STATE OF CALIFORNIA )
)
COUNTY OF SAN DIEGO )

I, Vaughan Duncan, AAERT No. 3738, Digital Reporter, State of California , do hereby certify that I was authorized to and did electronically report the Deposition of Charles Scott Courrege; that Charles Scott Courrege was duly sworn on the date indicated; that a review of the transcript was requested and that the electronic recording of the proceedings was provided for transcription.

I FURTHER CERTIFY that I am not a relative, employee, or attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

DATED this 22nd day of September 2025.

____________________________________
Vaughan Duncan, AAERT No. 3738

CERTIFICATE OF TRANSCRIPTIONIST

I, Nathan Pikover, do hereby certify that I transcribed the electronic recording produced by Vaughan Duncan, AAERT No. 3738, Digital Reporter, State of California of the Deposition on the record; and that the foregoing transcript is a true transcript of said electronic recording.

I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

DATED this 22nd day of September 2025.

__________________________________
Nathan Pikover

WITNESS NOTIFICATION LETTER

Date: SEPTEMBER 22, 2025
ATTN: Charles Scott Courrege
scott@courregeconsulting.com

RE: ALEXANDER CLARK vs. LIVINGSTON PARISH SHERIFF’S OFFICE DEPUTY JEAN HOTARD; DEPUTY CALVIN TAYLOR BOWDEN; SHERIFF JASON ARD; DENHAM SPRINGS POLICE OFFICER SYDNEY MCCULLOUGH; CHIEF J. SHANNON WOMACK; and CITY OF DENHAM SPRINGS
Date of Proceeding: 09/08/2025
U.S. Legal Support Reference Job No.: 6961290

Dear Sir:

The transcript of the above proceeding is now available for witness review, and the following applies:

__X__ The witness is requested to contact our office to make arrangements for review purposes.

_____ Counsel above ordered the transcript and is Requested to facilitate the witness' review from their copy.

_____ Other:_____________________________________

We respectfully request that the review be completed within 30 days. The completed errata sheet may be returned to our office at the Email address listed below for distribution.

Sincerely,
Production Department
U.S. Legal Support, Inc.
Email: Production@uslegalsupport.com
Phone: 866-876-8757
Letter via Transcript/Mail:
JOSHUA BEHRENS, Esq.
MARJORIE MENZA, Esq.

# ERRATA SHEET

Witness: Charles Scott Courrege
RE: ALEXANDER CLARK vs. LIVINGSTON PARISH SHERIFF’S OFFICE DEPUTY JEAN HOTARD; DEPUTY CALVIN TAYLOR BOWDEN; SHERIFF JASON ARD; DENHAM SPRINGS POLICE OFFICER SYDNEY MCCULLOUGH; CHIEF J. SHANNON WOMACK; and CITY OF DENHAM SPRINGS
Date of Proceeding: 09/08/2025
U.S. Legal Support Reference No.: 6961290

PLEASE MAKE ANY CORRECTIONS/CHANGES BELOW AND NOTE THE REASON FOR SAME, THEN SIGN AND DATE AT BOTTOM

Page / Line / Change / Reason.

_____/_____/_________________/_______________________
_____/_____/_________________/_______________________
_____/_____/_________________/_______________________
_____/_____/_________________/_______________________
_____/_____/_________________/_______________________
_____/_____/_________________/_______________________
_____/_____/_________________/_______________________
_____/_____/_________________/_______________________
_____/_____/_________________/_______________________
_____/_____/_________________/_______________________

Under penalties of perjury, I declare that I have read the foregoing transcript and that the facts stated in it are true.

______________________ ________________________
Charles Scott Courrege Date

(RESERVED FOR EXECUTION OF TRANSCRIPT REVIEW)
Sworn and subscribed to before me this ___ day of ________________, 20___.

____________________________________________
Notary Public Charles Scott Courrege

**Exhibits**

**EX 0001 Charles Scott Courrege PLF 090825**
4:5 14:18,19 15:18 16:15 105:20 121:8
**EX 0002 Charles Scott Courrege PLF 090825**
4:5 15:12,13
**EX 0003 Charles Scott Courrege PLF 090825**
4:6 28:18,19
**EX 0004 Charles Scott Courrege PLF 090825**
4:6 33:9,12
**EX 0005 Charles Scott Courrege PLF 090825 Cover Page**
4:7 105:5 117:23 118:2
**EX 0006 Charles Scott Courrege PLF 090825**
4:7 117:24 118:2
**EX 0007 Charles Scott Courrege PLF 090825 Cover Page**
4:8 133:2
**EX 0008 Charles Scott Courrege PLF 090825 Cover Page**
4:8 155:2

**$**

**$20**
112:13 113:25 114:8,19,22 115:1,5 124:13,14 128:6 135:24 136:4 138:14 145:1 146:11,20 167:3,6,7
**$250**
16:6
**$300**
16:6

**0**

**0.000001**
88:19
**00-09-48_cbowden**
155:10
**00:09:48**
155:3
**01:15**
132:21
**02:07**
167:16
**02:10**
167:17

**1**

**1**
14:18,19 15:18 16:15 105:20 121:8 133:5
**10.23**
39:11
**10.32**
39:12
**100**
105:14
**11**
121:10
**11:34**
84:24
**11:42**
84:25
**12(b)(6)**
166:6
**12:51**
132:20
**14:00**
155:10
**15**
132:17 135:19
**19**
16:20,23
**1983**
26:3 149:21
**1_2021-05-24_23-43-00_LELLIS**
105:3
**1_2021-5-25**
155:10

**2**

**2**
15:12,13 29:1,3 131:4 154:19,20 159:18,21
**20**
16:11 62:16 126:4 132:4 135:19,20,22 136:7,14 153:22
**20-727**
22:5
**20/20**
122:8
**200**
118:21 119:1
**2000**
34:21
**2001**
34:21
**2016**
34:24
**2020**
65:13 80:21 82:9 86:14,22
**2020s**
34:12
**2021**
65:14 80:21 82:9 86:14,23 118:8
**2021-05-24**
133:5
**2022**
28:24 33:11
**2025**
5:2
**21-CR-453**
22:19
**23-28-36_LELLIS**
133:5
**23:28:36**
133:3
**23:48:00**
105:6
**23:48:26**
105:4
**24-second**
105:4
**24th**
33:11
**25**
18:3 62:16 149:18 150:23
**255**
135:1
**26**
80:12 81:25
**26.8**
79:25

**27's**
70:25
**27th**
118:8
**28's**
70:24
**2:58**
133:6

**3**

**3**
28:18,19,24
33:17
**30**
39:5 131:19
153:22

**4**

**4**
16:15,16,19
33:9,12,17
**40**
84:19
**4K**
164:2
**4th**
28:24

**5**

**5**
105:5 117:23
118:2
**5'10**
118:21
**5'11-ish**
118:21
**5th**
41:23 42:7,
15,18

**6**

**6**
117:24 118:2

**7**

**7**
133:2
**7.3**
77:21 79:12,
22 80:12
81:24
**7.9**
77:16 79:12
80:12 81:24
**704**
42:4,13
**73**
32:14

**8**

**8**
155:2
**8th**
5:2

**9**

**9**
105:20
**9/11**
34:21
**9:34**
5:2

**A**

**a.m.**
5:2 39:11,12
84:24,25
**ability**
36:5 68:20
112:15,18
113:9 135:6
**able**
14:13,21
15:3 45:1
87:3 104:3,
10,16,20,22
113:23 123:5
**above**
105:23
153:13
**Abraham**
64:14,22
65:3 66:8
68:10 71:3
72:1,12
74:1,13 75:6
76:1,4 77:24
78:5
**Abraham's**
64:10 65:10
76:10,14
77:17 78:12
79:6,7 82:7
85:24 86:15,
24
**absolutely**
21:17 34:16,
17 120:2
144:9
**absurd**
158:19
**academies**
18:7 39:19,
20 40:6,14
147:22
**academy**
30:18,20
37:25 39:18
40:1,2,3,4,
9,13 58:18,
19
**accept**
35:6 142:10
**acceptable**
36:23
**access**
45:11,12
**accordance**
5:19
**account**
44:19 66:15
71:16 84:2
85:8 160:13,
17
**accountable**
34:5
**accurate**
47:22
**accurately**
15:21 79:15
**accusation**
64:2
**accused**
25:20,23
32:19,24
33:6 59:16
62:5,8,17
**acid**
152:15
**acquitted**
22:2
**across**
50:5 56:3
**act**
19:1 36:6
59:23 61:24
63:10
127:19,20
166:18
**acted**
60:20 157:7
**action**
31:23 48:12
50:21 67:18
85:21,22,23
91:2 123:4,
20 124:10
149:24
166:7,11,12
**actions**
22:16 34:14
35:24 47:20
49:5,6,7
51:22 56:10

60:9 85:6,20 87:25 88:13 117:4,5 121:25 122:20 123:21 124:9 128:22 136:10 138:10,17 143:18 144:6 146:10 159:11 164:7 165:3
**activate** 91:4
**active** 27:6,8 94:1 136:21,23 137:21 139:2
**actively** 119:13 126:17 136:20 137:17 138:11 143:5,6 145:16,17
**activities** 55:8
**activity** 55:13 66:17 76:24 92:8, 13 111:25 140:6
**acts** 59:12
**actual** 67:4
**add** 16:2 151:10
**addition** 120:12
**additional** 68:3 71:25 76:20 97:2, 19 98:3 125:10
**address** 47:6
**adhered** 48:6
**adjusted** 149:17
**administered** 5:5,16
**admissible** 41:25
**admit** 100:24
**adult** 77:18
**adults** 79:22
**advised** 7:10
**advocating** 94:2
**Affairs** 50:13 60:24 61:4
**affect** 42:21 111:14 146:17 165:22
**affidavit** 154:4
**affirm** 7:2
**affirmative** 53:5,12,14, 19,25 54:2, 12
**affixed** 15:4
**afford** 24:12 59:4
**afoot** 33:20,21 34:9 43:13
**agencies** 23:15 37:20 50:12 55:20, 24 58:24 59:3 67:23 72:23 73:7 74:20 76:25
**agency** 23:11 24:19 25:2 27:9 29:17 31:5, 14,15 44:25 45:10,12 48:4 49:2,16 51:4 55:19, 21 57:14,17 64:16 67:2,3 71:10 75:18, 20 89:2 157:8
**agency-wide** 49:17
**aggressive** 134:6 165:15
**aggressively** 142:5
**ago** 25:18 27:5 34:10 84:16 94:5 150:23
**agree** 5:7,16,25 6:2,4,7 9:13,14 13:8,14,20, 22,25 53:18 54:25 63:20 78:4,12,16, 18 79:6,11, 12,14 80:11, 12,19 81:11, 13,17 82:6, 19,20 97:3 109:12 130:21 134:12,14 135:20 140:8,14 141:3,15 161:11 165:5
**agreed** 128:16
**agreeing** 13:21
**agreement** 5:22 8:9 54:11 81:9, 22
**agrees** 75:23
**ahead** 87:23 137:20 141:10
**aid** 106:3
**alcohol** 10:8 100:10, 24
**Alexander** 5:13 6:1 7:20
**alienate** 30:10
**align** 128:20
**allegation** 62:3 74:11, 14 77:6,8 94:13 96:12 149:2
**allegations** 13:15,21 20:18 21:14 22:8,25
**alleged** 13:4 26:1,8 32:23 50:9 61:6 76:23 92:23 102:4 103:12
**allegedly** 13:7 21:19 22:13 59:19, 21 60:20 94:11 103:16 110:24 113:25
**alleges** 12:25

**alleging**
21:5 61:16 63:9
**allocations**
58:16
**allow**
7:12 21:24 110:21 140:11 145:23
**allowance**
121:12
**allowed**
55:7 125:6 126:22 130:24 134:5 137:4 145:1
**allowing**
166:5
**alter**
116:19 163:8
**amazingly**
8:4
**ambiguous**
120:21
**Amendment**
18:19 35:5 40:14 41:2, 3,4,5
**amount**
18:4 70:4 95:12 112:22,25 124:20 126:9,10 134:14
**amounts**
112:24
**ampules**
112:22
**analysis**
45:2 46:3 49:3,12 52:17 60:7, 12 65:7,10 68:13 70:11 71:18 73:13, 18 82:5 93:24 119:18 128:16 129:4 133:14,22 134:18 135:9 161:23 162:12
**analyze**
64:24 65:13 76:18 119:4 123:13 133:25 163:4
**analyzed**
64:14,25 65:3 68:10 72:1 113:5
**analyzes**
65:16
**analyzing**
71:3
**and/or**
5:8 57:21 114:5
**angle**
105:17
**angles**
163:25
**anomalies**
73:21
**answer**
8:23 9:1,3, 21,22 18:1 31:8 33:25 45:9 51:11 54:10,23 55:16 81:5 88:20,21 95:10 97:7 98:5,8,12 101:5,12 139:16 148:11 156:19
**answering**
56:16 98:9
**anti-racial**
60:15
**anybody**
80:17
**anyone**
12:4,10 17:7 70:11 119:12 148:25 149:3,4 150:24 151:21
**apart**
122:10,24
**apologize**
83:18
**apparent**
128:12 136:15 160:19
**Appeal**
41:23
**appearances**
5:23
**appears**
15:20 89:17 130:22 138:20
**applicable**
5:19 131:4 137:16
**application**
123:25 140:9 141:12 142:22
**applied**
121:4,24 137:9
**apply**
100:15 121:5 122:3 124:20 142:18 143:12 153:19
**applying**
144:22
**appreciate**
74:18 81:1 164:3
**appreciated**
34:23
**appreciation**
112:12
**approached**
103:18
**appropriate**
126:6,8,14 140:24
**appropriateness**
126:10
**approximate**
41:13 57:1 62:14
**approximately**
25:17 135:13,22
**approximation**
27:15
**Ard**
6:5 38:23
**area**
26:12 38:17 40:1 42:24 46:11 47:5, 7,8 69:5 71:23 79:1 82:14 86:9 93:20 97:20
**area's**
84:2
**argument**
158:24
**arise**
88:13
**arises**
64:5
**Arising**
28:24
**arm**
32:12 125:13 134:8,9 138:19,20,25 139:5,8 147:4,14 153:14

161:8,15,16
**arms**
125:2,19
**around**
34:21,24 39:7 55:9 62:6 114:25 135:21 139:24 143:20
**arrest**
20:13 52:1, 11 57:22 101:15 113:6 115:25 117:7,8,10 118:19 126:5 127:18 128:8 129:5,13 133:21 136:7,14,20 137:11,18 138:11 143:3 146:24,25 148:16 150:20 151:1 153:5 154:14 161:7,13,20
**arrested**
31:24 33:13 44:17 62:17 68:21 118:12 128:17 135:14 143:22,23 146:19 147:4,20 148:20,21 150:18,24 151:19 152:1,18
**arrestee**
133:23 134:18 142:23 150:2
**arrestees**
139:18
**arresting**
148:18
**arrests**
33:19 107:14 147:18
**article**
33:11,17 93:21 97:13
**articulation**
91:7
**artist**
154:21
**artists**
154:19
**arts**
135:6
**asked**
8:21 72:3 76:18 79:1 81:18 91:2 114:18,21 115:4 126:11 131:6 159:15 162:19 167:3
**asking**
13:11,20 86:16 93:12 150:8 156:15
**asks**
91:20
**aspect**
36:1
**aspects**
18:6 40:7,8, 16
**assert**
9:8
**assertion**
64:8 79:12
**assess**
69:12
**assist**
73:16
**assistance**
24:8 25:7, 10,19,22
**assume**
10:23 11:2 30:12 74:24 96:7,16 99:25 100:5, 17 101:17 142:9 143:19 159:23 160:7,20 162:17,25 163:1
**assumed**
65:1 162:19
**Assuming**
90:4
**attack**
37:14 42:21
**attempt**
126:16 146:8
**attempted**
125:18 126:12
**attempting**
21:18 78:19 137:11 139:1
**attempts**
115:13
**attention**
29:3
**attorney**
7:19 8:25 9:7,21 24:3, 4 26:2,3,13, 15 28:11 30:3
**attorney-client**
5:8 24:17
**attorneys**
8:18
**audio**
5:6,17 83:16 104:7 154:14 155:6,7,9, 11,12,13,15, 18 156:2 162:13
**auditing**
73:5
**auditor**
40:14 41:2,3
**auspice**
46:25
**author**
28:22
**authored**
15:6
**authority**
81:4
**auto**
156:2
**automobiles**
18:20
**available**
58:17
**avoid**
115:14,15
**aware**
16:25 53:1 66:20 72:4, 11 77:13,17, 23 81:2 86:13,16,22 90:15,22 99:4,7,8,14, 19,21,22,24 101:14 107:1 116:20,24 118:18 149:18 154:19 156:20 166:7
**awareness**
147:10

**B**

**back**
12:18,22 16:10,15 17:4 23:3 27:13,16,17 34:20 35:4 37:6,15

39:7,13,16 41:16 50:18 51:12 52:7 57:6,7 74:6 80:6,7 84:19 85:1 90:24 103:17 104:1 114:19,22 115:1,5 125:19 126:2,4 132:22 134:8,9 135:18 138:20,25 139:1,7,13 142:5,12,13 143:16 144:3,12,21, 23 145:3,6,8 146:16 151:7,11 155:21 161:9,16,17 162:11 167:2,3,10, 18

**background**
155:21 158:16

**backup**
163:18,20

**bad**
34:6 35:20, 21 37:11,13 123:9,10,11

**bag**
97:24 98:3

**baggie**
97:2

**bake**
132:16

**ball**
32:3 107:21, 23 110:18,19 167:9,10

**balls**
106:6 110:2
113:13

**bank**
70:13

**barber**
23:5

**barely**
108:2 125:20 158:14,16

**barring**
151:23

**base**
121:16

**based**
18:7 35:25 42:12 43:13, 22 44:3,10 46:2,11,19, 23 47:16 50:21 55:7,8 57:21 59:20 61:9 62:4 63:25 64:4 65:6 66:8 70:4,5 74:9, 11 76:23,25 77:4,11 79:17 81:25 82:13 84:1, 6,7 88:7 89:1 91:23 93:6 96:5 100:23 101:4 103:6 107:20 108:3,13 116:17 121:6 124:21 127:22 136:11 137:24 138:5 140:24 145:21 148:23 150:13,14 152:25 156:7 160:21 161:22 162:1 163:19 164:7,16,17

**bases**
50:21 161:3

**basically**
82:6 159:10

**basing**
44:4

**basis**
9:1 16:22 17:5 49:8 51:16,24 52:3 56:9 59:17 71:4 72:15 76:16, 17,18,20 86:23 87:8, 17 88:2 90:2 91:5 93:10 100:13 107:13 129:11 145:13 148:14 150:10 152:4 161:2

**Bates**
117:23

**Baton**
6:22 23:8, 20,22 40:2 83:22

**bear**
161:24

**bearing**
157:8 158:4 159:5

**began**
21:20,21 144:22 166:9

**begin**
33:19 97:7 129:13 138:16 146:13

**beginning**
5:23 29:3,5 56:24 105:3

**begins**
33:18

**behalf**
6:1,3,5,8 21:4 31:22

**behavior**
19:4 53:22 73:22 158:13

**behind**
126:1 134:8, 9 138:20,25 139:6,13 142:12 143:16 144:21 145:3,6 161:16

**Behrens**
5:25 7:15, 17,18 9:12, 18,19 13:13, 18 14:6,18, 21,23,25 15:2,5,12, 15,17 18:9 28:21 33:15 39:15 45:8, 19 46:5 51:20 52:23 53:10 54:8 58:11 63:8 64:9 68:8 69:11 74:12 75:4,10,24 76:8 77:1 78:21 79:4, 19 80:18 81:1,7 82:17 84:10 85:2 87:21 88:10 89:9,20 91:11 92:4, 22 94:20 100:7 101:13 102:1,15,20 104:13,16,19 105:7 107:12 108:8 109:19 115:23

117:21 118:3,4 122:15 124:5 131:18 132:1,3,8, 10,17,23 133:4,12 141:1 147:15 155:4,14 157:15,24 158:6 159:17 166:25 167:12,19
**belief**
90:6 103:11 128:4,5 129:2 140:16 154:8
**beliefs**
123:19
**believe**
10:16,24 11:1 14:4 31:16 34:16 35:13,17 36:11,18 47:13 50:22 53:4,11 55:11 62:24 64:17 68:22 69:12 86:1, 6,9 89:18,21 91:7 92:1 95:20 96:3 97:18 101:25 102:24 103:17 106:15 110:25 111:1 116:8,14,23 117:1,4,5,12 121:2 133:19,20 140:25 141:6 143:14 146:18 147:9 150:2 157:16 158:25
159:20
**believed**
31:20 48:12 62:3 91:25 136:2
**belt**
135:2
**belts**
69:7
**bending**
144:14
**benefit**
73:4 104:9
**besides**
12:4
**best**
8:7 9:24 10:10 54:6 58:13 85:5 109:2,9
**better**
42:25 45:21 109:15 157:6
**bias**
55:10,11
**biased-based**
54:18
**big**
52:8 59:21 108:2 147:11
**big-picture**
49:10
**bigger**
33:19,21 34:8 72:22 118:24 119:2 130:12
**bill**
112:13 113:25 114:8,19,22 115:1 124:13,14 128:6 135:24 136:4 138:14 145:1 146:11,20
167:3,6,7
**bit**
14:12 52:13 83:6 84:12 93:12 131:21 133:11 157:5 167:1
**black**
53:1 62:22 63:4 65:14, 18 68:21 74:21 75:7 77:14,18,24 79:8,22,24, 25 80:20 135:1,2 158:2,18,21
**blog**
28:16,22 33:9
**blue**
113:17
**blunt**
97:22,23 98:2
**blurry**
163:23
**board**
94:3
**body**
73:3,5 139:9
**bone**
153:13
**bono**
24:1,7,21 25:4,7,10, 19,22,25
**book**
125:23 146:5
**bottle**
39:4 84:13 91:25 93:9 103:16,19,24 104:4 105:10
**bottom**
127:4 135:8
**Bowden**
6:6 38:10,13 99:19 101:22 107:9 111:9 125:16,20 133:16 155:22,23 157:16 159:24
**Bowden's**
106:15 155:8,9 156:20 159:4,11 162:14
**box**
88:18
**boy**
106:6 108:3 109:23 110:5,12,21, 23 156:5
**bracing**
139:1
**brand**
110:15,16,22
**brands**
113:1
**Brazilian**
135:1,2
**break**
10:4 23:4 39:3,6 52:9 82:23 84:11, 12 122:24 131:16,19,20 167:13
**breaks**
10:2
**breath**
100:24
**brief**
12:2
**briefly**
139:5
**Brillo**
106:2,10,13,

17,19 107:6, 16 108:5,10, 16,20,22 109:20 110:4,13,15, 16,23
**bring** 16:15 37:5
**bringing** 161:24
**brings** 33:21
**broad** 102:14 166:21
**broader** 71:11 151:8
**broken** 52:5
**budget** 58:20
**budgets** 58:16
**build** 151:6
**buildup** 152:15
**burden** 74:25
**burdensome** 72:4
**burn** 107:24
**burned** 95:13
**burning** 106:7
**burnt** 95:15,16,22 96:22 100:2, 19 102:11,17
**business** 30:4,7 31:10 129:15 135:1
**Busken** 65:4 80:17
**Busken's** 75:22
**Buskin** 43:11
**Buskin's** 12:22
**bust** 112:21,22
**butterfly** 146:17
**buy** 97:22
**by-race** 85:4 87:1

**C**

**C-O-U-R-R-E-G-E** 6:14
**CAD** 66:24 67:4, 13,14,24 68:3,6 70:12,13,18, 23,24
**cages** 149:10
**calcium** 152:16
**calculation** 81:12 133:23
**calculations** 72:12
**calculus** 121:11,18
**calibrated** 163:21
**California** 5:4
**call** 12:11 27:5 57:12 58:16 95:1 110:15 152:8 166:4
**called** 7:7 57:17,25
**calling** 89:14
**calls** 143:10
**calm** 122:24
**camera** 73:5 163:21
**cameras** 73:3
**cannabis** 93:22
**capabilities** 122:12 123:7
**capability** 36:6
**capacity** 10:17 11:6,9 20:15 24:4 27:10 28:8, 10 30:2,3,25 56:20 59:14 60:13 61:19 62:10
**Capital** 40:1
**caption** 22:4,18 23:6,23 41:22
**capture** 155:8,9
**captured** 139:6
**car** 21:20 28:24 83:15 94:8,9 97:19 100:1, 3,18,20 101:10,11 102:9,12,17 111:21,23 142:5 149:9 151:14 161:10
**career** 52:8 56:25
59:10 62:17 98:6,25 147:18 148:20 150:23
**careful** 122:19
**carries** 7:25 157:2, 11
**Carroll** 92:3
**carrying** 123:4
**CARTA** 38:1 40:9 41:8,11
**case** 11:13,19 12:24 13:3, 15,19,25 15:7 16:5 17:11,16 18:11 21:5, 7,8,14 22:4, 6,8,18,20 23:1,9,11, 14,20 24:17 25:5 26:10 27:5,6,7,8, 12 28:1,3 29:8,18,20, 21 30:8,9 31:14,16,17, 18,19,21,25 33:18 41:17, 21 42:3,11 43:3,9,17, 20,24 46:2, 6,20 50:18 51:23 59:19 60:5 61:23 63:14 69:10 70:23 71:14 72:18 73:14 74:1 76:3, 13,22 86:20 91:9,12

92:19 93:6, 17 94:10 96:2,6,11 98:15 99:9 101:8 109:13 110:12 111:6,19 112:9 114:25 116:20 117:15 120:6,17 122:12 123:15 124:7,23 125:16 127:12,19,24 128:1,3 129:16,21 130:5,22 135:10 137:16 138:9,10 139:4 140:16 142:5,17,20, 22 143:6,9, 14 144:5 145:13,15 146:10 154:3,10,11 156:15 158:8 159:6 160:5, 6,16 161:10 162:21 164:5 167:24

**case-by-case**
51:24 71:4 72:15 73:13 129:11

**cases**
10:19,20 11:12,17,23 19:3 20:16, 20 21:4,9,11 26:3,4,5,6, 13 27:19,22 29:23 30:11 31:11,18 33:4 34:16 36:8 44:8 50:14 61:13, 14 69:22 121:25 126:13 138:7 143:7 164:9, 10,13,15

**catching**
127:16

**causal**
94:1

**causally**
21:22

**causation**
150:9 152:23,24 153:4

**caused**
32:12 148:24 149:2,4 165:16

**causing**
13:7

**caveat**
93:1

**CBOWDEN**
155:3

**center**
103:25

**centers**
39:22,25

**certain**
34:14 42:5 44:14,15,23, 24 47:4,5,12 49:7 58:25 66:11,17 74:19 75:18 77:9 82:9 111:25 112:23 120:24 162:3

**certainly**
10:4 34:2 37:18 60:7 73:16,19,23 74:24 85:5 88:4 92:16 93:16,17 97:8 103:13 107:4,10 112:1,17 113:7 137:5 138:2 145:21,22 153:25 157:9 158:24

**certainty**
105:14

**cetera**
128:23

**chain**
138:14 139:23 144:1 146:12,13

**Chainz**
154:19,20 159:18,21

**chance**
107:16 128:7

**change**
36:5,24 111:22 112:6

**changed**
52:12 73:3

**changes**
15:9 52:8

**chaotic**
122:24 123:16,23

**characteristics**
135:5

**charge**
71:16 90:23 114:3,5,6, 13,14 116:12,13,25 117:3,13 118:12,13 128:15,19,25

**charged**
31:24 34:14 115:24 116:1,4,9 118:7,14,15

**charges**
22:3 116:2, 19 118:7 128:9 129:15

**Charles**
6:13 7:6

**check**
151:11,15 153:6,18 154:2,5,6

**checking**
135:25

**chemical**
112:21

**chief**
6:8 38:25 55:25 56:2

**children**
62:22

**choice**
165:16

**choked**
20:13 161:19,22

**chokes**
161:22

**choose**
128:21

**chore**
106:6 108:3 109:23 110:5,12,21, 23 156:5

**chose**
24:12 124:19 128:19 157:21

**cigar**
97:25

**cigarette**
111:2,4,5,8

**cigarettes**
111:16

**circle**
39:16 41:16

167:2
**Circuit**
41:23 42:7, 15 90:9 129:21,25
**Circuit's**
42:18
**circumstance**
112:5 136:17 145:23
**circumstances**
24:7 101:3 113:7 129:10 137:3 142:21 143:2,11 145:22 167:11
**citation**
71:15 80:14
**cite**
128:14
**cited**
74:21 79:13, 16
**citizen**
46:11,13,21 47:2 86:22
**citizens'**
84:3 88:24
**city**
6:20 23:8,22 46:17 86:2
**civil**
10:21 11:4,5
**civilian**
20:13 165:20 166:8,19
**civilians**
26:1,8
**claim**
42:7 43:5,18 44:2 74:6 87:7 91:16 150:10 160:12
**claimed**
72:4 98:20
103:16,23 149:7 160:2
**claiming**
159:4
**claims**
13:2,8,19, 23,24,25 14:4 91:21 159:5
**clarified**
111:3
**clarify**
9:23,24 12:20 88:11 103:18 165:19
**Clark**
5:13 6:1,3 7:20 13:2, 19,24 46:21 62:2 74:11 77:9 89:11, 22,23 90:3, 16,22 94:15 99:4,20 103:2 111:15 114:18,21 115:1,5,17, 24 116:12,25 117:2,13 118:5,11 124:13,25 126:4,19 127:10,12 128:16 130:13 131:5 133:7 134:1 135:13,23 136:6,12 137:11,17,25 138:10,22 139:14 141:22 142:5 143:15 144:21 146:2,19,23 160:16 161:12,19,21
167:23
**Clark's**
33:2 43:5 74:14 91:3, 13 92:24 94:10 96:13 99:5,23 101:15,18 107:2,7,16 109:13 117:4 118:18 123:15,21 124:9,10 139:4 140:21 142:9 143:17 144:5,14 152:5 154:14 160:13 165:18 166:8
**class**
40:14 41:4 44:11
**classes**
38:2 40:12, 24
**classify**
163:23
**clean**
108:1 113:15
**cleaning**
107:17 108:11
**clear**
8:3,5 9:20, 22 17:14 29:8 30:12 93:6 111:1, 24 140:11 141:9 146:22 166:2
**cleared**
149:8 150:22
**clearing**
29:10
**clearly**
138:22
**client**
26:25 27:3 115:17
**clients**
30:10 31:10
**Clinton**
23:16,18
**Clorox**
113:16
**close**
82:23 101:23 127:20
**closer**
93:14
**clothes**
102:11
**cocaine**
98:18 106:3, 7 107:14,17, 25 108:7 111:15 112:8,16,18, 19 113:9,17 114:1,4,6,9, 11 128:6 129:2
**code**
28:24 105:23
**cognizant**
36:7
**coin**
136:3
**colleague**
60:19
**collect**
167:13
**collection**
52:17
**colluded**
159:8
**color**
112:23
**colors**
105:21 113:1
**combat**
20:3 53:19 54:10,14,15, 17,22

**combatting**
69:6
**combination**
148:18
**combined**
148:23
**come**
24:16 25:13 26:3 30:18, 21 31:3 38:1 60:15 61:2 80:7 82:19 83:22 84:19 110:21 138:22 155:15 166:5
**comes**
30:24 55:9 56:3 68:20 72:24 75:6 120:25 151:13 153:14
**comfortable**
103:9 153:17
**command**
142:24 143:15 144:21 145:11,12
**commands**
140:5,11 144:8 145:3
**comments**
159:11
**committing**
145:16
**common**
29:15 99:15 108:25 139:18 150:17 151:2 156:3,10,13, 23 158:21 162:1
**communications**
9:5
**compact**
110:2
**company**
18:4 59:5
**company's**
30:22
**compared**
74:22 75:11 79:8
**compensated**
16:5
**compile**
87:5,8
**compiled**
45:15
**compiles**
87:1
**complain**
149:19 151:3,9 152:19
**complained**
150:19,24 154:6
**complaint**
12:24 46:21 60:23 61:14 68:20 72:18, 25 149:5,6, 21 150:21 151:24 152:8 165:20,22 166:8
**complaint-by-complaint**
51:16
**complaints**
46:12,14 47:2,4 50:7, 8 60:21,22, 25 61:5 63:9 70:4 72:25 73:2 83:11 84:3 88:24 151:24 165:18 166:19
**complete**
7:13 20:19 21:7 46:3 49:3
**completely**
52:10 99:9 113:6 141:24 158:12 163:25
**compliance**
21:22,24 22:1 23:10 60:15 140:23 142:18
**compliant**
136:6,14 138:15,16
**comply**
21:25 128:23 140:11 142:1,19,24 143:15 144:7 145:12
**component**
13:5 30:5 60:4
**compress**
153:23,24
**Compstat**
51:18
**computer**
65:25 163:21
**computer-aided**
67:14
**concern**
157:12
**concerned**
32:22
**concerns**
31:9 50:12 86:22
**concise**
140:11
**concluded**
98:17
**concludes**
65:17
**conclusion**
64:6 74:8,9, 13 75:6,13, 15 76:24 78:19,23 79:17 96:25 120:1
**conclusions**
80:25 91:20
**conclusory**
136:9
**concrete**
113:21,22 142:3
**conduct**
20:23 24:19 39:17 58:4,8 71:18 85:4 87:2 134:18 157:7
**conducted**
5:15 47:12 99:20,22
**confirm**
104:3
**conflict**
26:17 31:17
**conflicts**
26:15
**connection**
94:1
**conscious**
87:16 88:1 139:14,25
**consent**
6:23
**consider**
84:7 122:17
**consideration**
31:15
**considerations**
50:12
**considered**
16:20 59:12

125:17 133:18 136:23
**consist** 139:1
**consistent** 22:16 90:21 107:11,22 109:23 138:21
**consisting** 57:18
**console** 103:25 104:1
**constantly** 94:4
**constituted** 61:25
**constitutional** 37:19 40:8, 18 41:5 120:4
**construction** 106:23 107:4
**consultant** 20:16 22:7 24:1 31:1,12 37:5 59:15 60:13,18 61:19
**consultation** 25:25 26:7
**consultations** 24:2,5
**consulting** 11:7 29:4 30:22 31:9 33:10
**consumed** 95:14 96:9, 17,23 97:17 99:5,9 102:5
**contact** 85:9
**contained** 113:25
**container** 101:1
**contention** 148:24
**context** 19:7 34:11 43:14 44:13, 17,18,21 45:17 46:8, 19 47:10 49:10 54:3 56:3 59:23 64:3 65:5,7 68:3,17,18, 24 69:3,9,21 71:9 72:22 75:2,25 76:3,11,13, 16 77:7,12 78:11 80:7, 24 81:15 82:3,5,15,22 83:9 84:4,8 85:13 95:18 101:2 107:10,21 110:1 114:24 119:25 125:23 145:14 156:18,19 157:12
**continue** 5:7 140:5 142:18,19
**continued** 21:22
**continuing** 91:15,21
**continuous** 51:25
**continuously** 22:1 56:22
**contrary** 81:4 94:13
**control** 37:7,18 72:7,10 125:11 127:14 130:10 136:22 138:24 139:9,12 142:12 144:12 145:7,8 147:7,10,12, 14 165:14
**controlled** 147:5
**conversation** 12:2,10 140:20
**conversations** 5:8
**convicted** 90:23
**convictions** 91:1
**convoluted** 141:5
**cooler** 157:3
**cop** 34:20
**copper** 106:2,5,10, 14 110:5,6, 17,18,19 114:15
**copper-colored** 109:24 110:10
**corral** 67:10
**correct** 11:5,7,17, 18,21,23,24 12:8,9,15 16:22 17:17, 23 18:16 21:6,10,12 22:21 24:2, 5,6 32:5,15 38:21 39:23, 24 40:16,17, 19,21,23 41:1,9,18, 19,20 42:10, 12 45:23 47:3 50:10 51:7 59:25 64:11,21,23 65:1 66:5 68:4 70:20 71:6 72:2,16 76:11 78:6, 13 79:22 80:1,21 82:10,21 92:9,10 95:12 96:13, 24 110:4 112:10 115:8 116:5 117:1 118:11,14,17 119:5 120:9 121:13 122:21 135:17 137:14,19 141:4 147:18 150:19 151:22 152:3 154:10 158:8 159:6,25 160:3,5,10, 11,14
**correction** 5:21
**cotton** 113:13
**counsel** 5:12,24 8:9, 11,12,14,15, 24 9:3,12 12:2,4,6,12 17:8 24:13 104:18
**count** 82:1

**counter**
135:10
**counting**
21:3
**couple**
94:5 128:9 132:3,4 164:10
**Courrege**
5:12 6:13, 18,22,25 7:6 10:12 15:6, 18 16:4 28:14 29:3 33:10 39:16 85:3 89:10 94:17 104:20 132:24 133:6 154:17 167:21
**courregeconsulting.com**
28:15
**course**
7:11 62:2 164:10
**courses**
30:22,23,25
**court**
5:14 8:4 21:12 28:20, 23 35:4 41:23,24 42:5,15,16, 20,25 43:1 54:1 91:15 104:8 119:21 133:1 138:4, 5 164:11
**court's**
42:12,22
**courteous**
157:16
**courteousness**
159:12
**courts**
166:5
**covering**
110:6
**crack**
98:18 106:3, 4,8 107:11, 14,17,23 108:6,10 111:15 112:8,16,18, 19 113:9 114:1,4,6,9, 11,15 128:6 129:2 155:19 156:4,5,7, 11,14 158:15,17,19 159:5,18
**Crash**
28:24
**create**
5:17 76:21
**creating**
17:3 165:11
**credibility**
42:22 160:9, 18 166:4
**credible**
160:16
**credit**
160:21
**crime**
34:1 46:15 47:6,8 51:17 73:20,21 83:22,24 84:2 86:13, 17,19 88:23 89:4,6 90:7, 13,19 92:12 93:5,24 108:13,14 113:5 114:11,14 119:11 124:15 128:11,13 129:7,8,17 145:17
**crimes**
47:5 61:7 98:11 108:4 128:2 129:3, 21,24,25 157:3
**criminal**
22:2 24:24, 25 42:14 47:14 59:23 72:6 83:9 86:12 160:5, 6
**criminally**
34:14
**critical**
140:10
**crude**
95:15
**crumble**
113:20
**cuff**
153:11
**cuffs**
146:4 151:5, 10 153:6
**culture**
72:20 166:20
**cup**
153:9
**current**
93:2
**curriculum**
39:21
**cursing**
157:20
**custody**
13:6 21:19 120:24 127:1 140:18
**custom**
72:20
**CV**
15:14,18,22 16:1 20:19 23:7 27:24

**D**

**DA**
90:25 116:18
**dad**
106:24,25
**damage**
153:25
**dammed**
126:24
**Damon**
23:8
**danger**
130:8,13 143:5
**Danna**
6:7 9:17 83:15,18 131:14 132:18
**DAS**
116:18
**dashcam**
105:1 155:8 160:13,23 161:1,12 162:5,14 163:3,15
**data**
16:20 43:8, 12,14,15,18, 20 44:5,23 45:4,14,16, 22 46:6 47:17 48:21 49:1,3,11, 15,24 50:4,5 51:1,2 52:17 63:15,18 64:13,22,25 65:13,16 66:7,12,20 67:12 68:3, 6,10,11,12 69:13,24,25 71:3,25

72:1,5,15 73:22 74:10 76:10 78:6 80:24 81:13 82:7 87:4,5
**date** 44:3
**dated** 33:10
**Daubert** 42:4,22
**day** 31:15 112:16 113:4 131:25
**day-to-day** 71:24
**de-escalate** 140:19 143:10 146:1 164:25 165:2
**de-escalated** 165:9
**de-escalating** 165:16
**de-escalation** 37:10 145:18,24 146:7 165:5, 10,11,17
**dead** 126:20
**deal** 49:15 66:13 157:8
**dealing** 113:2
**deals** 116:18
**death** 34:5 35:19
**decide** 42:23 43:12 105:18 123:3
**decided** 74:9 147:9
**decision** 29:5,6,11 57:22 103:1 122:25 124:12 127:1 130:18 138:5 140:1
**decision-making** 57:23 123:2
**decisions** 34:6 35:5,8, 20 51:15 122:23 123:10
**deem** 140:24
**deep** 131:25 135:9
**defendant** 23:11,14 61:16 89:21 90:1,15 91:5 96:11 99:14, 19 103:15,23 113:8 115:1 118:22 155:7,9,23 156:20 157:16 159:4,11,24 167:2
**Defendant's** 161:19
**Defendants** 8:17 23:12 37:22 101:14,17 102:2 103:2 108:9 112:15 114:18,21 115:4 120:8 124:11,23,24 126:3 136:7, 12,15 143:14 144:20 146:23 165:8 167:24
**defending** 20:17 21:2 144:4
**defense** 24:24,25 42:17
**defensive** 124:21 125:3 137:22 147:6
**defer** 73:18,24,25 74:4,5,8 77:19 78:5, 9,14,16,18 80:15 81:24 82:1,3 166:3
**deferring** 79:6 81:12
**defies** 122:12 123:7
**define** 136:21
**definitely** 45:15
**definition** 71:22 90:11 92:6 94:24 117:6 137:21,24 165:17
**definitions** 137:23
**defy** 122:25
**degree** 87:3 137:8,9
**delay** 123:4
**demand** 156:3
**demographics** 44:15 75:11
**demonstrates** 161:12
**Denham** 25:10 26:22 27:4,6 31:6 38:18
**denied** 111:15
**Denies** 28:20,23
**deny** 111:20,21, 22,24
**denying** 112:5
**department** 23:14,17,22 25:11,23 26:23 27:4 30:16 31:1,7 40:4,13,25 41:1 48:21, 23 51:1 55:17 60:14 61:20 69:18 73:12 85:18 87:7,14,24 88:12 166:18
**department's** 166:20
**departments** 23:21 50:25 53:4,11,18 54:12,13 56:5 58:3,4, 7 85:3,15
**dependent** 151:6
**depending** 68:7 149:8 153:8
**depends** 31:2 56:4 95:10 101:5, 8 102:19 137:6 142:25 143:2,6
**Depew** 22:19
**Depo** 14:20
**depose** 157:13

**deposed**
10:12,15,17 22:20
**deposition**
5:1 6:10,15 7:10,21 8:2 11:25 12:7, 14,21 14:22, 24 15:1 20:22,24 39:10,13 66:5 78:2 84:22 85:1 98:8 104:10, 14 106:15 113:8 118:1, 23,25 132:19,22 133:17 167:15,18
**depositions**
9:13 10:18 158:23
**deprive**
132:13
**deputies**
24:10 30:17, 18,19,22 31:6 33:13 46:9 55:13 66:19 75:17 80:14,21 82:9 88:5,8, 22 106:1,10 108:24 115:18 130:12 139:20 140:1 153:9
**deputy**
6:5 25:8,11 30:24 38:7, 10,15 50:16, 17,20 72:21 88:14 91:8 101:22 105:1 106:15 107:9 111:9 115:10 125:16,20 127:10 133:16 138:21,23,24 139:6,8,11, 12 142:11 154:4,8 155:22 157:2,11 161:15,16 162:14 163:17
**deputy's**
89:18 115:6 124:14 142:6 146:20 158:10,25
**Depuy**
59:19
**derived**
47:5
**describe**
133:7
**described**
47:22 106:16 107:9,21 109:23 136:21
**desk**
56:3
**destined**
33:25
**destroy**
115:13 127:18 138:17 144:18
**destroyed**
129:3 140:17,20 167:7
**destroying**
126:17 128:22 133:21 143:7
**detail**
106:16 122:11
**detailed**
55:22
**details**
109:5,7,12
**detain**
93:18 115:13 129:12 140:4 143:8
**detained**
70:14 115:16 135:13,15 136:8 139:2 143:4
**detected**
114:11
**detection**
99:10
**detention**
117:8 161:7
**determination**
108:9 128:1
**determination s**
160:9
**determinative**
112:1
**determine**
44:5 63:18 71:5 74:10 121:25 151:19
**determines**
35:7
**device**
97:1 98:17
**devices**
153:16
**dictates**
85:22 125:9 126:8
**die**
35:22,23
**Diego**
5:5
**dies**
35:24 36:5
**differed**
42:16
**differences**
125:17
**different**
11:15 23:15 33:4 39:19, 22 45:13 56:7 58:15, 16 62:25 64:6 73:7 81:19 89:6,8 90:7 95:16 96:21 109:22 113:1 124:1, 2,18 126:21 141:22,24 142:21 144:5 146:10 148:10,12,13 163:19,25 164:12
**difficult**
33:22 36:25 37:3 112:14 162:14
**diffuse**
165:12
**digital**
57:6
**diligence**
103:21
**direct**
9:1 16:16,19 29:1,2 33:16,17 105:20 121:10
**directed**
26:6 51:5 60:6
**direction**
43:10
**directives**
60:16
**directly**
161:1

**directs**
9:21
**disagree**
42:18 75:5 78:23
**disappear**
15:3
**disappointment**
34:1
**discarded**
97:15 99:10
**disciplinary**
166:11
**disciplined**
28:10
**discourage**
136:3
**discourteous**
157:19
**discovery**
56:14,15 72:7,9
**discredit**
160:22
**discredits**
160:13,17
**discrepancy**
163:16,17
**discretion**
37:10 102:25
**discriminate**
87:17 88:2, 15
**discriminating**
59:16 87:8
**discrimination**
19:9,12 20:3 45:21 47:21 48:13,15,20 49:12 50:1, 6,22 51:22 52:18 53:6, 12,19 54:14, 15,25 55:2, 4,18 56:13, 20,23 57:2, 19 59:8 60:4 61:6,17,21, 25 69:17 71:5 73:11, 13 74:14 77:3 85:16, 19 88:12
**discrimination-based**
54:19
**discriminatory**
43:6,21 44:6 59:12 60:20 77:11 87:15, 25 92:14
**discuss**
24:17,23 25:15 27:7 126:16
**discussed**
72:9
**discussion**
103:20
**discussions**
26:2 97:12
**dishes**
110:7
**dismissed**
91:16,21
**dispatch**
67:7,14
**dispatcher**
66:25
**displayed**
137:20
**dispo**
67:3
**disposal**
73:8
**disposed**
103:12,14
**disposition**
67:1,15
**disproportionate**
65:14,17 69:23 70:5,8 74:20 79:7 80:19 82:8 84:1 88:7 89:1
**disproportionately**
75:7
**dispute**
138:14
**dissipates**
113:21
**distracted**
109:4
**District**
5:14 81:3
**diverse**
55:20
**division**
44:24 48:24, 25 49:19,20 50:8,13 51:17 71:10
**division-wide**
49:23
**DL's**
70:25
**doc**
153:3
**doctor**
150:8 153:3
**doctors**
36:1,3,14,18
**doctrine**
92:3
**document**
14:15 17:4 85:12 108:25 109:7 162:8
**documented**
66:22 68:7 150:22
**documents**
12:12 16:24 17:2 65:23 118:20
**doing**
31:14 39:3 47:24,25 48:2,9 49:9 50:16 51:2 62:17 66:5 76:22 82:4 83:9 107:5 108:4 115:12 126:18 130:18 154:10 158:1 162:11
**dollar**
112:13 113:25 114:8,19,22 115:1
**double**
151:12,16 153:11 154:6
**double-check**
86:8 149:17
**drafting**
64:11
**dragged**
32:11 36:20
**dragging**
54:1
**draw**
161:3
**drawn**
162:3
**drinking**
100:24
**drive**
102:24,25 103:9 109:6
**driver**
101:9
**driver's**
6:19 70:17
**drivers**
70:23

**driving**
93:25 101:10 102:10
**drop**
126:20
**dropped**
131:8
**drug**
33:6 40:10 83:12 90:8 94:21 95:1,3 98:14 102:3 105:23 106:3 107:7 109:1 114:13 116:1,7 156:9 160:3 167:7
**drugs**
10:8 111:23 113:20 128:8
**Druit**
6:4 121:20
**drywall**
106:21
**DSPD**
38:25
**DT**
125:12
**due**
9:7 13:5 42:3 46:21 92:2 103:21 112:5 134:23 135:7 143:10 150:3,4 152:5
**duly**
7:7
**Duncan**
5:3
**duty**
53:5,12,14, 19,22,25 54:2,12 144:2 164:24
**DWI**
93:21 101:1 129:24
**dynamics**
65:7

**E**

**earlier**
32:6 41:16 68:17 83:8 85:7 116:16 122:6 123:9 130:6,15 133:16 140:16 144:16 162:17,23 167:1
**early**
34:12 98:25 103:19 150:22 166:5
**easier**
17:5
**easiest**
104:7
**easy**
123:8
**eat**
132:15
**EBR**
51:16
**EBRSO**
51:6
**Eden**
146:16
**educate**
37:9 58:14
**education**
15:21
**effect**
135:10 155:19
**effective**
34:3
**effectively**
108:1
**effectuate**
146:24
**egregious**
36:5
**either**
8:20 24:11 37:12 43:10 132:15 138:7
**elbow**
127:16
**elderly**
31:22 32:1 150:7
**electronic**
57:6
**elements**
17:15,19
**eliminates**
125:9
**email**
27:18 104:14,17
**emails**
27:13
**emanating**
95:11 96:8, 13,16
**embodied**
122:3
**embody**
121:11
**emotions**
147:10
**employ**
21:24
**employed**
23:12
**employees**
53:6,13 54:14 58:14
**emptying**
136:1
**encompass**
24:21
**encounter**
113:19
**encountered**
71:1 86:1
**encounters**
68:18
**encroach**
9:6
**end**
12:11 31:15 32:10 105:23 113:4
**ended**
41:10
**endured**
152:1
**enforcement**
11:10 18:3,4 19:1,6 20:17,23,25 21:1,5 23:10 24:2,5 27:9 28:8 29:6, 12,16,17 30:1,6 31:10 33:23 34:3, 6,13 35:7, 10,13,22 36:11,20 37:4 38:17 48:2,3 49:12 55:7 56:20 59:10,11 60:14,18 61:20 62:10, 12 67:23 72:23 73:11, 17 83:23 85:19 87:2, 15,25 88:13 139:19,21,22 144:8 149:25 164:24 165:6
**enforcing**
63:13,19,23
**engage**
53:22 55:7 59:11 140:6

144:4
**engaged**
44:9 48:20 63:10 111:25 145:17
**engagement**
27:18
**engages**
43:6,21 44:5 73:12
**engaging**
55:13 77:2 139:14
**ensue**
150:7
**ensure**
47:21 54:21 55:12
**enter**
14:18 15:12 104:6
**entered**
8:25 108:16, 22 111:5
**entire**
44:25 48:23 51:1,17 64:16 69:20
**entirety**
44:18,19
**entitled**
28:22
**entity**
74:22,23
**environment**
122:24 123:16
**environmental**
120:14
**equally**
57:25
**equals**
136:25
**equation**
57:23
**era**
34:13 57:6

165:2
**erred**
41:24
**errors**
72:11
**escalate**
134:25 135:7,9,11
**escalated**
134:22
**escalating**
130:11 165:14
**escalation**
115:15
**escape**
119:13
**escort**
125:3
**essence**
121:17
**essentially**
13:4 65:11 129:6 146:7
**establish**
69:17
**established**
79:21 121:16 162:9
**establishes**
75:7 120:18
**et**
128:23
**et al**
32:4
**evade**
137:11
**evaluate**
30:11 43:18, 20 45:21 55:23 63:21 69:16 72:13, 15,19 77:7 85:6,15 103:6 119:19,24 120:23

122:23 164:21
**evaluated**
61:20 74:19 75:15 78:17 103:2
**evaluating**
45:4 48:19 50:4 73:25 123:20
**evaluation**
43:9 51:1,2 64:7 122:9
**evaluations**
44:20 73:20
**event**
24:14 139:25
**events**
138:15 139:23 144:1 146:12,13
**everyone**
34:22,24 58:17,23
**everyone's**
50:3
**everything's**
31:13
**evidence**
20:6 29:8 43:23 46:1 47:16 50:1 62:1 63:25 64:1,4,5,7 69:16 72:8 74:25 77:5 84:6 85:16 90:7,13,18 92:8,12,19 94:10,13 97:2,19 99:4,8,11 101:7 102:23 103:11,14 108:17,23 109:1,11,16, 17 111:5,25 112:3 113:4

114:14,16 115:13 117:16,18 124:14 126:17 127:10,19 128:22,24 129:2 133:21 138:17 140:1,17,20 143:7 144:18 154:11 159:8 161:2,21 162:3,4,22 164:21,22 166:2 167:7
**evolving**
93:20 94:5
**exact**
67:25 116:2 118:24,25 135:18
**exactly**
65:13 67:1 87:4 103:18 104:1 111:11 116:9 127:21 144:24
**examination**
7:16 45:18 68:25
**examine**
72:5 114:10
**examined**
77:24
**examining**
111:9
**exceed**
126:10
**excessive**
13:6 31:23 32:23 149:22
**excluded**
28:1,3,4,5,7 41:17 42:9 117:18
**exclusion**

42:2 43:2
**excuse** 48:1 153:16
**exercised** 134:7
**exhibit** 14:7,18,19 15:12,13,18 16:15 28:13, 17,18,19 33:7,9,12 104:6 105:5, 20 117:22, 23,24 118:2 121:8 131:13,15 132:25 133:1,2 155:1,2
**exhibits** 7:12
**exigent** 112:5
**exist** 73:6
**exit** 131:5,6
**exonerated** 34:18
**expand** 25:4
**expect** 25:3 33:22 115:12 123:25 127:22 131:1 141:18 142:16 143:24
**expectations** 36:23 37:2
**expected** 140:10 141:12
**expecting** 148:5
**experience** 15:24 18:3,8 47:19 48:17 49:23 50:9 51:6 67:23 108:4,7 124:3 148:18 150:13,15,16 152:25
**experienced** 26:1,8 110:22 149:14 153:1
**expert** 10:18 11:7, 14 16:5 17:13 18:18, 22,25 19:5, 8,11,14,16, 18,21,24 20:2,5,8,12, 16,22 25:5 27:19,22 31:11 32:4 37:5 41:21 42:13 59:14 64:10 69:18 84:8 95:1,3 107:15 111:14 120:6 146:22 161:25 162:4 163:2 164:6, 15 167:23
**expert's** 42:23
**expertise** 11:15 17:10, 15,16,20,22 18:11,16 44:4 71:23 120:6,16 148:15 150:6 161:23
**experts** 73:25
**explain** 25:1 86:17
**explained** 86:14
**explaining** 141:6
**explanation** 156:2,20
**extend** 31:11
**extended** 101:22
**extends** 112:4
**extensive** 18:4 25:13 56:2
**extent** 91:19,20

**F**

**face** 125:24 138:8 144:2 146:2
**fact** 36:15 60:4 61:12 87:6 88:20 93:17 106:9 111:19,23 112:5 119:15 120:17 121:12 125:19 129:1 130:11 136:11 137:25 138:3 159:1 161:14 162:10 165:23
**factor** 57:22 73:15 78:10 82:19, 21 84:7 90:6 93:18 100:23 112:1 127:23 128:15 129:6,11 130:1,2,4, 16,21,24 131:3 133:14,15 136:16,19,24 137:13
**factors** 42:6 66:16 93:13 102:14 119:4,7,8,9, 14,16,22 120:7,8,12, 13,14,16,20, 21 121:9,11, 17 122:13, 16,20 129:9 130:7 133:18 134:4,17 137:6 143:2
**facts** 16:20 24:17, 23 25:16 27:7 32:7,13 50:19 65:5 76:21,22 77:4 82:5 91:3 93:15 101:3 122:2 141:24 160:20 161:14 162:18,21 164:4
**factual** 13:21 16:22 17:5 21:13 22:7,25 33:3 76:16,17,18, 20 127:25 161:2,3 162:3
**factually** 13:14
**failure** 89:22 90:23 118:9,13
**faint** 95:22

**fair**
26:7 32:17, 22 33:1 43:19 49:11 70:21 119:2, 3 136:6,9,11
**fairly**
31:19 57:25 151:2
**fairness**
122:16,17
**faith**
88:23
**fall**
165:17
**falling**
142:4 167:8
**false**
7:24
**familiar**
67:13 94:21, 24
**family**
63:5
**far**
9:25 42:8, 13,16 46:8 57:7 71:15 123:25
**fast**
127:14,15
**fate**
34:6
**favor**
130:7 132:12
**fear**
34:2
**feasible**
59:7 112:23 165:4 167:10
**February**
28:24 33:10
**Fed**
90:8
**federal**
10:20 42:25 57:5 166:5
**feel**
29:23 40:20 53:14 131:19
**feels**
62:7
**Feliciana**
23:18
**fellow**
59:11 98:19
**felonies**
128:10
**felony**
115:19 124:15 127:19 128:8,9 129:3,7 130:2 140:17,20 143:7
**felt**
20:13 103:8
**female**
38:18
**females**
38:17
**fentanyl**
126:19,22
**field**
37:1 40:11, 20 99:20,22 103:4,5 112:7,19 113:3,7 116:17
**Fifth**
129:21,25
**fight**
22:10 135:2
**figure**
128:7
**figures**
65:8
**file**
90:25 105:2 133:5 152:9 155:10
**filed**
5:13 15:18
**files**
104:7
**filter**
106:7 107:11,22 110:20 156:6
**final**
5:18 167:22
**finally**
10:7
**find**
27:18 60:10 92:8 99:15 100:2 102:2 109:3 111:21 112:14 113:23 134:3
**finding**
48:18 77:10 117:12
**findings**
86:14,23
**finds**
65:14
**fine**
9:16,17 79:2
**finger**
153:7,8,11, 14
**fingers**
153:9
**finish**
33:24
**finished**
97:10
**fire**
23:2,3,22 37:15
**first**
6:11 7:7,24 14:7 20:20 21:9,11,14 23:9 31:18 34:14 40:14 41:2,3,4,5 127:23 128:15 129:6 140:22 142:17 153:19
**Fisheries**
40:4
**fit**
117:4,6
**fitness**
153:18 154:2
**fits**
83:20
**five**
11:4,12 41:13 102:10 131:16 167:13
**five-minute**
39:6
**flee**
137:12
**flight**
137:11
**Florida**
6:18,24
**Floyd**
37:16
**fluid**
145:4,6
**focus**
115:16
**focuses**
86:2
**folks**
151:13
**follow**
26:17 29:9 35:15 37:9 51:18 59:3,4 89:19 126:14 151:18
**followed**
53:24 54:7, 22 115:18 151:21,25

**following** 47:23 48:10 49:22 50:3 53:16
**follows** 7:8 83:23
**foot** 115:14
**footage** 73:5 105:1, 9,10 164:8, 16,17 166:1, 15
**footnote** 160:8
**FOP** 24:12
**force** 13:6 21:20, 21 22:16 31:23 32:11, 23 40:18 60:11 112:2 115:15 117:9 119:20,25 120:4,25 121:2,18 124:1,15,18, 19,20 125:8, 9,10 126:9 127:6 128:2, 12 129:4,17, 22 130:22,24 131:2 134:7, 10,12,13,15, 22 135:7 136:16,25 137:1,4,6,9 140:9,24 141:12 142:14,22 143:12 144:13,19,22 145:15 146:3,6,8,23 148:6,7 149:22 157:9,12 158:7 164:9, 10 165:13,16
**forced** 121:12 124:6,11
**forcefully** 127:11 147:3
**forensic** 20:5
**form** 9:14 13:9 16:22 17:25 45:6,7,24 51:9 52:19 53:7,20 58:9 63:1,24 68:5,15 74:3,17 75:9,12 76:5,15 79:10 80:2, 22 82:11 87:18 88:3, 16 89:12 91:6,14 92:15 94:19 100:4,21 101:20 102:6,18 107:8,18 109:14 115:20 117:14 121:19,22,23 123:17 127:6 139:5 140:13 146:7 147:1 156:25 157:18 158:3 159:13 161:2 166:23 167:25
**formal** 61:14
**formally** 149:20
**forming** 165:19
**forth** 34:20 35:4
**forward** 25:3 34:7 35:7 98:8 139:12 142:12 144:11,14 161:15
**fought** 148:9
**found** 29:22 50:20 61:15 73:1 74:20 97:6 98:15 99:13 100:20 107:6,16 110:13 116:12,15,24 117:3 136:4 137:25 160:2
**foundation** 7:19 120:4 121:15
**founder** 29:4
**four** 10:16,20 21:4 40:14 147:22 158:9
**Fourth** 18:19 35:5
**frame** 70:9 75:17 100:13 135:21 144:23
**framed** 89:8
**framework** 14:5 122:4
**Franklin** 41:22
**frankly** 35:1 124:20
**free** 24:16
**frequently** 99:12 106:4
**fresh** 99:12
**freshly** 97:17
**Friday** 12:3 20:22 22:21,22
**friend** 97:11
**front** 65:21,23 78:25 79:3 126:17 138:3,23 139:9,10
**full** 51:13 75:19 104:22 107:10
**fuller** 68:3 72:1 75:25 76:3
**fully** 71:2 80:8
**function** 123:4
**fundamentally** 75:5
**future** 9:4 73:22

G

**gain** 140:23
**gained** 145:8
**game** 146:15
**gap** 153:11
**Garden** 146:16

**gas**
22:10
135:14,15
**gathers**
67:11
**gave**
20:22,24
26:7 67:6
139:21 141:3
143:14
**Gee**
132:9
**general**
17:13,17
19:4 85:11
89:7 125:25
135:16 137:5
154:9
156:16,17,18
165:17
**generally**
12:25 95:5,6
100:10 101:9
112:20 128:9
151:13
153:17,21
**gentlemen**
158:18
**geographical**
74:23
**geographically**
85:25
**George**
37:16
**get all**
58:23 59:6
**getting**
10:3 48:7
123:18
125:11
127:17
140:17 147:4
165:13
**give**
10:10 24:13
27:15 45:2,
18 55:2,8
85:13 87:20
102:14
114:23,24
115:11
117:19
119:21
121:15 126:4
137:23
140:5,10
141:19
142:18,23
144:20 153:3
155:19
156:11
159:15
160:21 163:2
**given**
19:2 42:14
65:6 68:10
70:22 72:8,9
120:20
121:18
142:1,2
144:7 145:12
**giving**
145:2
**gladly**
153:3
**glass**
106:4
**global**
69:2
**goal**
57:24,25
**goalposts**
36:21 37:3
**goals**
36:21
**goes**
8:8 29:7,12
37:16 156:9
**going**
16:19 17:24
24:19 25:1
28:13 33:23
34:11,15
39:2,3 42:22
43:15 44:15
46:1 50:17
51:9 55:6
57:5 59:3
66:18 67:21
68:18,25
72:18 73:18
75:20 81:10,
11,13,17
83:21,25
85:6 91:15,
18 95:16
98:7 104:6
105:19,21,22
110:3 114:5
115:22
117:22 118:2
119:21 121:8
123:19 126:4
127:11
128:10,21
134:20,22
139:12
140:4,21
142:6,7,19
144:2,4,14,
15 145:4
149:16
154:25 166:3
167:1,8
**good**
6:17 7:18
15:1 35:23
37:13 88:23
93:17 97:13
145:22
**gosh**
57:12,16
**gout**
152:10,12,19
**government**
57:5 74:22
120:23
129:14,20
**grab**
39:4 84:13
139:24
141:17,20,23
143:12
149:13
**grabbed**
22:14,15
59:20 115:1
139:19,21
143:20,23
**grabs**
135:24
139:13
**Graham**
119:4,7,14,
16,18,22
120:1,3,7,8,
12,13,16,20,
21 121:9,11,
16,17 122:1,
4,7,16,20
123:13
127:23
128:15
129:6,9
130:4,21
133:14
136:16,19,24
137:13
**grant**
23:13 69:7,8
**great**
7:1,9 8:11,
20 9:18
10:2,12
12:24 14:17,
25 15:21
16:4 28:17
29:1 32:7
39:2,6 66:7
82:25 84:11,
15 104:16,24
130:17
132:24 153:2
**Gremillion**
6:4 8:19
9:16 13:9,16
14:2 17:24
45:6,24 51:9
52:19 53:7,
20 58:9

63:1,24 68:5,15 74:3,17 75:9,12 76:5,15 78:15,24 79:10 80:2, 22 81:1,5 82:11 87:18 88:3,16 89:12 91:6, 14 92:15 94:19 100:4, 21 101:20 102:6,18 107:8,18 109:14 115:20 117:14 121:19,21 123:17 131:22 132:6,9,12 140:13 147:1 156:25 157:18 158:3 159:13 166:22 167:25

**grinder**
97:2 98:3

**groove**
151:5 153:13

**ground**
32:11 83:21 112:13 124:17 125:5,14,24 127:2 130:18 142:14 146:2 147:5 167:8

**group**
22:9 33:10 64:16 66:18 80:14 86:11, 12 88:25

**Group's**
29:4

**Gucci**
154:21,22 157:17 158:1

**guess**
25:15 32:1,3 68:9 81:8 88:11 89:5 142:8 146:15 157:14

**guidance**
55:2

**guilty**
42:14 116:13,15,25 117:3,13 137:25

**gum**
129:12,14

**guy**
125:21 127:1 147:12 149:6 150:20

**guys**
24:11 49:19 69:5 72:9 74:24 75:2 83:21 118:24 126:25 131:21 147:11

**H**

**half**
39:8

**hand**
7:2 63:25 101:17 102:16 115:2 124:14 138:12,22 139:8,10,23 142:6,12 144:12 146:20,25 147:3 149:13 153:13 161:16

**hand's**
144:14 149:16

**handcuff**
125:3 147:8, 21,23 153:1

**handcuffed**
136:23 139:25 147:16,25 148:2,4,12, 14,16,19,25 149:3,5,7,19 150:14 153:2

**handcuffing**
18:23 19:19 25:20 150:3, 5,7,11,14,17 151:20 152:2,5,7, 19,22

**handcuffs**
115:14 139:2 140:4 143:21 148:10 149:8,10,13 150:19,21,25 153:19,20 161:8

**handed**
101:14

**handful**
26:8 162:12

**handle**
26:3,5,15

**handled**
60:25 61:1,3 71:24

**handles**
157:2

**hands**
108:2 111:10 115:7,11 126:1,23 135:3 139:6 140:3 142:7, 16 143:16 144:3,21 145:3,5,6,7 148:7

**hands-on**
127:20

**Hang**
14:8 23:7

**happen**
98:22 103:13 122:8 143:19 145:4 160:19

**happened**
34:21 41:13 71:13 89:18 98:5 117:17 139:10 143:19 152:9 160:14

**happening**
164:3

**happy**
31:20

**hard**
36:24 61:7 88:20

**harm**
127:13 136:15

**hated**
34:24

**he'll**
153:3

**head**
77:15 164:2

**headquarters**
5:3

**heads**
123:22

**hear**
140:5 155:21 156:1,2 158:15,16 162:13,15

**heard**
40:15

**height**
118:18,22
**held**
5:9 35:10
125:25
**help**
24:18 37:5, 11,18,20
68:18 71:25
105:21
120:16
159:1,25
**helpful**
68:2 73:23, 24
**helps**
85:5,12
**heroin**
113:20
**hesitate**
29:25
**Hey**
50:5,17 67:8
70:3 83:3
98:24 122:4
131:14
147:11
149:11,15
156:8
**hiding**
32:3
**high**
31:19 35:10, 14 82:14
83:6 84:2
130:25
**high-crime**
46:11 48:2
**high-profile**
37:12 47:25
**higher**
134:22
135:9,11
**highlighting**
105:20
**hindsight**
122:8 123:8
**hip-hop**
154:17
**history**
15:21
**hold**
34:4 35:13
108:2 143:22
**holes**
44:25 45:3
**home**
102:9 109:6
**honest**
118:3
**hope**
35:15,16
**Hotard**
6:5 38:8
91:5,8
99:14,19
103:15,23
115:1 118:22
138:24
139:12
154:4,8
159:7 161:16
167:3
**Hotard's**
89:22 90:1, 15 96:12
105:1 113:8
138:21,24
139:6,9,11
161:15
**hour**
10:3 16:6
39:2,8 82:23
**hours**
16:8,11,12
132:3,4,7,11
138:15 158:9
**houses**
106:24
**Houston**
5:3
**huge**
55:20
**human**
35:25 36:6
122:12,13
123:1,7
**humans**
123:1
**hundreds**
98:12 107:14
121:5
147:17,18
148:19,20
**hurt**
129:17
**hurting**
31:9
**hurts**
149:11
**hypothetical**
162:23,24
163:1

**I**

**IA**
51:15 61:14
149:6 150:21
**idea**
38:2 70:1
117:18
159:19
**identification**
14:19 15:13
28:19 33:12
40:10 105:5
117:24 133:2
155:2
**identified**
61:24
**identifies**
85:18
**identify**
53:5
**ignore**
89:5 137:14, 15
**illegal**
60:11 91:16
92:8,13 93:4
94:7,8
101:11
111:23
**immediacy**
119:11
120:22
130:25
**immediate**
130:8,16
**immediately**
143:4,8,11
154:3
**imminent**
127:12
**impact**
133:13
148:15
**impaired**
100:18,25
101:11,19,25
102:23,24
103:9
**impairment**
93:25
100:10,12,14
101:2,10,24
103:3
**implement**
53:23 54:5, 20
**important**
109:7,8
128:10
138:18
**impossible**
113:24
123:14
**improper**
19:19 85:6
91:2 150:3,5
**improperly**
149:7
**in-training**
148:17

**inaccurate**
93:24
**inappropriate**
47:16 125:14 126:3,6 145:24
**inaudible**
8:6 154:15
**incident**
11:14 24:22 37:12,16 48:12 105:2 112:16 114:25 121:2 149:18 155:8 160:13,24
**include**
133:22
**included**
68:12 80:17 81:14
**incoming**
25:2
**inconsistent**
166:3
**incorporate**
17:5
**incorrect**
34:17
**indication**
158:17 166:19
**indicative**
128:23
**indictments**
34:12
**indiscernible**
45:5 56:18 66:6 83:1 84:16 97:25 135:4 162:3
**individual**
23:3 51:16 160:2
**individualized**
60:23 72:25
**individuals**
49:7 51:2 65:15,18 151:18
**inference**
108:12
**inferred**
74:9
**influence**
10:8 37:8
**influx**
94:7
**information**
44:2 45:2, 13,17 46:2, 16,20,23 47:11 52:15, 21,24 67:10 70:13,15,18 71:13 76:19, 23 77:8 80:10 83:20 84:9 86:21, 25 87:9
**informed**
47:2
**infraction**
46:24 90:14
**infused**
110:4
**ingest**
126:22 144:17
**inhabitants**
96:23
**initial**
54:9 89:11, 23 90:2,14
**initially**
141:2 153:5
**initiate**
54:24
**initiated**
141:23
**injured**
150:3,4 152:7
**injuries**
19:19 32:12 148:15 149:14 150:6 151:20
**injury**
13:7 26:14 115:22 148:25 149:3,4 150:11 152:1,5,22 153:1 165:16
**innocent**
42:15
**inquiry**
73:12
**inside**
49:15 93:4 101:22 112:4,12 148:14 153:9 167:7
**installed**
106:21
**instance**
73:3 88:14 123:1 134:25
**instantly**
123:5
**instruct**
120:14
**instructed**
120:15 121:3
**instruction**
123:12
**instructions**
35:15 119:21
**instructor**
18:6 40:7
**insufficient**
74:10
**intend**
128:23
**intent**
87:16 88:1, 14 90:2
92:8,13 127:18 130:9 136:15 159:2
**intention**
9:4 90:7,13
**intentionally**
136:2
**interactions**
5:9 103:7
**interdiction**
47:25
**interest**
120:23 128:12 129:14,20
**interesting**
34:15 93:23 94:2
**interface**
5:10
**Internal**
50:13 60:23 61:4
**interpretation**
42:13
**interpreting**
162:15
**interrupt**
8:8 118:1
**interrupting**
91:19
**intersections**
29:10
**interview**
24:18,19,20 25:2 68:23
**interviewing**
101:23
**interwoven**
31:13
**introduction**
40:9
**investigate**
48:11 85:23 101:6 166:19

**investigated**
95:4 150:22
**investigation**
25:3 40:22 48:8 60:19 83:13 109:5 165:24 166:12
**investigations**
40:10 44:18 109:3
**investigator**
23:2,3
**involve**
65:17 120:12
**involved**
10:20 11:17 23:15,21 24:10,14 46:9 49:6 51:19 56:10 60:19 66:10 122:11
**involvement**
116:16
**involving**
27:6 31:25 59:15 65:14
**irrational**
140:22
**issue**
42:4,19 43:2 52:20 60:6 101:25 122:16 158:5 164:4
**issued**
66:13,16,22 67:9 80:14 82:8
**issues**
67:3 136:13 164:4
**item**
106:2
**items**
12:2 16:20 107:1 109:17 111:23

**J**

**Jackson**
23:18
**Jason**
6:5
**jiu-jitsu**
135:2
**job**
37:3,4,17 49:1 55:12 76:21 164:21,22
**jobs**
58:1
**John**
6:7 8:19
**joint**
152:16
**jointly**
8:17
**joints**
152:16
**joking**
157:4
**Joshua**
5:25 7:18 131:14
**judge**
116:24 117:10,11,12,19 121:3 137:25
**judgments**
121:13 124:7
**jump**
79:17 128:25 142:16
**jumping**
131:12
**juries**
35:13,15,17
**jury**
35:15 59:22 60:10 120:3 121:2,24 138:4 160:18,21 164:21,22
**Jury's**
121:24
**justice**
7:19 57:24 118:12,15 128:3,14,17 145:17
**justification**
135:12
**justify**
83:6 92:24 129:4

**K**

**keep**
9:13 33:23 39:3 85:3 130:11
**Keeping**
118:3
**Kenner**
40:13,24 41:1
**kept**
123:21
**keys**
101:14,18 102:16
**kicked**
127:17
**kicks**
145:9
**kid**
59:20 106:24
**kids**
154:18
**kill**
36:1,15
**kind**
34:11 42:24 53:25 54:2 69:2 72:15 94:2 122:4 137:14 141:5 152:13 158:16 162:24
**Kindly**
7:12
**kinds**
150:6
**kit**
112:21
**kits**
113:3
**knee**
146:5
**knew**
143:25
**know**
7:21 8:24 10:3 12:24 13:10 14:3 16:12,14 24:13 27:24 30:9 31:25 34:13 35:8,25 36:4,13,19 37:24,25 38:3,19,23,25 39:1 41:4,10 43:10,11,14 44:10 46:8,10,16,17 47:10 48:3,4,7 49:9 50:8,9,19 51:3,18 52:3,7,14,20 54:15,22 55:13 58:1,15,25 59:1,7 62:3,4,16,18 63:6,7 66:21,23

67:8,13,14, 17,23 68:6 69:4,6,22,25 70:1,11 71:1,18 72:21,23 73:3,6,7,16 74:6,10,24 75:1,20 76:6 82:1,15 83:3,9,10, 11,13,19,20, 21,25 86:7,9 87:1,3 88:13 90:17,24 92:6,7,12 93:21,22 94:25 95:5,6 97:14,21 98:7,14,24 99:17 100:14,16 101:6,12,16 103:2,4,15, 23 106:9 107:3 108:1, 9,13,16,19, 22 110:15,23 111:24 112:7,15 113:5,15 114:3,15,18, 21 115:4,24 116:12,15 117:16 118:21 120:2 122:13 123:8,23 124:17 125:20 127:11 128:5 129:7,24 130:1,14 131:3 133:1, 18 134:17 135:4 136:2, 25 138:6 139:14,16 140:14,21 141:21 143:5 144:15,16,17 147:25 148:7,11,15, 22,23 149:4, 12 152:10, 12,20,21,23 153:23 154:2,15,20 156:5,7 157:2,4,10, 11,19,20,23 158:4 159:14,21,23 162:12 165:23 166:1,10,13, 14,15,17

**knowledge** 41:19 52:16 56:15 108:18,21 111:7 114:17 152:7

**known** 126:23 135:6

**L**

**L-A-R-U-E** 22:5

**L-E-L-L-I-S** 105:3

**lab** 93:24 108:13,14 113:5 114:11,14

**label** 105:15

**labeled** 104:4 105:10

**lacking** 76:1,4

**lacks** 75:2 77:12

**lady** 31:25 142:1

**laid** 42:25

**large** 22:9 95:12

**largely** 83:23

**larger** 45:22 83:12 109:25 142:3 151:10 153:10

**Larue** 22:5

**late** 87:13

**late-night** 87:20

**law** 5:19 11:9 18:3,4 19:1, 6 20:17,23, 25 21:1,5 23:10 24:2,5 27:9 28:8 29:6,12,16, 17,25 30:5 31:10 33:23 34:3,6,13 35:7,10,13, 16,21 36:2, 11,20 37:4,9 38:17 49:12 56:20 59:10, 11 60:13,18 61:19 62:10, 12 67:22 72:23 73:16 93:2,6,17, 20,21 96:6 97:12 100:11,23,25 105:23 119:14 129:21 139:19,21,22 144:7 149:25 164:24 165:6

**lawful** 49:6 50:15, 16 117:8

**lawfully-prescribed** 103:22

**laws** 63:13,19,23

**lawsuit** 126:21,22 152:9 165:20

**lawsuits** 10:21

**lawyer** 8:20 24:24, 25 26:9 27:10 37:5 60:13,18 61:19 83:1 115:17,21,22

**lawyers** 160:20 162:17

**lead** 55:22 64:5 68:6 72:18 81:14 88:24 96:3 101:24

**leading** 65:8 143:3

**leaning** 151:14

**leave** 54:11

**leaving** 58:20

**led** 59:22 128:2

**left** 125:21 132:4,7,10

**legal** 5:3 7:19 18:6 24:10, 13 36:12,14, 18,19 40:7,

8,15 42:19 49:8 54:2 56:9 89:13, 14 91:17,20 100:15 119:20 121:3
**legalese** 54:12
**legality** 89:11 90:2
**LELLIS** 105:6 133:3
**length** 90:19
**letter** 27:18
**level** 35:1 61:1 129:17,18 131:1 134:10,23 144:18
**levels** 120:24 124:3 144:13 146:6
**liability** 28:23 29:18
**liable** 29:22
**license** 6:19 67:17 70:16,17,22, 25
**licensed** 5:4 6:18
**lick** 98:1
**lieutenant** 61:1
**life** 18:7
**light** 129:6
**lighter** 157:5
**limitations** 37:19
**limited** 42:3,11 43:3 44:23 47:13 64:15 66:10 75:17 82:7 86:11 117:18
**limits** 35:6 36:6
**limp** 133:11,13 136:12,13
**line** 118:16 144:2 158:22
**linger** 95:9
**list** 21:7,8 37:16 119:9
**listed** 16:23,24 163:16
**listen** 154:16,17 163:6
**listened** 159:18
**listening** 155:20
**literally** 119:8 127:4 144:12
**litigate** 26:25 27:3
**little** 14:12 29:2 42:25 44:20 45:14 50:13 52:13 71:12 82:14 93:12 106:16 107:25 109:24 110:2 111:1,2 120:21 122:25 128:12
131:21 133:11 149:15 157:5 162:14
**live** 53:1
**Livingston** 5:13 25:8 26:19 27:1 30:13,14 53:2 77:13, 18 79:8,22, 25 80:20 86:2,13 158:20
**local** 31:20 97:20
**locally** 30:6 67:24
**located** 5:5 6:21 98:17 103:23 106:1,8,10 107:1 110:24
**location** 67:17
**lock** 153:11 154:6
**locked** 151:12,16 153:15
**lodge** 91:15
**lodging** 91:21
**log** 66:24 67:24
**logged** 66:25 67:20
**Logistically** 85:6
**logistics** 7:21
**logs** 67:16
**loitering** 22:10
**long** 90:19 95:4,8 100:25 135:13,15 142:23 153:25
**longer** 84:12 93:19 131:20,22 138:23
**look** 16:10,19 27:13 43:12 44:13,16,21 45:22 46:6 48:20 49:1 50:13,14,19 51:23 52:5,7 59:5 63:2 65:2,12 69:21,24 70:24 71:4, 9,10 73:20 76:20 82:21 90:7,13,18, 24,25 91:2 93:2 100:11 101:2 103:17 104:1 109:22 113:16 116:2,8,10 118:24 119:12 122:4 129:16,21 135:18 138:2,6,7 143:9 147:11 157:1 159:15 163:11 166:9
**looked** 12:18 45:16 52:2 64:12 73:9 75:16, 18 78:10 86:4 119:10, 11 165:21 166:14,15

**looking**
16:16 49:5 51:23,25 66:6 69:2 70:6 72:8,22 101:1,2 111:11 112:3 128:9 129:9 134:2 155:7 157:10 165:24
**looks**
88:25 95:7 105:17
**lose**
112:24
**lost**
112:13 145:8 155:1
**lot**
24:9,11 27:17 30:5,6 34:12,17 36:2 38:2 44:25 47:25 48:2 56:4 58:24 59:3 61:10 72:23, 24 73:2 82:4,5 97:11 102:13 108:3 109:3,4 124:18 129:21 144:15 148:1,10,12, 13 149:11 162:13 165:11
**lots**
111:20 124:15 126:7 138:6
**Louisiana**
5:14 6:19,22 18:6 22:5,19 23:13 24:9 28:20,23 33:13 39:18 40:3,4 41:22,24 55:24 57:4 58:5 81:3 93:1,3,6,17 96:5,6 117:8 120:5 137:22 158:19
**love**
39:4,16 59:5,6
**low**
129:17,18 144:18
**lower**
131:1 146:6
**lower-level**
128:13
**lowered**
146:2
**lowest**
127:5 134:10,12,14 144:13
**LPSO**
41:7 43:6,20 44:5 45:21 47:14 51:3 52:14 56:11 63:12,18,22 66:20 67:11 69:25 72:4 75:8 77:2,24 82:9 87:1 112:17 165:18
**LPSO's**
52:16 159:12
**LPSO50**
117:23
**LSPO**
82:9
**LSPO's**
159:12
**lunch**
132:2,13,15
**lunchtime**
131:20
**luxury**
122:8

**M**

**made**
13:15,19 50:5 62:2 70:22 72:12 74:11 77:8 78:19 91:17 98:11 105:20 108:9,12 109:21 123:10 150:21 159:7
**make**
7:22,23,25 9:20,22 10:9 15:3,10 43:9 44:9 47:23 48:6 49:20 50:2 53:14, 16,23 54:6 61:14 62:4 66:24 81:19 88:5 89:17 90:10 91:1 92:17 102:25 103:21 104:22 112:25 113:6 116:18 121:13 124:6,11 126:25 129:19 138:5 139:18 149:17 150:10 151:12,16 152:8 153:5, 10,12,15 155:10 157:4,12 158:20,24 159:7,9
**makes**
13:3 33:9 51:15 67:16 157:5
**making**
13:24 34:3 56:8 130:18 140:15 157:4 159:2 160:9 162:8
**mal-intent**
60:8
**malpractice**
36:2,17
**man**
150:7 152:18,21
**mandated**
59:1
**Mane**
154:21,22 157:17 158:1
**manifesting**
101:7 127:18
**manifests**
130:9
**manner**
34:4 60:20 123:23 146:19
**mannerism**
108:6 153:1
**manufactured**
149:10
**map**
122:1
**marijuana**
91:24 92:23 93:3,4,7 94:6,8,11, 14,16,17,21 95:2,5,6,8, 11,13,15,19, 22 96:2,4,8, 12,15,17,21, 22,23 97:3,

5,14,15,24 98:2,15,18, 20 99:5,8, 12,13,16 100:2,19,20 101:19 102:2,4,8, 11,12,17 103:3,12,19 156:10,13
**Marjorie** 6:2
**mark** 28:17 105:4
**marked** 14:19 15:13 28:19 33:12 105:5 117:24 133:2 155:2
**marking** 7:11
**marks** 107:24,25
**married** 62:24
**marshall's** 23:17
**martial** 135:6
**materials** 12:17,19,20 16:21 61:23
**math** 74:7 81:24 82:2
**mathematical** 72:11,13 75:6
**Matt** 97:11
**matter** 5:12 7:3,20 9:7 26:19 33:2 37:23 43:6 59:24 69:13 75:1 161:4
162:19,22 164:8,12 166:10
**matters** 56:3 145:14
**Mccullough** 6:9 38:15, 16,20 161:8, 20
**me-tooed** 43:11
**mean** 13:11 29:11 33:5 34:8 35:19,24 36:13 54:17 55:5 56:4 57:8,20 58:22 59:23 62:2,7 65:11 66:12 75:3 77:25 89:2 94:24,25 98:10 112:11 115:10 123:10 128:24 130:12 131:7 132:2,6,10, 13,14 134:2 140:16 144:15 156:1,18 157:13 158:14 161:5,10 163:17,24 164:2,9,12 165:10,11, 12,13 166:9, 10,11,14
**meaning** 81:23 134:23
**means** 13:10 35:21 36:13 54:16, 23 55:6,14 71:20 76:6
89:3 100:14, 16
**measured** 142:14
**mechanics** 67:2
**media** 34:25 163:5
**medical** 19:16 36:1, 17 93:3,4 94:7 150:8,9 152:23,24
**medically** 150:15
**medication** 10:9
**meet** 12:4 24:16 135:16
**meeting** 38:7
**Megan** 97:11
**members** 24:12 63:5
**memorize** 78:2
**memory** 32:7 38:7 154:10
**men** 158:2
**mentioned** 21:9 36:14 41:7 50:25 55:16 66:21 70:12 113:11 116:16 122:19 133:16,17 134:3,4,17 144:16
**mentioning** 123:11
**Menza** 6:2
**merit** 13:23 14:4 61:10 62:19, 21,23
**mesh** 110:20
**met** 12:6 37:22 39:1 137:4
**metadata** 163:11
**metal** 106:4 110:10,11,20
**methodology** 42:22
**microcosm** 44:20
**Middle** 5:14 81:3
**Mike** 105:8
**militate** 130:22
**minimal** 140:12 145:16
**minus** 29:2
**minute** 84:16 122:11 131:16,20 167:13
**minutes** 84:19 102:10 116:22,23 132:4 135:19,20,22 136:7,14 153:22 160:6
**misconduct** 26:1,9
**misdemeanor** 117:25 128:11 129:8,19 130:1,3

**missed**
54:9 109:12 132:2
**missing**
16:1 68:11 76:10,14 80:7
**Mississippi**
149:6
**mistake**
34:3
**mistaken**
41:25 134:19
**mistakes**
122:7
**mitigate**
37:11 53:5, 12
**mixed**
20:20
**Mobile**
20:24 32:6
**mobility**
136:13
**model**
51:18
**models**
137:22
**modify**
163:8
**modules**
57:7
**moment**
92:5 124:11, 16 127:20 138:18 140:19 142:10 145:18
**momentarily**
146:25 147:2
**moments**
99:9
**money**
58:25 161:6 167:6
**month-to-month**
52:3
**monthly**
52:3,4
**morning**
6:17 7:18
**motion**
139:23,25 141:24 144:1 145:4
**motivated**
34:16 59:20 68:22 90:4
**motivation**
92:17
**motive**
92:20
**motives**
49:8
**motor**
94:6 123:4
**motorist**
31:23 32:23
**mouth**
126:19
**move**
33:7 36:22 37:3 81:19 99:2 140:21, 22 149:17 162:10
**movement**
33:19,21 34:9 162:25
**moves**
125:20
**moving**
25:3 27:17 34:7,12 35:7 55:24 133:7 139:5,9
**multiple**
121:5
**mumble**
8:6
**music**
154:17 159:22

**N**

**N-I-K**
113:2
**n-word**
159:21
**name**
5:2 6:12,14 7:18 23:6 105:2 110:22 133:5 163:18
**names**
8:18 163:18
**narcotic**
32:19,24
**narcotics**
30:23 40:22 44:7 47:20, 24 48:3,11, 24,25 49:18 61:8 92:12 95:4 97:4 98:11 109:3 115:19 134:25
**narrative**
43:25 161:19
**narrow**
80:5 101:4
**national**
165:6
**nationwide**
58:10
**natural**
165:6
**naturally**
149:8 151:7
**nature**
108:15
**necessarily**
49:4 54:16 60:6 71:13, 19,22 73:6 78:17 81:23 90:17 95:23 101:11 116:18 128:20 130:12 162:20
**necessary**
7:13 72:14 103:6 126:11
**neck**
22:14
**need**
21:15 24:23, 25 36:18,19 43:13,14 45:22 46:7 55:22 71:3,4 72:21 78:10 93:12 99:2 104:15 114:7 120:24 122:6,19 125:9 134:4 143:4
**needed**
98:23
**needs**
75:21
**negligent**
25:20
**negotiate**
126:12
**negotiated**
72:5
**negotiating**
126:20
**neighborhoods**
44:15 89:6 158:21
**nerve**
153:24,25
**never**
14:10 28:3 35:23 41:17 49:11 50:4, 10 60:12

61:15 98:22 104:5 115:18 125:21 128:7 143:22 146:4 148:2,24 149:2,4 152:4,6
**night** 61:11 87:13
**nighttime** 99:10
**Nik** 113:2
**non-biased** 56:23 57:8, 15
**non-compliance** 135:23 138:17
**non-determinative** 112:2
**non-discrimination** 48:5
**non-profiling** 48:5
**non-technical** 100:9
**notary** 5:4 6:15,17, 23 7:1,9
**notch** 149:12
**noted** 136:2
**notes** 17:1,4 35:4 162:9 163:15 167:13
**notice** 14:20 37:1 134:16 143:23
**noticeable** 133:11,13 136:13
**notwithstanding** 33:18
**numb** 149:16
**number** 22:5 27:25 55:15 65:14, 17 67:17 69:23 70:5, 8,10,16 74:21 75:17 79:7 80:5, 19,20 82:8, 9,13 83:6 88:7 117:23 131:4 133:1 155:1
**numbers** 74:5,7 75:3 78:2,8,9,10, 13,16,17,20 79:6,7,14,18 80:15 81:11, 14,15,22,23, 25 82:1,4,7, 12,20 83:5 84:1,7
**numeral** 16:19

**O**

**oath** 5:5,16 7:24
**object** 8:20,25 13:9 17:24 45:6, 24 51:9 52:19 53:20 58:9 63:1,24 68:5,15 74:3,17 75:9,12 76:5,15 78:24 79:10 80:2,22 82:11 87:18 88:3,16 89:12 91:6, 14 92:15 94:19 100:4, 21 101:20 102:6,18 107:8,18 109:14 115:20 117:14 121:19,21 123:17 140:13 147:1 156:25 157:18 158:3 159:13 166:22 167:25
**objecting** 121:21
**objection** 8:22 9:15 13:16 14:2 53:7 81:2 83:14 91:15, 22
**objections** 8:22 9:2,14 81:2
**objective** 64:1
**objectively** 43:12 62:1 120:1 122:1
**obligation** 8:23 9:2,21
**observation** 46:24 89:16 91:8,25 108:12
**observations** 108:13 162:2
**observe** 89:15 125:22
**observed** 103:19 134:20 162:21
**obstructing** 145:17
**obstruction** 114:5 116:3 118:12,15 128:3,14,17, 25
**obtain** 17:19,21
**obtainable** 70:17
**obvious** 63:5 91:24 96:1,7,12
**obviously** 62:19,21,23 63:4 103:8 138:13
**occur** 25:17 43:24 58:21 153:18
**occurred** 36:10 47:16 62:15,20 67:19 70:10 128:20
**occurring** 43:24 47:21 71:5 76:24
**occurs** 58:14 99:12
**odd** 29:21
**odor** 98:21 103:19
**offense** 66:17 67:19
**offenses** 64:15
**offer** 28:22 76:3
**offering** 17:11,16

18:10,15 63:12 75:25 160:23 161:11,18
**office**
5:13 23:13, 17 25:8,14 26:20 27:1 30:14,15 44:19 46:15
**officer**
5:1 6:10,15 7:10 11:10 14:22,24 15:1 19:1 20:25 21:2,5 23:2 25:12, 20,23 28:8 29:7,8,12, 14,15 30:1 31:20 37:5 38:19 39:10, 13 49:13 56:21 59:10, 11,16,19 60:2,7,14,18 61:20 62:10, 12 67:5,16 68:21,23,25 73:2 84:22 85:1 87:16 88:1 90:6,12 92:1,7,16,20 96:3 97:5,18 98:20 99:25 100:17 101:6 104:10,14 116:5,11,17, 25 117:3,5, 6,7,9 118:1, 13 119:12 120:14 121:1 122:17 123:5 125:16 128:2,17 130:6 132:19,22 133:15,18,23 134:4,17,23 135:8 138:1 140:10,12 144:10,18 149:25 158:1 167:15,18
**officer's**
20:23 22:16 90:9 94:12 96:1 121:18 122:20,23 123:19 130:7 136:22 138:19 140:3 144:8
**officer-involved**
24:11,15
**officers**
19:1 20:17, 21 21:12,18 22:9,11 24:2,5 28:23 29:19 30:21 31:6,23 34:2,13,17 36:11,18 37:1,18 44:9 47:7 49:6 53:15,22 54:5,10,18 55:6,12,21, 25 56:5,9 59:6 66:24 73:17 89:15 95:17 98:17, 23 99:1 109:4,10 118:14 119:18,23 120:4,19,23 121:5,12,15 122:2 124:2, 6 125:16,25 127:6,13 128:10,19 129:22 131:1 134:1,21 136:2 139:23 140:17 146:1 156:3 164:24
**officers'**
164:7
**offices**
24:9
**oftentimes**
61:8 70:17 98:1 107:24 113:19
**okay**
5:1 11:6,16 13:8 14:7, 10,14,15 17:14 21:9 24:4 28:13 36:22 38:22 39:10,13 40:15 52:16 55:4 57:10 58:13 63:17 66:4 68:9,22 69:24 70:5,7 77:22 82:18 83:5 84:15 87:22 89:21 91:23 102:25 104:6,20 105:12,14,19 115:6 116:4 118:6 119:17 131:13,15 132:17 135:20 137:13 141:7,8,10 150:10 155:5,7 166:7 167:15,20
**older**
31:25 32:17, 23 136:12 158:2
**once**
14:12 82:13 122:5 144:25 145:15 162:9
**one**
9:15 10:19 11:13,16,19 12:6 22:11 23:21 25:12 30:24 36:22 37:11 38:1, 13 44:16 45:14 52:10 61:15 63:21 69:23 73:2 77:8 82:21, 25 83:1,3 86:9 87:12 95:12 109:5 110:14 111:3 112:20 116:5 122:5 125:4, 18 136:1 144:13 149:18 151:23 162:12 163:24,25 164:1 167:12
**one-off**
64:2
**one-on-one**
125:15,23
**ones**
11:4,5 87:12 109:22 110:5
**Oof**
61:7
**Ooh**
87:19
**open**
65:25 66:2 88:18 101:1
**opened**
88:18
**operate**
34:2
**operating**
77:8
**operation**

46:14
**operational** 68:17
**opine** 18:12
**opining** 11:20
**opinion** 13:22 18:15 21:22 34:1 41:21 42:15 43:5,19 44:4 45:18 54:1 58:20 59:15 60:3 61:25 63:12,17,21 65:6 77:2 89:10,14,21 90:1 91:12 107:6,13,15 111:14,17,18 117:2,19 120:6,18 124:23 127:23 130:4 136:19 137:17 139:4 146:22 148:23 155:23 156:1 157:9,25 158:7 159:11,16 161:12,18 164:6,13,15 165:8,19,22 167:22
**opinions** 13:12 14:5 18:10,13 112:6 158:10 160:10,21, 23,25 161:2, 24
**opportunity** 21:25 142:19 145:12
**opposite** 37:17
**options** 124:16,18,19
**order** 21:16 45:20 60:15 71:2 142:2 163:9
**ordered** 5:19
**ordinarily** 134:21
**ordinary** 150:12
**orient** 123:3
**original** 98:5 122:5
**osteoporosis** 152:21
**out-of-control** 123:23
**outcome** 71:15 123:9, 11
**outcomes** 35:21 36:8 37:11 87:15, 25 123:10
**outside** 5:9 18:11,15 23:4 81:15 90:13 148:2
**overanalyze** 122:20
**overcome** 117:9 131:2 137:5 138:18 144:19
**overly** 123:13
**overpower** 130:20 144:11
**overpowered** 134:9
**overreact** 123:21
**owned** 106:19
**owner** 129:15

**P**

**p.m.** 132:20,21 167:16,17
**Pacific** 5:2
**pack** 111:2,4,5,8 129:12,14
**pad** 106:2,10,14, 17,19 107:6, 16 108:5,10, 16,20,22 109:20,25 110:4,23 111:12
**pads** 106:6,8
**page** 7:23 16:15, 16 29:1 33:17 105:20 121:10
**pages** 132:10
**pain** 20:8,10 21:22,24 22:1 23:10 142:18 152:16,19
**Pandora's** 88:18
**panned** 50:10
**papers** 102:3
**paragraph** 29:3 33:16, 18,24 105:22,24
**parameters** 42:23 100:15
**paraphernalia** 97:1 98:4,14 102:3 105:23 106:3 107:7 109:1 116:2, 7 156:9 160:3
**parcel** 120:3
**parish** 5:13 23:13, 19 25:8 26:20 27:1 30:14 53:2 77:14,18 79:8,9,22,25 80:21 84:2 86:2,13 89:7 158:20
**Parish-wide** 86:5,7,10
**parked** 23:4
**Parole** 40:3
**parse** 122:10
**part** 37:4 46:15 48:3 55:16 56:1 57:23 59:21,22 60:7,12 97:20 111:17 119:17 120:3 121:14 122:13 134:2 137:13 159:25 160:15
**partially** 105:13,16

**participated** 98:10 147:17
**particular** 64:15,16 66:18 70:8,9 72:21 77:7 79:13 80:13, 14 86:11,17, 19 87:16 88:1,14,25 101:5 131:12 159:16
**particulars** 69:22
**parties** 5:7,16,22 8:3
**partner** 134:25 135:1
**partners** 62:6
**parts** 27:17 44:1 55:24 109:4
**party** 9:15
**passed** 60:23 94:5
**passenger** 99:5,23 101:8,9,15, 18,19 102:17,23 164:1
**passengers** 112:4 156:11,14
**past** 9:13 40:12 41:8 51:21 57:12
**path** 35:7 55:23 63:3 72:19
**patience** 167:20
**patrol** 47:14 72:6 83:9 86:12
**patrols** 46:9 48:3
**pattern** 60:4 162:10
**patting** 135:25
**pause** 163:5
**pavement** 124:25 146:24
**pay** 31:2,4
**paying** 31:1
**pays** 31:5
**peace** 23:2
**peer** 25:15
**penalty** 7:25
**pendulum** 34:19 35:3 36:21 37:6, 12
**people** 26:2,4 31:2 35:22 36:1, 15 37:8 38:1,3 49:2 53:1 57:21 61:8 62:4,6 63:6 64:16 70:8 74:21 75:7 77:24 79:8,13,16, 24,25 80:5, 8,9,13,20 88:9 97:24 99:25 100:10,17 110:16 111:20,22,24 125:2 138:15 148:13,18, 20,21 149:11 150:14 151:3 157:4,21
**people's** 151:6
**perceive** 98:20 123:2 128:2
**perceived** 124:1,14
**percent** 48:15 77:16, 21 79:12,13, 22,25 80:12 88:19 105:14
**percentage** 20:16 77:13, 17,23 79:21, 24 97:4
**perception** 162:2
**perfect** 35:25 39:9 58:22 84:20 122:6,7
**perfection** 33:25
**perfectly** 46:25 90:9 128:3,4
**perform** 135:6
**performance** 35:25 122:12 123:1,7
**performed** 34:4 161:22
**period** 65:16 80:13 86:11 101:22 103:7
**periodically** 55:10
**perjury** 7:25
**perpetrator** 148:6
**person** 21:19,25 44:17 50:15 63:4 68:21 73:18 93:19 97:9 101:7 102:13 115:13,16 122:11 125:5,14,24 129:5,16 130:9 134:23 141:17,19 142:19 143:4,8 149:9 151:10,25 153:20
**personal** 26:14 89:16 115:22 152:6 162:2
**personally** 38:5 148:19
**perspective** 63:4
**phone** 12:9 25:14
**phonetic** 12:23 22:19 65:4 97:11
**photograph** 108:19
**photographed** 108:23
**phrasing** 54:25
**physical** 125:7 127:13 130:9,23 131:1 133:20 134:10,15 135:5 136:5

137:3,4 144:11 151:6
**physically** 117:9 125:3 133:21 136:4 139:8 141:17 151:11
**picked** 129:18
**picking** 129:18
**picture** 71:11 72:1 113:14
**piece** 106:2,10,14 108:3 110:19 161:1 162:2, 4
**pieces** 106:5 107:25 109:24 110:1
**pill** 91:25 93:9 103:19,22 105:10
**pills** 103:16,24 104:4
**pin** 132:8
**pipe** 106:7 107:11 111:12 114:15
**pipes** 106:4,5
**place** 5:7 43:1 44:11 53:16 55:1 56:12 65:9 71:7,8 93:2 102:9 106:6 108:25
**plain** 21:24 93:7 95:23
**plaintiff** 5:12 6:1 7:20 21:4 32:10 59:24
**plaintiff's** 5:23 14:19 15:13 28:19 31:16 33:12 44:2 105:5 117:24 133:2 155:2
**plate** 67:17 70:16, 22,25
**platform** 57:14 104:8, 11
**play** 105:8 146:15
**played** 132:25 133:8 155:12
**player** 163:5
**playing** 36:25
**please** 5:22 6:11,15 7:1,10 29:4 33:24 81:3 98:9 126:4 144:3 145:5 167:9
**pled** 13:22 14:1
**plug** 45:3
**pocket** 31:3 136:3
**pockets** 136:1
**point** 36:4 43:18 52:10,11,12 55:16 58:17 60:6 68:20 71:1 78:22
79:1 81:8, 18,19 91:10 103:15 111:20 114:24 115:5,15 123:13 131:9,15 136:5 139:12 144:4 150:25 164:4 165:25
**pointed** 56:15
**police** 11:17,22 17:12,13,16, 17 18:5 19:4 20:21,22 21:10,12,18 22:9,11,17 23:16 25:11 26:1,8,22 27:4 29:9, 14,19 30:18 31:7 37:15 39:20 40:13 41:1 46:25 47:1 53:4, 11,18 54:4 56:5 58:3,7 59:5,14 60:1 64:19 65:16 69:14,15,17, 18 71:24 85:3,15 89:15 90:21 91:2 102:16 107:15 108:25 119:17,18,24 120:4,18 121:12 127:6 137:23,24 140:3 147:22 166:18 167:5,23
**policies** 44:8,11
48:4,5 49:22 52:16,20 53:16,23 54:20,21,22 55:15 56:24 57:9 159:12
**policing** 19:12,25 20:3 43:7,21 44:6,14 45:21 50:23 54:18,19 56:23 57:8 61:21 89:2
**policy** 11:15,20 47:24 48:10 50:3 53:15 54:5,24 55:1,8,22 71:24 85:22 157:6,14,22 159:15
**politely** 126:18
**political** 34:19 36:21
**politically** 34:16
**pop** 14:15 104:23
**popped** 126:19
**population** 65:15 74:22 77:14,18 79:9 84:1 89:1,7
**porous** 113:22
**portion** 157:9
**posed** 60:5 127:12
**position** 30:10 78:7 147:8

**positioned** 153:12
**positioning** 151:14
**possession** 32:20,24 33:6 114:4 128:5,8
**possibilities** 88:17 92:20 107:19
**possibility** 88:19,20,21 97:16 114:12
**possible** 85:8,14 86:17 87:7, 14,24 88:4, 6,11,19,22 92:11,13,18 107:20 110:12 114:11 115:14,16 130:11 132:12 134:12 140:18,23 145:11 150:2,4,15 159:3 164:25 165:1,2 167:2,4
**post** 18:7 28:22 33:9 39:18, 19,21 40:14 55:9 56:22 57:8 58:5,18 59:1 137:23
**POST-CERTIFIED** 23:3 29:15
**posts** 28:16
**potential** 19:19 50:23 53:5,12,19 54:14 61:24, 25 70:12 85:16,19 92:8 98:16 136:13 143:7
**potentially** 22:10 114:12 128:5 166:24
**pound** 135:1
**pounds** 118:21 119:1
**PPCT** 125:1
**practical** 148:8
**practice** 26:11,12,14 54:4,7,10 58:14 109:2, 15 154:5,9
**practices** 11:23 17:13, 17 18:6 22:17 29:9 43:13 44:14 45:22 47:1 56:8 59:14 67:25 69:14, 18 73:11 77:11 85:5 95:3 102:16 107:15 108:25 109:9 119:24 167:23
**pre-licked** 97:22
**predicated** 143:17 145:16
**predict** 73:21
**preferred** 145:21
**premise** 158:13
**preparation** 12:21
**prepare** 11:25 12:14 16:24 24:18
**prepared** 12:17,19
**preparing** 16:8 17:8
**presence** 5:9
**present** 12:10 117:15
**presented** 7:12 43:9,22 77:4 117:16
**presently** 6:20
**press** 129:15
**presumptive** 113:3,4,6,18
**pretext** 43:25 48:3 83:12 90:8
**pretextual** 90:11,16 92:6,7,11
**pretty** 36:8,9 103:19 134:10
**prevent** 54:24 73:21 136:22 139:2 146:8 147:4
**prevented** 36:10
**prevention** 55:2,4,18 56:12
**previously** 91:17 128:16
**primary** 26:14
**prime** 86:17
**principles** 29:7,13,18
**prior** 6:19 99:9 138:17
**Private** 5:8
**privilege** 9:1,8,14 24:17
**privileged** 9:5,7
**pro** 5:15 24:1,7, 21 25:4,7, 10,19,22,25
**proactive** 46:9
**probability** 97:17
**probable** 46:24 89:16 90:14 91:10 92:1 93:14, 16 95:20,21, 23 96:3 97:14,18 99:2 100:22
**probably** 52:3 57:3 93:16 98:18 132:1,4 162:11
**Probation** 40:3
**problem** 50:23 89:2
**problems** 47:6,8 88:11,13
**procedural** 44:1 57:24
**procedure** 11:15 47:24 48:10 53:15 54:5,24 55:1,8 56:1,

7
**procedures**
48:5 52:17 53:17,23,24 55:17 56:12 89:19 90:10 166:20
**proceed**
7:14 29:5,6,12,25
**proceeding**
5:11,15,18 7:11
**proceedings**
11:2 166:6
**process**
58:2 72:7 76:18 119:19 120:12 121:1 123:2
**produce**
5:18 72:5
**profession**
34:5
**professional**
15:24 18:8 26:18
**proffered**
17:12
**profile**
31:19
**profiled**
50:20
**profiles**
63:13,18
**profiling**
19:14 25:23 44:10 57:15 58:4,8 60:15 63:22
**program**
24:13
**programs**
125:12
**prohibit**
54:20
**prolong**
90:19
**prolonged**
125:10
**promise**
37:14
**prone**
29:16 147:8
**proof**
74:25
**proper**
89:24 91:1 102:16 113:5 117:20 145:18
**properly**
89:3,4 149:17
**proportionate**
65:15
**propriety**
116:17 119:19
**prosecuted**
60:1
**prosecutor**
60:2
**protect**
37:20
**protected**
44:11
**protection**
36:2,18
**protections**
36:12,14,19
**protocol**
151:15
**protocols**
124:21,22 147:6
**provide**
6:18 7:3 21:13 22:25 24:1,5,7,10 65:5 72:1 76:13,20 81:3
**provided**
5:20 25:7,10,19,22,25 44:3 46:2 47:11 52:14 64:22 74:19 81:13 86:23
**providing**
76:17
**proximity**
101:23
**public**
5:4 6:17 37:17,21
**publish**
28:14
**pull**
14:13 23:7 28:13 78:1,3 83:22 86:8 87:4 90:25 105:19 110:1 116:9 117:22 121:8 123:5 125:2 131:13 139:11 142:4,16 154:25 161:16
**pulled**
22:11,13 74:5 79:8 89:22 100:1,18 138:22,25 143:21
**pulling**
14:7 123:6 136:21 139:1,8 147:3 151:15
**pulls**
139:13 151:7
**punched**
127:17
**punches**
144:2 145:9
**punitive**
60:10,11
**purported**
32:9 77:6 114:15
**purpose**
67:7 90:20 148:9
**purposes**
43:10 78:18 137:24
**pursue**
114:6
**pursuing**
114:13,14
**pursuit**
11:13,17 29:18 32:9,10 115:14
**purview**
158:14
**pushing**
132:11
**put**
30:10,25 46:19 52:4 70:15 73:18 109:16,17 112:22 125:21 139:6 141:7 142:7,12,15 143:21 144:3,21 145:3,5 149:13 153:8,10,19 161:8,10 162:21 163:3
**puts**
56:22 137:6
**putting**
127:2 161:9

**Q**

**qualification**
81:25

**qualifications**
21:1 42:4,21
**qualified**
18:11,18,22, 25 19:5,8, 11,16,18,21, 24 20:2,5,8, 12,21 21:11 22:6 23:9 27:20 69:12, 16 95:3
**qualify**
96:18,20
**quality**
164:2
**qualms**
78:6
**quantify**
95:25
**question**
8:21,23 9:21,23 13:9,11,23, 24 14:3 17:25 33:22 45:7,24 49:17 51:5, 10 52:19 53:8,20 56:16 58:6,9 59:22 60:5 63:1,24 68:5,15 74:3,17 75:9,12 76:5,6,15 79:5,10,20 80:2,23 81:6 82:11,25 83:2 87:10, 18,20 88:3, 6,9,16,20,21 89:5,8,12,14 91:6,14 92:15,18 94:19 95:10 98:5,7,13 99:1 100:4, 13,15,21 101:4,12,20 102:6,18 105:8,9 106:9 107:8, 18,19 109:14 110:3 114:3, 23 115:4,20 117:14 121:19,22,24 123:17 126:7,13,14 131:24 133:6 139:17 140:13,15 141:2,3 147:1 148:11 150:9,15 153:2 156:19,25 157:8,18 158:3 159:13 160:18 166:21,23 167:22,25
**questionable**
91:18
**questioning**
158:22
**questions**
8:21 9:4,25 10:1,5 39:17 69:9 92:5 119:14,15 122:5 126:12
**quick**
7:22 124:9 126:25 127:15
**quicker**
135:7
**quickly**
8:4 36:23 115:14,16 124:8 125:9, 10 127:1 130:11 140:18,23 145:7 146:6, 9
**quite**
14:9 35:1 57:6 58:6 124:19

**R**

**race**
13:5 44:17 47:17 52:6 57:21,23 58:1 59:17 62:18,25 69:23 70:14, 19 85:8 87:8,17 88:2,7
**race-based**
87:9
**racial**
13:4 19:8, 11,14 20:3 22:14 25:23 43:6 45:21 48:13,15,20 49:12 50:1, 6,9,22 51:22 52:18 53:12, 19 54:14,15, 25 55:18 56:13,20,23 57:2,8,19 58:4,8 59:8, 21 60:4,8 61:6,17,21, 25 69:17 71:5 73:10, 12 74:14 77:3 85:16 88:12,25 89:2 92:14
**racial-based**
92:17
**racially**
43:13,21 44:6 50:20 53:6 55:7 59:12,20 60:20 61:8,9 62:4 63:12, 18,22 68:22 87:24 88:8 89:6 90:4
**racially-based**
90:6 92:20
**racing**
69:5
**racist**
62:5,8,25 63:4,5,6,10
**raise**
7:1
**random**
46:18 61:11
**range**
44:23
**rap**
158:1 159:5, 22
**rapid**
33:25
**rapping**
157:17
**rarely**
100:22
**rate**
48:15
**rational**
77:11
**raw**
95:15,17,19 96:20
**re-control**
138:25
**reach**
81:21 144:11
**reached**
32:10 80:25 138:24 142:11

**react**
145:2
**reacted**
145:7
**reaction**
123:20 139:20 140:8 141:11
**reactions**
123:20 139:19
**read**
29:4 41:20 78:1 97:13 105:22,24 113:8 116:22
**reading**
33:19 65:19, 20 134:16 141:21 142:21
**readjust**
151:13
**reagent**
112:21
**real**
45:18 135:9 140:2 148:7 149:6 150:22
**real-world**
121:6 122:3
**realistic**
36:9 58:24
**reality**
85:13
**realm**
88:17
**reason**
50:15,16 67:5,24 102:23 119:17,22 133:22 146:18
**reasonable**
19:1 35:6 37:6 46:25 60:9,12 93:11,14,18 95:19 96:3, 7,16 97:18 99:25 100:5, 17 120:2 122:1 124:24 128:1,4,25 143:13 146:23 167:5
**reasonableness**
19:6 42:6 97:14 121:11,18 164:7,11
**reasoned**
130:17
**reasoning**
97:20
**reasons**
49:8
**rebranded**
125:1
**rebuilt**
106:24
**recalculate**
74:7
**recall**
25:9 27:2 32:16,19 57:4,7 77:15 106:18 165:25
**receive**
47:4 50:7,8 60:21,22
**received**
46:18 57:10 63:9 70:3 118:5 151:24
**receives**
73:2
**recently**
41:7 95:13 96:9,17,23 102:4
**record**
5:1,8,17,23 6:12 7:12 8:3,5 17:14 38:21 39:10, 11,12,13 84:23,24,25 85:1 103:11 106:13 132:19,20, 21,22 144:20 167:15,16, 17,18
**recorded**
8:2
**recording**
5:6 6:19 133:8,9 155:12,13
**records**
16:13
**recovered**
109:1
**recovering**
129:14
**recreate**
78:8
**reduce**
116:18,19
**refer**
24:25 75:22
**reference**
21:15 155:22
**referencing**
66:4
**referred**
26:4
**reflect**
34:11 66:17 67:4 70:10, 13 71:13 79:15 80:8 117:17
**reflected**
15:22
**reflects**
80:5
**reflexive**
142:9,11 162:25
**refrain**
98:9
**refuse**
88:21
**refute**
166:1
**refutes**
166:4
**regarding**
11:15 43:5 49:12 52:17 56:19 89:10 91:12,17 120:7 127:23 130:4 149:22 159:12 160:23 164:6
**regional**
39:20 40:1,2
**regularly**
36:1 95:18
**related**
10:18 11:13, 14 21:23 27:7 52:18 72:6 86:18, 19 91:16,20 98:14 102:3 120:7 158:7, 12,17 161:1
**relates**
18:5,19
**relation**
38:5 83:12
**relationship**
9:8
**relative**
65:15 133:25 137:8
**released**
79:17 80:8
**releases**
66:15

**relevancy**
91:18
**relevant**
73:11 128:15 138:1,3
**reliable**
73:22
**relied**
16:21 64:10
**relieved**
9:2
**relying**
93:24
**remain**
34:2
**remember**
19:7 27:12 38:18 57:17, 18 61:5 131:5,7,10, 11 155:20
**remote**
5:9
**Remotedepo**
5:15
**remotely**
5:6,15
**removed**
105:16 158:12
**render**
164:15
**rendered**
14:5 164:6, 14
**repetition**
36:24
**rephrase**
54:13 87:11
**report**
12:1,15,23 15:6,9,19 16:9,16,17, 21,24 17:3,8 18:13,14 43:11 45:14 64:11,12,14 65:16,18,19, 20,21 66:6,8 67:21 70:13, 18,23,24 74:18 75:22 76:14 77:17, 19,21,25 78:22,25 79:1,3 80:3, 5 85:24 86:4,8,10, 15,24 90:5 103:17 105:19 110:25 116:8,10 119:4 121:8, 10 128:14,22 133:19 134:16 136:18 141:25 147:16 150:11 160:8,12 162:9,10
**reported**
86:22
**reporter**
8:4 133:1
**reporter's**
104:9
**reports**
64:19 65:2, 17 163:20
**represent**
7:20 77:16 155:17,18
**representation**
47:22
**represented**
8:11,12,14 27:9
**requests**
47:2
**required**
126:8,16
**requirement**
145:5
**residue**
97:1 98:3 102:3 112:12,24 114:9
**resist**
21:21 125:2, 3 127:18 129:13 130:9 138:11 142:20 145:11 150:20
**resistance**
21:23 120:22 125:6,7 130:20,24 131:2,3 134:7 136:5, 21,23,25 137:3,5,8,22 138:19 139:3,5,15 144:19 158:13
**resistant**
137:4
**resisted**
139:16 148:9 161:13
**resisting**
21:19 22:3 114:5 116:1, 4,11,25 117:3,5,6,7, 10 118:10,13 119:13 128:4,17 133:21 136:20 137:18 138:1 143:5 146:24 149:14
**resistive**
147:24
**resists**
117:8
**resorting**
130:19
**respectfully**
167:23
**respond**
123:22 124:8 127:22 141:19 145:1
**responded**
22:9 127:21 146:9
**responding**
47:7 88:23, 24 89:3,4 125:6 165:3
**response**
19:4 46:13 83:10 84:3 105:9 123:24 124:9 126:25 127:15 134:7 140:9 141:12,16,18 142:7,9,11 143:24 158:13 163:2 167:5
**responsibility**
26:18
**responsible**
48:6 49:19
**rest**
89:7 162:10
**restraint**
134:8
**restroom**
131:17
**result**
35:23 148:15,22
**results**
34:5 35:19
**retained**
8:14,16,17

21:4 27:12, 20,22 59:24
**return** 92:5
**review** 5:20 12:12 16:23 28:20, 23 47:17,18 50:2 55:23 63:16 64:13 78:3 93:21 97:12 144:20 154:14 164:7 165:18
**reviewed** 12:1,15,19, 21 17:1 43:15 44:8 61:23 64:18, 20,21 80:25 149:8 164:13
**reviewing** 16:13 47:20 49:23 51:22 73:5
**reviews** 56:2
**revolves** 114:25
**ride** 101:11
**right** 7:2,10 12:16 16:17 21:3 33:8 34:21 40:15 43:4 55:23 59:7 65:19,25 66:6 70:6 72:14 84:21, 22 89:25 94:3 102:5 104:25 105:23 118:16 125:21 127:5 128:18 132:13,18 138:12,19,22 146:25 153:13,21 154:1,24 162:23 167:14
**righteous** 29:21,23
**rights** 10:21 11:4,5 41:4,6
**rigid** 153:16
**road** 122:1
**rocks** 113:22
**role** 49:4 51:14 76:3,13 120:3 163:2
**roll** 97:25 106:5 110:1,18
**rolled** 97:22 107:21,24 110:19
**rolling** 102:3
**Roman** 16:19
**room** 8:9,25
**Rouge** 6:22 23:8, 20,22 40:2 83:22
**rough** 27:15
**roughly** 18:2
**route** 88:19
**routinely** 73:2
**rule** 57:20 85:11 102:14 125:25 137:5
**ruled** 41:24
**rules** 26:17
**ruling** 41:24 42:18
**run** 70:15,17,23 129:13
**run-of-the-mill** 128:11
**rung** 135:8

**S**

**Sabra** 64:10
**safely** 29:9
**sales** 153:10
**San** 5:5
**Sanders** 23:23,24
**Sarah** 64:10 65:3
**sat** 131:9
**satisfied** 159:12
**saying** 45:20,25 47:1 68:2, 10,16 71:2,7 72:14,17 74:8,16 76:23 79:14 81:21 82:22 83:5 84:5 109:15 116:4 122:4 131:18 149:15 155:24,25 156:21 158:10,11 159:10
**says** 42:20 55:10 77:20,21 80:3,12 96:5 104:16 122:7 153:8 155:18 158:15 159:15 165:25
**scale** 97:16,17
**scenario** 85:5
**scenarios** 148:6,7,8
**scenes** 148:21
**scent** 95:8
**schoolyard** 167:9
**scientific** 71:22
**scope** 24:21 42:23, 24 90:14
**Scott** 5:11 6:13 7:6
**Scott's** 29:7,13
**scratch** 87:12
**screen** 14:13,15 104:8,12,20, 22 106:7 155:6
**screened** 101:9

**scrubbing** 106:2,5,10, 14
**scrutinized** 35:1
**search** 91:13,16 92:2,24 93:7,10 100:19 105:25 106:1 112:2,3 158:2,12 159:25 161:6
**searches** 18:19
**searching** 92:12 156:24
**seat** 69:7 149:10
**second** 14:22 22:6 23:14 31:19 41:5 113:10 130:4,21,24 133:14 136:15 140:7
**seconds** 39:5
**section** 69:20 121:9
**see** 8:2 14:13 31:16 33:10 34:12 37:4 39:22 42:10 50:14 54:9 60:3 64:21 65:21 69:24 70:6 77:2 87:14 90:25 96:22 97:24 101:7,24 103:11 104:1,9,20, 22 105:12,18 106:17 107:11 109:9,10 110:16,22 111:8,9 114:10 116:9 118:7 123:8 132:11 136:5 138:12,20,22 144:24 152:1 155:5,6 157:13 158:19,21 161:5,21 162:1 163:25 164:2,5
**seeing** 38:18 93:9 131:5
**seek** 9:5
**seeking** 26:25 27:3
**seemingly** 29:7,12 36:22
**seized** 128:6
**seizures** 52:12
**self-defense** 42:7
**sense** 7:25 29:15 129:20 157:12 162:2
**sentence** 29:5
**September** 5:2
**sergeant** 38:20 48:24 49:18 51:14 161:8,20
**series** 10:4
**serve** 106:7
**service** 34:23
**services** 24:10,21 25:4
**set** 45:22 47:12, 13 68:12 78:6 82:7 119:20 131:19 139:23,25 141:23,24 142:21 143:25 162:18
**sets** 151:10
**setting** 121:6 122:24
**seven** 39:7 51:13
**several** 98:11
**severe** 128:11 129:7,8,25
**severity** 119:10
**shake** 132:16
**Shannon** 6:8
**share** 28:17 104:7, 8,11,17 155:6
**sheet** 16:10 107:5
**sheetrock** 107:5
**Sheriff** 6:5 38:23
**sheriff's** 5:13 23:13 24:9 25:8 26:20 27:1 30:14 46:15 58:7
**sheriffs'** 58:3
**shift** 34:15 72:20
**shifting** 146:25 147:3
**shooting** 24:11,15 25:12,16
**shop** 23:5
**short** 125:25 132:12
**shot** 23:3
**shoulder** 32:12
**shoulders** 151:8 161:9
**show** 52:1,2 65:10 79:2,7 82:7 125:15 135:23
**showing** 73:10 127:17
**shown** 146:5
**shows** 130:17 161:5,6,7,8, 9,10
**side** 30:8 51:19 69:14,15 122:10 164:1
**sideways** 149:12
**signal** 89:23 90:23 91:4,8 116:3 118:9,13
**signature** 5:21

**significant**
24:15 32:12 71:21 129:20
**signs**
61:4 101:24 135:23
**similar**
71:14,15
**similarities**
33:2
**similarly**
65:17
**simply**
9:13 34:3 125:19 130:19 134:8 138:24 146:3 147:11 149:13
**simultaneously**
145:2
**sing**
156:23
**singing**
156:22 158:11,16 159:4
**single**
59:1 85:8 97:23 100:23 151:25
**sir**
6:20 7:18 58:12 144:3 145:5,6 154:23
**sit**
122:10 153:20
**siting**
151:4
**sits**
149:9
**sitting**
149:16 151:14 153:22
**situation**
19:2 21:25 25:15 33:2,3 63:3 67:22 71:4 85:9 98:19 100:22 107:10 123:15 125:11,15,23 127:7 130:10 140:2 141:20,21,22 142:3,15 143:9,10 144:9 145:19,25 157:5,6 165:4,9,12 167:5
**situational**
147:10
**situations**
48:9 98:22 122:3 140:12 164:25
**size**
107:23 125:17 133:25
**skew**
44:16
**skimmed**
12:22
**skip**
136:3
**slam**
147:12
**slapped**
144:1
**slide**
153:7
**slider**
71:12
**slightly**
56:7 125:7
**slither**
66:10 77:9 82:14
**slow**
87:22 143:9 163:6
**slowed**
146:3
**slowing**
165:13
**slur**
59:21 60:8
**slurs**
22:14
**small**
40:24 70:8 75:17 77:9 80:14 104:21 106:1,4,6, 10,14 107:21,23 109:5,7 110:2 112:22,24 113:16
**smaller**
40:12 136:12
**smell**
91:24 92:23 93:7 95:11, 16,17,19,22, 23,25 96:1, 8,12,15,18, 20,22 98:2, 23 99:12 100:2,19 102:10,11 156:10,13
**smelled**
94:11,14 97:5 98:20 102:2,17 103:18
**smelling**
99:16
**smells**
95:5,6,16 96:21 102:12
**smoke**
93:4 94:9,15 96:21 98:1 102:8 110:21
**smoked**
94:17
**smoker**
111:15
**smoking**
94:6 95:8 97:1 98:16 106:3 107:17,23 108:6,10
**snapped**
140:3
**snatch**
141:23 143:18,19 161:6
**snatched**
115:6 124:13 138:14 139:22 142:2 144:25 145:1 146:11
**snatches**
115:9 125:13 142:5
**snatching**
146:20
**soap**
110:4
**soapy**
110:6
**sober**
100:1,6,9, 14,15
**sobriety**
40:11,20 99:20,23 103:5
**social**
7:19 34:25
**society**
33:22 37:7

**society's**
35:6 36:23
**software**
163:4
**sold**
97:23
**solely**
158:7
**solemnly**
7:2
**someone's**
127:17 165:3
**song**
156:22 157:17 158:1 159:5,18
**songs**
156:23
**sort**
45:1,18 88:24 110:20 123:23 130:19 141:18 145:10 152:15
**sorts**
109:22
**sounds**
21:3 45:20 54:11 87:19 150:18
**South**
158:19
**space**
165:11
**spat**
167:9
**speak**
17:7 25:12 50:16 82:12
**speaking**
81:2 103:8
**speaks**
77:25
**special**
163:3,7
**specialized**
44:24
**specific**
17:10,15,19 18:11 38:7 46:13,14 47:4,12 55:17 66:7 74:14 80:20 81:12 83:11 84:2 85:25 86:9 138:10 154:10 161:23
**specifically**
11:20 16:13 56:11 57:19 78:22 131:8 133:17
**speed**
155:17
**spell**
6:11
**spend**
16:8
**spent**
16:12 162:13
**spike**
88:25
**spikes**
73:20
**spin**
139:24 147:13
**split-second**
121:13 122:25 124:6,12
**spoke**
12:9 25:14 101:21
**spot**
111:3
**Springs**
25:11 26:22 27:4,6 31:7
**spun**
143:20
**SSGT**
125:2
**stage**
150:11
**stalemate**
125:8
**stamp**
14:21 15:2,15 133:6
**stand**
78:9
**standalone**
30:20
**standard**
34:5 35:11,14 37:6 59:2,4 95:21 119:20 165:6
**standardized**
40:11 103:5
**standards**
121:4
**standing**
103:7
**standpoint**
44:12 54:4 71:24 122:9 157:10
**start**
7:21 69:2 70:6 71:8 72:18,22 102:9 125:2 162:8
**started**
72:24 122:6 138:13,14 143:20 146:11 165:24
**starting**
70:7 105:24
**startle**
142:16
**starts**
42:9
**stat**
69:3
**state**
5:4,22 6:11,18,20 8:21 11:2,5 30:6 40:3 41:23 42:7 43:1 56:5 63:13 93:2,6,23 94:8 96:6 100:11 147:16 164:10
**state's**
94:3
**stated**
41:16 77:16
**statement**
61:24 62:2 107:4 119:3 136:9 140:15 141:3,7 158:19 159:16
**statements**
62:4 158:25
**States**
5:14
**station**
22:11 135:14,15
**stationary**
22:13
**statistic**
44:16 68:19
**statistical**
49:3 65:6 71:18 73:10,17,22,24 78:8 81:12
**statistically**
71:21
**statistics**
19:22,25

20:3 45:14 64:2 73:19, 21 74:19 77:9,10 78:5 83:22,23 85:4,15,19 87:1 88:7

**stats**
46:18 51:17, 25 52:4,5,11 68:25 74:4

**statute**
42:17 100:12 117:7

**stay**
37:1 81:16

**stayed**
135:8

**stays**
37:1

**stealing**
129:12

**steam**
157:4

**steel**
153:16

**step**
61:3 79:20 144:3

**steps**
123:12

**stick**
113:13 114:4

**stood**
101:21

**stop**
19:6 22:12 32:3 33:5 42:8 43:25 44:1 46:21, 23 61:9,11 64:13 65:13 66:15,24 67:1,5,6,7, 16,17,25 70:22 77:8 89:11,17,23 90:2,8,11, 15,16,20 91:5,17 92:6,7,11, 17,21 99:6, 9,10 101:5 102:10 103:15 109:1 123:6 126:18 135:16 145:3,5 146:13 157:21 158:12,13 159:1,2,7,9, 24

**stopped**
44:17 70:14 74:21 75:7 79:15,16 80:6,13 97:10 133:9 155:13 157:21

**stopping**
46:10 131:15

**stops**
44:24 47:12, 25 65:14 66:10,13 75:8 77:23 79:24 83:12 97:4 98:12

**story**
50:18 75:20

**story's**
166:3

**straight**
11:16 101:4

**straightforward**
30:12

**strategies**
47:5

**strategy**
46:15

**street**
61:7 69:5 98:11 108:4 157:3

**streets**
56:9

**strength**
125:17 126:1 127:3,5 130:20 134:11,15 144:11

**stressful**
122:23 123:15 124:2

**stretch**
30:9 158:23

**strike**
29:20 142:13 146:5

**strikes**
145:9

**striking**
127:3

**strip**
110:17

**strong**
93:18 95:11, 19,25 96:15, 18,22 100:1, 19

**strongly**
102:11,17

**studies**
153:24

**stuff**
66:2 71:17 163:6 166:2

**stumbled**
50:5

**subject**
22:1 29:19 70:14,19 140:11 147:24 149:21,24 159:1

**subject's**
119:13 125:6 127:11

**subjective**
87:16 88:1, 14 90:1,6,7, 12 92:8,13 123:19 136:15

**subjectively**
88:8 89:4 90:18

**subjects**
40:5 140:8 141:11

**submit**
114:13

**substance**
94:4

**substances**
113:18

**suddenly**
139:19,21,22 143:24 148:4

**sue**
29:17

**sued**
151:23

**suffer**
152:21

**sufficiency**
69:13

**sufficient**
43:8,20 44:5 46:6 63:15, 18 68:11 69:17 76:18 91:5 92:24 93:7,10 132:5 142:23 143:15 144:7

**suggest**
95:12 96:23

**suit**
61:16

**summarize**
13:2 22:7

**summarized**
13:25

**summary**
13:17 21:13 22:25 64:20, 22 65:1
**summation**
65:5
**summons**
117:25 118:5
**supervisee**
48:12
**supervisees**
47:21 48:16, 19 61:5
**supervisees'**
51:22
**supervisor**
44:7 45:1,4, 10,12 47:19 48:11,23 51:21 60:21, 24 157:13
**supervisor's**
44:12
**supervisors**
43:16 54:6, 21 55:12,22 73:4 157:23
**support**
5:3 25:15 55:2,4,17 56:12 61:12 64:7 74:25 76:24 77:6, 10 93:25
**supported**
74:11
**supporting**
93:18
**supports**
44:2 96:25 129:4 161:19
**supposed**
85:22
**Supreme**
28:20,23 35:4
**sure**
7:23 10:6 15:3 21:15 22:9 25:9 29:24 32:25 33:6 35:18 38:2,14 39:1 44:9 45:15 47:17,23 48:6 49:20 50:2,24 51:3 53:14,16,23 54:6,17 56:8,14 58:13 67:1, 10 76:20 78:15 85:7 88:5 99:18 103:21 106:20 111:13 114:3,6 119:10 124:2 146:14 149:17 151:12,16 153:3,10,12, 15 155:11
**surprised**
140:2
**suspect**
128:23 134:24 148:7 152:8
**suspected**
101:18
**suspects**
156:23
**suspicion**
93:11,14,18
**suspicions**
115:19
**sustained**
19:19 150:11 151:19
**swab**
113:12
**swabs**
112:25 113:2
**swear**
6:15 7:2
**swing**
139:10
**swinging**
37:12
**swings**
34:20 35:4
**switch**
129:6 130:15 136:24 137:2
**sworn**
6:24 7:7
**Sydney**
6:9
**system**
14:10 66:25 67:13,14,15 70:12
**systematic**
73:1 119:19
**systems**
125:4,15

**T**

**table**
137:6
**tabs**
65:25
**tackled**
146:4 148:8
**tactic**
124:21 125:4
**tactics**
137:22 147:6
**tailgate**
131:8,9 139:24
**take**
5:7 10:4 16:4 17:1 20:16 21:19 26:9,13 29:23 30:8, 11 31:11,17, 21 39:4,6 55:10 79:5 80:24 82:3 84:4,11 85:21,22,23 87:22 91:9 109:16 110:9,17 115:10 124:19,24 125:5,14,18, 24 130:18 131:16 138:10,12,16 140:1 141:25 142:13 144:11 145:5 147:4 159:25 162:8 163:15 167:6,13
**takedown**
125:4,5
**takedowns**
145:9
**taken**
5:12 13:6 26:5,19 44:19 50:21 67:19 108:19 114:16 123:12 124:16 126:23 129:10 137:7 147:7 161:14 166:7
**takes**
14:12 48:7 83:3 123:2 125:13
**taking**
10:2 29:20 31:17 39:10 84:22 91:3 120:24 127:10 146:1 167:15

**talk**
8:6,24 24:22 53:25 86:9
**talked**
43:25 47:20 71:17 83:8 102:22 123:9 129:24 162:25
**talking**
32:1 35:3 43:4 49:16 51:3 54:1 57:16 58:10 67:15 69:19 85:7 113:12 115:7 129:3
**tap**
93:13
**target**
57:21
**targeted**
13:5 50:20 69:7
**targeting**
44:10 49:7 50:9 88:8
**task**
7:13 113:24
**taught**
147:5
**Taylor**
20:24 32:4, 8,22 33:3
**teach**
29:18 38:2 40:7,8,9,11, 13,20,22 59:8 95:17 109:3 119:18 121:5 125:4, 12 129:21,23
**teaching**
41:5
**technique**
127:3 130:19,20
134:11,15 147:5 150:12 165:15
**techniques**
18:23 19:19 21:20,21 23:10 124:1 126:1 127:5 150:3,5,17 152:8
**tell**
9:3 24:23 34:7 46:3 50:18 62:19 65:13 67:6 75:19 89:14 97:9 104:5 105:10 108:3 109:2 111:10 119:7 145:3 147:24 148:12 154:12
**telling**
53:21 54:4 63:3 75:2,19 115:11 150:16
**ten**
81:18 131:16
**term**
57:13 100:9
**terms**
137:23
**terrorist**
37:14
**test**
94:3 99:20, 23 112:14, 15,18,19 113:7,9,10, 18,23 137:3 153:7,14
**testable**
112:25
**tested**
108:14 114:1,2,8
**testified**
7:8 20:20 31:22 32:4 106:12 113:9 125:17 142:17 155:25 160:5
**testify**
21:11 25:4 42:5,13,16, 20 152:24 164:11
**testifying**
42:2 152:25
**testimony**
7:2,24 10:7, 10 16:7 20:25 22:15 28:1,3,7 41:17,25 42:3,9,10 43:3 89:18, 22 91:23 94:12 96:1 111:1 138:21
**testing**
108:14
**tests**
112:7 113:3
**Texas**
5:4
**Thank**
6:10,23 7:1, 9,13,15 14:23 15:4 39:14 118:3 161:11 167:20
**thank-you-for-your-service**
37:15
**thanked**
34:22
**THC**
93:24,25 94:1
**thereof**
148:18
**thing**
36:5 66:11, 12 104:7 122:10 132:24 151:9
**things**
8:6 36:10 37:11 56:6 57:16 58:25 69:19,21 73:6,8 95:12 102:22 107:20 109:6 111:10,20,22 117:17 124:17 126:7 165:11,13
**think**
11:1 19:3 23:16,17 24:23,25 29:15 31:13 33:9 34:17 35:9,10 38:11 43:8, 17 44:1 51:14 55:19 58:3,5,6,13, 17 62:1,23 63:15 64:6 68:14,16 72:3,23 73:15 75:2, 14,15 77:10, 25 80:4 82:12,13,22 83:15 85:17, 21 88:17 89:13 92:18 93:11 95:15 96:1 97:12 98:16 103:25 104:7,10 105:20 108:12 109:7 110:7 114:2

116:3 123:19 125:23 127:8,12 128:3 130:6, 16 131:23 133:19 134:9,21 136:9,20 138:13 140:2 145:24 146:1,2 147:2,3 152:17 153:2 154:22 155:25 157:23 158:18,23 163:14,19,20 164:2,5 165:14 167:4

**thinking**
35:9 132:6

**third**
105:22 136:19,24 137:13

**thought**
26:4 30:7 49:17 58:1,2

**thousands**
55:21 147:18 148:20

**threat**
42:5 119:11 120:14,22 123:2,3 127:12,16 129:13 130:7,8,13, 16,25 133:15,18,20 134:4,23,24 140:12

**threats**
131:3

**three**
11:3,5,22 17:15,19 25:18 40:3,6 41:15 55:25 119:9

**threw**
97:9 162:24

**throat**
22:15 59:21

**throw**
61:9 113:21

**thrown**
102:7

**Thursday**
12:3

**ticketed**
75:18 80:6, 20

**tickets**
64:19 66:13, 16,21 67:3 82:2,8 86:4, 10

**tie**
42:6

**tied**
120:12

**ties**
98:4

**tight**
149:15 150:21 151:3,4 153:22

**tightness**
150:19,25 151:12,16 153:6 154:3, 5

**till**
81:16

**time**
7:13 8:20 9:23 12:6 15:10 16:2, 10 34:7,14, 21 51:13 52:13 57:10 59:6 62:5 66:10 70:9 75:17 79:14 80:13 83:11 86:11 91:19 92:2 93:2,24 94:2 95:4 96:4 101:22 103:8 109:9 116:19 118:19 123:2 132:25 133:6 135:18,21 140:11 141:19 142:1,23 143:15 144:7 157:3 162:13 163:16

**times**
10:15 11:4 31:4 35:12 36:21 57:1 60:24 61:10 62:6,8,14,16 72:3 75:16 76:10 81:18, 19 113:24 121:5 147:17,24 148:19 162:5,7,12 163:19

**timestamp**
105:4 155:10

**tiny**
71:12 82:14

**tips**
129:23

**tired**
10:3

**today**
8:4,11 10:2, 8,10 29:14 32:7 78:9 109:8 122:6 148:24 149:2 167:20,22

**today's**
11:25 12:14, 21

**told**
143:22

**tomorrow**
42:3,9

**tongue**
129:24

**tons**
45:12

**tools**
107:3

**top**
77:15

**topic**
81:20 95:17

**torn**
105:12,13,15

**tort**
149:24

**total**
11:5 70:10 84:1

**totality**
78:10 101:3 129:10 137:3 143:11 145:21

**touch**
112:25 113:17

**touched**
57:8 167:1

**track**
85:3 155:1

**tracks**
66:20

**traffic**
19:6 22:12 33:5 44:1,23 46:24 47:12, 13 61:11 63:13,19,23 64:13,18 65:13 66:10, 11,13,17,24

67:6,16 70:21 75:8 77:23 79:24 82:8 89:15, 17 90:14,20 91:5 92:9,17 99:5 109:1 135:16 146:13 159:1,2

**trafficking** 52:1

**train** 29:19 37:8 39:19,20 40:5,15 53:22 54:5, 13,16,18 55:6 60:11 99:1 117:5, 10 122:2 127:4 128:10 134:15 137:21

**trained** 21:23 30:13, 14,15,16,19, 21,24 31:6 41:7,8 53:15 73:17 89:15 92:1 119:23 120:5,8,11, 19,23 121:1 127:6 130:10 134:11 140:18 144:19

**training** 17:12,16 18:4,5,7 22:17 29:9, 22 30:5,7 31:1,3,10 36:24 37:25 38:18 39:17, 22,25 40:1,2 41:10 46:25 54:10 55:9, 10,11,16 56:19,23 57:2,7,11, 13,18 58:4, 8,16,18,21, 23 59:5,6,8 89:19 90:9, 21 93:5 96:5 99:15,17 109:6 119:17,24 120:10 121:7,14 122:14 124:21 125:8 126:8,15 127:22 134:5 137:23,24 140:25 147:8,17,21, 22 148:2,3, 15 150:13 152:25 153:8 156:8

**trainings** 129:22

**transcript** 5:19,20

**transcriptionist** 5:18

**transpire** 25:1

**transported** 95:13

**travel** 131:25

**treated** 167:23

**treating** 153:3

**trend** 73:10

**trends** 47:8 51:23 52:1 73:25 83:24 86:13, 17,18,19 88:23

**trial** 22:2 41:24 42:2,5,9,14, 15,16 81:17 116:20,22,23

**trials** 117:17

**trier** 120:17 159:1

**trigger** 123:6 144:5

**trouble** 162:15

**truck** 91:24 94:14 96:13 101:15,16, 18,22 102:7 107:2,7,16 131:5 147:13 164:1

**true** 15:24 18:10 39:17 49:25 50:1,11 62:7 74:15 82:20 83:5 91:3 106:11 121:17 142:10 147:19 159:24 160:21 162:18,19 163:1

**truth** 7:3,4

**truthful** 10:10

**truthfully** 97:7 98:8 148:11

**try** 27:17 30:11 37:7 129:23 145:22 151:12 154:16

**trying** 19:7 23:4,16 60:9 68:9 81:8 101:6 119:13 136:3,22 137:12 141:25 143:20 144:17 162:13 165:12

**tubes** 106:5

**turn** 89:23 90:23 91:4,8 113:1,17 116:3 125:21 138:16

**turned** 26:25 27:3,7 101:16 149:12

**turning** 20:15 138:19

**turns** 112:23

**two** 10:22,23,24 11:1,2 18:6 20:20 21:9, 11 25:18 31:18 34:10 35:8 39:19, 22,25 41:15 55:25 74:19 95:12 112:20 113:3 116:7 125:16 130:12 132:6,11 138:15 147:5 151:10 153:9 167:12

**two-hour** 41:3
**two-on-one** 125:4
**type** 17:4 36:10 41:4 56:4 57:10 67:21 113:10 143:8
**types** 26:13 56:5 143:7
**typical** 70:13 112:19
**typically** 97:24
**typing** 8:4

**U**

**U.S.** 5:3
**uh-huh** 8:7
**ultimate** 57:20
**ultimately** 51:15 61:3 90:22 91:1 116:12,24
**unaware** 52:21
**unbecoming** 157:7
**uncomfortable** 149:10
**unconscious** 139:18
**unconstitutional** 44:10
**uncontrollably** 142:4
**underlying** 64:13,25 67:19
**understand** 9:5,6,10,24 37:19 42:24 44:14,23 53:9 55:15 65:7,10,12 66:7 68:9,19 71:2,20 74:13 75:3 85:24 86:4 88:6 114:23 131:20 159:1 160:25 163:9
**understanding** 42:1 47:7 48:8 67:11 68:24 69:3 109:20 110:4 112:12 152:14
**Understood** 17:7 56:19 60:3 134:16
**unexpected** 140:22
**unexpectedly** 141:20 142:15
**unfair** 122:11,21
**unfold** 113:15
**unit** 23:4 44:8,18 47:14 66:18 69:1 72:20 83:9 163:18, 20
**unit-by-unit** 44:20
**United** 5:14
**units** 49:14,16
**unknown** 152:17
**unlabeled** 93:9 103:16, 24
**unlawfully** 90:19
**unnecessary** 145:9
**unprecedented** 34:1
**unrealistic** 35:2
**unreasonable** 147:6
**unsure** 87:5 98:23
**untested** 42:24
**up-close** 114:10
**upcoming** 24:19
**updates** 15:9
**upload** 104:11
**urge** 37:8,9,10
**urgency** 127:7,9
**use-of-force** 11:12,14,19, 22 17:13,17 18:5 20:20, 21 21:12 22:7 24:15 40:9
**users** 106:4,5,8 113:19
**uttered** 60:7

**V**

**vacuum** 93:13,15
**vague** 111:3
**valid** 45:2 50:15 61:15 73:1 81:3
**Vaughan** 5:2 7:15 14:21 15:2, 15
**vehicle** 22:12,13 32:11 91:13 92:2,21,25 93:4,7,10 94:6,11 95:11 96:2, 4,8,9,16,17, 24 99:13 105:2 106:1 111:1 112:4 142:2 156:6, 14,24 161:7
**vehicles** 46:10 106:8
**verbal** 67:6,8 127:5 140:5 158:10
**verbally** 165:12
**verbatim** 165:25
**versa** 111:2
**version** 91:3
**versus** 69:24 95:17 108:10 120:14,24 128:12,19 130:7 133:15,18,23 134:1,4,17
**vetted** 164:13

**vice**
111:2
**video**
5:6 20:6 104:3,6 105:4,6 111:8 118:2 125:20,22 132:25 133:3,6,8,9 138:20,23 140:6 154:12 155:3 160:12,13, 17,19,24 161:3,12,18, 21,23,25 163:15 164:3,8,16, 17 166:1,2, 3,4,6
**video's**
163:11
**video-recorded**
5:11
**videos**
106:17 111:11 162:6 163:3,8,13, 23 166:5
**view**
68:20 123:13
**viewing**
163:13
**village**
56:5
**violated**
29:21 157:13,22
**violating**
100:25
**violation**
67:22 70:9 71:15 79:13 80:15 89:16 90:8 91:8 92:9
**violations**
47:13 52:2 66:11,14 70:10 71:14 74:21 75:18
**void**
46:18

**W**

**Wait**
122:18
**walk**
131:11 161:8
**walked**
131:10,11
**walks**
133:10
**want**
7:21,23 9:20,22 10:7 21:8 30:8,10 31:3 33:22 35:23 41:16 47:19 54:16 63:2 71:8 78:1 79:2 82:21 84:13, 16 92:5 114:3 116:9 122:22 129:15 132:13 135:2,3 144:24 146:18 153:12,21 160:22 162:22
**wanted**
61:13
**warning**
67:3,4,6,9, 18 80:9
**warnings**
66:16,21
**warrant**
92:2 93:8 156:24
**warrantless**
18:19 91:13 92:24 93:10 158:2
**wash**
110:7
**watch**
144:23,24 161:25 162:5
**watched**
162:5,7,11
**watching**
162:9
**water**
39:4 82:24 84:13
**way**
17:6 37:12 44:16 52:10 62:7 63:21 65:11 67:9 74:18 85:12 89:8 95:25 107:20 108:5 109:23 111:6,20 117:4,10,16, 17 119:23,24 122:25 123:14 125:25 130:3 136:20,21 138:7 146:15 149:11,19 151:4 161:22 163:9
**ways**
148:10,12
**weapon**
127:2 135:7
**website**
28:14
**weeds**
48:8
**week**
12:3 36:22 81:16
**weekends**
69:6
**weigh**
164:22
**weighed**
130:7
**weighs**
136:16
**weight**
118:18,22,25 125:21
**weights**
118:24
**well-known**
29:9
**well-reasoned**
123:24
**went**
34:22,25 43:24 64:18 67:5 116:20 162:11
**West**
23:18
**wet**
113:14
**what-happened**
157:10
**whatnot**
93:22
**white**
20:24 32:4, 8,22 33:3 68:21 107:25 158:21
**who've**
26:3,8
**whoa**
143:21
**wife**
62:22
**Wildlife**
40:4

**Williams**
23:8,20,23, 24
**wipe**
113:10,14,16
**wire**
109:24 110:19
**wiring**
110:17
**wished**
68:12 90:18
**withdraw**
79:5
**withdrawn**
159:20
**witness**
5:6,17,20 6:11,16 7:5, 7 13:10,17 14:3 15:14 18:2 20:16 25:5 27:19, 23 32:4 33:14 41:21 45:10,25 51:12 52:20 53:9,21 58:10 63:2, 25 68:6,16 74:4,18 75:14 76:6, 16 78:16 79:11 80:4 81:6 82:12 83:17,19 87:19 88:4, 17 89:13 91:7,23 92:16 100:5, 22 101:21 102:7,19 107:9,19 109:15 115:21 117:15 121:20,23 123:18 131:24 132:2,15 133:10 140:14 147:2 157:1,19 158:4 159:14 160:16 166:24 167:14
**witnessed**
59:11 98:19
**Womack**
6:8 38:25
**woman**
32:14,17
**wonder**
50:5
**wondered**
115:18
**wondering**
36:17 68:11 120:19
**word**
17:4 96:1 162:8
**words**
83:7
**work**
16:6 26:16 39:18,22 66:2 81:9 97:16 102:14 106:25 107:5 155:5,6
**worked**
51:4 57:4 60:1,2,14 106:23 125:19
**working**
46:14 69:7 83:10 107:4
**works**
108:4
**world**
47:24 58:22 92:19
**world's**
73:3
**worries**
14:12
**woven**
109:25
**wrap**
10:4
**wrapped**
120:25 127:15 167:7
**wrestled**
134:8
**wrist**
138:25 149:11 151:5 153:13
**wrists**
151:6
**write**
29:11 33:11 34:8 121:9 160:8
**writing**
28:14 105:17
**written**
59:15 63:9
**wrong**
31:16,20 35:17 86:7 117:12
**wrongdoing**
20:18 61:4
**wrote**
34:10 35:19 87:13 93:21 97:12 142:1 154:4

**Y**

**y'all**
158:24
**yeah**
9:11 11:1,4 14:16 17:24 18:2 21:18 22:23 23:25 26:11 28:16 29:24 32:2, 3,6,18 38:14,20 41:3 43:22 44:7 45:25 47:4 48:22 50:2,24 51:5,7,12 53:21 54:9, 15 55:3 56:22 57:20 58:5,13,22 62:12,13 63:2 66:3,9 68:16 69:15 70:21 71:7 72:17 73:15 74:18 75:14 76:9 77:21 78:7 79:20 80:4 81:8,21 83:18 85:17 86:6 93:20 94:4 96:11 98:7,10 103:10,25 104:16,21,23 105:12 106:25 110:3 113:12 114:2,12,25 115:3 116:1, 6,8,11 118:9,20 119:2,3 120:10 122:19 127:8 129:19 130:6 131:7,18,24 132:15 133:10 134:2 135:21 136:9,18 138:8 140:7, 14 141:14,16 143:17 147:2,19

150:20 151:2 154:15,16, 23,25 155:21,22 156:22 157:1 164:9,12,23 165:1,7,10, 16 166:22

**year**
25:17 27:5 38:3 41:10 57:12,14 58:15,23 59:1 121:5

**yearly**
55:11 57:3, 9,17 58:14 147:22

**years**
18:3 25:18 30:19,23 32:14 34:10 35:8 36:24 37:25 40:12 41:14,15 51:13 57:5 60:22 94:5 98:11,25 108:4 135:1 149:18 150:23 152:25

**yelled**
146:4

**yelling**
157:20

**younger**
109:10

**Z**

**zero**
48:15

**zoom**
29:2 163:13