**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| **ALEXANDER CLARK** | **CIVIL ACTION NO.: 3:22-CV-00326** |
| **VS.** | **JUDGE JOHN W. deGRAVELLES** |
| **JEAN HOTARD, ET AL** | **MAGISTRATE RICHARD L. BOURGEOIS, JR.** |

**MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE CERTAIN EXPERT TESTIMONY OF C. SCOTT COURREGE**

**MAY IT PLEASE THE COURT:**

Defendants, Sydney McCullough, J. Shannon Womack, and City of Denham Springs, through undersigned counsel, respectfully request that this Honorable Court deny Plaintiff, Alexander Clark's *Motion to Exclude Certain Expert Testimony of C. Scott Courrege* (R. Doc. 173) for the reasons set forth below:

## I. INTRODUCTION

In support of her *Motion for Summary Judgment* (R. Doc. 172), Defendant offered the Affidavit of C. Scott Courrege (R. Doc. 172-8), a law enforcement expert in police practices and use of force, to opine on whether the amount of force used by the Defendant officers, Hotard, Bowden, and McCullough, during the course of Plaintiff, Alexander Clark's arrest was reasonable. Mr. Courrege's expert report expounds on the findings summarized in his affidavit. (R. Doc. 173-3). Plaintiff seeks to exclude substantial portions of Defendants' qualified police practices expert's testimony through an overly broad challenge that fundamentally mischaracterizes both Mr. Courrege's opinions and the applicable legal standards governing expert testimony. Mr. C. Scott Courrege is an eminently qualified law enforcement expert in police practices, use of force, and officer training who began his career in law enforcement over twenty-five years ago. His testimony will properly assist the trier of fact in understanding critical issues in this case, including the

context of law enforcement decisions, the interpretation of events captured on video, and the application of accepted police practices to the incident at issue.

Plaintiff's motion conflates admissibility with weight, improperly seeks to exclude testimony based on disagreements that should be resolved through cross-examination, and misconstrues settled law regarding the scope of permissible expert testimony. The motion represents an attempt to prevent the jury from hearing probative evidence that contradicts Plaintiff's narrative. While styled as a *Daubert* challenge, the motion is an improper effort to prevent vigorous adversarial testing of Plaintiff's claims and expert opinions. Mr. Courrege's testimony is admissible under Federal Rules of Evidence 702 and 704, and any perceived weaknesses in his opinions are properly addressed through cross-examination and competing evidence – not exclusion. The Court should deny Plaintiff's motion in its entirety, or at most, limit specific narrow portions of Mr. Courrege's testimony while permitting the substantial remainder to be presented to the jury.

## II. LAW AND ANALYSIS

Trial courts have broad discretion in deciding whether to admit expert opinion testimony.[1] In the exercise of that discretion, Fed. R. Evid. 702 mandates the following standard:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

[1] *See, e.g.*, *General ElectricCo. v. Joiner*, 522 U.S. 136, 142 (1997) (appellate courts review a trial court's decision to admit or exclude expert testimony under *Daubert* under the abuse of discretion standard); *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988 ("District courts enjoy wide latitude in determining the admissibility of expert testimony.").

This rule codifies the Supreme Court's decisions in *Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). Under *Daubert*, Rule 702 charges trial courts to act as "gate-keepers" with respect to the admissibility of expert testimony.[2] This rule requires a trial judge to ensure "that an expert's testimony both rests on reliable foundation and that it is relevant to the task at hand."[3]

However, "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system."[4] As with all other admissible evidence, expert testimony is subject to being tested by "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof."[5] In determining the admissibility of expert testimony, a district court must defer to "'the jury's role as the proper arbiter of disputes between conflicting opinions. Generally, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.'"[6] Accordingly, courts have interpreted the policy objectives of Rule 702 as requiring a liberal standard for admitting expert testimony.[7] "Experts should be excluded only if their testimony is so fundamentally unsupported that it cannot possibly help the factfinder."[8]

Here, there is no dispute whether Mr. Courrege is qualified as an expert in police practices. Rather, Plaintiff raises a series of challenges that either go to the weight, rather than the admissibility of his testimony, or fundamentally misconstrue the proper scope of police practices

---

[2] *U. S. v. Hicks*, 389 F.3d 514, 525 (5th Cir. 2004) (citing to *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243-44 (5th Cir. 2002) (quoting *Daubert* at 592-3)).
[3] *Daubert* at 597.
[4] *United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cnty., Miss.*, 80 F.3d 1074, 1078 (5th Cir. 1996).
[5] *Daubert* at 596.
[6] *United States v. 14.38 Acres of Land* at 1077 (quoting *Viterbo v. Dow Chem. Co.,* 826 F.2d 420, 422 (5th Cir.1987)).
[7] *Daubert* at 588.
[8] *Smiley v. New Hampshire Ins. Co.,* 2021 WL 292449, at *8 (M.D. La. Jan. 28, 2021) (quoting *General Electric Capital Business Funding Corp. v. S.A.S.E. Military Ltd.*, 2004 WL 5495590, at *5 (W.D. Tex. Oct. 21, 2004) (citing *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987)).

expert testimony. As demonstrated below, each of these challenges either confuses the nature of Mr. Courrege's testimony or seeks to exclude opinions that, even if subject to legitimate critique, are properly tested through cross-examination rather than wholesale exclusion. Plaintiff's motion should therefore be denied, as Mr. Courrege's testimony readily satisfies the liberal admission standard under Rule 702 and will meaningfully assist the jury in understanding the law enforcement context of this case.

### A. <u>Mr. Courrege's Critique of Dr. Abraham's Statistical Analysis Is Admissible</u>.

Plaintiff contends that Mr. Courrege's opinions regarding Dr. Abraham's statistical analysis should be excluded because he is not a statistician and lacks expertise in identifying racially discriminatory practices. This argument fundamentally misunderstands the nature of Mr. Courrege's testimony and the proper scope of police practices expert opinions. Mr. Courrege does not purport to conduct his own statistical analysis or to replicate Dr. Abraham's calculations. Rather, he offers his professional opinion, which is grounded in decades of law enforcement experience, that Dr. Abraham's analysis fails to account for critical operational factors that any meaningful evaluation of police enforcement patterns must consider. This type of contextual critique falls squarely within his expertise.

Mr. Courrege does not need to be a statistician to opine on whether a statistical analysis captures the relevant operational realities of law enforcement that bear on its conclusions. His critique is not that Dr. Abraham performed her calculations incorrectly, but rather that her analysis is incomplete because it fails to consider how police departments function. As Mr. Courrege explains in his report, Dr. Abraham's analysis does not account for: (1) the Criminal Patrol Division's specific mandate; (2) deployment strategies employed by LPSO; or (3) whether patrols were focused in certain areas due to crime trends or citizen-reported concerns. (R. Doc. 173-3 at

8). These are precisely the types of operational realities that a police practices expert is uniquely qualified to identify and explain.

Here, Mr. Courrege's opinions are grounded squarely in his understanding of police operations and practices. As he aptly states in his report, "[a] proper bias analysis must evaluate not just outcomes, but also the rationale behind patrol patterns and enforcement strategies. Without considering why deputies focused their efforts in specific areas, any statistical inference regarding racial bias remains incomplete and potentially misleading." (R. Doc. 173-3 at 8). This is a methodological critique rooted in law enforcement expertise, not statistical analysis. Notably, even Plaintiff's own police practices expert, Daniel J. Buskin, acknowledges the limitations of the data Dr. Abraham analyzed. Mr. Courrege quotes Mr. Buskin as stating:

> While this information alone does not provide context to better understand the dynamics which may drive these figures, and this table alone is insufficient to prove any systemic bias, this finding is simply presented as a summation of facts which emerged from the analysis of the data that was provided... (R. Doc. 173-3 at 8).

When Plaintiff's own expert recognizes that context is needed to understand the data, it is difficult to argue that Defendants' expert should be barred from explaining what that missing context is.

Plaintiff's assertion that Mr. Courrege's opinions lack a sufficient factual foundation confuses the standard for admissibility with arguments more appropriately directed to the weight of his testimony. Plaintiff faults Mr. Courrege for not knowing whether specific data regarding LPSO's deployment strategies or citizen complaints exist in this case. However, this critique actually underscores Mr. Courrege's point: Dr. Abraham's analysis proceeds without accounting for these potentially explanatory factors. Mr. Courrege has identified specific categories of missing information based on his professional understanding of law enforcement operations. These are concrete, specific operational factors he knows from his experience are relevant to understanding enforcement data *not* vague speculation. The cases Plaintiff cites are inapposite. Those cases

involved experts who speculated about facts affirmatively contradicted by the record or who made assumptions entirely untethered from any evidentiary basis. Here, Mr. Courrege has identified types of operational data that, based on his law enforcement experience, are relevant to evaluating enforcement patterns but are absent from Dr. Abraham's analysis.

*Hathaway v. Bazany*, 507 F.3d 312 (5th Cir. 2007), involved the exclusion of a law enforcement officer's forensic reconstruction testimony. The expert attempted to determine the shooter's location based on bullet trajectory and shell casing placement, essentially acting as a forensic analyst rather than a police practices expert.[9] The court excluded the testimony because it was based on "a host of unsupported conjectures that falls far short of a methodology" and the expert lacked "any discernable training in or use of a scientific methodology" suited to such reconstruction.[10] Here, Mr. Courrege is not purporting to act as an expert in statistics. As an expert in police practices, Mr. Courrege is qualified to evaluate whether data captures relevant context for evaluating enforcement patterns. His report methodically explains the types of operations that can affect enforcement patterns (pretextual stops, high-saturation patrols, targeted enforcement in high-crime areas), why these operations are conducted (crime statistics, citizen complaints), and why data limited to citations and reports may not capture the full picture of enforcement activity. (R. Doc. 173-3 at 7-8). This constitutes a reliable, experience-based methodology that is precisely what Rule 702 contemplates for expert testimony.

The *Bibbins* case cited by Plaintiff is readily distinguishable. In *Bibbins v. City of Baton Rouge*, 498 F. Supp. 2d 562, 571 (M.D. La. 2007), the expert offered a specific probability conclusion without explaining any basis for that probability assessment. Mr. Courrege, by contrast, offers no statistical calculations or probability determinations regarding the policing practices

[9] 507 F.3d at 318-19.
[10] *Id*. at 318.

being utilized by LPSO or DSPD. He does not claim that Dr. Abraham's statistical findings are mathematically incorrect or that any particular probability is "astronomically low," like the expert in *Bibbins*. Instead, he provides a contextual critique grounded in his law enforcement experience, identifying several operational factors that Dr. Abraham's analysis fails to consider. This is not an unexplained probability calculation; it is a reasoned, experience-based critique with a clear foundation. As discussed above, even Plaintiff's police practices expert, Mr. Buskin, acknowledges that Dr. Abraham's data "alone does not provide context to better understand the dynamics which may drive these figures." (R. Doc. 173-3 at 8). *Bibbins* stands for the narrow proposition that an expert cannot offer statistical probability conclusions without explaining the statistical methodology used to reach them. That case does not prohibit experience-based experts, affirmatively permitted by Rule 702 and *Kumho Tire*, from identifying operational factors that a statistical analysis overlooks. Mr. Courrege's testimony falls squarely within the latter category and should be admitted.

**B. <u>Mr. Courrege's Observation About the Uncommon Nature of Mr. Clark's Injury Is Permissible Experience-Based Testimony</u>.**

Plaintiff contends that Mr. Courrege impermissibly offers a medical opinion when he states that Mr. Clark's handcuffing injury is "not ordinary" based on his extensive law enforcement experience. This argument fundamentally mischaracterizes Mr. Courrege's testimony and conflates two distinct types of statements: (1) medical opinions about causation, diagnosis, or treatment; and (2) experience-based observations about what is typical or atypical in law enforcement encounters. Mr. Courrege's testimony falls squarely in the latter category and is entirely permissible under Rule 702. Mr. Courrege's report states as follows:

> Mr. Clark contends that he was injured during the handcuffing process or when Deputy Hotard grabbed his hand. Whether his injury was causally related to this action is beyond the scope of my expertise; however, I have personally been handcuffed likely hundreds of times in training and participated in hundreds if not thousands of arrests in my career. I have never seen an injury arising in this manner. Based on my experience, an injury sustained in this stage of the handcuffing technique is not ordinary. (R. Doc. 173-3 at 18).

Plaintiff's motion mistakenly states that Mr. Courrege's opinion was based on Mr. Clark's alleged injury resulting from the handcuffs being too tight. Mr. Courrege's assessment of the facts aligns with Mr. Clark's testimony – that the injury occurred during the handcuffing process or when grabbed by one of the officers. As detailed in his report, the handcuffing process includes use of force techniques necessary to overcome any physical resistance to secure the handcuffs. (R. Doc. 173-3 at 17). Taking control of the hands is an integral part of the handcuffing technique itself. (R. Doc. 173-3 at 18). There is no "counter-factual strawman" as Plaintiff contends.

Moreover, Mr. Courrege explicitly and repeatedly disclaims any opinion about medical causation. He does not diagnose Mr. Clark's injury, does not explain the medical mechanism by which it occurred, does not opine as to whether the handcuffing technique caused the injury, and does not suggest any medical treatment. What Mr. Courrege does offer is a narrow, experience-based observation: in his decades of law enforcement experience, he has never seen an injury arise from the handcuffing technique at issue, and based on this extensive experience, such an injury is "not ordinary." (R. Doc. 173-3 at 18). This is an observation about frequency and typicality, not medical causation or diagnosis. Mr. Courrege's testimony that falls squarely within the scope of police practices expertise and directly addresses a fact in issue. Plaintiff's objection conflates medical causation opinions with experiential observations and, if accepted, would improperly exclude valuable expert testimony that assists the trier of fact. Accordingly, the Court should

permit Mr. Courrege's testimony that injuries from hand-control during handcuffing are "not ordinary" in his experience.

### C. Mr. Courrege's Analysis of the Dashcam Video Is Proper Expert Testimony That Assists the Trier of Fact.

Plaintiff contends that Mr. Courrege's analysis of the dashcam video constitutes inadmissible lay opinion that does not assist the trier of fact and improperly makes credibility determinations. This argument mischaracterizes the nature and purpose of Mr. Courrege's video analysis. Mr. Courrege does not simply narrate what the video shows – he applies his specialized training and experience to interpret the significance of the physical actions visible on the video, explain what those actions mean in the context of police practices and use of force analysis, and identify details that a lay jury might overlook or misunderstand. This is precisely the type of expert assistance that Rule 702 contemplates.

#### 1. Mr. Courrege Applies Specialized Training to Interpret Physical Movements.

Plaintiff conflates two very different types of testimony: (1) an expert simply narrating what the video shows, which adds nothing to the jury's own observation; and (2) an expert applying specialized knowledge to interpret the significance of what the video depicts. Mr. Courrege provides the latter. This is particularly useful in rapid sequences such as an arrest. For example, Mr. Courrege explains that he observes "a back-and-forth motion of Mr. Clark's right arm in an apparent struggle" and that "the right arm was forced behind Mr. Clark's back momentarily, but then can be seen moving forward out of Deputy Hotard's grip." (R. Doc. 173-3 at 6). To a lay jury, these movements might appear ambiguous or unclear. But Mr. Courrege, with his extensive training in defensive tactics, handcuffing techniques, and recognizing resistance, can explain what these specific movements indicate: the back-and-forth motion is characteristic of active resistance, not mere passive non-compliance; the arm being forced behind the back

momentarily shows the officer gained control; the arm then moving forward out of the officer's grip demonstrates Mr. Clark pulling away from that control; and that this sequence is what officers are trained to recognize as active resistance requiring force to overcome. This interpretation requires specialized knowledge.

Similarly, when Mr. Courrege discusses Officer McCullough's hand placement, he explains:

> It has also been alleged that Officer McCullough choked Mr. Clark. …. There is simply no evidence that she grabbed his throat or applied pressure to the side of his neck or throat. Although possible to apply either type of neck restraint when a subject is bent over at the waist as Mr. Clark was positioned, it would require Officer McCullough's arm to be at a downward angle and on side of the neck. This did not happen as her elbow is near the back of his neck and her hand near his shoulder. In my experience, a choke simply cannot be performed from the back of the neck with one hand as alleged. (R. Doc. 173-3 at 17).

This analysis applies Mr. Courrege's specialized knowledge of neck restraint techniques to explain why the positioning visible in the video is not consistent with a chokehold. Plaintiff contends that he did not allege in his Complaint that Officer McCullough "choked" him; instead, the language he used was that she "applied pressure" to his neck. Semantics do not change the fact that Plaintiff testified that he was choked. (R. Doc. 172-3, Deposition of Alexander Clark at 100:14 – "They choked me."). Therefore, Mr. Courrege's opinion that Mr. Clark was not choked is not a "strawman rebuttal" that should be excluded – it is expert interpretation applying specialized training and experience in use of force, resistance recognition, and arrest procedures.

Plaintiff points to Mr. Courrege's deposition testimony that "you don't have to be an expert" to analyze the dashcam video. (R. Doc. 173-4 at 161:25-162:4). But this concession, in context, means only that anyone can watch the video, which is obviously true. It does not mean that expert interpretation is unnecessary or that it fails to assist the jury. The full context of Mr. Courrege's testimony shows that while anyone can observe the video, trained officers interpret

what they see differently based on their training and experience. The movements that appear ambiguous to a lay observer are recognized by trained officers as indicating specific types of resistance or compliance. This interpretation is what makes Mr. Courrege's testimony valuable.

Plaintiff further argues that Mr. Courrege impermissibly makes credibility determinations by stating that the video "appears to debunk" Mr. Clark's testimony. (R. Doc. 173-3 at 10). This argument misunderstands the distinction between describing objective evidence and assessing witness credibility. What Mr. Courrege does is compare testimonial accounts to objective video evidence and explain whether the physical actions visible on the video are consistent or inconsistent with those accounts. This is not a credibility determination – it is evidence comparison and interpretation. The jury remains free to resolve any conflicts between the testimony and the video evidence. Mr. Courrege explains what the video shows from his expert perspective and how that compares to the competing accounts. The jury decides who and what to believe.

The cases Plaintiff relies upon involve materially different circumstances where experts did not provide specialized interpretation of video evidence. In *Day v. Baton Rouge City Police*, 2020 WL 7024478 (M.D. La. Nov. 30, 2020), the court had already determined in its summary judgment opinion that the video evidence at issue was "inconclusive" prior to the plaintiff filing a motion to exclude the defendants' law enforcement expert.[11] The court found that the defendants' law enforcement expert "appears to accept, *in toto*, Defendants' version of events" based on multiple *incomplete* videos and photographs of the plaintiff's arrest without applying "any particular analysis or methodology."[12] Accordingly, the court excluded the defendants' expert's testimony regarding probable cause and/or excessive force: "In simply accepting Defendants'

---

[11] *Day* at *5.
[12] *Id*.

version of the facts, Najolia's report artificially bolsters and potentially elevates Defendants' version without any apparent basis for such enhanced credibility."[13]

Here, the dashcam footage of Mr. Clark's arrest captured the entire incident from start to finish from a single viewpoint. Unlike the "inconclusive" video evidence in *Day*, this footage provides a complete visual record that the jury can assess independently. Unlike the expert in *Day* who applied no "particular analysis or methodology," Mr. Courrege grounds his opinions in specific, recognized law enforcement training frameworks. He cites Strategic Self-Defense & Gunfighting Tactics (SSGT) and Human Factor Research Group (HFRG) training programs, both of which are taught in Louisiana and provide objective standards for evaluating police conduct. (R. Doc. 173-3 at 11-15). He applies the *Graham v. Connor* factors that are mandated by constitutional law and taught to all Louisiana police officers through the POST curriculum. (R. Doc. 173-3 at 11). These methodologies provide a principled basis for his analysis *not* an artificial bolstering of one party's version of events. Mr. Courrege's testimony will assist the jury in understanding police training and practices without improperly influencing their fact-finding role.

Plaintiff also cites *Castro v. Wal-Mart Real Estate Business Trust*, 645 F. Supp. 3d 638, 645 (W.D. Tex. 2022), which states that "expert testimony on video recordings" should be excluded "where the expert is no better suited than a lay person to" interpret the video. This principle is sound but inapplicable here. In *Castro*, the court excluded a flooring expert's testimony as to the condition of the mat at issue in a slip and fall case "given that it will primarily rely on video footage available to the jury."[14] The court found that the expert's testimony was unlikely to be helpful and would "invade the province of the jury."[15] Here, Mr. Courrege is better suited than

[13] *Id.*
[14] *Castro* at 645.
[15] *Id.*

a lay person to interpret the video because of his law enforcement training which specifically teaches officers to recognize different types of resistance, distinguish active from passive resistance, and identify when subjects are pulling away from control. Moreover, Mr. Courrege has participated in "hundreds if not thousands of arrests" over his 20+ year career. (R. Doc. 173-3 at 18). This experience provides a baseline for what movements and actions are typical in arrest situations versus what indicates resistance. Finally, Mr. Courrege has studied and teaches specific handcuffing and control techniques (SSGT, HFRG). (R. Doc. 173-3 at 14-17). He can identify which techniques officers are attempting to employ and whether subjects are complying or resisting those techniques. A lay juror has none of this training or experience. When Mr. Courrege explains that the back-and-forth arm movement visible in the video is consistent with active resistance rather than passive positioning, he is applying specialized knowledge that assists the jury without "invading" their role as fact-finders.

Similarly to *Day* and *Castro*, the expert testimony at issue in *Williams v. City of Houston, Tex*., 2019 WL 2435854 (S.D. Tex. June 11, 2019), opining about what the surveillance videos at a prison showed was excluded because the court found that a description of the events "is information within a factfinder's lay knowledge and does not require specialized knowledge, training, or education."[16] In *Williams*, the plaintiff's law enforcement expert's report included language such as "Officer Corral deliberately and without any justification, forcefully shoved [Williams]...into the steel frame of the cell door....Officers are trained [to know] that...such conduct...would rise to the level of criminal conduct."[17] Mr. Courrege's report, in contrast, provides a helpful interpretation of the events depicted in the dashcam footage rather than an inflammatory assessment of the officer's conduct. For example, Mr. Courrege opines: "However,

[16] *Williams* at *6.
[17] *Id*.

assuming that Mr. Clark did, in fact, pull his right hand away from Deputy Hotard's control, this action would be considered active resistance." (R. Doc. 173-3 at 12). Mr. Courrege's testimony assists the fact-finders in drawing their own conclusions about whether the actions depicted in the dashcam footage constitute active resistance which is not a concept within the jury's lay knowledge.

**2. Mr. Courrege Does Not Make Improper Credibility Determinations.**

Plaintiff argues that Mr. Courrege improperly assesses the credibility of Mr. Clark and the officers by stating that the video "appears to debunk" Mr. Clark's testimony and "supports" Deputy Hotard's description of events. This argument conflates objective observations about what video evidence shows with subjective credibility assessments about witness truthfulness. Courts recognize an important distinction between (1) comparing witness testimony to objective video evidence, and (2) making subjective assessments about whether a witness is truthful or believable. The former is permissible; the latter is not.

In *Hagan v. Jackson Cnty., Mississippi*, 2016 WL 1091107 (S.D. Miss. Mar. 21, 2016), cited by Plaintiff, the court excluded the plaintiff's law enforcement expert's testimony regarding his opinion that the plaintiff was subjected to an "objectively unreasonable and malicious prosecution."[18] The court held that:

> This conclusory opinion is of the type that is not permitted by Rule 704 because it is for the jury to judge the credibility of a witness and render a fact determination on malice or intent, based upon proper instruction on the law from the Court. Rule 704 does not permit a witness to tell a jury what result it should reach, nor is the Rule intended to allow an expert to invade the Court's province by giving an opinion on the legal conclusions to be drawn from the evidence.[19]

[18] *Hagan* at *6.
[19] *Id*.

The expert in *Hagan* went beyond comparing testimony to observable facts and instead rendered opinions about witness character and veracity. Mr. Courrege does not do this. When he states that the dashcam footage "appears to debunk" Mr. Clark's testimony that he did not resist, he is not assessing Mr. Clark's character or truthfulness. He is observing that the video shows Mr. Clark's arm moving away from Deputy Hotard's control – an objective fact captured on video – which contradicts Mr. Clark's testimony. The jury will see the same video and can make its own determination about whether the video corroborates or contradicts the testimony. Mr. Courrege's role is to explain what these physical movements *mean* in the context of law enforcement training about resistance.

Similarly, when Mr. Courrege states that the video "supports Deputy Hotard's description of the resistance" (R. Doc. 173-3 at 12), he is noting a correlation between testimony and observable video evidence, not vouching for Deputy Hotard's truthfulness. The full context makes this clear:

> Despite the dispute in testimony, a review of the video supports Deputy Hotard's description of the resistance as Mr. Clark's right arm is clearly out of Deputy Hotard's grasp after first being moved to his back. (R. Doc 173-3 at 12).

Mr. Courrege then includes screenshots showing the arm positions. (R. Doc. 173-3 at 12-13). This is objective analysis: *if* the video shows the arm out of the deputy's grasp (which the jury can see for itself), *then* this corresponds with the deputy's testimony about resistance. Mr. Courrege is not asking the jury to believe Deputy Hotard because he finds him credible; he is pointing to observable facts that either do or do not align with testimony.

Unlike the expert in *Day*, who "appears to accept, *in toto*, Defendants' version of events,"[20] Mr. Courrege explicitly states in his report: "In the event that there was a discrepancy in the

[20] 2020 WL 7024478, at *5.

testimony regarding the facts, I have avoided making credibility determinations." (R. Doc. 173-3 at 5 n.1). Throughout his report, as seen in the excerpt above, Mr. Courrege uses conditional language when discussing disputed facts. This framing demonstrates that Mr. Courrege recognizes factual disputes exist and is not resolving them. Instead, he provides analysis under different factual scenarios, allowing the jury to apply his expertise regardless of which version of disputed facts it credits. Plaintiff cherry-picks one deposition statement where Mr. Courrege acknowledged that his opinion is "that Mr. Clark's account is discredited by the video evidence." (R. Doc. 173-4 at 160:12-15). But the full context of this testimony shows Mr. Courrege was explaining that the video provides objective evidence the jury can compare to testimony *not* that he was making a personal credibility assessment:

> Q. You also claim in your report that the video, the dashcam video of the incident, discredits Mr. Clark's account of what happened; is that correct?
>
> A. Part of it. Yes.
>
> Q. So is Mr. Clark a credible witness in this case if the video discredits his account?
>
> A. The credibility is a question for the Jury, but if something is apparent on video that did or did not happen, I would assume that lawyers would ask me to assume those facts to be true and give opinions based on that. So the Jury can credit or discredit anything they want.

(R. Doc. 173-4 at 160:12-22). Mr. Courrege's expert testimony is limited to observing objective facts, explaining their significance based on training, and leaving credibility judgments to the jury.

For these reasons, Mr. Courrege's testimony analyzing the video evidence should not be excluded. His testimony applies specialized knowledge about law enforcement training and defensive tactics to observable facts captured on video. Mr. Courrege does not make credibility determinations. He explains what physical movements mean in the context of use of force training. He explicitly acknowledges factual disputes and uses conditional language throughout his analysis.

Unlike the expert in *Day*, Mr. Courrege applies recognized methodologies and does not simply endorse one party's version of events. His testimony will assist the jury in understanding complex issues related to police training and practices without usurping the jury's role as fact-finder.

### D. <u>Mr. Courrege's Analysis of the *Graham* Factors Is Permissible Expert Testimony That Explains Police Training and Decision-Making</u>.

Plaintiff contends that Mr. Courrege impermissibly draws legal conclusions by analyzing the *Graham v. Connor* factors and opining that "there was a government interest in using some force to detain Mr. Clark." (R. Doc. 173-3 at 11). This argument misunderstands the permissible scope of police practices expert testimony and the distinction between (1) explaining how officers are trained to evaluate use of force situations, including the factors they consider; and (2) making the ultimate legal determination of objective reasonableness reserved for the jury. Mr. Courrege does the former. His testimony will help the jury understand the analytical framework officers use in making split-second decisions.

#### 1. The *Graham* Factors Are Not Merely a Legal Standard – They Are the Training Framework Officers Use in Real-Time Decision-Making.

Plaintiff treats the *Graham* factors as if they exist solely as a legal test for courts and juries to apply after the fact. But this ignores a critical reality: the Graham factors are the framework that officers are trained to use in real-time when making use of force decisions. As Mr. Courrege explains:

> As discussed by *Graham* and as taught to all Louisiana police officers in the POST curriculum, the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. (R. Doc. 173-3 at 11).

He further notes:

> Proper application of the *Graham* principles by police officers requires careful attention to the facts and circumstances of each particular case, including: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. (R. Doc. 173-3 at 11).

Mr. Courrege is explaining police training *not* performing a legal analysis. Officers across Louisiana (and the nation) are taught to evaluate these three factors when deciding what level of force to use. They do not apply some other framework and then have *Graham* applied to their actions later – they use *Graham* in the moment. An expert explaining how officers are trained to evaluate situations and what factors they are trained to consider is providing exactly the kind of specialized knowledge that assists the jury under Rule 702. The jury needs to understand that officers do not make force decisions randomly or based on subjective preferences; rather, they are trained to assess specific factors. Mr. Courrege's testimony explains that training.

**2. Mr. Courrege Explains the Presence or Absence of Factors, Not the Ultimate Legal Conclusion of Objective Reasonableness.**

There is critical distinction between explaining whether the *Graham* factors are present in a situation, which is permissible and what Mr. Courrege does in his report, and concluding that force was "objectively reasonable" as a legal matter. Mr. Courrege analyzes each factor:

**(1) Severity of Crime:** Mr. Courrege explains that officers believed Mr. Clark had committed felony drug possession and obstruction of justice. (R. Doc. 173-3 at 11). This is a factual observation about what crime officers believed was at issue

**(2) Immediate Threat:** Mr. Courrege states: "Mr. Clark's actions of destroying the evidence and pulling his arm away from Deputy Hotard, if assumed to be true, would be indicative of a suspect who intends to not comply with commands. A non-compliant suspect does not always pose an immediate risk of harm to officers, but certainly that non-compliance should be considered when evaluating the presence of a threat. In my review of the video, it does not

appear that Mr. Clark intended to harm the deputies, although caution should always be used during arrest." (R. Doc. 173-3 at 11). Notably, Mr. Courrege explains that the threat level was lower because Mr. Clark did not appear to intend harm. This is a factor-analysis, not a legal conclusion that force was reasonable.

**(3) Active Resistance:** Mr. Courrege opines that "assuming Deputy Hotard's account is accurate and that Mr. Clark leaned forward and pulled his arm away during the handcuffing process, Mr. Clark's actions amounted to active resistance to arrest." (R. Doc. 173-3 at 11). Again, this is a factual assessment of whether active resistance was present *not* a legal conclusion.

After analyzing all three factors, Mr. Courrege concludes: "it is my opinion that there was a government interest in using some force to detain Mr. Clark." (R. Doc. 173-3 at 11). Critically, he does not say: "The force used was objectively reasonable." Mr. Courrege states that there was "a government interest in using ***some*** force," meaning, the factors indicate that some level of force was appropriate. (R. Doc. 173-3 at 11) (emphasis added). But he expressly does not opine on ***how much force*** was reasonable or whether the specific force used was objectively reasonable. Following this statement, he proceeds to analyze "the amount or level of force used" separately.

### 3. Mr. Courrege's Use of "Reasonable" Language Describes Officer Perception, Not Ultimate Objective Reasonableness.

Plaintiff objects to Mr. Courrege's use of language like "perfectly reasonable belief" and "reasoned decision making" – but context matters. Mr. Courrege uses this language to describe what the officers perceived and believed at the time. He does not use "reasonable" to make a legal conclusion about objective reasonableness. For example, when Mr. Courrege testified that "obstruction of justice is a perfectly reasonable belief" (R. Doc. 173-4 at 128:3-5), he was describing whether officers had a rational basis to believe this crime occurred, which goes to the first *Graham* factor (severity of crime). It does not conclude that the force used was objectively

reasonable. Similarly, Mr. Courrege's statement that "because the immediate threat wasn't so great that really shows how reasoned that decision making was in not doing that take down to the ground" (R. Doc. 173-4 at 130:16-19) explains that the arresting officers used restraint based on their decision to use a lower level of force than they were trained they could use. Mr. Courrege does not opine as to whether the forced used was legally reasonable.

Mr. Courrege testifies about the officers' "reasonable belief," i.e., that the officers had factual basis for their perception which is a permissible expert observation about officer thought process rather than a legal conclusion. Mr. Courrege explains what the officers perceived, what they believed, and how their training taught them to evaluate the situation. This information is crucial for the jury to evaluate whether officers acted reasonably from "the perspective of a reasonable officer on the scene."[21] He does not testify that their actions met the legal standard of objective reasonableness.

**4. Plaintiff's Cases Are Distinguishable.**

Plaintiff cites *Fetty v. City of Baton Rouge*, 518 F. Supp. 3d 923, 930 (M.D. La. 2021), where this Court excluded expert testimony where the expert "analyzed officers' actions through the impermissible frame of reasonableness and necessity." The critical word is "frame," meaning the expert's entire analysis was structured around determining whether actions were reasonable and necessary. Here, Mr. Courrege's testimony is not framed that way. His analysis is framed around: (1) what officers perceived; (2) what factors officers considered based on their training; (3) what techniques officers employed; and (4) what level of force officers used compared to what they were trained they could use. The *Graham* factors are discussed because they are part of officer training, not because Mr. Courrege is determining reasonableness as a legal matter.

[21] *Graham v. Connor*, 490 U.S. 386 (1989) at 396.

Plaintiff also cites *State of Louisiana v. Byron Franklin*, 2024 WL 4875633 (La.App. 5. Cir. 11/22/24) in which the state appellate court overturned the district court's ruling, concluding that Mr. Courrege could not give an opinion on whether the victim's actions created reasonable fear for a generic person in the context of a deadly force case. Here, the *State v. Franklin* decision is inapposite to Mr. Courrege's proposed testimony regarding the *Graham* factors. While *Franklin* properly excluded testimony that would have usurped the jury's function by opining on the ultimate question of whether a defendant's fear was reasonable, Mr. Courrege's testimony serves an entirely different purpose: explaining the training framework that officers use in real-time and identifying whether the *Graham* factors are present in the evidence, not whether the force was ultimately reasonable.

Unlike self-defense cases where jurors can draw on their own life experience about fear and danger, use-of-force cases require understanding a specialized professional training framework. As the Supreme Court recognized in *Graham*, force must be judged "from the perspective of a reasonable officer on the scene" who makes "split-second judgments" based on training.[22] Jurors cannot evaluate whether officers followed their training without expert testimony explaining that training. Mr. Courrege's testimony regarding the *Graham* factors is fundamentally different from the excluded testimony in *Franklin*. He does not tell the jury whether a reasonable person would have been afraid, whether Mr. Clark's actions justified the force used, or whether the force was objectively reasonable. Instead, he educates the jury about the training framework officers use, identifies whether the factors officers are trained to consider are present in the evidence, and explains how the officers' actions relate to their training while expressly reserving the ultimate question of objective reasonableness for the jury.

[22] *Id*.

In *O'Hara v. Lott*, No. 4:23CV442 HEA, 2025 WL 2549231, at *14-15 (E.D. Mo. Sept. 4, 2025), the court excluded testimony where the expert opined on "how the evidence...does or does not meet each factor of *Graham v. Connor*" and concluded "the key factors in *Graham v. Connor* had been met." The expert in *O'Hara* made a definitive legal conclusion that the *Graham* factors "had been met," meaning the force satisfied the legal standard. Mr. Courrege explains the factors were present, which is a permissible factual observation, but does not conclude they were "met," an impermissible legal conclusion.

Mr. Courrege's discussion of the *Graham* factors does not constitute impermissible legal conclusions. He explains the training framework officers use to evaluate use of force situations, identifies whether the factors were present or absent, describes officer perceptions and decision-making, and provides context about the level of force used compared to available options. He does not conclude that force was "objectively reasonable" as a matter of law or usurp the jury's role. His testimony assists the jury in understanding the specialized knowledge officers bring to rapidly evolving situations. The cases Plaintiff cites are distinguishable and reflect varying approaches to this issue. If the Court has concerns, a limiting instruction can address them without requiring wholesale exclusion of valuable expert testimony. For these reasons, this Court should permit Mr. Courrege to testify about the *Graham* factors, officer training, and the analysis the officers conducted in this case.

**E. Mr. Courrege's Opinions About Mr. Clark's Actions Are Relevant to Officers' Perceptions and the *Graham* Analysis, Not Impermissible Legal Conclusions.**

Plaintiff contends that Mr. Courrege impermissibly offers legal conclusions when he opines that Mr. Clark's actions constituted Obstruction of Justice and Resisting an Officer under Louisiana law. Plaintiff argues these opinions are irrelevant because the validity of the criminal charges is not an element of the remaining claims. This argument misunderstands the role these

opinions serve. Mr. Courrege does not opine on Mr. Clark's guilt or the validity of the charges for their own sake. Rather, he explains what the officers reasonably believed at the time about the nature of the suspected criminal activity, which is directly relevant to the *Graham* factors and the officers' decision-making during the use of force. This testimony assists the jury in evaluating whether officers acted reasonably from their perspective at the time.

### F. Mr. Courrege's Opinions About the Stop, Search, and Arrest Provide Essential Context and Are Not Confusing.

Plaintiff contends that certain of Mr. Courrege's opinions "do not bear on any live claim in the case" because they address the traffic stop and search, which Plaintiff characterizes as dismissed issues. Plaintiff also argues that Mr. Courrege's opinions about "108" calls are irrelevant. These arguments misunderstand both the scope of dismissed claims and the relevance of contextual testimony to the remaining claims.

Plaintiff seems to argue that because this Court dismissed certain claims related to the stop and search, no testimony about the stop and search is permissible. Mr. Courrege explains that the stop and search were "consistent with generally accepted police practices and training." (R. Doc. 173-3 at 11). This testimony serves several permissible purposes. It explains officers were following their training which is relevant to good faith and reasonableness. The testimony also shows that the officers had a basis for their actions which goes to their state of mind and establishes the officers' reasonable beliefs about the situation. These purposes do not require the jury to determine the constitutional validity of the stop and search. To the extent Mr. Courrege's testimony addresses the specific dismissed claim about the use of the code "108," his explanation of what happened in this specific incident, including what "108" means and whether Officer McCullough's actions constituted force, remains relevant to Plaintiff's excessive force claim.

Plaintiff argues generally that Mr. Courrege's contextual opinions "will only serve to confuse the trier of fact," but does not explain how or why this testimony would be confusing. The narrative of events, from stop to search to arrest to force, is straightforward and helps (not hinders) jury comprehension. Fed. R. Evid. 403 requires that probative value be "substantially outweighed" by danger of confusion. Plaintiff has not met this burden. At most, Plaintiff has identified testimony that may require some limiting instructions, not testimony that substantially confuses the issues.

## III. CONCLUSION

Plaintiff's motion represents an improper attempt to exclude probative expert testimony through challenges that fundamentally misconstrue both the nature of Mr. Courrege's opinions and the applicable legal standards. Mr. Courrege is an eminently qualified law enforcement expert whose testimony readily satisfies the liberal admission standard under Fed. R. Evid. 702 and will meaningfully assist the jury in understanding the specialized knowledge, training, and decision-making framework that law enforcement officers employ during arrest situations. Each of Plaintiff's challenges either goes to the weight rather than the admissibility of Mr. Courrege's testimony or mischaracterizes the proper scope of police practices expert testimony.

Moreover, to the extent Plaintiff has identified any specific concerns about particular aspects of Mr. Courrege's testimony, those concerns are properly addressed through a targeted motion *in limine* with appropriate limiting instructions, not through wholesale exclusion of expert testimony. Plaintiff has failed to demonstrate that Mr. Courrege's testimony is substantially more prejudicial than probative under Rule 403 or that it will confuse the jury. The proper forum for testing Mr. Courrege's opinions is through vigorous cross-examination, presentation of contrary evidence, and careful jury instruction. Mr. Courrege's opinions rest on reliable foundations, apply

recognized methodologies, and will assist the jury in evaluating complex issues involving police training and practices.

For these reasons, Defendants respectfully request that this Court deny Plaintiff's *Motion to Exclude Certain Expert Testimony of C. Scott Courrege* (R. Doc. 173) in its entirety and permit Mr. Courrege to testify at trial as to the opinions expressed in his report.

Respectfully submitted,

**GAUDRY, RANSON,**
**HIGGINS & GREMILLION, L.L.C.**

*/s/ Allison J. Johnson*

WADE A. LANGLOIS, III (#17681)
JOHN J. DANNA, JR. (#28894)
ALLISON J. JOHNSON (#36207)
401 Whitney Avenue, Suite 500
Gretna, LA 70056
Telephone: (504) 362-2466
Fax: (504) 362-5938
Email: wlanglois@grhg.net
jdanna@grhg.net
ajohnson@grhg.net

*Counsel for Defendants,*
*Sydney McCullough, J. Shannon Womack, and*
*City of Denham Springs*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that a copy of the above and foregoing was filed electronically with the Clerk of Court using the CM/ECF system on this 14th day of October, 2025. Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system.

*/s/ Allison J. Johnson*

ALLISON J. JOHNSON