# EXHIBIT K
# Excerpts from the Transcript of the Deposition of C. Scott Courrege

```
                    UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF LOUISIANA
                      CASE NO.: 22-326-JWD-RLB
```

ALEXANDER CLARK,

     Plaintiff,

v.

LIVINGSTON PARISH SHERIFF'S OFFICE DEPUTY
JEAN HOTARD; DEPUTY CALVIN TAYLOR BOWDEN;
SHERIFF JASON ARD; DENHAM SPRINGS POLICE
OFFICER SYDNEY MCCULLOUGH; CHIEF J. SHANNON
WOMACK; and CITY OF DENHAM SPRINGS,

     Defendant.
_____

    REMOTE DEPOSITION OF CHARLES SCOTT COURREGE

    DATE TAKEN: 09/08/2025

    TIME:       11:33 a.m. - 4:11 p.m.

         (Based on Time Zone from Notice)

    WITNESS APPEARED BY: VIDEO TELECONFERENCE

Reported By:
Vaughan Duncan, AAERT No. 3738

## Page 2

```
 1  APPEARANCES
 2       On behalf of ALEXANDER CLARK:
           SOCIAL JUSTICE LEGAL FOUNDATION
 3         BY: JOSHUA BEHRENS, ESQUIRE
           523 West Sixth Street, Suite 450
 4         Los Angeles, California 90013
           jbehrens@socialjusticelaw.org
 5         APPEARED VIA VIDEO TELECONFERENCE
 6
 7       On behalf of ALEXANDER CLARK:
           SOCIAL JUSTICE LEGAL FOUNDATION
 8         BY: MARJORIE MENZA, ESQUIRE
           523 West Sixth Street, Suite 450
 9         Los Angeles, California 90013
           mmenza@socialjusticelaw.org
10         APPEARED VIA VIDEO TELECONFERENCE
11
12       On behalf of ALEXANDER CLARK:
           SOUTHERN POVERTY LAW CENTRE
13         BY: EMMA DOUGLAS, ESQUIRE
           400 Washington Avenue
14         Montgomery, Alabama 36104
           emma.douglas@splcenter.org
15         APPEARED VIA VIDEO TELECONFERENCE
16
17       On behalf of Deputy Jean Hotard; Deputy Calvin Taylor
         Bowden; Sheriff Jason Ard:
18         LIVINGSTON PARISH SHERIFF'S OFFICE
           BY: DRUIT GREMILLION JR., ESQUIRE
19         20300 Government Boulevard
           Livingston, Louisiana 70754
20         dgremillion@lpso.org
           APPEARED VIA VIDEO TELECONFERENCE
21
22       On behalf of Denham Springs Police Officer Sydney
         McCullough; Chief J. Shannon Womack:
23         GAUDRY, RANSON, HIGGINS & GREMILLION, L.L.C.
           BY: JOHN DANNA, ESQUIRE
24         401 Whitney Avenue, Suite 500
           Gretna, Louisiana 70056
25         jdanna@grhg.net
           APPEARED VIA VIDEO TELECONFERENCE
```

## Page 3

```
 1                    INDEX TO EXAMINATION
 2
 3  EXAMINATION OF Charles Scott Courrege             PAGE
 4  BY MR. BEHRENS                                       7
 5  CERTIFICATE OF REMOTE NOTARY FOR WITNESS           169
 6  CERTIFICATE OF REPORTER                            170
 7  CERTIFICATE OF TRANSCRIPTIONIST                    171
 8  WITNESS NOTIFICATION LETTER                        172
 9  ERRATA SHEET                                       173
```

## Page 4

```
 1                      INDEX TO EXHIBITS
 2
 3         PLAINTIFF'S EXHIBITS FOR IDENTIFICATION:
 4  MARKED            DESCRIPTION                      PAGE
 5  Exhibit 1    Depo Notice                            14
    Exhibit 2    Witness CV                             15
 6  Exhibit 3    Louisiana Supreme Court Denies Review  28
    Exhibit 4    Louisiana Deputies Arrested            33
 7  Exhibit 5    Video LELLIS 23:48:00                 105
    Exhibit 6    Misdemeanor Summons                   117
 8  Exhibit 7    Video LELLIS 23:28:36                 133
    Exhibit 8    Video CBOWDEN 00:09:48                155
```

## Page 5

```
 1        DEPOSITION OFFICER:  Okay.  We're on the record at
 2  9:34 a.m. Pacific on September 8th, 2025.  My name is Vaughan
 3  Duncan, with U.S. Legal Support, with headquarters in Houston,
 4  Texas.  I'm a notary public licensed in the state of California.
 5  I'm located in San Diego, and the oath will be administered to
 6  the witness remotely.  The audio and video recording will
 7  continue to take place until all parties agree to go off the
 8  record.  Private conversations and/or attorney-client
 9  interactions should be held outside the presence of the remote
10  interface.
11        This is the video-recorded proceeding of Scott
12  Courrege taken by the counsel of the Plaintiff in the matter of
13  Alexander Clark v. Livingston Parish Sheriff's Office, filed in
14  the United States District Court, Middle District of Louisiana.
15  This proceeding is being conducted remotely via RemoteDepo Pro.
16        The parties agree that an oath would be administered
17  to the witness, that I'll create an audio record of this
18  proceeding, after which a transcriptionist will produce a final
19  transcript if ordered.  In accordance with applicable law, the
20  transcript will be provided to the witness for review,
21  correction, and signature.
22        Will the parties please state your agreement and
23  appearances for the record, beginning with the Plaintiff's
24  counsel?
25        MR. BEHRENS:  I agree.  This is Joshua Behrens, on
```

Page 134

1 officers versus Mr. Clark?
2    A.   Yeah.  I mean, that was -- that was part of looking at
3 them.  And I even mentioned it in -- I could find it in here if
4 need be, I mentioned the officer versus threat factors.  And
5 that's why I say they -- they -- the training would have allowed
6 for more -- or more of -- a more aggressive, if you will, use of
7 force in response to his resistance, but they exercised a
8 restraint and just simply wrestled the arm back behind the back
9 or overpowered the arm behind his back.  So to me I think they
10 pretty much did the lowest physical level of force that is
11 trained, a strength technique.
12    Q.   Wouldn't you agree that the lowest possible force
13 would have been no force?
14    A.   No I don't agree with that.  I said the lowest amount
15 of physical force that we train is a strength technique.
16    Q.   Understood.  In reading over your report I did notice
17 that you mentioned the factors of the, you know, officer versus
18 arrestee analysis, but you did not conduct that analysis
19 yourself; am I mistaken in that?
20    A.   No.  I observed -- I observed what was going on here.
21 And that's why I said I think the officers -- so ordinarily when
22 you're going to -- say, we escalated force to a much higher
23 level due to officer threat, meaning the threat, the person, the
24 suspect was a threat to us which then that's why we tried to
25 escalate it.  For instance, my -- my partner in narcotics for

Page 135

1 years and now my business partner is 255 pound Brazilian black
2 belt -- Brazilian jiu-jitsu black belt.  You don't want to fight
3 him at all with your hands.  You might.  I don't want to.  I
4 have and it's not (indiscernible).  So, you know, if you have
5 someone with that physical -- those physical characteristics,
6 that -- that known ability to -- in perform martial arts, I
7 might escalate force much quicker or go to a weapon with him due
8 to that.  So when the officer stayed at the bottom rung, there's
9 no real deep analysis of, Well, why did they escalate higher,
10 because it -- it has the counter effect.  So in this case, they
11 didn't escalate higher.  So there -- that wasn't -- that wasn't
12 a justification for them to do so.
13    Q.   Approximately how long was Mr. Clark detained in the
14 gas station before he was arrested?
15    A.   How long was he detained in the gas station?  Do you
16 just meet on the traffic stop in general?
17    Q.   Correct.
18    A.   We can go back and look at the exact time, and it was
19 15, 20 minutes or something like that.
20    Q.   Okay.  So we can agree to say it's about 20 minutes?
21    A.   Yeah.  Something around that -- that time frame.
22    Q.   And during this approximately 20 minutes does
23 Mr. Clark show any signs of non-compliance up until when he
24 grabs the $20 bill?
25    A.   Well, when they're patting down, they -- or checking

Page 136

1 his pockets or when he's emptying his pockets, one of the
2 officers noted that he believed he intentionally, you know, was
3 trying to discourage them or -- or skip the coin pocket where
4 the $20 bill was found.  But physically, no.  That's the only
5 point that you see any physical resistance.
6    Q.   So it's fair to say that Mr. Clark was compliant
7 before his arrest for about the 20 minutes that Defendants had
8 him detained?
9    A.   Yeah, I think that's fair conclusory statement about
10 his actions.
11    Q.   So it's fair to say that based on the fact that
12 Mr. Clark was smaller and older than Defendants, had a limp, a
13 noticeable limp, and potential mobility issues, had been
14 compliant for at least 20 minutes before the arrest and had no
15 apparent subjective intent to harm Defendants, so the second
16 Graham factor weighs against the use of force in the
17 circumstance?
18    A.   I would say yeah.  And I said that in my report.
19    Q.   And what is your opinion on the third Graham factor?
20    A.   I think that he was actively resisting arrest the way
21 we described, or the way we define active resistance of pulling
22 away from an officer's control, trying to prevent from being
23 handcuffed, that's all considered active resistance.
24    Q.   Is the third Graham factor an on off switch of
25 resistance, you know, equals force?  Any resistance equals

Page 137

1 force?
2    A.   No.  None of it's an on off switch.  Again, it's a
3 totality of circumstances test.  But physical resistance is
4 allowed to be met with physical resistant -- or physical force
5 to overcome that resistance as a general rule.  So it certainly
6 puts force on the table, but it's depends on all the factors,
7 and they have to be taken all together.
8    Q.   So the degree of resistance would be relative to the
9 degree of the use of force that could be reasonably applied?
10    A.   Yes.
11    Q.   Was Mr. Clark attempting to evade arrest by flight?
12    A.   It didn't appear like he was trying to flee.
13    Q.   Okay.  So that part of the third Graham factor, we can
14 kind of ignore; is that correct?
15    A.   I -- I wouldn't ignore it, but I'd say it's not
16 applicable to this case.
17    Q.   So it's your opinion that, Mr. Clark was actively
18 resisting arrest?
19    A.   That's correct.
20    Q.   And this is displayed -- go ahead.
21    A.   Sorry.  As -- as we train the definition of active
22 resistance.  So in the defensive tactics models and in Louisiana
23 POST we -- we give these terms, definitions for police training
24 purposes.  So based on the police training definition, yes.
25    Q.   So the fact that a Judge found Mr. Clark not guilty of

Page 138

1 resisting an officer isn't relevant at all here.
2  A.  It's -- it's -- it may -- look, it's certainly --
3 maybe it could -- maybe is a relevant fact if it gets in front
4 of a jury.  But, again, what -- what happens in court?  I can't
5 make a decision always based on what happens in court.
6 They've -- you know, again, we can look at lots of -- lots of
7 cases that go either way.  We just have to look at it for what
8 it is on it's face.  Now if -- yeah, yeah, it's -- it's just
9 case by case.
10  Q.  What specific actions in this case did Mr. Clark take
11 to actively resist arrest?
12  A.  You can see him take his right hand for -- well, what
13 started this was obviously him, and I don't think there's any
14 dispute.  He snatched the $20 bill which started this chain of
15 events.  And so people can be compliant for two hours, but if
16 they then turn and become not compliant and then begin to take
17 actions to destroy evidence then all that prior non-compliance
18 is not important in the moment.  We -- we still have to overcome
19 that resistance.  So the officer's turning, got his arm, right
20 arm, behind his back.  You can see in the video.  It appears
21 that and consistent with Deputy Hotard's testimony that
22 Mr. Clark pulled his right hand down, you see it clearly come
23 down in front of him in the video.  It's no longer in Deputy
24 Hotard's control.  Deputy Hotard simply reached up, got
25 re-control of the wrist and pulled his arm back again behind his

Page 139

1 back.  So all that would consist of pulling, bracing, attempting
2 to prevent being detained in handcuffs.  And that's active
3 resistance.
4  Q.  So your opinion in this case is that Mr. Clark's
5 resistance was in the form of moving his arm down briefly before
6 it was captured again by Deputy Hotard's hands and put behind
7 his back again?
8  A.  He's physically pulling his arm and hand out of Deputy
9 Hotard's control and moving it toward the front of his body.  So
10 it's not that just hand just happened to swing down in front of
11 him.  That's not -- he had to pull it out of Deputy Hotard's
12 control and it's going forward, and at which point Deputy Hotard
13 again grabs it and pulls it behind his back.
14  Q.  Do you know if Mr. Clark was engaging in conscious
15 resistance?
16  A.  I -- I don't know why he resisted.  I can't answer
17 that question.
18  Q.  Is it common for arrestees to make unconscious
19 reactions when they are suddenly grabbed by law enforcement?
20  A.  It can be -- it can be a reaction -- these deputies
21 gave -- again, he wasn't suddenly grabbed by law enforcement.
22 He suddenly snatched something out of the law enforcement
23 officers hand and set this chain of events in motion.  They
24 didn't just grab him off the tailgate and spin him around and
25 handcuffed him.  This event was set into motion by his conscious

Page 140

1 decision if you will.  Just take the evidence from the deputies.
2 So I don't think in that situation you should be real surprised
3 when you snapped something out of the police officer's hands
4 that they are going to detain you in handcuffs.  And they
5 continue to give verbal commands, you can hear them on the
6 video, for him not to engage in that activity.
7  Q.  Yeah.  And we'll get into that in a second.  Wouldn't
8 you agree, though, that subjects very often have some reaction
9 to the application of force and such a response should be
10 expected?  And this is why it is critical for an officer to give
11 clear and concise commands and allow the subject time to comply
12 in situations where there is minimal threat to the officer?
13  MR. GREMILLION:  Object to the form of the question.
14  THE WITNESS:  Yeah.  I don't know if I can agree with
15 the question, but or -- or -- or the statement you're making,
16 but the -- I -- I mean earlier, in this case, there's a belief
17 that felony evidence is getting destroyed and these officers
18 would be trained to get him in custody as quickly as possible.
19 This isn't -- this isn't a moment to de-escalate and have a
20 conversation as this felony evidence is being destroyed and you
21 just don't know what Mr. Clark's next move is going to be
22 because his first move was so irrational and unexpected.  So
23 from there on you gain compliance as quickly as possible, you
24 use the force that you deem is appropriate as based on your
25 training.  And that's what I believe they did here.

Page 141

1 BY MR. BEHRENS:
2  Q.  You said initially to my question that you would not
3 agree with the statement that I gave in my question; is that
4 correct?
5  A.  It kind of got convoluted and I -- I just was
6 explaining to you what -- what I believe there, so.
7  Q.  Okay, I'll put the statement to you again.
8  A.  Okay.
9  Q.  Just so we're clear.
10  A.  Okay.  Go ahead.
11  Q.  Subjects very often have some reaction to the
12 application of force, and such a response should be expected; do
13 you --
14  A.  Yeah.
15  Q.  -- agree with that?
16  A.  Yeah, so -- so that is -- that is a response, but what
17 you shouldn't have is a person then physically -- so if I grab
18 someone, I do expect some sort of response but it -- that's if
19 you don't give a person time to -- to respond, if you
20 unexpectedly grab someone in a situation.  Again, in this
21 situation -- and I know where you're reading this from, in this
22 situation is a much different situation.  This -- Mr. Clark
23 initiated the grab.  He initiated the snatch.  He set this into
24 motion.  And so that's a completely different set of facts from
25 where you're trying to take this report or this other report

Charles Scott Courrege
September 08, 2025

```
                                               Page 142
 1  that I wrote because this lady was not given time to comply, was
 2  not given an order, and was snatched from her vehicle by someone
 3  much larger than her onto the concrete.  And in that situation,
 4  she was falling uncontrollably, and she tried to pull herself
 5  back in her car.  In this case, Mr. Clark aggressively snatches
 6  something out of a deputy's hand, and then yes, you're going to
 7  get hands put on you.  That's going to be a response.
 8         But guess what?  You still, when you have that
 9  response -- let's assume Mr. Clark's response was reflexive.
10  I'll -- I'll accept that as true for this moment.  Let's say his
11  response was reflexive.  The deputy still then just reached
12  forward and got control of his hand and then put it back behind
13  his back.  He didn't strike him.  He didn't take him to the
14  ground.  So that's why I say the force was measured in that
15  situation.  So yes.  Is it -- is it -- if you unexpectedly put
16  hands on someone, can you expect them to jump or startle or pull
17  away?  Yes.  But it's also just like the first case I testified
18  in, if you continue to apply pain compliance but then not give a
19  person an opportunity to comply they're going to continue to
20  resist.  So, again, case by case, but that case that you're
21  reading from is a very different set of circumstances in
22  application of force than this case.
23     Q.   How long is sufficient time to give an arrestee to
24  comply with your command?
25     A.   It depends.
```

```
                                               Page 143
 1     Q.   On what?
 2     A.   It depends on all the factors and circumstances
 3  leading up to the arrest.  What is the arrest for?  Is there a
 4  need to immediately get this person detained?  Are they at
 5  danger?  Are they actively resisting?  Are they -- you know,
 6  it's -- it just depends.  In this case, are they actively
 7  destroying potential felony evidence?  In those types of cases I
 8  would say you immediately detain that type of person.  So you
 9  got to look at a case by case situation.  Sometimes you slow
10  down and you de-escalate because the situation calls for it due
11  to the totality of the circumstances.  Sometimes you immediately
12  grab someone and apply force, but that force then still -- it
13  just has to be reasonable, so.
14     Q.   Do you believe in this case that Defendants gave
15  Mr. Clark sufficient time to comply with their command to get
16  your hands behind your back?
17     A.   Yeah, again, this is all predicated on Mr. Clark's
18  actions.  If they would have just -- if the -- if the snatch
19  wouldn't have happened, let's assume the snatch didn't happen,
20  and they grabbed him and spun him around and started trying to
21  put him in handcuffs and he pulled away, I'd say, Whoa, whoa,
22  hold on.  You never told him why he was being arrested.  He had
23  no notice of what he was being arrested for.  You grabbed him
24  suddenly.  I would have -- I would expect a response.  But he
25  knew -- he knows what he did because he did it, and that set
```

```
                                               Page 144
 1  this chain of events into motion.  So if someone slapped you in
 2  the line of duty or punches you in the face, you're not going to
 3  step back and say, Sir, please put your hands by -- no, you're
 4  going to engage in defending yourself at that point.  So every
 5  case is different.  In this case, the trigger is Mr. Clark's
 6  actions.
 7     Q.   Was he given sufficient time to comply with the law
 8  enforcement officer's commands?
 9     A.   In this situation, absolutely.  He -- he -- they
10  and -- and the officer -- again, the officer did nothing but
11  reach forward and use a physical strength to overpower and take
12  control back over the hand.  That's -- it's -- it's literally
13  one of the lowest levels of force.  So he -- he did -- and the
14  hand's going forward, Mr. Clark's bending over, you don't -- you
15  know, I mean, it's just -- there's a lot going there.  You
16  don't -- again, I mentioned earlier, you don't know if he's
17  trying to ingest something.  You don't know if he's trying to
18  destroy more evidence.  So this officer used a very low level of
19  force to overcome the resistance and -- as trained.
20     Q.   In your review off the record, did Defendants give
21  Mr. Clark the command to put his hands behind his back before
22  they began applying force?
23     A.   We -- we can go back and watch it frame by frame if
24  you want to watch it and see exactly when everything was said,
25  but they -- when he snatched -- again, once again when he
```

```
                                               Page 145
 1  snatched the -- the $20 bill, they're allowed to respond to that
 2  and react to that.  And if they're simultaneously giving the
 3  commands to tell him put his hands behind his back, to stop --
 4  that's going to happen in a fluid motion.  There's no
 5  requirement to stop, Take your hands off, sir.  Please now put
 6  your hands behind your back, sir.  Now this is all fluid and
 7  they reacted quickly.  They got control of the hands and they
 8  lost control.  And then they gained control back without any
 9  other unnecessary strikes, punches, kicks, takedowns, or
10  anything of the sort.
11     Q.   Is it possible for someone to resist a command if
12  they're not given the opportunity to comply with that command?
13     A.   Again, case by case basis, it all -- it all -- it
14  matters the context of the -- it matters the context of the
15  case.  So in this case, once again, this use of force, as
16  minimal as it was, was predicated on someone actively committing
17  another crime obstructing justice and are actively engaged in
18  that in the moment.  So de-escalation isn't proper for every
19  situation.  It's just not.  It's -- it's --
20     Q.   And --
21     A.   -- preferred.  It's certainly based on the totality of
22  the circumstances, it's certainly good to try, but every
23  circumstance doesn't allow it.
24     Q.   Do you think that de-escalation was inappropriate in
25  this situation?
```

Charles Scott Courrege
September 08, 2025

## Page 170

```
 1              CERTIFICATE OF REPORTER
 2
 3   STATE OF CALIFORNIA         )
                                 )
 4   COUNTY OF SAN DIEGO         )
 5
 6        I, Vaughan Duncan, AAERT No. 3738, Digital Reporter, State
 7   of California , do hereby certify that I was authorized to and
 8   did electronically report the Deposition of Charles Scott
 9   Courrege; that Charles Scott Courrege was duly sworn on the
10   date indicated; that a review of the transcript was requested
11   and that the electronic recording of the proceedings was
12   provided for transcription.
13        I FURTHER CERTIFY that I am not a relative, employee, or
14   attorney, or counsel of any of the parties, nor am I a
15   relative or employee of any of the parties' attorneys or
16   counsel connected with the action, nor am I financially
17   interested in the action.
18        DATED this 22nd day of September 2025.
19
20
21        _____
             Vaughan Duncan, AAERT No. 3738
22
23
24
25
```

## Page 171

```
 1              CERTIFICATE OF TRANSCRIPTIONIST
 2
 3        I, Nathan Pikover, do hereby certify that I transcribed the
 4   electronic recording produced by Vaughan Duncan, AAERT No.
 5   3738, Digital Reporter, State of California of the Deposition
 6   on the record; and that the foregoing transcript is a true
 7   transcript of said electronic recording.
 8        I FURTHER CERTIFY that I am not a relative, employee,
 9   attorney, or counsel of any of the parties, nor am I a
10   relative or employee of any of the parties' attorneys or
11   counsel connected with the action, nor am I financially
12   interested in the action.
13        DATED this 22nd day of September 2025.
14
15
16        _____
             Nathan Pikover
17
```

## Page 172

```
 1              WITNESS NOTIFICATION LETTER
 2   Date: SEPTEMBER 22, 2025
     ATTN: Charles Scott Courrege
 3   scott@courregeconsulting.com
 4   RE: ALEXANDER CLARK vs. LIVINGSTON PARISH SHERIFF'S OFFICE
     DEPUTY JEAN HOTARD; DEPUTY CALVIN TAYLOR BOWDEN; SHERIFF JASON
 5   ARD; DENHAM SPRINGS POLICE OFFICER SYDNEY MCCULLOUGH; CHIEF J.
     SHANNON WOMACK; and CITY OF DENHAM SPRINGS
 6   Date of Proceeding: 09/08/2025
     U.S. Legal Support Reference Job No.: 6961290
 7
 8   Dear Sir:
 9        The transcript of the above proceeding is now
     available for witness review, and the following
10   applies:
11   __X__ The witness is requested to contact our office to
          make arrangements for review purposes.
12
     _____ Counsel above ordered the transcript and is
13        Requested to facilitate the witness' review from
          their copy.
14
     _____ Other:_____
15
16
17        We respectfully request that the review be completed within
     30 days. The completed errata sheet may be returned to our
18   office at the Email address listed below for distribution.
19
20
21   Sincerely,
     Production Department
22   U.S. Legal Support, Inc.
     Email: Production@uslegalsupport.com
23   Phone: 866-876-8757
     Letter via Transcript/Mail:
24   JOSHUA BEHRENS, Esq.
     MARJORIE MENZA, Esq.
25
```

## Page 173

```
 1                    ERRATA SHEET
 2   Witness: Charles Scott Courrege
     RE: ALEXANDER CLARK vs. LIVINGSTON PARISH
 3   SHERIFF'S OFFICE DEPUTY JEAN HOTARD; DEPUTY CALVIN
     TAYLOR BOWDEN; SHERIFF JASON ARD; DENHAM SPRINGS
 4   POLICE OFFICER SYDNEY MCCULLOUGH; CHIEF J. SHANNON
     WOMACK; and CITY OF DENHAM SPRINGS
 5   Date of Proceeding: 09/08/2025
     U.S. Legal Support Reference No.: 6961290
 6
 7        PLEASE MAKE ANY CORRECTIONS/CHANGES BELOW AND NOTE THE
             REASON FOR SAME, THEN SIGN AND DATE AT BOTTOM
 8
 9        Page / Line /     Change     / Reason.
10   _____/_____/_____/_____
11   _____/_____/_____/_____
12   _____/_____/_____/_____
13   _____/_____/_____/_____
14   _____/_____/_____/_____
15   _____/_____/_____/_____
16   _____/_____/_____/_____
17   _____/_____/_____/_____
18   _____/_____/_____/_____
19   _____/_____/_____/_____
20   Under penalties of perjury, I declare that I have
     read the foregoing transcript and that the facts stated in it
21   are true.
     _____   _____
22   Charles Scott Courrege               Date
23   (RESERVED FOR EXECUTION OF TRANSCRIPT REVIEW)
     Sworn and subscribed to before me this ___ day of
24   _____, 20___.
25   _____
     Notary Public         Charles Scott Courrege
```