## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

Alexander Clark,

      Plaintiff,

vs.

Livingston Parish Sheriff's Office;
Deputy Jean Hotard;
Deputy Calvin Taylor Bowden;
Sheriff Jason Ard;
Denham Springs Police
Officer Sydney McCullough;
Chief J. Shannon Womack; and City of Denham
Springs,

      Defendants.

CASE NO. 22-326-JWD-RLB

JUDGE JOHN W. DEGRAVELLES

MAGISTRATE JUDGE RICHARD L. BOURGEOIS, JR.

## PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS LIVINGSTON PARISH SHERIFF'S OFFICE, DEPUTY JEAN HOTARD, DEPUTY CALVIN TAYLOR BOWDEN, AND SHERIFF JASON ARD (ECF NO. 171)

TABLE OF CONTENTS

Page

I.      INTRODUCTION………………………………………………………iii

II.     STATEMENT OF FACTS……………………………………………1

III.    LAW AND ARGUMENT………………………………………… 4

        A.    Legal Standard for Summary Judgment…………………………4

        B.    The LPSO Defendants Are Not Entitled to Qualified Immunity.  4
              i. LPSO Deputies Violated Mr. Clark's Constitutional Rights during his
              Arrest. ................................................................................5
              ii. Defendants Could Not Have Reasonably Believed That Their Conduct
              Was Lawful.......................................................................7
     iii.  Defendants are Not Entitled to Qualified Immunity Because They Violated a
     Clearly Established Right.....................................................10

              1.    Mr. Clark was pulled over for a minor traffic violation. ................11

              2.    Mr. Clark was not a flight risk. .......................................12

        3.    The Defendants' Use of Force Was Not Justified due to Mr. Clark's Lack of
        Resistance................................................................13

C.   There is Sufficient Evidence for Mr. Clark's State Law Claims for Excessive Force /
Battery and Negligent Handcuffing to Create a Genuine Issue of Material Fact for
the Jury……………………………………………………………14
              i. Mr. Clark Suffered a Cognizable Injury from LPSO's Negligent
              Handcuffing.....................................................................14
     ii.   There is a Genuine Issue of Material Fact as to Whether LPSO Officers Caused
     Mr. Clark's Hand, Hip, and Psychological Injuries..............................15

D.   Mr. Clark Presents Sufficient Evidence to Create a Genuine Issue of Fact in his
Title VI Claim……………………………………………………………17
              i. The Record Shows a Prima Facie Case of Racial Discrimination. ......19
     ii.   Defendants have offered no evidence that the stop of Mr. Clark was for any
     reason besides racial discrimination. .........................................22
              iii. Plaintiff's Title VI claim is not Heck Barred. .................................24
              iv. Defendant LPSO has been deliberately indifferent to intentional race
              discrimination..................................................................25

IV.     CONCLUSION………………………………………………………26

TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alexander v. Sandoval,*
  532 U.S. 275 (2001) ................................................................................................ 19

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) .................................................................................................. 6

*Auguster v. Vermilion Par. Sch. Bd.,*
  249 F.3d 400 (5th Cir. 2001) ................................................................................... 6

*Bailey v. Quiroga,*
  517 F. App'x 268 (5th Cir. 2013) ........................................................................... 17

*Baldwin v. Univ. of Tex. Med. Branch at Galveston,*
  122 F.3d 1066 (5th Cir. 1997) ............................................................................... 21

*Baldwin v. Univ. of Texas Med. Branch at Galveston,*
  945 F. Supp. 1022 (S.D. Tex. 1996) ....................................................................... 21

*Bone v. Dunnaway,*
  657 F. App'x 258 (5th Cir. 2016) ........................................................................... 15

*Brown v. Lynch,*
  524 F. App'x 69 (5th Cir. 2013) ............................................................................. 16

*Brown v. Strain,*
  663 F.3d 245 (5th Cir. 2011) ................................................................................... 6

*Brunswick Corp. v. Vineberg,*
  370 F.2d 605 (5th Cir. 1967) ................................................................................... 6

*Bush v. Strain,*
  513 F.3d 492 (5th Cir. 2008) ................................................................................. 12

*Cope v. Cogdill,*
  3 F.4th 198 (5th Cir. 2021) ...................................................................................... 6

*Darden v. City of Fort Worth, Texas,*
  880 F.3d 722 (5th Cir. 2018) ................................................................................. 18

*Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.,*
  526 U.S. 629 (1999) ................................................................................................ 27

*Deville v. Marcantel,*
  567 F.3d 156 (5th Cir. 2009) .......................................................................... passim

*First Nat. Bank of Ariz. v. Cities Serv. Co.,*
  391 U.S. 253 (1968) .................................................................................................. 6

*Flores v. City of Palacios,*
  381 F.3d 391 (5th Cir. 2004) ........................................................................... 16, 17

TABLE OF AUTHORITIES

Page(s)

*Gomez v. Chandler*,
  163 F.3d 921 (5th Cir. 1999) ................................................................ 8

*Goodson v. City of Corpus Christi*,
  202 F.3d 730 (5th Cir. 2000) ............................................................... 15

*Graham v. Connor*,
  490 U.S. 386 (1989) ...................................................................... 8, 12

*Grutter v. Bollinger*,
  539 U.S. 306 (2003) ......................................................................... 19

*Hanks v. Rogers*,
  853 F.3d 738 (5th Cir. 2017) ..................................................... 7, 9, 10, 13

*Int'l Bhd. of Teamsters v. United States*,
  431 U.S. 324 (1977) ..................................................................... 21, 22

*Jackson v. Cain*,
  864 F.2d 1235 (5th Cir. 1989) ............................................................... 6

*Kirk v. Monroe City Sch. Bd.*,
  No. 17-1466, 2018 WL 4291750 (W.D. La. Sept. 7, 2018) ................................... 21

*Kirk v. Monroe City Sch. Bd.*,
  No. 17-1466, 2018 WL 4292355 (W.D. La. Aug. 24, 2018) .................................. 21

*Marcantel v. State of La., Dep't of Transp. & Dev.*,
  37 F.3d 197 (5th Cir. 1994) ................................................................ 21

*McDonnell Douglas Corp. v. Green*,
  411 U.S. 792 (1973) ........................................................................ 20

*Murrell v. Bennett*,
  615 F.2d 306 (5th Cir. 1980) ................................................................ 6

*Nat'l Ass'n For Advancement of Colored People v. Med. Ctr., Inc.*,
  657 F.2d 1322 (3d Cir. 1981) ............................................................... 21

*Newman v. Guedry*,
  703 F.3d 757 (5th Cir. 2012) ........................................................... 12, 14

*Payne v. Travenol Lab'ys, Inc.*,
  673 F.2d 798 (5th Cir. 1982) ............................................................... 22

*Price Waterhouse v. Hopkins*,
  490 U.S. 228 (1989) ........................................................................ 20

*Ramirez v. Martinez*,
  716 F.3d 369 (5th Cir. 2013) ............................................................... 7

TABLE OF AUTHORITIES

Page(s)

*Regents of Univ. of California. v. Bakke*,
    438 U.S. 265 (1978) ................................................................................................................. 19

*Saucier v. Katz*,
    533 U.S. 194 (2001) ................................................................................................................... 7

*Sewell v. Monroe City Sch. Bd.*,
    974 F.3d 577 (5th Cir. 2020) .................................................................................................... 21

*Silva v. St. Anne Catholic Sch.*,
    595 F. Supp. 2d 1171 (D. Kan. 2009) ..................................................................................... 21

*Sneed v. Austin Indep. Sch. Dist.*,
    490 F. Supp. 3d 1069 (W.D. Tex. 2020) ................................................................................. 27

*Texas Dep't. of Cmty. Affs. v. Burdine*,
    450 US. 248 (1981) ................................................................................................................... 21

*Tolan v. Cotton*,
    572 U.S. 650 (2014) ................................................................................................................... 5

*Trabucco v. Rivera*,
    141 F.4th 720 (5th Cir. 2025) .................................................................................................. 12

*Trammell v. Fruge*,
    868 F.3d 332 (5th Cir. 2017) ........................................................................................ 13, 14, 15

*Triple Tee Golf, Inc. v. Nike, Inc.*,
    485 F.3d 253 (5th Cir. 2007) ..................................................................................................... 6

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ............................................................................................................. 20, 22

*Wallace v. Texas Tech Univ.*,
    80 F.3d 1042 (5th Cir. 1996) .................................................................................................... 21

*Washington v. Davis*,
    426 U.S. 229 (1976) ................................................................................................................. 20

*Washington v. Smith*,
    639 F. Supp. 3d 625 (E.D. La. 2022) ...................................................................................... 26

*Windham v. Harris Cnty., Texas*,
    875 F.3d 229 (5th Cir. 2017) ..................................................................................................... 9

*Yates v. Spring Indep. Sch. Dist.*,
    115 F.4th 414 (5th Cir. 2024) .................................................................................................... 5

**Federal Rules**
Fed. R. Civ. P. 56(a) ..................................................................................................................... 5

TABLE OF CONTENTS

Page

## I.     INTRODUCTION

Plaintiff Alexander Clark opposes the Motion for Summary Judgment filed by Defendants Livingston Parish Sheriff's Office ("LPSO"), Deputy Jean Hotard, Deputy Calvin Taylor Bowden, and Sheriff Jason Ard (collectively the "LPSO Defendants").[1]

On May 24, 2021, Alexander Clark, at the time a 67-year-old Black man, was heading home after a long day of work hanging drywall. He was in the Black neighborhood of Denham Springs and had stopped for gas before realizing the station was closed. He was pulled over at that gas station by LPSO deputies for allegedly failing to use his turn signal. Defendant Deputy Jean Hotard, without any apparent justification, chose to subject Mr. Clark to a prolonged and invasive warrantless search. What was soon apparent, however, was the overtly racist motivation for the stop.

Mr. Clark calmly complied with all of Defendant Hotard's requests, exiting the vehicle while Defendant Hotard searched his car from top to bottom. Despite finding nothing in the car, Defendant Hotard, accompanied by Defendant Deputy Calvin Taylor Bowden, proceeded to search and question Mr. Clark, insinuating that he was in possession of crack cocaine. Deputy Bowden "sang" a rap song with racially charged lyrics about crack while he searched Mr. Clark's vehicle, a choice even his colleague, Deputy Hotard, thought was unprofessional. Mr. Clark remained calm as LPSO deputies attempted to humiliate him as an elderly Black man. When Defendant Hotard found a $20 bill in Mr. Clark's pocket, he shook it in his face, asking whether he used it as an instrument to smoke crack. Embarrassed and upset, Mr. Clark attempted to take his money back. At that point, the LPSO Defendants aggressively restrained Mr. Clark, grabbing his hands behind his back to handcuff him, injuring his hand and exacerbating an existing hip injury in the process. Long after this ordeal, Mr. Clark continues to be haunted by this encounter, during which his character was questioned and he was violently arrested, when he was just trying to get home after a long day.

---

[1] ECF No. 171.

0

LPSO Defendants' Motion for Summary Judgment is without merit, and this Court should deny it.

## I.    STATEMENT OF FACTS

On May 24, 2021, Alexander Clark was stopped at a gas station in a predominantly Black neighborhood in Denham Springs by Defendant Jean Hotard for allegedly failing to use his turn signal.[2] After several minutes passed, Defendant Hotard finally approached the driver's side of Mr. Clark's vehicle and demanded his license.[3] Soon after, Defendant Calvin Taylor Bowden arrived, approaching the passenger side of Mr. Clark's vehicle.[4]

After Mr. Clark complied with the request for license and registration, Defendant Hotard ordered Mr. Clark out of his vehicle. Mr. Clark complied again, visibly limping over to sit on the tailgate of his truck. Defendant Hotard proceeded to conduct a warrantless search of his truck[5] while Mr. Clark patiently waited for the search to conclude.[6]

Defendants Hotard and Bowden searched the car extensively, for approximately 12 minutes, much longer than would be necessary for a simple traffic stop.[7] During the search, Defendants Hotard and Bowden made repeated insinuations that Mr. Clark was in possession of illicit drugs, when no evidence of such was found.[8] Defendant Hotard found a prescription medication bottle in the car and questioned Mr. Clark, who informed him it was for treatment of gout.[9] Defendant Hotard also questioned Mr. Clark about the tools in his truck, including a "quick connect," which is used to join two air hoses together, as if it were used to smoke crack.[10] After finding a Brillo pad in the truck, Deputy Bowden also questioned Mr.

---

[2] Ex. 1, Deposition Transcript of Jean Hotard ("Hotard Dep. Tr.") at 118:10-12.
[3] Ex. 2, Deposition Transcript of Alexander Clark ("Clark Dep. Tr.") at 59:20-22, 62:8-9.
[4] Ex. 3, 1_2021-05-24_23-28-36_LELLIS at 23:28:36-23:33:01.
[5] Ex. 1, Hotard Dep. Tr. at 127:13-16; Ex. 2, Clark Dep. Tr. at 62:10-11; Ex. 3, 1_2021-05-24_23-28-36_LELLIS at 23:31:34.
[6] Ex. 3, 1_2021-05-24_23-28-36_LELLIS at 23:31:34.
[7] Ex. 4, 1_2021-05-24_23-38-00_LELLIS at 23:42:22; Ex. 5, 1_2021-05-24_23-43-00_LELLIS; Ex. 6, 1_2021-05-24_23-48-00_LELLIS at 23:48:21.
[8] Ex. 7, 1_2021-05-25_00-14-00_CBOWDEN at 0:14:22 -16:01; Ex. 8, 1_2021-05-25_00-09-48_CBOWDEN at 0:10:05.
[9] Ex. 1, Hotard Dep. Tr. at 143:23; Ex. 2, Clark Dep. Tr. at 18:17-21.
[10] Ex. , Clark Dep. Tr. at 68:2-5.

Clark about whether he used this to smoke crack.[11] During the stop Defendant Bowden also sang a tune from a rap song about crack cocaine, while also saying "give me the crack" repeatedly and "where's the crack?"[12] Mr. Clark complied with all of the questions and demands of the Defendant Deputies throughout this humiliating and racist experience. After this blatantly discriminatory exercise, none of the items that the LPSO Defendants questioned Mr. Clark about were seized or logged into evidence, and none of the items were field tested for narcotics.[13]

The next stage in the LPSO Defendant's warrantless search escalated a situation that should never have occurred to a climax with lasting consequences for Mr. Clark. Defendant Hotard repeatedly searched Mr. Clark's pockets, continuing to question him about the innocuous items that Mr. Clark used for his job. Defendant Hotard also found a $20 bill.[14] Yet again insinuating that Mr. Clark was in the possession of illicit drugs, Defendant Hotard questioned Mr. Clark about alleged "residue" on the bill.[15] After enduring many questions about drug use, and listening to Defendant Bowden sing about crack, Mr. Clark was frustrated.[16] He told Defendant Hotard to give him back his money and then attempted to retrieve it.[17] Immediately, the two deputies, who were much younger and much larger than Mr. Clark, aggressively arrested him.[18] Defendant Hotard pushed Mr. Clark against his truck, wrenching his right hand behind his back, while Defendant Bowden grabbed his left hand.[19] Despite their aggression and continued insistence they would find crack on the money, the deputies never conducted a field test of the money.[20] Additionally, Defendant Hotard wrote in his report that the "evidence" was lost into the concrete and Defendant Bowden claimed it fell into a puddle at the scene. But the ground was not wet, and there are no puddles to be seen in the only video from the scene, LPSO's dash cam video. Defendant Deputies never

---

[11] Ex. 7, 1_2021-05-25_00-14-00_CBOWDEN at 0:15:54 – 0:16:01; Ex. 9, Deposition Transcript of Calvin Taylor Bowden ("Bowden Dep. Tr.") at 93:3-19.
[12] Ex. 9, Bowden Dep. Tr. at 125:11–25; Ex. 10, Calvin Taylor Bowden's Interrogatory Responses, Set Two ("Bowden ROGs Set Two") No. 1; Ex. 8, 1_2021-05-25_00-09-48_CBOWDEN at 00:19.
[13] Ex 1, Hotard Dep. Tr. at 146:22-148:1-2.
[14] Ex. 6, 1_2021-05-24_23-48-00_LELLIS at 23:48:00-23:53:00.
[15] Ex. 7, 1_2021-05-25_00-14-00_CBOWDEN at 0:14:09 – 0:14:56.
[16] Ex. 2, Clark Dep. Tr. at 68:19-69:1-6.
[17] Ex. 2, Clark Dep. Tr. at 69:4-6.
[18] Ex. 6, 1_2021-05-24_23-48-00_LELLIS at 23:48:00-23:53:00.
[19] *Id.*
[20] Ex. 9, Bowden Dep. Tr. at 59:16-21; Ex. 1, Hotard Dep. Tr. 147:5-10

asked Mr. Clark for his $20 bill back to preserve evidence or for continued examination.[21]

That night, Mr. Clark was issued a summons for failure to use a turn signal and resisting an officer.[22] The charge of failure to use a turn signal was dropped.[23] But, nearly two years later, a charge of obstruction of justice was added.[24] At trial, Mr. Clark was found not guilty of resisting arrest and guilty of misdemeanor obstruction of justice.[25]

The LPSO intentionally discriminates against Black people and did so against Mr. Clark on May 24, 2021. In 2020 and 2021, adult Black residents comprised approximately 7.9% of the total population in Livingston Parish.[26] However, despite being in the extreme minority of the adult population, a Black person driving in any part of Livingston Parish in 2020 or 2021 was nearly five times as likely to be stopped and ticketed by the deputies of LPSO.[27]

The LPSO does not compile data with respect to traffic and arrest reports by race and does not possess the technology to filter and report its traffic arrest reports by race.[28] In addition, the LPSO also does not conduct any training regarding racial profiling or racial bias for its deputies.[29]

This illegal, excessive force would leave Mr. Clark with lasting physical injuries. Mr. Clark received treatment for a broken hook of hamate and two ruptured tendons as a result of the handcuffing by the LPSO Defendants and also suffered an exacerbation of a hip injury that led to a replacement.[30] Further, he continues to suffer from clinically-significant PTSD symptoms, including sustained hypervigilance, intrusive memories, intense fear of future harm by police, and a diminished sense of

---

[21] Ex. 9, Bowden Dep. Tr. at 107:19-21; Ex. 11, LPSO0000050-LPSO0000058 - Summons and Incident Report.
[22] ECF No. 89, ¶ 110.
[23] *Id*. at ¶ 111.
[24] *Id*. at ¶ 112.
[25] *Id*. at ¶ 112.
[26] Ex. 12, Declaration and Expert Report of Dr. Sarah Abraham ("Abraham Report") at 5.
[27] *Id*. at 7.
[28] Ex. 13, Declaration of Marjorie Menza ("Menza Decl.").
[29] Ex. 9, Bowden Dep. Tr. at 28:17-29:14 (describing his racial bias training as coming from the police academy and CARTA, not Livingston Parish Sheriff's office); Ex. 1, Hotard Dep. Tr. at 64:22-65:7 (describing his racial bias training as coming from CARTA, not the Livingston Parish Sheriff's office).
[30] Ex. 14, Deposition Transcript of Dr. Mark Garon ("Garon Dep. Tr.") at 20:9-18; Ex. 2, Clark Dep. Tr. at 36:1-10, 36:18-20.

safety and control.[31]

## II.  LAW AND ARGUMENT

### A.  Legal Standard for Summary Judgment

Summary judgment should be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Tolan v. Cotton*, 572 U.S. 650, 656–657 (2014). A fact is deemed material when proof of its existence—or nonexistence—"might affect the outcome of the suit under the governing law." *Yates v. Spring Indep. Sch. Dist.*, 115 F.4th 414, 419 (5th Cir. 2024).

When determining if there is a genuine dispute, courts must draw all reasonable inferences in favor of the nonmoving party." *Auguster v. Vermilion Par. Sch. Bd.*, 249 F.3d 400, 402 (5th Cir. 2001). Because summary judgment is a final adjudication on the merits, courts must employ this device cautiously. *Murrell v. Bennett*, 615 F.2d 306, 311 (5th Cir. 1980); *see also Jackson v. Cain*, 864 F.2d 1235, 1241 (5th Cir. 1989); *Brunswick Corp. v. Vineberg*, 370 F.2d 605, 612 (5th Cir. 1967) ("Summary judgment is a lethal weapon, and courts must . . . beware of overkill in its use.").

A non-movant need not carry the burden of proving their case. *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968); *see Cope v. Cogdill*, 3 F.4th 198 (5th Cir. 2021). Rather, a non-movant can defeat summary judgement by setting forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *see also Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007). Rule 56(c) requires that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth. *Anderson*, 477 U.S. at 248–49; *see Cope*, 3 F.4th at 204–205. Based on the evidence cited within this brief, it is clear there are disputes as to material facts such that summary judgment in favor of the LPSO Defendants is precluded, and this case must proceed to trial.

### B.  The LPSO Defendants Are Not Entitled to Qualified Immunity.

---

[31] Ex.15 , Declaration and Expert Report of Dr. Sierra Carter ("Carter Report") at 26.

To prevail on Mr. Clark's Fourth Amendment claims, the LPSO Defendants must show either that they are entitled to qualified immunity as to their actions or that Mr. Clark has not demonstrated that his constitutional rights were violated. Defendants fail to make either showing. A public official is not entitled to qualified immunity where his or her actions violate a clearly established right that would have been known to a reasonable person. *Brown v. Strain*, 663 F.3d 245, 249 (5th Cir. 2011). In making this determination, courts look to 1) whether the plaintiff's factual claims show a violation of a constitutional right; and 2) whether the right in question was clearly established at the time of the defendant's misconduct. *Ramirez v. Martinez*, 716 F.3d 369, 375 (5th Cir. 2013). Qualified immunity should be denied at the summary judgment stage when, in viewing the facts in the light most favorable to plaintiff, "a reasonable officer would have known that the degree of force was unconstitutionally excessive under the circumstances." *Deville v. Marcantel*, 567 F.3d 156, 169 (5th Cir. 2009). Defendants assert that qualified immunity renders the summary judgment "less rigid,"[32] but this language appears nowhere in the case Defendants claim to quote. *See Saucier v. Katz*, 533 U.S. 194 (2001). In an excessive force case, an officer may not use greater physical force than what is necessary to effectuate compliance, even where a suspect demonstrates some level of resistance or non-compliance. *Deville*, 567 F.3d at 167.

       i. *LPSO Deputies Violated Mr. Clark's Constitutional Rights during his Arrest.*

In the instant case, Mr. Clark's constitutional rights were violated during his interaction with the LPSO. Established Fifth Circuit law holds that "an officer violates the Fourth Amendment if he abruptly resorts to overwhelming physical force rather than continuing verbal

---

[32] The Denham Springs Police Department Defendants similarly inserted identical made-up language into *Saucier v. Katz*, 533 U.S. 194 (2001) in their Memorandum in Support of Motion for Summary Judgment. *See* ECF No. 172-1 at 11.

negotiations with an individual who poses no immediate threat or flight risk, who engages in, at most, passive resistance, and whom the officer stopped for a minor traffic violation." *Hanks v. Rogers*, 853 F.3d 738, 747 (5th Cir. 2017). An officer may not use greater physical force than is necessary to effectuate compliance, even where a suspect demonstrates some level of resistance or non-compliance. *Deville*, 567 F.3d at 167. "[O]fficers must assess not only the need for force, but also 'the relationship between the need and the amount of force used.'" *Id.* (*citing Gomez v. Chandler*, 163 F.3d 921, 923 (5th Cir. 1999)).

In determining whether an officer's use of excessive force violated a clearly established right, courts apply the *Graham* factors, examining 1) the nature of the crime at issue, 2) whether the suspect poses an immediate threat to the safety of officers or others, and 3) whether the suspect is actively resisting or attempting to evade arrest by flight. *Graham v. Connor*, 490 U.S. 386, 395 (1989).

As to the first *Graham* factor, there is significant dispute regarding the nature of the crime at issue. While Defendants argue that they engaged in a search for drugs, Plaintiff contends that this justification is pretextual. Because the evidence regarding the first factor must therefore be put to the trier of fact, resolution in favor of Defendants on this factor is inappropriate.

As to the second *Graham* factor, there is a genuine issue of fact as to whether Mr. Clark ever posed a threat to the Deputies at the scene or to the public. The extensive search of Mr. Clark's car and his person before he was restrained and taken into custody,[33] and the fact that Mr. Clark was allowed to sit in his car for a period of time before the Deputies searched the car

---

[33] *See* Ex. 4, 1_2021-05-24_23-38-00_LELLIS at 23:38:25 (beginning of vehicle search); Ex. 5, 1_2021-05-24_23-43-00_LELLIS 23:47:13; Ex. 6 , 1_2021-05-24_23-48-00_LELLIS23:48:21 – 23:51:44.

or Mr. Clark or asked him to leave the vehicle[34] is in direct conflict with the amount of force used to arrest Mr. Clark and the physical presence of several officers at the time of Mr. Clark's arrest.[35] Resolution in favor of the Defendants is inappropriate because the evidence regarding this factor must be put to the trier of fact.

Finally, as to the third *Graham* factor, there is a genuine issue of fact as to whether Mr. Clark was actively resisting or attempting to flee the scene. Defendants paint Mr. Clark's arrest as one that used only necessary force while Mr. Clark presents evidence that he was not attempting to flee the scene,[36] and any resistance was easily overcome by the deputies before they or the public were ever in danger.[37] Mr. Clark had endured approximately 12 minutes of a warrantless search of his person, jeering by the Defendant Deputies, and several searches of his person without attempting to flee or resist at any point. Read in the light most favorable to the non-moving party, none of these factors favor the LPSO Defendants, and as such summary judgment based on qualified immunity should be denied.

> ii. *Defendants Could Not Have Reasonably Believed That Their Conduct Was Lawful.*

To prevail on an excessive force claim, a plaintiff must show that 1) he or she suffered an injury, 2) the injury was caused by excessive force, and 3) that the force used was objectively unreasonable. *Windham v. Harris Cnty., Texas*, <u>875 F.3d 229, 242</u> (5th Cir. 2017). Because the third prong of the excessive force analysis mirrors the qualified immunity analysis, courts typically find that a defendant is not entitled to qualified immunity if there is a disputed material fact about whether the force was objectively unreasonable. *See Deville*, <u>567 F.3d 156</u>.

---

[34] Ex. 3, 1_2021-05-24_23-28-36_LELLIS at 23:38:26 – 23:29:13 (Initial stop of Mr. Clark, Defendant Hotard does not immediately approach the vehicle, Mr. Clark is allowed to leave the vehicle before Defendant Hotard approaches).
[35] Ex. 6, 1_2021-05-24_23-48-00_LELLIS at 23:50:27 – 23:52:18, 23:53:01 – 23:55:02.
[36] *See* ECF No. 171-1 at 11-13.
[37] Ex. 6, 1_2021-05-24_23-48-00_LELLIS at 23:50:27 – 23:52:18.

Here, LPSO Defendants fail to show sufficient facts or law to defeat Mr. Clark's excessive force claim, specifically as to whether the force they used was objectively reasonable. Mr. Clark's case is analogous to Fifth Circuit precedent where officers' excessive force was deemed objectively unreasonable. In *Hanks v. Rogers*, an officer stopped a motorist for driving 20 miles per hour below the speed limit. 853 F.3d at 745. After the plaintiff stepped out of the car, he faced away from the officer and kept his empty hands visible. *Id.* at 746. When the plaintiff remained standing despite an order to kneel, the officer performed a "half spear" take down, injuring the plaintiff. *Id.* Video showed the plaintiff making a "lateral step" as the officer executed the takedown, which defendants characterized as resistance. *Id.* Because the plaintiff was stopped for a minor traffic infraction, was not a threat to the officer, and was showing only "passive resistance," the court held that the *Graham* factors favored a finding that the officer used excessive force. *Id.*

Similarly, in *Deville*, the appellate court reversed the lower court's grant of summary judgment on the basis of qualified immunity. 567 F.3d at 167. An officer stopped the plaintiff for driving 10 miles per hour over the posted speed limit. *Id.* When the plaintiff refused to exit her car because she was travelling with her young grandchild, the officer broke the plaintiff's window and dragged her out of the car. *Id.* at 168. The court held that a reasonable jury could find the use of force in this case unreasonable, citing the officer's refusal to negotiate with the plaintiff, noting that "continued negotiations are more appropriate than actual force where the suspect is only stopped for a minor traffic offense and is making no attempt to flee." *Id.* Additionally, the court held that the plaintiff's injuries caused by both the officer pulling her out of the vehicle and by handcuffs applied too tightly favored a denial of qualified immunity. *Id.* at 169.

Here, Mr. Clark demonstrated behavior that was even milder and more compliant than that of the plaintiffs in *Hanks* and *Deville,* and yet it led to similarly aggressive actions by the Defendant Deputies as officers in those cases. Mr. Clark was pulled over for failure to use a turn signal, a minor traffic violation. He remained in his vehicle for some time before Defendant Hotard approached him.[38] Defendant Hotard did not fear that Mr. Clark would flee, having given him ample opportunity to do so. Further, he left Mr. Clark in his vehicle after pulling him over, apparently unafraid that he would draw a weapon. Mr. Clark and Defendant Hotard even had a conversation with the door open before Deputy Hotard checked Mr. Clark or his car for weapons.[39] Defendant Hotard simply did not behave like he was afraid Mr. Clark would harm him or flee. Indeed, Mr. Clark complied with Defendant Hotard's demand for him to exit the vehicle, making no attempts to flee.[40] He was an elderly man who moved with a visible limp.[41] Once out of his truck, Mr. Clark complied while Defendants searched his person and pockets four times, and he sat calmly on the tailgate for the duration of the extensive search of his car.[42]

After waiting calmly and complying with orders, Mr. Clark was arrested after he attempted to take back his $20 bill from Defendant Hotard, who baselessly and insultingly insinuated that Mr. Clark was using drugs. Both Defendant Hotard and Defendant Bowden of LPSO, along with Defendant Sydney McCullough of DSPD, used force to place Mr. Clark under arrest rather than speaking with him, attempting to de-escalate the situation, asking for the $20 bill back, or issuing him a handwritten summons for any perceived misdemeanor. Instead, they resorted to quick, forceful, and painful force on an elderly man. This was after Mr. Clark calmly allowed warrantless searches of his vehicle and person for approximately 12 minutes. The

---

[38] Ex. 2, Clark Dep. Tr. at 61:15-25.
[39] Ex. 3, 1_2021-05-24_23-28-36_LELLIS at 23:28:36 – 23:31:34.
[40] *Id.* at 23:31:34.
[41] Ex. 3, 1_2021-05-24_23-28-36_LELLIS at 23:31:34.
[42] *Id.* at 23:31:52; Ex. 16, 1_2021-05-24_23-33-00_LELLIS (whole video); Ex. 4, 1_2021-05-24_23-38-00_LELLIS (whole video); Ex. 5, 1_2021-05-24_23-43-00_LELLIS (whole video); Ex. 2, Clark Dep. Tr. at 68:6-13.

Defendants had no reason to suspect that Mr. Clark was dangerous or at risk of fleeing. Instead, before them was an elderly man on his way home from a long day of work. Mr. Clark did not resist the LPSO Defendants as they were attempting to handcuff him.[43]

Not only was the force used by Defendants Hotard and Bowden on Mr. Clark objectively unreasonable, but Mr. Clark has raised significant disputed material facts regarding that force. Thus, the LPSO Defendants are not entitled to summary judgment for Mr. Clark's Fourth Amendment claims.

### iii. Defendants are Not Entitled to Qualified Immunity Because They Violated a Clearly Established Right.

For a right to be "clearly established," "'[t]he contours of the right must be sufficiently clear such that a reasonable official would understand that what he is doing violates that right.' Although this does not mean that 'a case directly on point' is required, 'existing precedent must have placed the statutory or constitutional question beyond debate.' '[T]here [also] can be the rare obvious case, where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances.'" *Trabucco v. Rivera*, 141 F.4th 720, 727 (5th Cir. 2025) (internal citations omitted). In determining whether an officer's use of excessive force violated a clearly established right, courts apply the *Graham* factors, examining 1) the nature of the crime at issue, 2) whether the suspect poses an immediate threat to the safety of officers or others, and 3) whether the suspect is actively resisting or attempting to evade arrest by flight. *Graham*, 490 U.S. at 395.[44] Applying the *Graham* analysis to the facts of

---

[43] Ex. 2, Clark Dep. Tr. at 70:25-71:13.

[44] Qualified immunity analysis in excessive force claims is redundant and courts typically conduct the analysis as to immunity and use of force at the same time: If the force used was objectively unreasonable under excessive force jurisprudence it violated a clearly established right under qualified immunity jurisprudence. *See e.g., Newman v. Guedry*, 703 F.3d 757, 761 (5th Cir. 2012) (applying *Graham* factors test in denying qualified immunity); *Deville*, 567 F.3d at 168 (relying on *Bush v. Strain*, 513 F.3d 492 (5th Cir. 2008), and *Graham* factors in denying immunity).

this case, it is clear the LPSO Defendants violated Mr. Clark's clearly established right to be free from excessive force, and accordingly should be denied summary judgment.

1. Mr. Clark was pulled over for a minor traffic violation.

Mr. Clark was stopped for failing to signal, a minor traffic violation. The first *Graham* factor favors a finding that defendants' use of force was unreasonable in light of the minor nature of the violation. The Fifth Circuit has repeatedly held that where police stop a motorist for a minor traffic violation like Mr. Clark's failure to signal, officers should rely on negotiation prior to resorting to the use of force. *Hanks*, 853 F.3d at 748 (holding that force used was disproportionate in response to a moving violation); *Deville*, 567 F.3d 156 (holding that an officer should have used negotiation before escalating to force during the stop of a motorist for speeding). Even where a plaintiff has been charged with a misdemeanor, courts in this circuit have found that the low-level of severity of the charge favors the plaintiff. *Trammell v. Fruge*, 868 F.3d 332, 340 (5th Cir. 2017). Here, the plaintiff was stopped for failing to signal, a routine and minor moving violation. As such, the first *Graham* factor favors Mr. Clark.

Twenty months after the incident, Mr. Clark was also charged with obstruction of justice for taking his $20 bill back from Officer Hotard during his interaction with LPSO.[45] Even if this action is analyzed under the *Graham* factors, the outcome still favors Mr. Clark. During one of the several searches of Mr. Clark's person that night, Defendant Hotard took a $20 bill from Mr. Clark's pocket.[46] Deputy Hotard made several comments regarding finding drugs on the bill.[47] Mr. Clark took his money back, frustrated with the ongoing disrespectful commentary.[48] Then Deputies Hotard and Bowden grabbed Mr. Clark's hand and yanked Mr. Clark's arms behind his

---

[45] Ex. 17, LPSO000228-LPSO000271 - Transcript of Mr. Clark's Criminal Trial at 5.
[46] Ex. 7, 1_2021-05-25_00-14-00_CBOWDEN 0:14:09 – 0:14:56.
[47] *Id*.
[48] Ex. 2, Clark Dep. Tr. at 68:19-69:10.

back and handcuffed him.[49] At the time that Mr. Clark took back his money, he had been complying with a warrantless search of his vehicle for approximately 12 minutes. The Defendant Deputies had mockingly asked him about drugs several times.[50] All of this occurred after Mr. Clarke worked a nearly 14-hour day.[51] The officers immediately moved to handcuff Mr. Clark without any attempt to negotiate or de-escalate the situation.[52] "[T]he speed with which an officer resorts to force is relevant in determining whether that force was excessive to the need." *Trammell*, 868 F.3d at 342 (citing *Newman v. Guedry*, 703 F.3d 757, 763 (5th Cir. 2012) (holding that disputes of fact were material because "a reasonable jury could find that the degree of force used was not justified where the officer 'engaged in very little, if any, negotiation' with the suspect and 'instead quickly resorted to'" force)).

### 2. Mr. Clark was not a flight risk.

Mr. Clark's cooperation throughout the stop and minimal resistance show that he was not a flight risk and was not actively resisting arrest. Where the subject of a traffic stop complies with officers and manifests no intent to leave the scene, no reasonable officer would view the subject as a flight risk. In *Deville*, the Fifth Circuit found that the plaintiff made no attempt to flee, even where she refused to leave her vehicle or turn off her engine, despite law enforcement orders to do so. 567 F.3d at 167. Even considering those actions, the *Deville* court still concluded that a reasonable jury could infer that the officer's actions were unjustifiable because he immediately turned to force without attempting negotiation. Here, Mr. Clark was even less of a flight risk than the plaintiff in *Deville*. Mr. Clark voluntarily exited his vehicle, sat on the tailgate

---

[49] Ex. 6, 1_2021-05-24_23-48-00_LELLIS at 23:48:00-23:53:00.
[50] Ex. 9, Bowden Dep. Tr. at 125:11–25.
[51] Ex. 2, Clark Dep. Tr. at 65:19-66:2.
[52] Ex. 6, 1_2021-05-24_23-48-00_LELLIS at 23:48:21.

of his truck, and at no point attempted to reenter the cab of his truck.[53] Even when Mr. Clark took back his money, he did not attempt to run from officers. Taking the facts in the light most favorable to Mr. Clark, a reasonable jury could find that Mr. Clark's actions did not justify Defendants' use of force.

### 3. The Defendants' Use of Force Was Not Justified due to Mr. Clark's Lack of Resistance.

Mr. Clark did not resist the arrest, and thus there was no justification for the Defendants' use of physical force. Mr. Clark retrieved a $20 bill that Defendant Hotard had removed from Mr. Clark's pocket. It is undisputed that at this point, Mr. Clark had not been told he was under arrest. Over the course of just two seconds, Mr. Clark was told to place his hands behind his back and then violently restrained.[54] No physical evidence of any crime other than the moving violation had been discovered. Courts have previously held that actions such as Mr. Clark's constitute passive resistance and do not justify the use of force. *Trammell*, 868 F.3d at 343 (holding that a suspect pulling his hand away during handcuffing was an act of passive resistance that did not justify escalating the use of force); *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000) (reversing the lower court's finding that defendants were entitled to qualified immunity where the plaintiff passively resisted by pulling his arm away from officers); *Bone v. Dunnaway*, 657 F. App'x 258, 260 (5th Cir. 2016) (holding that force used against a plaintiff was excessive where the plaintiff was not told she was under arrest and passively resisted officer commands);. Because Mr. Clark did not resist, the officer's escalation to the use of force was unreasonable under the circumstances.

---

[53] Ex. 2, Clark Dep. Tr. at 63:10-17.
[54] Ex. 7, 1_2021-05-25_00-14-00_CBOWDEN.

Plaintiff's Expert, Dan Busken, detailed the facts the LPSO Deputies should have taken into account when deciding whether or not to use force on Mr. Clark stating, "these deputies were dealing with -- with Mr. Clark for quite a bit of time. During that time, . .  it was obvious that they were dealing with an . . older working man. They had a lengthy contact with him. I didn't hear him yelling at the deputies or threatening the deputies during that time. He denied any illegal activity. . ."[55] Mr. Busken went on to offer the opinion that, "if the use of force that occurred during the handcuffing was not based on some reasonable threat, and it was instead based on retaliation because he snatched that money back from them, I don't believe it would be an appropriate use of force at that point based on -- on the training that I received throughout my career and the -- the training the deputies should receive."[56]In light of these facts, the Defendants' use of force against Mr. Clark was excessive, and they violated Mr. Clark's Fourth Amendment rights when they used excessive force against him during arrest. Even on the facts alleged by Defendants, summary judgment would fail. But there are genuine issues of material fact as to this issue, and summary judgment should be denied.

**C. There is Sufficient Evidence for Mr. Clark's State Law Claims for Excessive Force / Battery and Negligent Handcuffing to Create a Genuine Issue of Material Fact for the Jury**

       *i. Mr. Clark Suffered a Cognizable Injury from LPSO's Negligent Handcuffing.*

The Fifth Circuit has held that "as long as a plaintiff has suffered 'some injury,' even relatively insignificant injuries and purely psychological injuries will prove cognizable when resulting from an officer's unreasonably excessive force." *Brown v. Lynch*, 524 F. App'x 69, 79

---

[55] Ex. 18, Deposition Transcript of Daniel Busken ("Busken Dep. Tr.") at 77:12-20.
[56] *Id*. at 78:5-14.

(5th Cir. 2013). In addition, even where physical injuries are de minimis, significant psychological injuries caused by excessive force can demonstrate a Fourth Amendment violation. *Flores v. City of Palacios*, <u>381 F.3d 391, 397</u>–98 (5th Cir. 2004).

Mr. Clark suffered more than just a de minimis injury, as he continues to suffer from two significant physical injuries from LPSO Defendants' excessive force. First, Mr. Clark suffered an injury to his hand when Defendants Hotard and Bowden aggressively restrained and handcuffed him. This injury was severe, causing Mr. Clark pain and numbness, while impairing him from conducting daily activities.[57] Further, Mr. Clark required surgery to repair two torn ligaments in his hand.[58] Mr. Clark also suffered a hip injury as a direct result of the Defendant Deputies' excessive force, resulting in significant pain in his right hip.[59] This injury impaired Mr. Clark's ability to sleep and walk, and he ultimately required a hip replacement.[60]

Each of these injuries more than account for the Fifth Circuit's requirement for a showing of "some injury" in proving Mr. Clark's claim that the LPSO Defendants exerted unreasonable excessive force. Moreover, as a result of the physical injuries he suffered at the hands of Defendants Hotard and Bowden, Mr. Clark also continues to experience significant psychological injuries, including a diagnosis of Post-Traumatic Stress Disorder (PTSD).[61]

Therefore, Mr. Clark demonstrates there are genuine disputes as to material facts regarding the nature of his injuries and thus, summary judgment should be denied.

    *ii.  There is a Genuine Issue of Material Fact as to Whether LPSO Officers Caused Mr. Clark's Hand, Hip, and Psychological Injuries.*

---

[57] Ex. 19, CLARK_000537-CLARK_000538 – Occupational Therapy Discharge Summary, March 2, 2022.
[58] Ex. 2, Clark Dep. Tr. at 26:21-25.
[59] Ex. 2, Clark Dep. Tr. at 36:18-20.
[60] *Id.* at 36:1-10.
[61] Ex. 15, Carter Report at 20.

To state a claim for excessive force, the plaintiff must show that the suffered an injury that "resulted directly and only from the use of force that was excessive to the need." *Flores*, [381 F.3d at 396](). The plaintiff need not show that excessive force was the exclusive cause of his claimed injuries, only that the excessive and unreasonable use of force was a contributing cause of the claimed injuries. *Bailey v. Quiroga*, [517 F. App'x 268]() (5th Cir. 2013) (rejecting the argument that the alleged excessive force must be the exclusive cause of the plaintiff's injuries). Moreover, the Fifth Circuit recognizes that a pre-existing medical condition does not negate causation where excessive force exacerbated the condition, resulting in injury. *Darden v. City of Fort Worth, Texas*, [880 F.3d 722, 728]() (5th Cir. 2018) (holding that the "eggshell skull rule" applies in the context of excessive force claims).

There are genuine disputes of material fact as to the causes of each of Mr. Clark's significant injuries. Defendants deny that Mr. Clark suffered significant injury to his hand, but Mr. Clark can show that he received treatment for a broken hook of the hamate and two ruptured tendons.[62] He received this treatment after the excessive force put on him by the LPSO Defendants, which included when Defendant Hotard grabbed his right hand behind him as he handcuffed Mr. Clark.[63] The excessive force from the handcuffing exacerbated the pain from the traumatic blow to Mr. Clark's palm when the officers restrained him.[64] Indeed, the only cause of injury to Mr. Clark's hand listed in his medical records is the reckless handcuffing by Defendant Hotard.[65]

Mr. Clark also suffered an injury to his hip due to the excessive force by the LSPO Defendants. While Mr. Clark has arthritis, he did not experience this level of pain until after the

---

[62] Ex. 14, Garon Dep. Tr. at 20:9-18.
[63] Ex. 2, Clark Dep. Tr. at 71:18-72:7.
[64] *Id.*. at 74:25-75:1; Ex. 14 , Garon Dep. Tr. at 21:6-8.
[65] See Ex. 20, CLARK_001168, CLARK_001175, CLARK_001149, CLARK_000444 - Medical Records of Mr. Alexander Clark.

force applied by Defendants Hotard and Bowden.[66] It is irrelevant whether Mr. Clark had a pre-existing condition prior to the excessive force, since the actions of the Defendants exacerbated the damage. *See Darden*, 880 F.3d at 728.

Finally, as to Mr. Clark's psychological injuries, Mr. Clark's PTSD was directly caused by the violence he experienced at the hands of the Defendants on May 24, 2021. Since that night, Mr. Clark has experienced ongoing symptoms such as hypervigilance, intrusive memories, and irritability stemming from the physical and racial trauma he experienced.[67] These symptoms are sufficiently severe to disrupt his functioning.[68] Prior to that night, Mr. Clark had not experienced any of these symptoms, suggesting a causal connection.[69]

As Mr. Clark can demonstrate a causal connection between the LSPO Defendants' excessive force and his subsequent injuries and diagnoses, summary judgment on this issue should be denied.

### D. Mr. Clark Presents Sufficient Evidence to Create a Genuine Issue of Fact in his Title VI Claim

Mr. Clark presents evidence in support of his claim under Title VI of the Civil Rights Act that creates a genuine issue of material fact, requiring denial of LPSO Defendants' Motion for Summary Judgment.

Private individuals may sue to enforce Title VI for either injunctive relief or damages. *Alexander v. Sandoval,* 532 U.S. 275, 279 (2001). Those private individuals must prove intentional discrimination. *Id.* at 280–8. Because the Title VI statutory prohibition on discrimination is based on the Equal Protection Clause, the constitutional analysis of intentional

---

[66] Ex. 2, Clark Dep. Tr. at 29:9-12; 36:16-20.
[67] Ex. 15, Carter Report at 23-24.
[68] *Id.*
[69] *Id.* at 20.

discrimination should be applied under Title VI. *See Grutter v. Bollinger*, 539 U.S. 306, 343–44 (2003) (citing *Regents of Univ. of California. v. Bakke*, 438 U.S. 265, 287 (1978) (opinion of Powell, J.) ("Title VI . . . proscribe[s] only those racial classifications that would violate the Equal Protection Clause or the Fifth Amendment."). The analytical framework employed in cases of intentional discrimination is the *McDonnell-Douglas* burden shifting analysis: "[f]irst, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, non-discriminatory reason for the [alleged discriminatory action]." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not true reasons, but were rather a pretext for discrimination. *Id.* at 804. Both direct and circumstantial evidence can be used to prove an intentional discrimination case. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) (*Arlington Heights*) ("Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. The impact of the official action whether it 'bears more heavily on one race than another,' may provide an important starting point."). Even without a direct admission or express policy, a plaintiff may prove intentional discrimination with other forms of direct evidence demonstrating that the "decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring). "Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts. . ." *Washington v. Davis*, 426 U.S. 229, 242 (1976). "[S]tatistics showing racial or ethnic imbalance

are probative … because such imbalance is often a telltale sign of purposeful discrimination." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 339 n. 20 (1977) (citations omitted).

### i.   The Record Shows a Prima Facie Case of Racial Discrimination.

"The Court's inquiry into intentional race discrimination is essentially the same for individual actions brought under §§ 1981 and 1983, Title VI and Title VII." *Baldwin v. Univ. of Texas Med. Branch at Galveston*, 945 F. Supp. 1022, 1031 (S.D. Tex. 1996), *aff'd,* 122 F.3d 1066 (5th Cir. 1997) *citing Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996); *Marcantel v. State of La., Dep't of Transp. & Dev.*, 37 F.3d 197, 198 (5th Cir. 1994); *Nat'l Ass'n For Advancement of Colored People v. Med. Ctr., Inc.*, 657 F.2d 1322 (3d Cir. 1981). [A] prima facie case of discrimination, comprised of the following elements: '(1) they are members of a protected class; (2) they suffered adverse action; and (3) they were treated less favorably than similarly situated students.'" *Silva v. St. Anne Catholic Sch.*, 595 F. Supp. 2d 1171, 1182 (D. Kan. 2009). Alternatively, the third factor may be satisfied with facts to indicate that discrimination was a substantial or motivating factor in defendant's actions. *Kirk v. Monroe City Sch. Bd.,* No. 17-1466, 2018 WL 4292355, at *6 (W.D. La. Aug. 24, 2018), *report and recommendation adopted,* No. 17-1466, 2018 WL 4291750 (W.D. La. Sept. 7, 2018), *aff'd in part, rev'd in part sub nom. Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577 (5th Cir. 2020). The burden of establishing a prima facie case of disparate treatment is not onerous. *Texas Dep't of Cmty. Affs. v. Burdine*, 450 US. 248, 251-253 (1981).  The prima facie case "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Id.* at 254, citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 n.44 (1977).

Defendants misconstrue the significance of Plaintiff's unrebutted statistical data analysis, which, in conjunction with Mr. Clark's individual experiences, meets Mr. Clark's burden to establish a prima facie case. *See Payne v. Travenol Lab'ys, Inc.*, 673 F.2d 798, 817 (5th Cir. 1982) ("If the statistical disparity is insufficient alone to establish a prima facie case, the plaintiff may get over his or her initial hurdle by combining statistics with historical, individual, or circumstantial evidence."). The Supreme Court has directed that when the query involves inferring discriminatory intent, the district court should make a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available," including evidence that shows "a clear pattern, unexplainable on grounds other than race." *Arlington Heights*, 429 U.S. at 266 n.13; *see also Int'l Bhd. of Teamsters*, 431 U.S. at 339 ( "[O]ur cases make it unmistakably clear that statistical analyses have served and will continue to serve an important role in cases in which the existence of discrimination is a disputed issue.") (cleaned up).

Plaintiff's expert report by Dr. Sarah Abraham provides statistical evidence that the LPSO Defendants demonstrated a clear pattern of racial discrimination through their policing practices.[70] Further, Mr. Clark alleged, and video and audio evidence and Defendant Bowden's written discovery responses corroborate, that the stop began with racial animus, the search was conducted with racial animus, and the disregard for Plaintiff's bodily integrity was committed with racial animus. The video shows that Mr. Clark was not stopped immediately after allegedly failing to signal on a street corner but instead after he had pulled into a well-lit but closed gas station, when Defendant Hotard could readily see that a Black man was driving in a truck with a Black passenger.[71] Defendant Bowden admitted to chanting a rap song with lyrics about drug use

---

[70] *See* Ex. 12, Abraham Report.
[71] Ex. 3, 1_2021-05-24_23-28-36_LELLIS at 23:28:36.

while searching through Plaintiff's truck.[72] Plaintiff has explained how he understood the LPSO Defendants' conduct– how any Black man would understand that conduct – which Defendants have not disputed.

Plaintiff's expert, Dr. Abraham, presented statistical evidence and an expert report demonstrating that LPSO engages in racist policing practices by pulling over and "up-charging" Black people at disproportionate rates.[73] Dr. Abraham identified a statistically significant difference in the amount of traffic stops experienced by Black people in Livingston Parish.[74] Her analysis finds that "there is strong statistical evidence that Black people are being stopped at a higher rate than would be expected based on their proportion of the Livingston Parish population."[75] She provides detail stating:

> Based on my analysis of the 112 traffic stops, 26.8% of the traffic stops were for Black people. However, based on the 2020 census, Black people make up only 7.9% of the total population in Livingston Parish, and only 7.3% of the adult population. If Black people were stopped at the same rate as other races, one would expect that Black people would also make up 7.9% of all traffic stops based purely on their share of the population. Instead, as shown in Figure 1, my analysis shows that Black people are stopped 3.4 times more often.[76]

In his deposition, Mr. Clark detailed the racist nature of the search of his vehicle and the comments made by LPSO officers. Mr. Clark said that Deputy Hotard kept asking him, "Where is the crack? Where is the crack pipe?"[77] When asked directly if he felt the LPSO officers were being racist Mr. Clark replied that he believed they were,[78] because they were asking questions about where the crack was in Mr. Clark's truck, which he believed to be "[b]ecause they figure

---

[72] Ex. 9, Bowden Dep. Tr. at 104:3 – 105:11.
[73] *See* Ex. 12, Abraham Report.
[74] *Id.* at 2.
[75] *Id.* at 6.
[76] *Id.* at 5.
[77] Ex. 2, Clark Dep. Tr. at 66:6-7.
[78] *Id.* at 111:15-21.

black people – all black people do drugs and everything."[79] His account is backed up by the audio recording of the encounter,[80] as well as Deputy Bowden's own testimony at deposition and admissions in later discovery.[81]

The original reason Mr. Clark was pulled over, a supposed failure to use his turn signal when turning into the gas station, was dropped and he was never convicted of the offense or given a ticket for it.[82]

> ii. *Defendants have offered no evidence that the stop of Mr. Clark was for any reason besides racial discrimination.*

Defendants purportedly pulled Mr. Clark over because he failed to use his turn signal as he turned from the main road into a gas station. But this fails to satisfy LPSO Defendants' burden to provide a nondiscriminatory reason, as Dr. Abraham's report demonstrates that LPSO disproportionately pulls over and cites Black drivers at a statistically significant higher rate than other drivers in Livingston Parish.[83] Further, Mr. Clark was never charged with a failure to use his turn signal.[84] Indeed, there is an issue of material fact as to whether Mr. Clark used his blinker that night.[85] LPSO Defendants have not shown that the initial stop of Mr. Clark was not an excuse to search a Black man and his car. By the time Deputy Hotard pulled up behind Mr. Clark, he had slowed his vehicle and moved into the well-lit area of the gas station such that Mr. Hotard could see that Mr. Clark is a Black man.[86]

---

[79] *Id.* at 111:23-25.
[80] Ex. 8, 1_2021-05-25_00-09-48_CBOWDEN at :0019.
[81] Ex. 9, Bowden Dep. Tr. at 125:11–25.
[82] Ex. 17, LPSO000228-LPSO000271 – Transcript of Criminal Trial of Alexander Clark.
[83] Ex. 12, Abraham Report at 2.
[84] Ex. 17, LPSO000228-LPSO000271 – Transcript of Criminal Trial of Alexander Clark.
[85] *See* Ex. 21, LPSO0000058 – Mr. Alexander Clark's Original Traffic Citation; Ex. 2, Clark Dep. Tr. at 58:18-25 (Mr. Clark describing how he used his turn signal to turn into the gas station on the night in question); Ex. 17, LPSO000228-LPSO000271 – Transcript of Mr. Clark's Criminal Trial (showing he was not charged with failure to use his turn signal).
[86] Ex. 3, 1_2021-05-24_23-28-36_LELLIS at 23:28:36.

Defendants state that they searched Mr. Clark's car because of "the smell of marijuana" but found no evidence of marijuana, nor any other drugs, and decided not to deploy any field testing kits on any alleged evidence they uncovered during the stop.[87] But Mr. Clark has shown through expert analysis that Black drivers are stopped and ticketed at rates vastly disproportionate to drivers of other races. In addition to the statistical disparity regarding number of traffic stops (quoted above in "Section D.i.") Dr. Abraham made the following findings:

> . . . 35.4% of the police reports [from 2020 and 2021] were for Black people. However, as discussed above, Black people make up only 7.9% of the total population in Livingston Parish and only 7.3% of the adult population. The disparity in the proportion of police reports for Black people relative to the proportion of the Livingston Parish population that is Black is statistically significant, i.e., unlikely to be due to chance alone.
>
> . . . I also conducted a sensitivity analysis to assess whether there are plausible alternative explanations for the observed racial disparity in traffic stops and police reports. I find no evidence that behavioral or demographic differences across races in Livingston Parish are likely to explain the statistically significant racial disparities in traffic stops or police reports that my analysis shows. [88]

Defendants argue that Plaintiff's Expert, Mr. Busken, conceded that statistics alone do not *prove* systemic bias. But proving discrimination is Mr. Clark's burden at trial, not in opposing summary judgment. Further, Mr. Clark does not rely solely on the raw statistical data analyzed by Dr. Abraham. Mr. Clark also points to the statistical analysis of the data, the extent of the searches he endured, the racialized comments from Deputy Bowden during the stop, and the speed with which excessive force was used during his interaction with the LPSO. The fact of the matter is that Mr. Clark was stopped in the only Black neighborhood in Denham Springs[89] for an alleged minor violation and was harassed by LPSO Deputies. He endured a warrantless

---

[87] Ex. 9, Bowden Dep. Tr. at 59:16-21; Ex. 1, Hotard Dep. Tr. at 146:22-148:1-2.

[88] Ex. 12, Abraham Report at 2.

[89] Statistical Atlas, "Race and Ethnicity in Livingston Parish, Louisiana", STATISTICAL ATLAS (last visited October 20, 2025), https://statisticalatlas.com/county/Louisiana/Livingston-Parish/Race-and-Ethnicity#google_vignette.

search of his vehicle, insulting racialized comments from the LPSO deputies at the scene, and was physically injured despite presenting no threat of flight or causing harm. Based on his experience and bolstered by statistical evidence, Plaintiff has made a prima facie case for racial discrimination, and the Defendants have not offered a reason for the stop that is not pretextual. Defendants have declined to produce any evidence whatsoever to rebut Plaintiff's evidence of racial profiling and the overwhelmingly disproportionate number of stops of Black drivers in the Parish, nor any reason except for Mr. Clark's race to use excessive force during his arrest

Defendants misplace their reliance on *Washington v. Smith* to allege that Mr. Clark has not provided enough evidence to meet their current burden to sustain a Title VI claim. In *Washington* the plaintiff was unable to meet their burden supporting a Title VI claim because they had supported their claim with a conclusory statement in the complaint. *Washington v. Smith*, 639 F. Supp. 3d 625, 658 (E.D. La. 2022). Mr. Clark does not rest his Title VI claims on one conclusory statement; instead Mr. Clark relies on statistical evidence, racist remarks during the stop, and excessive force in arresting him, all building a case that provides ample evidence to create a genuine issue of material fact such that the evidence should be heard by the trier of fact.

### iii. *Plaintiff's Title VI claim is not Heck Barred.*

The Court ruled in October 2024 that Mr. Clark's Title VI was not *Heck* barred by his obstruction of justice claim. The Court stated:

> Defendants' argument that Count Twelve, a Title VI claim against Sheriff Ard for intentional racial discrimination, is *Heck*-barred, fails. Defendants do not cite to any binding precedent applying a *Heck* bar to Title VI claims. Nor is the Court aware of any Fifth Circuit precedent applying a *Heck* bar to Title VI claims. Defendants do not move to dismiss Count Twelve on other grounds. Defendants' Motion to Dismiss is therefore denied with respect to Count Twelve."[90]

---

[90] ECF No. 136 at 10 (internal citations omitted).

LPSO Defendants have proffered no new evidence to support their argument that Mr. Clark's Title VI claims are *Heck* barred, instead merely restating their prior assertions. The Court's ruling that Mr. Clark's Title VI claims are not barred further supports the pretextual nature of any reason the Defendants have put forward to justify the stop of Mr. Clark. If the reason for stopping Mr. Clark in the first place was not sufficient to lead to a conviction that would have been *Heck* barred, the reason can be nothing but pretextual. They did not have sufficient evidence to charge Mr. Clark with a failure to use his turn signal, and they do not have sufficient evidence to show that the stop and subsequent search of Mr. Clark was not a pretext for racist policing.

### iv. Defendant LPSO has been deliberately indifferent to intentional race discrimination

Mr. Clark has met his burden in showing that Sheriff Ard and the Livingston Parish Sheriff's Office have been on notice about their grossly disproportionate policing by race and that their failure to investigate and correct their illegal actions amounts to deliberate indifference, or at the very least has raised disputes of material fact foreclosing summary judgment on the issue of deliberate indifference. The failure to investigate or put an end to discrimination itself is evidence of deliberate indifference. *See Sneed v. Austin Indep. Sch. Dist.*, 490 F. Supp. 3d 1069, 1088 (W.D. Tex. 2020) (citing *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 654 (1999) (plaintiff adequately alleged deliberate indifference when defendant "made no effort whatsoever either to investigate or to put an end to the harassment").

The LPSO has been on notice of potential racial discrimination within the department for over three years. Defendants were put on notice by Plaintiff's complaint filed May 19, 2022. The LPSO could have also found out about the racism evident in their own traffic data by compiling statistics. Yet when asked about a data set that was broken down by race, counsel for Defendant

LPSO could not produce those statistics without onerous work searching and redacting by hand.[91] Defendant LPSO's response to Plaintiff's counsel indicated that their office had not looked at the statistics they have available for potential race-based discrimination, despite being notified that there was a racial discrimination problem in the department by Mr. Clark's complaint in this instant matter as well as his public records and discovery requests.[92] Mr. Busken also opines that LPSO's failure to audit its treatment of Black people, despite such stark statistical disparities, was inappropriate:

> [I]t would have been appropriate for LPSO to have had these numbers compiled and then analyze the data to ensure officers are following the policy. Through the discovery materials I have reviewed it is my understanding that while LPSO maintains a racial profiling policy, LPSO takes no action to implement that policy by compiling the numbers or analyzing the data. Merely compiling numbers and filing them away without any thoughtful analysis or auditing serves no purpose, nor does it serve the purpose intended by the policy, which is an examination in an effort to discover any racial profiling. Without further analysis the numbers speak for themselves.[93]

The LPSO defendants had all of the data necessary to see and correct racially biased policing in the department and chose not to, thereby acting with deliberate indifference.

### III. CONCLUSION

In conclusion, Plaintiff has presented evidence of clear issues of material fact in this matter. Defendant LPSO's Motion for Summary Judgement should be denied.

Dated:  October 20, 2025

Respectfully submitted,

/s/ *Emma Douglas*
Emma Douglas (La. Bar No. 39076)
**Southern Poverty Law Center**
201 Saint Charles Avenue, Suite 2000
New Orleans, Louisiana 70170

---

[91] *See* Ex. 13, Menza Decl.
[92] *See Id.*
[93] Ex. 22, Declaration, Expert Report, and Expert Rebuttal Report of Daniel Busken ("Busken Reports") at 6-7.

Telephone: (225) 316-6709
emma.douglas@splcenter.org

/s/ *Andrea Alajbegovic*
Andrea Alajbegovic (*pro hac vice*)
**Southern Poverty Law Center**
111 East Capitol Street, Suite 280
Jackson, Mississippi 39201
Telephone: (601) 265-8309
andrea.alajbegovic@splcenter.org

/s/ *Marjorie H. Menza*
Marjorie H. Menza (*pro hac vice*)
Joshua Z. Behrens (*pro hac vice*)
Sara Haji (*pro hac vice*)
**Social Justice Legal Foundation**
523 West 6th St., Suite 450
Los Angeles, CA 90014
T: 213-677-0883
F: 213-677-0883
jbehrens@socialjusticelaw.org
mmenza@socialjusticelaw.org
shaji@socialjusticelaw.org

/s/ *Nora Ahmed*
Nora Ahmed (*pro hac vice*)
Malcolm C. Lloyd (La. Bar No. 41573)
**ACLU Foundation of Louisiana**
1340 Poydras Street, Suite 2160
New Orleans, Louisiana 70112
Telephone: (504) 522-0628
nahmed@laaclu.org
mlloyd@laaclu.org
justicelab@laaclu.org

**Attorneys for Plaintiff, Alexander Clark**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 20th day of October, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notice to counsel of record.

<u>/s/ *Emma Douglas*</u>
Emma Douglas