# EXHIBIT 1



UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

ALEXANDER CLARK,

    Plaintiff,

v.                              Case No. 22-326-JWD-RLB

Livingston Parish Sheriff's Office Deputy Jean Hotard; Deputy Calvin Taylor Bowden; Sheriff Jason Ard; Denham Springs Police, Officer Sydney McCullough; Chief J. Shannon Womack; and City of Denham Springs,

    Defendants.

VIDEOTAPED DEPOSITION OF

JEAN HOTARD

TAKEN ON

MONDAY, DECEMBER 9, 2024

9:07 A.M.

WALKER MUNICIPAL COURT

13600 AYDELL LANE

WALKER, LOUISIANA 70785




1  Q. Okay. Is that something within uniform
2  patrol that you have been involved in as far as
3  pulling somebody over and looking in their trunk and
4  seeing that there's a narcotics operation happening?
5  A. No, as far as like the interdiction, not
6  specifically. Just -- just -- I have -- we have,
7  you know, been on stops and assisted other deputies
8  and find large sums of narcotics.
9  Q. Mm-hmm.
10 A. But not specific on interdiction, I would
11 say.
12 Q. Okay. And there is a narcotics unit
13 within Livingston Parish Sheriff's Office?
14 A. That's correct.
15 Q. And they do -- that's their focus to your
16 knowledge?
17 A. They -- they do some interdiction type but
18 no. They mostly have these large lengthy
19 investigations that, you know, where they -- they
20 try to get from the source of the dealer kind of
21 thing.
22 Q. So I, you said earlier that you looked at
23 a racial bias policy. I don't see that you've done
24 any training on bias, specifically. Is that -- am I
25 missing something or --

| | |
|---|---|
| 1 | A.   No, it was definitely a class that we had |
| 2 | in CARTA. |
| 3 | Q.   In CARTA. |
| 4 | A.   Capital, you know.  And I don't -- I don't |
| 5 | remember specifically whether or not there was a |
| 6 | certification, per se, but there was definitely a |
| 7 | class |
| 8 | Q.   And what do you recall from that class? |
| 9 | A.   It went over what, you know, racial |
| 10 | profiling is, what the biased policing and what the |
| 11 | details about what that is and, et cetera. |
| 12 | Q.   And what did CARTA tell you racial |
| 13 | profiling was? |
| 14 | A.   Basically policing or profiling somebody |
| 15 | solely off of race or religion or things of that. |
| 16 | Q.   And so, and what does that mean to profile |
| 17 | somebody off of, or you're saying policing off of |
| 18 | that.  What -- what do you imagine that to mean? |
| 19 | A.   Do you want an explanation of what I |
| 20 | believe racial policing is or? |
| 21 | Q.   Yes. |
| 22 | A.   Okay.  It would be basically maybe |
| 23 | choosing a, or not choosing, but seeing a specific |
| 24 | person of a race or -- or religion or things of that |
| 25 | nature and solely basing your interaction off of |

```
 1        A.   I remember the traffic stop.  I remember
 2   the part with the -- with the $20 bill and it being
 3   snatched.
 4        Q.   Those are the two things.  And when you
 5   say you remember the traffic stop, do you mean you
 6   remember the reason for the stop or like seeing him
 7   turn into the gas station or something?
 8        A.   Yes.
 9        Q.   What is it that you recall from that?
10        A.   I can -- I can still remember the picture,
11   his vehicle making the right turn without its signal
12   and me catching up to the vehicle to make the stop.
13        Q.   And it was around midnight, so you were on
14   the night shift.
15        A.   Correct.
16        Q.   And what are the hours of the night shift,
17   or what were those hours, do you recall?
18        A.   We would work 6P to 6A.
19        Q.   Got it.  And by that you mean 6 p.m. to 6
20   a.m.
21        A.   That's correct.
22        Q.   Got it.  And how many days in a row would
23   you be on a night shift?
24        A.   We work shift work.  So you'd be two on,
25   two off, three on, two off, two on, three off.
```

```
 1  BY MS. MENZA:
 2       Q.   Okay.  Do you see him walking with a limp
 3  when he gets out of the car.  I'm going to press
 4  play again.  And this is 2 minutes and 58 seconds
 5  into the video.  Time stamp 23:31:34.
 6            (WHEREUPON, playing of the video resumed.)
 7            (WHEREUPON, playing of the video was
 8  paused.)
 9            MR. GREMILLION:  Object to the form of the
10  question.
11            THE DEPONENT:  Yes.
12  BY MS. MENZA:
13       Q.   Okay.  And so have you asked him to get
14  out of the vehicle at this point?  Is that why he's
15  out?
16       A.   Yes.
17       Q.   And he's sitting in the bed of the car.
18       A.   Sitting on the tailgate of the truck.
19       Q.   Right, tailgate of the truck.  Thanks.
20  Okay.  And you're still talking to him.  So you have
21  not gone back to your vehicle at this point.
22       A.   Correct.
23       Q.   Okay.  And you -- do have any, given that
24  we have no audio, do you have any recollection as to
25  what you're talking about?
```

1  connector or like a fitting.  And it appeared like
2  it was  -- like it was burnt on one end.
3  BY MS. MENZA:
4       Q.    Okay.  Did you take that into evidence at
5  any point?
6       A.    No.
7       Q.    No.  You also, in your report, said that
8  you found a bottle of pills, but then you determined
9  that they were not narcotics.  Do you remember that?
10      A.    Yes.
11      Q.    How did you determine that the pills were
12 not Narcotics?
13      A.    So we use a website that identifies pills.
14 It's the same as what the crime lab would use.  And
15 you're able to, you know, put the shape, color, and
16 the imprint on it and it tells you what they are.
17      Q.    I see.  So if it says like, whatever,
18 there's always some little three-digit code or
19 something on the back of the pill.
20      A.    Right.  There's going to be a letter or a
21 number.
22      Q.    Okay.  Do you recall what they were?
23      A.    I believe they were for gout.
24      Q.    For gout.  Okay.  And so Officer Bowden,
25 we don't see him, but he's still inside the truck at

1  potentially could have been concealed on their
2  persons.  So we checked those avenues and if nothing
3  was found, then at that point, maybe a citation and
4  would have been on his way.
5      **Q.   Did you smell marijuana on Mr. Clark?**
6      A.   The smell of marijuana was rather strong
7  from my recollection.  So whether it was coming off
8  at his person or the vehicle itself, it was --
9  whether it was soaked into his seat and onto his
10 clothes from him sitting in it, it's hard to
11 determine.  But he and the car smelled like
12 marijuana.
13     **Q.   In the car, it smelled of marijuana.  And**
14 **then outside of the car, you said it smelled like**
15 **cigarette smoke.**
16     A.   Well, the gentleman that was smoking a
17 cigarette, whenever he was smoking a cigarette
18 around us, of course we smelled cigarette smoke.
19     **Q.   Okay.  And you did ultimately search Mr.**
20 **Clark.  Did you ever find any marijuana on him?**
21     A.   No.
22     **Q.   Okay.  And you didn't, so you did some**
23 **field test on his gout medication.  Did you run any**
24 **other field test that night?**
25     A.   When you say a field test, it wasn't, like

1  I tested it.  It was just a --
2      Q.   Oh right.  It was just a website.
3      A.   It's, yes, it's a -- it's a drug
4  identifier that we use.
5      Q.   Okay.  Did you use the wipes that you had
6  in your car to test for crack cocaine?
7      A.   No, I didn't.
8      Q.   Okay.  So you did not use the wipes on the
9  $20 bill, for instance.
10     A.   No, I didn't.
11     Q.   And any of the other potential residue
12 that you may have seen, you didn't use the wipes on
13 any of that.
14     A.   Other potential residue?
15     Q.   Well, so we can look at it.  There's some
16 audio from Mr. Bowden's microphone, so we don't know
17 who's saying it, but someone says, "Oh, that might
18 be sheetrock."  But nobody ever tested, to your
19 memory, no one tested any of the tools or anything
20 in Mr. Clark's car with those wipes.
21     A.   It wouldn't -- it wouldn't make sense for
22 us to test tools for like obvious hand tools for
23 narcotics.
24     Q.   Got it.  Okay.  So that's a no, though.
25 Nobody used -- nobody deployed those wipes to test

1  for crack cocaine that night.
2       A.   No.
3       Q.   Okay.  Okay.  Let's look at the last
4  video, which is one that's going to be Exhibit 5.
5            THE REPORTER:  That's correct.
6            MS. MENZA:  Thank you.  And that's 1_2021-
7  05-24_23-48-00_LELLIS, L-E-L-L-I-S.  Okay.
8            (WHEREUPON, Exhibit 5 was marked for
9  identification.)
10           (WHEREUPON, a video was played.)
11  BY MS. MENZA:
12      Q.   Okay.  So this is possibly at 11:48, we
13  think.  Are these still your flashers, do you think?
14      A.   Yes.
15      Q.   That blue light?  Okay.  Do you remember
16  Denham Springs pulling up this night?
17      A.   I remember Officer McCullough
18  specifically.
19      Q.   You do.
20      A.   I remember when --
21      Q.   I'm just going to pause it for a second.
22  (WHEREUPON, playing of the video was paused.)
23           THE DEPONENT:  -- she came, when she
24  walked over --
25  BY MS. MENZA: