# EXHIBIT 2

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


ALEXANDER CLARK,                          CIVIL ACTION NO.

       Plaintiff,                         22-326-JWD-RLB

VERSUS


JEAN HOTARD, ET AL.,

       Defendants.




         DEPOSITION OF ALEXANDER CLARK,

given in the above-entitled cause, pursuant to the

following stipulation, before Sandra P. DiFebbo,

Certified Shorthand Reporter, in and for the State

of Louisiana, at Southern Poverty Law Center, 201

St. Charles Avenue, Suite 2000, New Orleans,

Louisiana, on the 26th day of February, 2025,

commencing at 9:20 AM.

1     Q.   About how long did you treat with Dr.
2  Wilson for your back? Was it a single visit or was
3  it multiple?
4     A.   Maybe about a year or so.
5     Q.   Other than treating for your knees and
6  back, did you have any other part of your body
7  treated by Dr. Wilson?
8     A.   No.
9     Q.   So prior to the incident we have talked
10 about Dr. -- I'm going to mispronounce his name.
11 Folivi?
12     A.   Folivi.
13     Q.   Dr. Babin and Dr. Wilson, any other
14 doctors that you treated with on a regular basis
15 prior to the incident?
16     A.   No.
17     Q.   Prior to the incident, were you on any
18 regular medications?
19     A.   Blood pressure.
20     Q.   Any others?
21     A.   That's it.  Oh, gout.
22     Q.   Where did you get those prescriptions
23 filled?
24     A.   At the Baker Walmart.
25     Q.   I'm going to stick with our discussion

1      A.    No, sir.

2      Q.    We talked about the conviction that arose

3  out of the aggravated battery or assault.  Any

4  other convictions other than traffic violations?  I

5  don't need to hear about those, but any other

6  convictions that you've had prior to the May 2021

7  incident?

8      A.    No, sir.

9      Q.    So I assume it's safe to say that prior

10 to May of 2021, you had never been arrested by the

11 Livingston Parish Sheriff's Office, right?

12     A.    No.

13     Q.    I'm going to switch gears.  I may have

14 some stuff later on about before the incident, but

15 now we're going to switch to the incident itself

16 and afterwards.  Okay.  What injuries do you claim

17 that you have incurred as a result of the May 2021

18 incident? Let's begin with physical injuries.  What

19 physical injuries do you claim resulted from that

20 incident?

21     A.    Both of my hips had to be replaced, and I

22 had to have surgery on my hand to reattach the torn

23 ligaments in two of my fingers.  They had to remove

24 a bone that they broke in my hand when they

25 attempted to put handcuffs on me.

1    Q.    That would have been before the May 2021
2   incident?
3    A.    Yeah.
4    Q.    Where was that?
5    A.    At the Bone & Joint Clinic.
6    Q.    Any other issues with your left hip prior
7   to the May 2021 incident?
8    A.    No.
9    Q.    How about any issues or injuries with
10   your right hip prior to the May 2021 incident?
11   A.    No.  I didn't have any problem with my
12   right hip.
13   Q.    Have we talked about all of the issues or
14   injuries or treatment that you've received with
15   respect to your hips prior to the May 2021
16   incident?
17   A.    Yes.
18   Q.    So I am going to switch gears now to your
19   hand.  Which hand was injured as a result of the
20   incident?
21   A.    My right hand.
22   Q.    Prior to the May 2021 incident, had you
23   ever had any issues or injuries to your right hand?
24   A.    No, sir.
25   Q.    Prior to the May 2021 incident, did you

1     A.   It was -- the pain was so severe that I

2  could not walk.  I could not sleep.  I could not

3  lay on that side.

4     Q.   Similar question as before.  First of

5  all, I assume Dr. Hess did the surgery as well,

6  right?

7     A.   Yes, sir.

8     Q.   When I say the surgery, I'm talking about

9  the right total hip.

10    A.   The hip.

11    Q.   Did Dr. Hess tell you, with respect to

12  your right hip, what caused the need for surgery?

13  Again, talking about physiologically.  Was it

14  fractured?  Was it a cartilage torn?  Was it bone

15  on bone?

16    A.   It was, yeah, bone on bone, and I guess

17  arthritis or what have you.

18    Q.   How soon after the May 2021 incident did

19  you begin experiencing pain in your right hip?

20    A.   Immediately that same night.

21    Q.   When you went to Dr. Hess -- let me back

22  up a little bit.  Did you see Dr. Hess at all

23  between May of 2021 and August of 2021?

24    A.   May of 2021 and August.

25    Q.   Just for clarification, you testified

1      Q.   So that wasn't marked?

2      A.   It appeared as if he was trying to get

3    somewhere, and they was trying to catch up with

4    him.  This is what I assumed.  But, like I say,

5    they didn't have any lights on or anything.  The

6    lights on top of the car I'm talking about.

7      Q.   Do you know if these two LPSO units --

8    when I say LPSO, you understand I mean the

9    Livingston Parish Sheriff's Office, right?

10     A.   Yes, sir.

11     Q.   Do you know if these two LPSO units were

12   the same two units that were involved in your

13   incident?

14     A.   No.  They couldn't have been.

15     Q.   So after you saw those law enforcement

16   officers, when is the next time that you noticed or

17   saw law enforcement?

18     A.   Once I went through the four-way stop

19   sign at Summers, I'm headed to Range Avenue, and a

20   Livingston Parish sheriff comes out of Louise

21   Street in front of me, and he gets to Range Avenue,

22   and I'm behind him.  I put my blinkers on.  He goes

23   straight across Range.  I make a right on Range

24   beside the McDonald's.  I make a right at Florida

25   Boulevard and go into the service station.

1    Q.    How did the LPSO unit come to be behind

2    you?

3    A.    Like I said, he went across. They got a

4    ServePro over there now.  It used to be a

5    Delchamps.  Anyway, a supermarket, and they sits on

6    this parking lot.  They can look down Martin Luther

7    King and see whatever is going on or what have you,

8    and I'm assuming they might have saw my license tag

9    or whatever, because if he had -- he claimed I

10   didn't put my blinkers on, and I know I did.  And

11   by the time I get up to the service station and get

12   out my truck to go in there, that's when I realized

13   that the store was closed.  I come back, get in my

14   truck.  Just as I pulled -- get ready to pull off

15   -- I pulled off.  I drove away from the pump maybe

16   ten, 20 yards.  He put his lights on.  I stopped

17   right where I was.  He pulls over here.

18       I'm sitting there waiting for him to come

19   to the car, truck.  He don't come.  I look in my

20   rearview mirror, and I see him sitting there.  A

21   few minutes later another Livingston Parish sheriff

22   pulls up beside him. He gets out of his truck.  He

23   goes over here and talk to the one that originally

24   got there first, and they sit there for however

25   long.  I'm sitting --

1   to my side of the truck.  So this is my window

2   here.  He is standing like where she is.  He don't

3   even come all the way up where he can look in my

4   face, I can see his badge number, or whatever.

5       Q.   Just because it's not necessarily clear

6   for the record, you're saying that he was, I guess,

7   a little bit -- he didn't walk all the way up to

8   your window.  He was standing back a little bit.

9   Is that what you are saying?

10      A.   Not back.  He was standing to where I had

11  to turn --

12      Q.   Towards the rear of your vehicle?

13      A.   -- to see where he was or who he was or

14  what he was saying or doing.

15      Q.   About how much time do you think it was

16  between when you -- when that first deputy pulled

17  up, turned on his lights, and when someone finally

18  approached you, this deputy finally approached you

19  to speak with you?

20      A.   I would say five to ten minutes.

21      Q.   That's while the two deputies were

22  talking to each other?

23      A.   Uh-huh.

24      Q.   Is that a yes?

25      A.   Yes, yes.

```
 1          Q.    I'm sorry. Go ahead.
 2          A.    Okay.  He comes up, and he asks me for my
 3     license.  I give him my license.  At this time,
 4     while I'm talking to him, the other officer, he is
 5     coming to the other side of my truck, not knowing
 6     that somebody was in there.  I'm assuming he
 7     probably was coming there to try to plant some dope
 8     or something in there.  But, anyway, I give him my
 9     license and all.  He goes back there and do
10     something.  Then he comes back and asks me to step
11     to the back of the vehicle.
12          Q.    I'm not meaning to interrupt you when I
13     do this.  I am trying to get clarification on some
14     facts.  He takes your license, and he goes back to
15     his unit; is that your testimony?
16          A.    Yes.
17          Q.    During that time period, are you still
18     seated in your truck or are you outside of the
19     vehicle?
20          A.    No.  I'm inside the -- once I gave him my
21     license, I sit inside the vehicle.
22          Q.    Was your door open or were you doing this
23     transaction through the window?
24          A.    Na-huh. Through the window.
25          Q.    He goes back to his unit.  He either runs
```

1    your license or does something over there, correct?

2         A.    Yes, sir.

3         Q.    And he returns to your window; is that

4    correct?

5         A.    Yes, sir.

6         Q.    During this whole time, you have not

7    gotten out of your truck; is that correct?

8         A.    Right.

9         Q.    What happened next?

10        A.    He asked me, when he came back, he asked

11   me to step to the back of the vehicle.  I gets out

12   of the truck.  As I get out of the truck, he says,

13   "Is it okay if I search your vehicle?"  I say, "No,

14   unless you got a warrant."  Just like that.  And

15   they proceeded to search my vehicle.  I went and

16   let my tailgate down and sit on the back of my

17   truck with my back to the truck, because I know I

18   don't have anything in there.  I told him,

19   "Anything you find in there is yours," because he

20   didn't have a warrant.  He had no reason to search

21   my vehicle or anything.

22        Q.    So despite your protest for searching,

23   they searched your vehicle anyway, right?

24        A.    They searched my vehicle.

25        Q.    Did both deputies participate in the

1      Q.    Were you watching them search your
2  vehicle?
3      A.    No, sir.  I sit on my tailgate and looked
4  that way.
5      Q.    When you say that way, you mean it would
6  have been --
7      A.    Opposite of my cab.
8      Q.    That would have been looking at one of
9  the LPSO units that was parked behind you, right?
10      A.    Looking at both of them.
11      Q.    So after this five minute or so search,
12  what happened next?
13      A.    He comes -- one of them -- the big one,
14  he comes back there, and he go to fumbling on the
15  back of my truck, asking me where the crack at and
16  everything.  I didn't say anything, and he was
17  making all kinds of comments saying all type of
18  stuff, you know, and I ignored it.
19      Q.    What type of comments?
20      A.    I don't know -- like I say, I wasn't
21  paying any attention to him, because the stuff he
22  was saying, and it's 11:30.  I'm tired.  I done
23  worked all day since 9:00 that morning, and they've
24  gone too far already.  What he should have done, if
25  I didn't put my signal on, if my blinker wasn't

1   working, he should not have done anything but wrote
2   me a ticket and let me be on my way.
3        Q.   As you sit here today, can you tell me
4   any of the comments that this officer made to you
5   other than I think you said where is the crack?
6        A.   He kept saying, "Where is the crack?
7   Where is the crack pipe?"  This, that, and the
8   other.   Then he went to fumbling in the back of my
9   truck.   Still I'm sitting on my tailgate, not
10  paying him any attention, because I know I don't
11  have any of this stuff he talking about on my
12  vehicle.   No kind of way you can find none of this,
13  because I don't indulge in it.
14       Q.   Fair enough.   I just want to make sure
15  that to the best of your recollection, as you sit
16  here today, do you recall anything else that this
17  deputy said to you other than where is the crack or
18  where is the crack pipe?
19       A.   No.   I can't tell you exactly another
20  statement he made besides he kept saying, "Where is
21  the crack?   Where is the crack pipe?"
22       Q.   Before we continue on, kind of on what
23  happened, do you recall any statements that the
24  other deputy made?   I think you referred -- the
25  deputy that said, "Where is the crack?   Where is

1      Q.   What happened next?

2      A.   He finds a quick connect which is a

3 little device that you join two air hoses together

4 with. "Oh, here it is."  He comes up with the quick

5 connect, holding it up.  "I found the crack pipe,"

6 this, that, and the other.  Still, you know, and so

7 he asked -- they had already asked me if I had

8 weapons on me, and I told him I had a screwdriver

9 and a utility knife in my pocket, so they frisked

10 me or whatever.  Then, a while later, he wanted to

11 search me again.  "You got any weapons on you?"  I

12 said, "I told you I had a screwdriver and a utility

13 knife in my pocket."

14      Q.   That first time that they frisked you,

15 did they remove the utility knife and screwdriver

16 from your pocket?

17      A.   No.

18      Q.   Okay.  Sorry.  Continue on.

19      A.   Exactly, you know.  And so after a while,

20 they fumble around.  They go over there shoo-

21 shooing.  Then about four Denham Springs police

22 come.  All right.  I see right now what it is about

23 to go.  And so he asked me, "You got anything else

24 in your pocket?"  I said, "Yeah.  I got $20 in my

25 pocket," and he attempted to go -- I said, "No.

1   You not going in my pocket."  I went in my pocket
2   and got the $20 out and gave it to him.  "Well,
3   whatever comes out of here, you are going to own up
4   to it."  I'm not paying them any attention.  He
5   takes the $20 bill, unfolds it.  He takes it, holds
6   it up.  He do all this.  I reached to get my money.
7   When I reached to get my money, that's when they
8   grabbed my -- one grabbed my hand, one grabbed this
9   arm.  Somebody got me behind the neck.  They flung
10  me in the back of the truck.
11       Q.   We'll talk about that in just a second.
12  Which deputy was it that was holding up the dollar
13  bill?
14       A.   The big one.
15       Q.   And it was from him that you took it
16  from?
17       A.   Yes.
18       Q.   Describe for me, again, if you can -- it
19  was immediately after that, that they moved to put
20  you in handcuffs?  Is that your testimony?
21       A.   Yes, sir.
22       Q.   Describe for me, if you can, and you can
23  use the phrases "the big one" and "the small one,"
24  so we know who you are talking about.  In as much
25  detail as you can give me, which one grabbed which

1    hand and what did they do to you?

2         A.    The one that came up first, the little

3    one, he grabbed my right hand.  They got a -- I

4    don't know where he come from, but I think he was a

5    Livingston Parish Sheriff's deputy.  I'm not sure.

6    He might have been a Denham Springs police.  He

7    grabs me by this arm.

8         Q.    That's your left hand, right?

9         A.    My left hand. Then somebody grabbed me

10   around my neck.  So I don't know who is doing what

11   or what or who is who, the way they handled me and

12   threw me in the back of the truck.

13        Q.    So it's your testimony that they threw

14   you into the back of your truck, correct?

15        A.    Pushed me, yeah, into the back of the

16   truck.

17        Q.    Would that have been face first or would

18   they have pulled you back into your truck?

19        A.    Back.

20        Q.    What happened next?

21        A.    They handcuffed me, didn't read me my

22   Miranda rights or anything.  When I reached to grab

23   -- as I reached to grab the money, they were

24   grabbing me.

25        Q.    At any point did you resist their

1  attempts to put you in handcuffs?

2      A.   No.

3      Q.   At any point did you pull your arms or

4  hands away from them attempting to handcuff you?

5      A.   No.

6      Q.   At any time did use any part of your body

7  to try to get away from them or try to push back

8  against them during the handcuffing?

9      A.   No.

10      Q.   At any time did you tense your muscles up

11  to keep them from being able to pull your hands

12  behind your back?

13      A.   No.

14      Q.   After you were pulled onto your back into

15  your truck, what happened to you next?

16      A.   They wrestled me and handcuffed me, and

17  they put me in the back of the police car.

18      Q.   Do you know at what point during this

19  interaction, if it was during this interaction,

20  that you injured your right hand?

21      A.   Probably when this one grabbed me.

22      Q.   When you say this one, just for the

23  record --

24      A.   The little one.  The first officer to get

25  there.

1    injury, right?

2         A.    No.

3         Q.    So you were placed in the back of which

4    unit, the one who arrived first or the one who

5    arrived second?

6         A.    The one who arrived first.

7         Q.    Could you see what the officers were

8    doing while you were sitting in the back of the

9    police unit?

10        A.    They were over there acting like they had

11   won the Superbowl.

12        Q.    In what way?  Describe that for me.

13        A.    Like they all had smiles on their face,

14   like they was dapping each other or what have you.

15        Q.    Let me ask you this.  How long were you

16   in the back of the unit?  I assume you were in the

17   unit alone.

18        A.    Yes.  At one point.  Once they put me in

19   the vehicle, he left, and they went over there

20   talking and going on, and then when he come back to

21   the vehicle, I asked him if he could release these

22   handcuffs, because my hand is hurting, you know.

23        Q.    How long was it between the time that you

24   were put in the back of the unit and when he came

25   back and you had this discussion with him?

74

1      A.     Probably ten minutes.

2      Q.     Did he loosen the handcuffs at that time?

3      A.     Yes, he did.

4      Q.     Did he then get in the car and drive you

5   to the detention center or did he get back out and

6   continue to interact with the other officers?

7      A.     No.  At that point, once he come back to

8   the car, I asked him to release these cuffs on me

9   because I could not -- I didn't have no feelings in

10  my hand.  They was too tight.  So at this point he

11  takes me to the jail.

12     Q.     Did you feel the pain in your right hand

13  as soon as you were grabbed by the deputy or was it

14  after the handcuffs were put on you, if you know?

15     A.     Well, it was after the handcuffs were put

16  on me.  You really don't know what is going on at a

17  time like that, you know.  So I can't tell you

18  exactly when I realized that my hand was broke.

19     Q.     I'm trying to understand, because it's

20  been your testimony that there was a bone broken in

21  your hand.  I'm trying to understand whether that

22  might have been caused by the deputy grabbing you

23  or did they crush the handcuffs down on you so

24  tight that it caused it?  Do you know?

25     A.     I don't think it's from crushing it.  It

1      Q.   Had you done any illicit drugs that day,
2   other than marijuana?
3      A.   No, sir.
4      Q.   To your knowledge, had Mr. Cobb done any
5   illicit drugs that day other than marijuana?
6      A.   I didn't see Mr. Cobbs until that night.
7   I don't know what he did that day.
8      Q.   In your presence, he did not?
9      A.   No, sir.  No, sir.
10      Q.   Based on the allegations in your lawsuit,
11   I understand that you made a complaint with the
12   Livingston Parish Sheriff's Office after this
13   incident; is that right?
14      A.   Yes, sir.
15      Q.   Do you know when you made that complaint?
16      A.   Probably a week or two after it happened.
17      Q.   How did you make that complaint?
18      A.   I went to Internal Affairs and filled out
19   a complaint.
20      Q.   Do you know who you spoke to when you
21   went to make that complaint?
22      A.   A gentleman named Mr. Roberts.
23      Q.   I'll represent to you that there is a
24   deputy named Charlie Roberts that works in our
25   warrants division, which is kind of our front

1  clarify that the person that you referred to as the
2  little one, were we calling him that because he was
3  smaller than you or smaller than the other officer,
4  the other deputy?
5       A.   He was smaller than the other deputy.  He
6  was bigger than me.  Taller, too.
7       Q.   The larger deputy, when he was speaking
8  to you, did he use the "N" word?
9       A.   I don't recall him -- I can't say I heard
10  him use the "N" word.
11       Q.   And when he was speaking, was he like
12  singing or was he asking direct questions?
13       A.   He was asking direct questions.  "Where
14  is the crack?  Where the crack pipe?"
15       Q.   Speaking about questions about crack, do
16  you believe the questions about crack to be
17  stereotyping?
18            MR. GREMILLION:
19                 Object to the form of the question.
20            THE WITNESS:
21                 Yes.
22  BY MS. DOUGLAS:
23       Q.   Why?
24       A.   Because they figure black people -- all
25  black people do drugs and everything.