# EXHIBIT 9



UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

ALEXANDER CLARK,

    Plaintiff,

v.                                Case No. 22-326-JWD-RLB

Livingston Parish Sheriff's Office Deputy Jean Hotard; Deputy Calvin Taylor Bowden; Sheriff Jason Ard; Denham Springs Police, Officer Sydney McCullough; Chief J. Shannon Womack; and City of Denham Springs,

    Defendants.

VIDEOTAPED DEPOSITION OF

CALVIN TAYLOR BOWDEN

TAKEN ON

MONDAY, DECEMBER 9, 2024

2:08 P.M.

WALKER MUNICIPAL COURT

13600 AYDELL LANE

WALKER, LOUISIANA  70785



1  Q.  Okay. And sorry, did you complete, I only
2  have them through 2022. So, did you complete them
3  this training in 2023 and this year?
4  A.  Yes.
5  Q.  All right. So, do these trainings cover
6  anything related to training on racial profiling or
7  racial bias?
8  A.  In those specifically?
9  Q.  Mm-hmm.
10 A.  Not that I can recall. I know that you
11 cannot use racial bias in policing. That's a well-
12 established practice.
13 Q.  Mm-hmm.
14 A.  But as far as, to the best of my
15 recollection, I don't recall specifically if that's
16 covered in there or not.
17 Q.  Okay. Do you -- have you received
18 training specifically on racial profiling and or
19 racial bias in policing?
20 A.  That's covered in the academy and it's
21 covered in separate trainings, and it's part of
22 policy on -- it's a well-established practice that
23 you cannot use racial bias in policing.
24 Q.  So, what have you learned about what
25 racial bias in policing is?

1    A.    Using someone's, excuse me, race,
2 ethnicity, age, gender as a means of detaining them
3 for, with that being the only reason, you know, that
4 would be racial bias and that's not acceptable.
5 It's not a practice that is used.
6    **Q.    Okay.  So, you said you learned that in**
7 **the academy, CARTA and also other trainings.  Is**
8 **that other trainings here at LPSO?**
9    A.    Like I said, it's well-established.  This
10 isn't a practice that is used, and I know that
11 racial bias is not acceptable in law enforcement.
12 As far as every time I've been instructed or shown
13 racial bias, I can't tell you off the top of my
14 head.
15    **Q.    Okay.  I just want to talk briefly about**
16 **your disciplinary history.  Can you describe what**
17 **type of, if you've received any discipline while**
18 **you've been at LPSO?**
19    A.    I have not received any disciplinary --
20 any established disciplinary proceedings while
21 employed here.
22    **Q.    Have you received any informal discipline**
23 **like verbal warnings or anything like that?**
24    A.    Possibly.  I mean it depends on what your
25 definition of informal, disciplinary hearings.

1  typically there would not be a field test done.  But
2  just like I just said with the prevalence of
3  fentanyl, we don't typically conduct field tests
4  now.  We mostly send it to the state lab for it to
5  be tested in a controlled environment.
6       Q.   At the time of the incident involving Mr.
7  Clark, was fentanyl prevalent?
8       A.   Mm-hmm.
9            THE REPORTER:  Was that yes?
10           THE DEPONENT:  Yes.  I'm sorry.
11 BY MS. ALAJBEGOVIC:
12      Q.   Did you -- so did you at that time
13 determine, well, we will get to this, but there was
14 a suspect, you had a suspicion that there was crack?
15      A.   Mm-hmm.
16      Q.   Did you determine that there wasn't enough
17 to field test?
18      A.   That's not up to me.  I'm not the lead
19 case officer.  That would be a question for Deputy
20 Hotard.  I didn't conduct anything with the evidence
21 that was obtained in the case.
22      Q.   Sorry, can you just explain a little bit
23 more.  Why does fentanyl, the presence of, or the
24 possible presence of fentanyl change whether or not
25 you're doing field drug testing?

1                MS. ALAJBEGOVIC:  Okay.  We can stop.
2    BY MS. ALAJBEGOIC:
3        Q.   So what's happening?  What are you doing
4    at this -- in this section of the video?
5        A.   Searching the vehicle.
6        Q.   Okay.  At this point, are you still
7    searching for  marijuana or anything related to it?
8        A.   I believe during the search I found Chore
9    Boy, which would be the Brillo without any type of
10   chemicals used and which, as I explained earlier, is
11   used to filter crack cocaine when using it in a
12   smoking device.
13       Q.   Okay.  So, okay.  So, that's what you
14   found during this point.
15       A.   Somewhere in the -- I can't tell you
16   exactly --
17       Q.   During the search.
18       A.   -- the exact moment but somewhere during
19   this, yes.
20       Q.   Okay.  All right.
21               MS. ALAJBEGOVIC:  And then let's go to 4
22   minutes and 15 seconds and then we'll go to the end.
23               (WHEREUPON, playing of the video resumed.)
24   BY MS. ALAJBEGOVIC:
25       Q.   Okay.  So, in this video, you're shown

1  know.  I mean, maybe.
2      Q.   Okay.  Would it influence your decision to
3  do that depending on the race of the individuals who
4  you're searching?
5      A.   No.  Any race can use crack cocaine or
6  possess illegal items.
7      Q.   Okay.  But you didn't take an account that
8  it was two elderly black men that you were searching
9  at that point?
10     A.   That I believe were possessing illegal
11 narcotics.  The age, race, sex orientation,
12 ethnicity, religion of someone that is committing a
13 crime does not affect the fact that they are still
14 committing a crime.
15     Q.   But did you find crack during this search?
16     A.   The crack was going to be on the $20 bill
17 that Mr. Alexander Clark threw into the puddle at
18 his feet.
19     Q.   It was going to be on the --
20     A.   Yes, that's -- it's now in the puddle
21 where he had obstructed justice.
22     Q.   Well -- okay.  So, okay.  All right.
23          MS. ALAJBEGOVIC:  We're going to go to the
24 next video which is Exhibit 12.  Is that right?
25 1_2021-05-25_00-14-00_CBowden.  And we're, let's

1  think he was hot at that time?  Probably not.  But
2  was he in possession?  Yes.
3      Q.   I'm just trying to get really and truly,
4  truly trying to understand what -- why are you
5  making the assumption that Mr. Clark was smoking
6  crack?  I really don't understand.  Because there
7  was no crack found, no crack that was found, nothing
8  was entered into evidence.  So, I just want to
9  understand why the continual questioning of crack.
10     A.   Because of my training --
11     Q.   Related to crack.
12     A.   -- my training, knowledge and experience,
13 what I observed with my own two eyes, the evidence
14 that I observed is consistent with ingesting crack
15 cocaine.  That's why.
16     Q.   But crack was never found.
17     A.   The crack that was present, Mr. Clark
18 obstructed justice and destroyed into the puddle
19 that was at our feet. That's why there was no crack
20 found.
21     Q.   Okay.  I mean if that's what you want to,
22 I mean at the end of the day though you, so you
23 didn't make a report, right?  It was the lead, Mr.
24 Hotard.
25     A.   Yes.

1  next video, Exhibit -- remind me.
2              THE REPORTER:  13 or is it 14.
3              MS. ALAJBEGOVIC:  Okay.  1_2021-05-25_00-
4  10-19-00_CBowden.
5              MS. DOUGLAS:  Where do you want to start?
6              MS. ALAJBEGOVIC:  1:20 and then stop at
7  1:40.  You can stop.
8              (WHEREUPON, Exhibit 13 was marked for
9  identification.)
10             (WHEREUPON, playing of the video resumed.)
11 BY MS. ALAJBEGOVIC:
12     Q.  Okay.  So, do you hear the words, "Oh that
13 might actually be sheetrock.  That might be
14 sheetrock."
15     A.  Yes.
16     Q.  Who says that?
17     A.  It sounds like me.
18     Q.  Okay.
19     A.  Mm-hmm.
20     Q.  And then who says, "Yeah, but them
21 granules, that ain't sheetrock. Sheetrock ain't
22 shiny granules.
23     A.  Which is true.  And but --
24     Q.  I'm not asking that.  I'm not asking you
25 who said that?

```
 1              MS. DOUGLAS:  The first video at 17
 2   seconds.
 3              MS. ALAJBEGOVIC:  Yeah.  So let's just
 4   start from the beginning and then stop at 20.
 5              MS. DOUGLAS:  Okay.
 6              (WHEREUPON, a video was played.)
 7   BY MS. ALAJBEGOVIC:
 8        Q.   Okay.  So that, "Give me some crack."
 9        A.   No, that wasn't -- that -- that wasn't him
10   because he's not in the vehicle.
11        Q.   Right.  But your testimony previously was
12   that you were saying that.  You said, "Give me some
13   crack."  Who -- who is saying, "Give me some crack."
14        A.   That's what I'm saying.  I believe me
15   because he's outside the vehicle.
16        Q.   Okay.  So, you're -- so you said, "Give me
17   some crack."
18        A.   All the time that I was singing, Gucci
19   Man, and talking to myself, just me, God, and my
20   microphone was how I conduct a lot of business.
21   But, yeah, I would say that was me considering he's
22   outside vehicle.  That's what I was confused about.
23        Q.   Okay. So, "Give me some crack," is still
24   the rap song.
25        A.   Yeah, I would --
```