# EXHIBIT 12

<u>DECLARATION OF SARAH ABRAHAM, PhD</u>

I, Sarah Abraham, declare as follows:

1.     I am a statistical and economic analyst with a doctorate in Economics, and I have been designated as an independent expert witness on behalf of Plaintiff, Alexander Clark, in the matter *Clark v. Hotard, et al..,* 3:22-CV-00326 (M.D. La.). This declaration is submitted in support of Plaintiff's Opposition to Defendants' Motions for Summary Judgment. I have personal knowledge of the matters contained in this declaration and if called to testify to them could and would do so competently.

2.     Attached hereto as Exhibit A is a true and correct copy of the June 18, 2025 Expert Report of Sarah Abraham, which sets forth my initial expert opinions in the above matter.

3.     If called to testify at trial, I attest that I will testify to the matters set forth in these Reports.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 20th day of October 2025, at Boston, Massachusetts.



Sarah Abraham, PhD

Exhibit A to Declaration of Dr. Sarah Abraham:
Expert Report of Dr. Sarah Abraham

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

Alexander Clark,

             Plaintiff,

     v.

Livingston Parish Police
Deputy Jean Hotard;
Deputy Calvin Taylor Bowden;
Sheriff Jason Ard;
Denham Springs Police
Deputy Sydney McCullough;
Chief J. Shannon Womack; and
City of Denham Springs,

             Defendants.

Case No. 22-326-JWD-RLB

# EXPERT REPORT OF SARAH ABRAHAM

June 18, 2025

# Table of Contents

I.      Qualifications ...................................................................................................... 1

II.     Assignment ......................................................................................................... 1

III.    Summary of Opinions ........................................................................................ 2

IV.     Case Background ................................................................................................ 3

V.      Description of Data ............................................................................................ 3

        A.      Overview of LPSO Data ........................................................................ 3

        B.      Overview of DSPD Data ........................................................................ 4

VI.     The Rate of Traffic Stops for Black People in Livingston Parish Is Disproportionate to Their Population Share ........................................................................................ 5

VII.    Police Report Data from LPSO Shows a Disproportionate Number of Police Reports Resulting from Traffic Stops for Black People ................................................... 7

VIII.   The Disproportionate Rate of Traffic Stops and Police Reports for Black People in Livingston Parish Is Not Explained by Behavioral and Demographic Factors ............ 8

## I.     Qualifications

1.      I am a Principal at Cornerstone Research where I have been employed since 2018.  I provide economic and financial analysis in litigation, spanning a wide range of matters.  I have provided consulting services to both private firms and government agencies, where I conducted statistical and economic analyses of large, proprietary datasets for high-profile matters.

2.      I have published articles in peer-reviewed journals, including the *Journal of the American Medical Association* and the *Journal of Econometrics.*  My research on health inequality in the United States has been featured in the public press, including *The New York Times* and *The Wall Street Journal*.  In 2022, my article on econometric and statistical methods won the Aigner Award for Best Empirical Paper as selected by a committee of fellows at the *Journal of Econometrics*.

3.      I earned a B.S. and Ph.D. in Economics from the Massachusetts Institute of Technology ("MIT") in 2012 and 2018, respectively.  For two years between my undergraduate and graduate studies, 2012–2014, I was a pre-doctoral fellow with Opportunity Insights, a team of researchers and policy analysts at Harvard University focused on analyzing data to enable local stakeholders to make more informed decisions.  I was also awarded the National Bureau of Economic Research ("NBER") Health and Aging Pre-Doctoral Fellowship and the MIT Economics Castle Krob Fellowship for my doctoral research.

4.      A current copy of my *curriculum vitae*, including a list of my publications, is attached as **Appendix A**.  I have not provided testimony in the last four years.

5.      Neither Cornerstone Research nor I are being compensated for my work on this matter, or for the work by staff who are supporting me.  I have agreed to serve as an expert on a pro bono basis for all work in this matter, including deposition and trial testimony.

## II.     Assignment

6.      I have been retained by the Social Justice Legal Foundation ("SJLF"), which I understand represents Alexander Clark ("Plaintiff") in the above-captioned matter.  Counsel has asked me to review data produced in this matter by the Livingston Parish Sheriff's Office ("LPSO") and other data on LPSO traffic stop activity to assess whether there are differences by race in LPSO's traffic stop and police report activities in 2020 and 2021.  Counsel has also

asked me to review agency assist report data produced in this matter by the Denham Springs Police Department ("DSPD") between 2019–2021 to determine first whether such data can be used to assess whether there are differences by race in DSPD's agency assist activity and, if so, to perform such an assessment.

7.     A complete list of the information I have considered in forming my opinions is attached as **Appendix B**.

8.     The conclusions and analyses presented are based on currently available information. If new information relating to my analyses or conclusions becomes available, I reserve the right to revise my analyses and conclusions.

**III.     Summary of Opinions**

9.     My analysis of traffic stops conducted by LPSO in 2020 and 2021 shows a disproportionate number of traffic stops of Black people relative to the size of the Black population in Livingston Parish. Specifically, I find that 26.8% of the traffic stops were for Black people. However, based on the 2020 census, Black people make up only 7.9% of the total population in Livingston Parish and only 7.3% of the adult population. The disparity in the proportion of traffic stops of Black people relative to the proportion of the Livingston Parish population that is Black is statistically significant, i.e., unlikely to be due to chance alone.

10.     My analysis of LPSO police report data from 2020 and 2021 produced in this matter similarly shows a disproportionate number of police reports for Black people relative to the size of the Black population in Livingston Parish. Specifically, I find that 35.4% of the police reports were for Black people. However, as discussed above, Black people make up only 7.9% of the total population in Livingston Parish and only 7.3% of the adult population. The disparity in the proportion of police reports for Black people relative to the proportion of the Livingston Parish population that is Black is statistically significant, i.e., unlikely to be due to chance alone.

11.     I also conducted a sensitivity analysis to assess whether there are plausible alternative explanations for the observed racial disparity in traffic stops and police reports. I find no evidence that behavioral or demographic differences across races in Livingston Parish are likely to explain the statistically significant racial disparities in traffic stops or police reports that my analysis shows.

## IV.    Case Background

12.    According to Plaintiff's Amended Complaint, on the evening of May 24, 2021, Mr. Clark was stopped by an LPSO officer, Defendant Hotard, while driving.[1]  Prior to interacting with Mr. Clark, dispatch called for an "agency assist."[2]  Defendant Bowden from the LPSO then arrived on the scene several minutes later.[3]  Officers from DSPD also arrived on the scene.[4]  Mr. Clark was charged with failure to use a turn signal and resisting an officer, with a charge for obstruction of justice added sometime in March 2023.[5]  The charge for failure to use a turn signal was ultimately dropped and on May 4, 2023, Mr. Clark was found guilty of misdemeanor obstruction of justice and not guilty of resisting an officer.[6]  The traffic stop involving Mr. Clark occurred within the "sole predominantly Black neighborhood in Denham Springs."[7]  Denham Springs is the largest city in Livingston Parish.[8]

13.    Plaintiff alleges systemic over-policing in the predominantly Black neighborhood in Denham Springs where Mr. Clark was stopped.[9]  Plaintiff alleges that the Black population in Livingston Parish receives a disproportionate number of traffic stops.[10]

## V.    Description of Data

### A.    Overview of LPSO Data

14.    I obtained from Counsel PDF files that I understand include traffic stops conducted in Livingston Parish across multiple agencies between 2020 and 2021 that include at least one of four types of traffic offenses.[11]  From those files, I analyzed all traffic stops that Counsel

---

[1] First Amended Complaint, *Alexander Clark v. Livingston Parish Police Deputy Jean Hotard, et al.*, United States District Court for the Middle District of Louisiana, Case No. 22-326-JWD-RLB, Document 89, filed on December 4, 2023 ("Amended Complaint"), ¶¶ 32–37.
[2] Amended Complaint, ¶ 37.
[3] Amended Complaint, ¶¶ 32–49.
[4] Amended Complaint, ¶¶ 77, 86.
[5] Amended Complaint, ¶¶ 110, 112.
[6] Amended Complaint, ¶¶ 111–112.
[7] Amended Complaint, ¶ 135.
[8] Amended Complaint, ¶ 136.
[9] Amended Complaint, ¶¶ 135–138
[10] Amended Complaint, ¶¶ 140–145.
[11] The four types of traffic offenses are as follows:  LRS 32:304C (License Plate Light Required), LRS 47:536.8 (Switched License Plate), LRS 32:361.1 (View Outward or Inward through Windshield/Window (TINT)), and LRS 32:104 (Failure to Signal).  Case Charge Report records for nine types of traffic offenses were requested through a Public Records Request by Counsel on April 23, 2025.  Case Charge Report records for LRS 32:104 (Failure to Signal) had previously been obtained by Counsel through a prior Public Records Request and were attached as Exhibit A to the Public Records Request submitted on April 23, 2025.  Counsel obtained the Case Charge Report records on April 24, 2025.  Traffic stops identified in the Case Charge Report records for the four types of traffic offenses identified above were printed at the Livingston Parish Courthouse on May 14, 2025.  *See* Memo from Sara Haji to Jason Harris, "Re: Public Records Request on behalf of The Social Justice Legal Foundation," April 23, 2025; Email from ct@livclerk.org to Lars Odland, "Public Record Request Reports," April 24, 2025; Official Receipt: 2025-00012605, Livingston Parish, LA, Jason B. Harris Clerk of Court, May 14, 2025.

identified as having been conducted by LPSO. The files include identifying information about the traffic stop; information on the person who was stopped, including race; and details on the charges being brought, including the offense date and statute number. I note that the incident involving Mr. Clark is not included in these files.[12] I analyzed these files and created a dataset with the information from these files that is relevant to my analysis. There are 112 unique traffic stops in this dataset.

15.    I also analyzed PDF files produced in this matter that I understand from Counsel include all LPSO police reports from 2020 and 2021 that include at least one of 10 types of traffic offenses.[13] I understand from counsel that with the exception of police reports that include a traffic offense for LRS 32:104 (Failure to Signal), these police reports are missing traffic stops conducted by divisions within LPSO other than the LPSO Criminal Patrol Division. I understand from counsel that this limitation is due to LPSO data constraints, and I did not analyze these police reports by the different divisions within LPSO. These files include detailed information on the offenses alleged to have been committed by the suspect(s); information on the suspect(s), including race; details regarding the traffic stop, including the location, date, time of day, and the reporting officer(s); and a narrative description of the traffic stop and follow-up interactions related to the incident. I understand from Counsel that police reports are only created subsequent to a routine traffic stop if certain offenses are alleged, or the specific circumstances of the traffic stop require a police report. A police report was created in response to the incident involving Mr. Clark as described in **Section IV** and is included in this database.[14] I analyzed these files and created a dataset with the information from these files that is relevant to my analysis. There are 427 unique police reports in this dataset.

### B.   Overview of DSPD Data

16.    I received and reviewed agency assist reports between 2019–2021 that DSPD produced in this matter. DSPD produced 36 agency assist reports. I understand from

---

[12] Amended Complaint, ¶¶ 32–36, 110.
[13] Email chain from Druit Gremillion Jr. to Marjorie Menza and Lars Odland, "Re: Clark v. Hotard et al -- Revised Expert Discovery Deadlines," May 21, 2025, pp. 7–8, 11–12. The 10 types of traffic offenses are as follows: LRS 32:304C (License Plate Light Required), LRS 47:536.8 (Switched License Plate), LRS 32:361.1 (View Outward or Inward through Windshield/Window (TINT)), LRS 32:104 (Failure to Signal), LRS 32:79 (Improper Lane Usage), LRS 32:1304 (False Motor Vehicle Inspection Certificate), LRS 32:303 (Headlights Required), LRS 32:123 (Stop Sign/Yield Sign), LRS 32:304 (Taillights Required), and LRS 32:53 (Motor Vehicle Inspection Certificate Required). *See* Email chain from Druit Gremillion Jr. to Marjorie Menza and Lars Odland, "Re: Clark v. Hotard et al -- Revised Expert Discovery Deadlines," May 21, 2025, pp. 11–12.
[14] Amended Complaint, ¶¶ 32–36, 110. The incident involving Mr. Clark is report number 2100007849 000.

discovery responses that DSPD does not create a report each time it is called upon for an agency assist, and instead only creates a report when it determines a report is necessary.[15]  I understand from Counsel that DSPD did not create an agency assist report for the incident involving Mr. Clark, which I have confirmed based on my review of the produced agency assist reports.  Due to the data limitation that a report is only created when DSPD determines a report is necessary, and that I do not have information on the factors involved in this determination, I did not conduct any statistical analyses of the DSPD data.

## VI.  The Rate of Traffic Stops for Black People in Livingston Parish Is Disproportionate to Their Population Share

17.     My analysis of the LPSO traffic stops data shows a disproportionate number of traffic stops of Black people relative to the size of the Black population in Livingston Parish.

18.     I find that Black people are stopped for traffic stops at a higher rate than would be expected based on their share of the population in Livingston Parish alone.  Based on my analysis of the 112 traffic stops, 26.8% of the traffic stops were for Black people.  However, based on the 2020 census, Black people make up only 7.9% of the total population[16] in Livingston Parish, and only 7.3% of the adult population.[17]  If Black people were stopped at the same rate as other races, one would expect that Black people would also make up 7.9% of all traffic stops based purely on their share of the population.  Instead, as shown in **Figure 1**, my analysis shows that Black people are stopped 3.4 times more often.

---

[15] Supplemental Responses to Plaintiff's Second Set of Interrogatories and Requests for Production on Behalf of City of Denham Springs, Chief J. Shannon Womack, and Sydney McCullough, *Alexander Clark v. Livingston Parish Police Deputy Jean Hotard, et al.*, United States District Court for the Middle District of Louisiana, Case No. 22-326-JWD-RLB, March 18, 2025, p. 2.

[16] In the traffic stop and police report data I analyzed, at most a single value is listed for each individual's race.  I define a traffic stop or police report as being for a Black person if the driver's race is listed as "Black."  In the census data, individuals are identified as either a single race or as multiple races.  The percent of Livingston Parish that identifies as Black alone is 7.9%.  The percent of Livingston Parish that identifies as either (i) Black alone or (ii) as multiple races, one of which is Black, is 8.9%.  Given that the traffic stop and police report data only identify one race value for drivers, I define individuals as Black in the census data if they identify as Black alone.  Using an alternative definition of Black to include those identified as multiple races, one of which is Black, in my statistical analyses does not change any of my conclusions.  *See* my workpapers.

[17] Adult is defined as individuals aged 18 years or older.  I conduct my statistical analysis using the total population instead of the adult population because Black people make up a larger portion of the total population than they do the adult population (i.e., 7.9% of the total population and 7.3% of the adult population).  Thus, if I find a statistically significant disparity based on Black people's share of the total population, it is also the case that I find a statistically significant disparity based on Black people's share of the adult population.  *See* my workpapers.

**Figure 1:  Share of Traffic Stops for Black People and Share of Black Population in Livingston Parish**



Source:  LPSO Traffic Stops; Decennial Census
Note:
[1]    A Black Traffic Stop is one in which the race of the driver is indicated as being Black.
[2]    The Black Population in Livingston Parish is based on the 2020 census estimate of single-race Black or African American residents.

19.    I find this observed disparity in traffic stops of Black people in Livingston Parish to be statistically significant.[18]  Specifically, I conducted a statistical test to compare the proportion of traffic stops of Black people to the proportion of the Livingston Parish population that is Black.  If the proportion of Black traffic stops is sufficiently higher than the proportion of Black people in Livingston Parish, then it is unlikely that the observed results are due to random chance and the result is said to be "statistically significant."  In other words, there is strong statistical evidence that Black people are being stopped at a higher rate than would be expected based on their proportion of the Livingston Parish population.  My statistical analysis finds that the likelihood of observing a disparity as large or larger than the disparity shown in **Figure 1** is less than one in four hundred million.[19]

---

[18] I conducted a one-sided binomial test.  A one-sided binomial test can be used to compare whether the relative portion for a binary outcome for an observed sample is significantly greater than a hypothesized proportion. Comparing the proportion of traffic stops that are for Black people in the LPSO traffic stop dataset to the proportion of the Livingston Parish population that is Black yielded a p-value < 0.0001.  This p-value falls below a commonly used threshold of 0.05 for determining statistical significance.  *See* "Binomial Test," *The University of Texas at Austin*, available at https://sites.utexas.edu/sos/guided/inferential/categorical/univariate/binomial/.  *See also* Federal Judicial Center and National Research Council, *Reference Manual on Scientific Evidence*, Third Edition (Washington DC: The National Academies Press, 2011) ("Reference Manual on Scientific Evidence"), pp. 241, 250–251, 320–321.
[19] *See* my backup for Figure 1.

**VII.    Police Report Data from LPSO Shows a Disproportionate Number of Police Reports Resulting from Traffic Stops for Black People**

20.     My analysis of the database of LPSO police reports produced in this matter shows a disproportionate number of police reports for Black people based on the relative size of the Black population in Livingston Parish.

21.     I find that the rate of police reports for Black people is 4.5 times higher than would be expected based on their share of the population in Livingston Parish.  Based on my analysis of the 427 police reports, 35.4% of the police reports were for Black people.  However, as discussed above, Black people make up only 7.9% of the population in Livingston Parish.  As shown in **Figure 2**, my analysis shows that Black people have police reports 4.5 times more often.

**Figure 2:  Share of Police Reports for Black People and Share of Black Population in Livingston Parish**



Source:  LPSO Police Reports; Decennial Census
Note:
[1]    A Black Police Report is one in which the race of the driver is indicated as being Black.
[2]    The Black Population in Livingston Parish is based on the 2020 census estimate of single-race Black or African American residents.

22.     Similar to my findings related to the traffic stop data, I find that this observed disparity in police reports for Black people in Livingston Parish is statistically significant.[20] My statistical analysis finds that the likelihood of observing a disparity as large or larger than the disparity shown in **Figure 2** is less than one in one hundred trillion.[21]

**VIII.    The Disproportionate Rate of Traffic Stops and Police Reports for Black People in Livingston Parish Is Not Explained by Behavioral and Demographic Factors**

23.     I conducted a sensitivity analysis to assess whether there are plausible alternative explanations for the observed racial disparity in traffic stops and police reports for LPSO in 2020–2021.

24.     One potential explanation for the disproportionate share of traffic stops and police reports that involve Black people (relative to the share of the Black population) is if there are

---

[20] As with my statistical analysis of traffic stop data, I also conducted a one-sided binomial test, which yielded a p-value < 0.0001.  This p-value falls below a commonly used threshold of 0.05 for determining statistical significance.  *See* "Binomial Test," *The University of Texas at Austin,* available at https://sites.utexas.edu/sos/guided/inferential/categorical/univariate/binomial/.  *See also* Reference Manual on Scientific Evidence, pp. 241, 250–251, 320–321.
[21] *See* my backup for Figure 2.

vehicle usage differences between Black people and white people in Livingston Parish.  For example, if Black people drive substantially more than non-Black people on average in Livingston Parish, this may explain a portion of the observed disparity in the rate of traffic stops and police reports for Black people and non-Black people.  I analyzed American Community Survey ("ACS")[22] data between 2017–2021 on vehicle usage-related metrics for Black people and white people in Livingston Parish.[23]  As described below, I conducted statistical tests to compare various vehicle usage statistics for Black people and white people in Livingston Parish and find that their usage is not statistically significantly different, and that any percentage difference is small relative to the 3.4 times difference in the rate of traffic stops for Black people in Livingston Parish.  Thus, as I show in **Figures 3–5**, vehicle usage differences by race cannot explain the racial disparities I describe in **Section VI** and **Section VII**.[24]

25.     As I show in **Figure 3**, commuting times for Black people and white people in Livingston Parish are comparable and not statistically distinguishable.

---

[22] The ACS is an annual, government-run survey that collects long-form-type information from people across the United States.  The ACS includes detailed questions about respondents' social, economic, housing, and demographic information.  Survey results are published across a wide range of geographic levels, including county equivalents such as Livingston Parish.  *See* "American Community Survey Information Guide," *United States Census Bureau*, December 18, 2024, available at https://www.census.gov/programs-surveys/acs/about/information-guide.html; "Areas Published," *United States Census Bureau*, September 3, 2024, available at https://www.census.gov/programs-surveys/acs/geography-acs/areas-published.html.

[23] The 2020 census for Livingston Parish shows that white people account for 82.1% of the population.  ACS data is not reported specifically for non-Black people, and thus it is not possible to conduct a reliable statistical test comparing vehicle usage for Black people and non-Black people in Livingston Parish.  I use white people as a proxy for the non-Black population in Livingston Parish given that they represent approximately 90% of the non-Black population in Livingston Parish (i.e., 82.1% / (100%-7.9%)).  *See* my workpapers.

[24] The ACS data includes documentation on using a Z-test to calculate statistically significant differences between two estimates.  Using a Z-test, I find no statistically significant differences between Black people and white people for the various vehicle usage statistics in **Figures 3–5**.  That is, the p-value falls below a commonly used threshold of 0.05 for determining statistical significance.  *See* my workpapers.  *See also* "Instructions for Applying Statistical Testing to American Community Survey Data," *United States Census Bureau*, November 2021, available at https://www2.census.gov/programs-surveys/acs/tech_docs/statistical_testing/2020_Instructions_for_Stat_Testing_ACS.pdf.

**Figure 3:  Comparison of Average Commuting Time by Race for Livingston Parish Workers Age 16 Years or Older[1][2]**
**2017–2021**



Source:  American Community Survey

Note:
[1]   This chart uses ACS 5-year estimates based on survey data collected in Livingston Parish from 2017–2021.
[2]   This analysis only considers when a single race is reported.  2.4% of observations report more than one race.  *See* my workpapers.

26.     As I show in **Figure 4**, commuting mode for Black people and white people in Livingston Parish is also comparable and not statistically distinguishable.

**Figure 4:  Comparison of Commuting Mode by Race for Livingston Parish Workers Age 16 Years or Older[1][2]**
**2017–2021**



Source:  American Community Survey

Note:

[1]    This chart uses ACS 5-year estimates based on survey data collected in Livingston Parish from 2017–2021.

[2]    This analysis only considers when a single race is reported.  2.4% of observations report more than one race.  *See* my workpapers.

27.     As I show in **Figure 5**, the number of vehicles per household for Black people and white people in Livingston Parish is also comparable and not statistically distinguishable.

**Figure 5:  Comparison of Vehicles per Household by Race in Livingston Parish[1][2]**
2017–2021



Source:  American Community Survey

Note:
[1]    This chart uses ACS 5-year estimates based on survey data collected in Livingston Parish from 2017–2021.
[2]    This analysis only considers when a single race is reported.  2.2% of observations report more than one race.  *See* my workpapers.

28.    Another potential explanation for the disproportionate share of traffic stops and police reports that involve Black people is demographic differences among Black people and white people in Livingston Parish, such as income disparities.  According to governmental and industry studies, lower income individuals may be less likely to be involved in a traffic stop than higher income individuals.  In particular, the Bureau of Justice Statistics analyzed data from the 2020 Police-Public Contact Survey and found that residents in households making $49,999 or less were less likely to have police-initiated contact (i.e., a traffic stop or other non-traffic stop interaction initiated by the police) than higher income households.[25]  A possible explanation is that flat-fee traffic offenses have a more substantial negative financial

---

[25] Police-initiated contact includes "being stopped by police while driving or riding as a passenger in a motor vehicle (i.e., a traffic stop); being stopped by police while in a public place or parked vehicle (i.e., a street stop); being arrested, excluding arrests due to some other type of police contact; and being stopped or approached by police for some other reason."  *See* Susannah N. Tapp and Elizabeth J. Davis, "Contacts Between Police and the Public, 2020," *Bureau of Justice Statistics*, March 1, 2024, p. 1, Table 1.

impact on lower income individuals than higher income individuals because the flat fee represents a higher portion of the former's total income.[26]

29.    According to the income information in the ACS data for 2017–2021, the percent of households making $49,999 or less is estimated at 40.1% for Black people and 33.9% for white people in Livingston Parish.  I show the distribution of income for Black people and white people in Livingston Parish in **Figure 6** below.

**Figure 6:  Comparison of Household Income by Race in Livingston Parish[1][2]**
2017–2021



Source:  American Community Survey

Note:
[1]    This chart uses ACS 5-year estimates based on survey data collected in Livingston Parish from 2017–2021.
[2]    This analysis only considers when a single race is reported.  2.2% of observations report more than one race.  *See* my workpapers.

30.    Further, the estimated median household income is $61,286 for Black people and $73,133 for white people.  This difference in median household income is statistically significant.[27]  In other words, given (i) the studies discussed above regarding the relationship between household income and traffic stops, and (ii) data on income differences between Black people and white people in Livingston Parish, one would expect to see a *lower* rate of

---

[26] Tiffany Smith and Leah Shahum, "Fair Warnings: Recommendations to Promote Equity in Speed Safety Camera Programs," *Vision Zero Network*, December 2024, p. 6 ("A $100 ticket affects a person who lives on a minimum wage salary differently than a person earning $100,000 annually.").
[27] I find the difference in median income between Black people and white people in Livingston Parish to be statistically significant when using a commonly used threshold of 0.05 for determining statistical significance. *See* my workpapers.

traffic stops for Black people than for white people (holding all else equal).  However, as discussed in **Section VI** and **Section VII**, my analysis finds a statistically significant *higher* rate of traffic stops and police reports involving Black people than non-Black people.  Thus, differences in income by race do not explain the racial disparities in traffic stops and police reports I describe in **Section VI** and **Section VII**.

31.      In sum, I find no evidence that behavioral and demographic differences across races in Livingston Parish are likely to explain the statistically significant racial disparities in traffic stops and police reports involving Black people that my analysis shows.


Executed this 18th of June, 2025


_____

Sarah Abraham

# Sarah Abraham, Ph.D.
## Principal

**Cornerstone Research**
699 Boylston Street • Boston, MA  02116
617.927.3107
sabraham@cornerstone.com

## ACADEMIC BACKGROUND

| | | |
|---|---|---|
| 2014 – 2018 | **Massachusetts Institute of Technology (MIT)** | Cambridge, Massachusetts |

*Ph.D., Economics*
Thesis: Essays in Healthcare Economics and Estimation Methods

| | | |
|---|---|---|
| 2009 – 2012 | **Massachusetts Institute of Technology (MIT)** | Cambridge, Massachusetts |

*B.S., Economics, Phi Beta Kappa*

| | | |
|---|---|---|
| 2005 – 2009 | **The Westminster Schools** | Atlanta, Georgia |

## PROFESSIONAL EXPERIENCE

| | | |
|---|---|---|
| 2018 – Present | **Cornerstone Research, Inc.** | Boston, Massachusetts |

*Principal*
Provide financial, economic, and statistical analysis for commercial litigation matters including support for experts deposition and trial testimony.

| | | |
|---|---|---|
| 2012 – 2014 | **Harvard University** | Cambridge, Massachusetts |

*Pre-Doctoral Fellow, Opportunity Insights*
Conduct empirical analyses on the equality of opportunity and intergenerational mobility across the United States using large administrative datasets for Professors Raj Chetty, John Friedman, Nathan Hendren, and Emmanuel Saez.

## PUBLICATIONS

"Comments for the FTC's Multilateral Pharmaceutical Merger Task Force," *Public Comment Submission to the FTC, Multilateral Pharmaceutical Merger Task Force,* June 25, 2021, with John Asker, Kostis Hatzitaskos, Avigail Kifer, and Margaret Kyle.

"Estimating Dynamic Treatment Effects in Event Studies with Heterogeneous Treatment Effects," with Liyang Sun, *Journal of Econometrics*, 2020. (Best paper award)

"Clinical decision support for high-cost imaging: A randomized clinical trial," with Joseph Doyle, Laura Feeney, Sarah Reimer, and Amy Finkelstein, *PLOS ONE*, 2019.

 "The Association Between Income and Life Expectancy in the United States, 2001-2014," with Raj Chetty, Michael Stepner, Shelby Lin, Benjamin Scuderi, Nicholas Turner, Augustin Bergeron, and David Cutler, *Journal of the American Medical Association*, 2016. (Selected press coverage includes: The New York Times (front page), NPR, and The Guardian; paper and associated information available at https://healthinequality.org/)

**Appendix A**
**S a r a h   A b r a h a m ,   P h . D .**

**HONORS AND AWARDS**

Aigner Award for Best Empirical Paper (*Journal of Econometrics*)                           2022

NBER Health and Aging Pre-Doctoral Fellowship                                   2017 – 2018

Castle Krob Fellowship                                                           2015 – 2016

**REPRESENTATIVE CASE EXPERIENCE**

Antitrust Litigation and Merger Reviews

1.  *Sidibe et al. v. Sutter Health* and *UEBT et al. v. Sutter Health,* 2018-2025. Retained by counsel for Sutter Health. Analyzed healthcare claims data. Assisted counsel and testifying expert in performing and leveraging empirical analyses to inform expert reports, motions, deposition, and trial arguments.
2.  Generics price fixing, 2018-2025. Retained by counsel for a generics manufacturer. Performed empirical analyses regarding liability and damages. Consulted counsel throughout various stages of litigation.
3.  Monopolization of technology markets for digital content distribution and payments, 2022-2025. Retained by counsel for Defendants. Assessed the statistical reliability of Plaintiffs' proposed model for damages. Assisted testifying expert in report preparation.
4.  Non-horizontal technology merger, 2023. Retained by counsel for Defendants. Assessed the reliability of the European Commission's survey results, including the content of the survey and the ability of survey respondents' answers to be representative of relevant economic forces. Assisted testifying expert in report preparation.
5.  *UnitedHealth Group/Change Healthcare merger,* 2021-2022. Retained by DOJ. Analyzed market definition, market power, and both horizontal and vertical competitive effects. Assessed the value of claims data. Assisted two experts with preparation of expert reports, deposition, and trial testimony.
6.  *FTC et al. v. Martin Shkreli,* 2020. Retained by FTC. Performed analyses to determine the opposing expert performed analyses on a selected and small sample of data and therefore were unreliable. Assisted testifying expert in preparing a report.

Other

1.  Class action regarding tuition payments to higher education institutions during COVID pandemic, 2022-2023. Retained by counsel for a defendant. Analyzed tuition data. Assisted counsel and two testifying experts in rebutting class certification and Plaintiffs' proposed theory of harm.
2.  RMBS class action, 2020-2021. Retained by counsel for Defendants. Analyzed the statistical reliability of Plaintiffs' damages model. Assisted counsel with preparation for opposing expert deposition on core statistical topics.
3.  Allocation of assets across claimants in bankruptcy, 2020-2021. Retained by counsel for Defendants. Consulted counsel on value of claims asserted, including the feasibility of sampling and survey data to reliably address the value of all asserted claims.

**Appendix B**

# Documents Considered List

**Agency Assist Reports**

- Denham Springs Police Department Agency Assist Reports, March 18, 2025
- Notarized Certificate of Service by Cassie Clement, March 19, 2025

**Data Sources**

- American Community Survey
- Decennial Census

**Emails and Memos**

- Email chain from Druit Gremillion Jr. to Marjorie Menza and Lars Odland, "Re: Clark v. Hotard et al -- Revised Expert Discovery Deadlines," May 9, 2025
- Email chain from Druit Gremillion Jr. to Marjorie Menza and Lars Odland, "Re: Clark v. Hotard et al -- Revised Expert Discovery Deadlines," May 13, 2025
- Email chain from Druit Gremillion Jr. to Marjorie Menza and Lars Odland, "Re: Clark v. Hotard et al -- Revised Expert Discovery Deadlines," May 20, 2025
- Email chain from Druit Gremillion Jr. to Marjorie Menza and Lars Odland, "Re: Clark v. Hotard et al -- Revised Expert Discovery Deadlines," May 21, 2025
- Email chain from Marjorie Menza to John Danna, "RE: Today"s Meet and Confer Clark v. Hotard, et al, 3:22-cv-00326 (M.D. La.)," February 27, 2025
- Email chain from Marjorie Menza to John Danna, "RE: Today"s Meet and Confer Clark v. Hotard, et al, 3:22-cv-00326 (M.D. La.)," March 18, 2025
- Email from ct@livclerk.org to Lars Odland, "Public Record Request Reports," April 24, 2025
- Memo from Sara Haji to Jason Harris, "Re: Public Records Request on behalf of The Social Justice Legal Foundation," April 23, 2025

**LPSO Case Charges Reports**

- 2025-04-24 LP Traffic Response re PRR 32-53
- 2025-04-24 LP Traffic Response re PRR 32-79
- 2025-04-24 LP Traffic Response re PRR 32-123
- 2025-04-24 LP Traffic Response re PRR 32-303
- 2025-04-24 LP Traffic Response re PRR 32-304

**Appendix B**

- 2025-04-24 LP Traffic Response re PRR 32-361.1
- 2025-04-24 LP Traffic Response re PRR 32-1304
- 2025-04-24 LP Traffic Response re PRR 47-536.8

**LPSO Police Reports**
- <u>Received May 1, 2025</u>
  - PRR Rpt Set 1_0001
  - PRR Rpt Set 2_0001
  - PRR Rpt Set 3_0001
  - PRR Rpt Set 4_0001
  - PRR Rpt Set 5_0001
  - PRR Rpt Set 6_0001
  - PRR Rpt Set 7_0001
- <u>Received May 12, 2025</u>
  - Clark Production 1
  - Clark Production 2
  - Clark Production 3
  - Clark Production 4
  - Clark Production 5
  - Clark Production 6
- <u>Received May 21, 2025</u>
  - Additional Ellis Reports
  - Additional Evitt Reports
  - Additional Jarreau Reports
  - Additional LoCicero Reports

**LPSO Traffic Stop Reports**
- <u>Received May 15, 2025</u>
  - DOC1
  - DOC2
  - DOC3
  - DOC4

**Appendix B**

- o DOC5
- o DOC6
- o DOC7
- o DOC8
- o DOC9
- o DOC10
- o DOC11
- o Official Receipt: 2025-00012605, Livingston Parish, LA, Jason B. Harris Clerk of Court, May 14, 2025
- <u>Received June 6, 2025</u>
- o 2023.10.11_From Pgs. 1-14 Failure to Signal
- <u>Received June 7, 2025</u>
- o 2023.10.11_From Pgs. 1-14 Failure to Signal only LPSO tickets 2020 2021
- o 2023.10.11_From Pgs. 1-14 Failure to Signal pp 76 79 91
- <u>Received June 8, 2025</u>
- o 2025.05.15 LPSO Traffic Citations Combined (1-100)
- o 2025.05.15 LPSO Traffic Citations Combined (101-338)
- o 2025.05.15 LPSO Traffic Citations Combined (341-400)
- o 2025.05.15 LPSO Traffic Citations Combined (400-500)
- o 2025.05.15 LPSO Traffic Citations Combined (501-583)
- o 2025.05.15 LPSO Traffic Citations Combined (584-600)
- o 2025.05.15 LPSO Traffic Citations Combined (600-691)
- o 2025.05.15 LPSO Traffic Citations Combined (697-767)

**Pleadings**

- First Amended Complaint, *Alexander Clark v. Livingston Parish Police Deputy Jean Hotard, et al.*, United States District Court for the Middle District of Louisiana, Case No. 22-326-JWD-RLB, Document 89, filed on December 4, 2023

- Ruling and Order, *Alexander Clark v. Livingston Parish Police Deputy Jean Hotard, et al.*, United States District Court for the Middle District of Louisiana, Case No. 22-326-JWD-RLB, Document 136, filed on October 1, 2024

- Supplemental Responses to Plaintiff's Second Set of Interrogatories and Requests for Production on Behalf of City of Denham Springs, Chief J. Shannon Womack, and Sydney McCullough, *Alexander Clark v. Livingston Parish Police Deputy Jean Hotard,*



*et al.*, United States District Court for the Middle District of Louisiana, Case No. 22-326-JWD-RLB, March 18, 2025

**Public Reports**

- Susannah N. Tapp and Elizabeth J. Davis, "Contacts Between Police and the Public, 2020," *Bureau of Justice Statistics*, March 1, 2024

- Tiffany Smith and Leah Shahum, "Fair Warnings: Recommendations to Promote Equity in Speed Safety Camera Programs," *Vision Zero Network*, December 2024

**Textbooks**

- Federal Judicial Center and National Research Council, *Reference Manual on Scientific Evidence*, Third Edition (Washington DC: The National Academies Press, 2011)

**Websites**

- "American Community Survey Information Guide," *United States Census Bureau*, December 18, 2024, available at https://www.census.gov/programs-surveys/acs/about/information-guide.html

- "Areas Published," *United States Census Bureau*, September 3, 2024, available at https://www.census.gov/programs-surveys/acs/geography-acs/areas-published.html

- "Binomial Test," *The University of Texas at Austin*, available at https://sites.utexas.edu/sos/guided/inferential/categorical/univariate/binomial/

- "Instructions for Applying Statistical Testing to American Community Survey Data," *United States Census Bureau*, November 2021, available at https://www2.census.gov/programs-surveys/acs/tech_docs/statistical_testing/2020_Instructions_for_Stat_Testing_ACS.pdf

**Note:  In addition to the documents on this list, I considered all documents cited in my report and my figures to form my opinions.**