# EXHIBIT 13-5

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| Alexander Clark, | **CIVIL ACTION NO. 22-326-JWD-RLB** |
| Plaintiff, | |
| *vs.* | **JUDGE JOHN W. DEGRAVELLES** |
| Jean Hotard, et al., | **MAGISTRATE JUDGE RICHARD L. BOURGEOIS, JR.** |
| Defendants. | |

**RESPONSE TO PLAINTIFF'S SECOND SET OF REQUESTS FOR PRODUCTION TO SHERIFF JASON ARD**

**NOW COME** Defendant, through undersigned counsel, Jason Ard, Sheriff of Livingston Parish, State of Louisiana, who responds to Plaintiff's Second Set of Requests for Production of Documents as follows:

**RESPONSE TO REQUEST FOR PRODUCTION**

**REQUEST FOR PRODUCTION NO. 25**

All Documents of any policies, including but not limited to written standard operating procedures, guidelines or trainings related to searches and seizures of narcotics, including during traffic stops.

**RESPONSE TO REQUEST FOR ADMISSION NO. 25:**

Defendant objects to Request for Production No. 25 as seeking information that is not relevant in proportion to the needs of this case. Subject to said objection, defendant states that,

1

produced herewith are policies that were effective at the time of the incident giving rise to this cause of action which may relate to searches and seizures of narcotics.

Dated: February 7, 2025

Respectfully Submitted,

**LIVINGSTON PARISH SHERIFF'S OFFICE**
20300 Government Blvd.
Livingston, LA 70754
P: 225-686-2241
E: dgremillion@lpso.org

*/s/ Druit G. Gremillion, Jr.*
**Druit G. Gremillion, Jr. (La. Bar Roll No. 33867)**
*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on February 7, 2025, a copy of the foregoing ***RESPONSE TO PLAINTIFF'S SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO SHERIFF JASON ARD*** were served on Counsel via email to:

Emma L. Douglas, (La. Bar No. 39076)
Andrea Alajbegovic, *pro hac vice*
SOUTHERN POVERTY LAW CENTER
201 St. Charles Ave
New Orleans, LA 70170
T: 504-377-6086
Email: Emma.douglas@splcenter.org
    andrea.alajbegovic@splcenter.org

Lars Robert Dybdahl Odland
Marjorie J. Menza
Sara Haji
The Social Justice Legal Foundation
523 West 6th Street, Suite 450
Los Angeles, CA 90014
213-542-5241
Email: lodland@socialjusticelaw.org
    mmenza@socialjusticelaw.org
    shaji@socialjusticelaw.org

John Joseph Danna , Jr.
Gaudry, Ranson, Higgins & Gremillion
2223 Quail Run
Suite C-2
Baton Rouge, LA 70808
225-663-6101
Fax: 225-663-6102
jdanna@grhg.net
***Counsel for J. Shannon Womack, Sydney McCullough, and City of Denham Springs***

2

Charles Andrew Perry
Nora Ahmed
American Civil Liberties Union Foundation
  of Louisiana
1340 Poydras St
Suite 2160
New Orleans, LA 70112
917-842-3902
Email: nahmed@laaclu.org
        aperry@laaclu.org
**Counsel for Plaintiff**

Livingston, Louisiana, this 7th day of February, 2025.

*/s/ Druit G. Gremillion, Jr.*
**Druit G. Gremillion, Jr. (#33867)**

**OPERATIONS ORDER NUMBER 202**
**MOTOR VEHICLE INVENTORY POLICY AND PROCEDURE**

I.     Policy

A motor vehicle inventory is an administrative measure designed to protect motor vehicles and their contents while in police custody, to protect the Livingston Parish Sheriff s Office and deputies against claims of lost, stolen, or damaged property; and to protect office personnel and the public against injury or damaged property due to hazardous materials or substances that be in the vehicle. All vehicles will be inventoried prior to being placed in the impound lot.

II.    Procedure

    A.    The contents of all motor vehicles that are lawfully seized and/or impounded by this agency will be subject to inventory.

        1.    Nothing precludes an administrative vehicle inventory from becoming a vehicle search upon discovery of fruits or instrumentalities of crime or probable cause.

        2.    Lawfully seized vehicles are defined as the following:

            a)    Vehicles violating state compulsory insurance laws.

            b)    A vehicle that presents a hazard or obstructs traffic in violation of state of local regulations and the owner cannot be contacted or cannot remove the vehicle in a timely manner.

            c)    Vehicles that need to be held in connection with a police investigation.

            d)    Recovered stolen vehicles; to protect the lawful owner from hazards or illegal contraband left by criminal suspects, regardless if the vehicle is impounded or not.

            e)    Unsafe vehicles in violation of state or local regulations that if allowed to operate on the highway may cause harm to the operator or other motorists.

            f)    Abandoned vehicles that need to be safeguarded due to the inability of the owner or operator to do so.

            g)    When the operator of the vehicle has been arrested and cannot make arrangements for someone to assume responsibility for the vehicle and the vehicle cannot be left parked and locked at the location.

            h)    If the owner is incapacitated and it is necessary for the Sheriffs Office to assume responsibility for a vehicle involved in a crash.

            i)    Vehicles subject to civil seizure per court order.

      j) Vehicles that are subject to seizure and forfeiture under the state asset forfeiture laws.

   3. Legal searches are defined by state law and jurisprudence.

B. A motor vehicle inventory may extend to all areas of the vehicle in which personal property or hazardous materials may reasonably be found, including but not limited to the passenger compartment, trunk, and glove compartment.

   1. All closed containers found within the vehicle shall be opened for purposes of the inventory. Closed and locked containers should not be forced open, unless a key or lock combination is available. In that case locked containers may be opened and inventoried.

C. Deputies will complete a vehicle report for any vehicle seized or impounded. The deputy will have the communications center contact a tow company before conducting an inventory. The deputy should complete the vehicle report before the vehicle is towed unless there is a safety issue that prohibits completion at that time. In that case, the vehicle report should be completed before the deputy releases custody to the towing service.

   1. Deputies will indicate on the vehicle report the overall condition of the vehicle, any vehicle damage and the location of keys or any items of values that cannot be removed from the vehicle (i.e. stereos, speakers, electronics, rims).

   2. The vehicle report will contain an accurate vehicle identification number copied directly from the vehicle and not the registration or title, license information and the name and address of the owner, if known.

   3. The vehicle report will indicate if the vehicle is to be held or not, and if it is to be held, for whom and what reason.

   4. The vehicle report will indicate a listing of all property and valuables in the vehicle with physical description and/or names or models and serial numbers if applicable. Photos or videos of the contents may also be taken.

   5. The releasing deputy will complete a towing information report to be signed by the deputy and the tow truck driver and indicate if the vehicle is to be held and why. The deputy will retain the original and provide the tow driver a copy.

   6. Any items of evidentiary value found will be listed in the deputy's offense report.

7.    The deputy will supply the communications office with the following
      information on any vehicle towed.

      a)    Vehicle identification number and description
      b)    Where the vehicle was towed from and to
      c)    What wrecker service towed the vehicle
      d)    Name of the driver if arrested

8.    The communications center will record all vehicle information in the
      wrecker log.

## OPERATIONS ORDER NUMBER 402,
## PHYSICAL ARREST OF VIOLATORS

I.    Discretionary Arrest Powers

    A.    It is the policy of the Livingston Parish Sheriff's Office that officers of the Office shall, at all times, be fair and equitable in the administration of their duties. For this reason, no person should be physically arrested for a criminal violation due to an arbitrary, capricious, or prejudicial whim of the arresting officer.

        1.    In the event of any physical arrest, it is the duty and responsibility of the arresting officer to submit a Sheriffs Office report of Arrest, the narrative of which should explicitly outline the circumstances of the arrest.

        2.    Following any physical arrest it will be the duty of the shift supervisor to thoroughly check the arrest report. This check includes, but is not limited to, the conciseness, clarity, thoroughness, and accuracy of the report; and, additionally, it is the duty of the supervisor to reasonably insure that the arresting officer was not arbitrary, capricious, or prejudicial in his decision to arrest, but that the circumstances surrounding the arrest at hand were such that the officer had reason to believe that the violator was guilty of the offense charged and that booking was required.

        3.    A person may be notified to come in and make bond on certain charges/minor offenses.

II.    Search of Arrested Persons - Officers are authorized to conduct a full search of the person of any individual arrested. Any evidence gained through this procedure may be used as evidence in court.

III.    Use of Handcuffs on Arrested Persons - In order to establish a standard procedure regarding use of handcuffs, the following will be strictly adhered to:

    A.    Each person, male or female, who is physically arrested should be restrained by the use of handcuffs while they are in the custody of the arresting officer until released to the booking officer at the place of incarceration. In those cases where individuals are not handcuffed, officers shall have substantial justification.

    B.    Handcuffs are not a subduing device but a restraining device and the handcuffed individual may still pose a dangerous problem if the handcuffs are not properly applied. The arms should be restrained behind his back.

    C.    Under no circumstances will a prisoner be handcuffed to a part of the patrol unit or to the arresting officer.

D.     Particular care will be taken when searching an arrested person to eliminate the possibility of a weapon or device for unlocking handcuffs being hidden on his person.

E.     The "Doublelocking device" will be used when handcuffing a prisoner.

IV.     Arrest by Deputy Without Warrant

    A.     A peace officer may, without a warrant, arrest a person when:

        1.     The person to be arrested has committed an offense in his presence; and if the arrest if for a misdemeanor, it must be made immediately or on close pursuit;

        2.     The person to be arrested has committed a felony, although not in the presence of the officer;

        3.     The peace officer has reasonable cause to believe that the person to be arrested has committed an offense, although not in the presence of the officer; or

        4.     The peace officer has received positive and reliable information that another peace officer from this state holds an arrest warrant, or  peace officer of another state or the United States holds an arrest warrant for a felony offense.

        A peace officer in close pursuit of a person to be arrested, who is making an arrest pursuant to this Article may enter another jurisdiction in this state and make the arrest.

V.     Data Check on Arrested Persons - In order to create a more effective method of reporting to the district attorney's office on frequent violators the following procedures will be employed by all:

    A.     A computer check shall be made on all:

        1.     Persons arrested for D.W.I in order to:

            a)     Insure that the correct charge is filed (1st offense, 2nd offense, etc.)

                1.     To file D.W.I. charges of 2nd, 3rd, 4th offense, previous conviction(s) must have been violations of State Statutes and within the past ten-year period.

            b)     Have a complete record of other traffic convictions for the district attorney and court use.

2.    Persons arrested for serious offenses such as negligent injury or negligent homicide.

3.    Persons arrested in connection with a fatal or serious injury accident.

4.    Routine arrest only when the officer has a good reason to believe that the violator may be a frequent violator.

B.    To prevent unnecessary use of radio frequencies, all computer checks, where a violator is physically arrested, should be checked upon his booking in the Parish jail.

C.    Whenever information is received from the computer which gives previous conviction, the operator shall give one copy of the teletype message to the arresting officer.

1.    The arresting officer shall attach the record (teletype message) to his citation with his name, rank, and badge # printed on it.

2.    The arresting officer or person responsible for submitting charges will forward a copy of this record to the District Attorney with the affidavit (arrest citation).

VI.    Transportation of Members of the Opposite Sex - When officers, in the course of their duties, transport members of the opposite sex in their unit (regardless of custodial status) point of origin and point of termination mileages shall be provided the radio operator (with both time and mileage logged on the Radio Log). If vehicles have video camera, it shall activate in video and audio mode.

**OPERATIONS ORDER NUMBER 405,**
**FELONY VEHICLE STOPS**

I.      Purpose – the purpose of this order is to establish a common procedure for handling the hazardous task of stopping a vehicle containing suspects in a felony offense. Deputies should be familiar with these procedures so that responding officers will function as a team and be aware of the expected response this procedure will require.

Although all situations are different, these guidelines should be followed unless deviation becomes absolutely necessary.

FELONY STOP PROCEDURE

1.    Call for backup unit before stopping.
2.    Stop 50-55 feet to the rear of the felon.
3.    Offset left 2-3 feet.
4.    Backup move to initials right and angle to the left.
5.    Turn wheels to the left.
6.    Set your parking brake and put windows down.
7.    Take cover behind driver door.
8.    Initial deputy use his revolver/backup use his shotgun aimed at the suspect.
9.    First statement "We are Sheriff Deputies. You are under arrest. Do not move until told to do so!"
10.   Initial deputy have suspect turn off car, remove keys and throw them to the left as far as he can.
11.   Have all suspects put their hands in view.
12.   Command officer has the suspect in the right front open the door from the outside, stand up, and face the front of the suspect's vehicle.
13.   Command officer has the suspect turn around slowly, turning 360 degrees to check for weapons and stop facing the front.
14.   Have suspect walk backwards guiding him towards the middle of the parked sheriff units/keeping hands high in the air.
15.   Make sure backup and command officer communicate with each other, make sure command officer talks slowly.
16.   Once suspect is in front of units have him turn 360 degrees again. Then have him drop to his knees and cross his legs. Backup secures his shotgun and approaches suspect for pat down.
17.   After handcuffing bring suspect to rear of unit and do a thorough search. Let 3rd backup unit do this if available.
18.   Question the suspect about weapons, how many more suspects, explosives, etc.
19.   Command officer then orders "You in the vehicle sit up" when no more suspects can be seen.
20.   After securing all suspects, command officer approaches suspect vehicle using a low profile going to left rear corner.
21.   Check the trunk lid to make sure it is secure. If not have backup deputy approach from right side and standby while command officer checks interior of vehicle/if

interior is clear stand behind trunk area by rear doors and command officer checks for strings and/or wires attached to trunk. If none, stand by the rear doors and lift the trunk lid slowly.

**OPERATIONS ORDER NUMBER 406,**
**DISCRIMINATORY PRACTICES/RACIALPROFILING**

I.    Purpose

    A.    The purpose of this policy is to ensure that race, ethnicity, age, gender or sexual orientation shall not be the sole basis for detention, interdiction or other disparate treatment of any individual by any employee of the Livingston Parish Sheriff's Office.    This policy constitutes the written policy contemplated by La. R.S. 32:398.10(E).

II.    Policy

    A.    It is the policy of the Livingston Parish Sheriff's Office to present and prohibit the practice of racial profiling (as defined below) by employees of this office.

III.    Procedure

    A.    Definition – Racial Profiling

        The detention, interdiction or other disparate treatment of an individual on the basis of the racial or ethnic status of such individual.

    B.    Discriminatory Practices/Racial Profiling

        1.    Racial profiling of individuals is strictly prohibited by employees of the Livingston Parish Sheriff's Office.

            a)    In the absence of a specific report of criminal activity, race or ethnicity of an individual shall not be a factor in determining the existence of probable cause to place in custody or arrest an individual or in constituting a reasonable and articulable suspicion that an offense has been or is being committed so as to justify the detention of an individual or the investigatory stop of a motor vehicle.

            b)    In response to a specific credible report of criminal activity, race or ethnicity of an individual shall not be the sole factor in determining the existence of probable cause to place in custody or arrest an individual.

                (1)    Stops or detentions based on racial profiling by any employee of the Livingston Parish Sheriff's Office are prohibited.

                (2)    No employee shall stop, detain or search any person which such action is motivated by race or ethnicity, except as provided in Article III, B(1)(b).

IV.    Authority and Responsibility

    1.    Each supervising officer will continually examine all areas of law enforcement action under his/her purview in an effort to discover any racial profiling.

    2.    Any employee who believes there is, or is made aware of, any violations of this Policy shall immediately notify his/her immediate supervisor.

    3.    All complaints or racial profiling made by detainees or by employees shall be received, documented, and investigated with internal investigations.

V.    Training

    1.    All Sheriff's Office employees having law enforcement responsibilities shall receive training on the harms of racial profiling, including review of this policy and of the video on racial profiling provided by the Department of Public Safety and Corrections, Office of State Police.

    2.    Additional diversity and sensitivity training shall be designated for employees with sustained racial profiling or discriminatory complaints filed against them. In addition to required training, employees who have sustained racial profiling or discriminatory complaints filed against them be reassigned, or disciplined as provided below.

VI.    Disciplinary Procedures

    1.    Appropriate discipline, up to and including dismissal, shall be administered for non-compliance with this policy.

    2.    Failure to report any observed or known violations of this Policy by any employee of this Office shall result in disciplinary action.

**OPERATIONS ORDER NUMBER 502,**
**DEPUTY TRAINING AND QUALIFICATIONS**

I.    General

    A.    In consideration of the liabilities, both criminal and civil, which may result from the use of force by law enforcement personnel, the Livingston Parish Sheriffs Office hereby establishes an on-going, in-service training and qualification program for its enforcement deputies. This general order shall establish:

        1.    Those responsible for administering the program.
        2.    Those required to participate in the program, and
        3.    The program to be undertaken.

    B.    Deputies are reminded of Sheriffs Office Firearms Policy and Defensive Impact Weapons Policy and are required to become intimately familiar with and comply with these regulations.

II.   Firearms Instructions

    A.    The Training Coordinator shall be responsible for administering the enforcement training and qualification program. The duties of the Training Coordinator shall include, but not be limited to, the following:

        1.    He shall conduct and/or supervise classroom training and practical exercises in the use of police weapons and techniques.
        2.    He shall maintain records relative to such training and qualification, and submit reports relative thereto.
        3.    He shall appoint, subject to the approval of the Sheriff, qualified instructors, who shall assist with practical exercises and training.
        4.    He shall issue certification documents to deputies who have earned the same.
        5.    He shall maintain communications with the P.O.S.T. Council, National Rifle Association and other law enforcement agencies and training organizations relative to law enforcement training and qualification to ensure an up-to-date training program for the Livingston Parish Sheriffs Office.
        6.    He shall establish, subject to the approval of the Sheriff, the criteria to be used in training and qualification.
        7.    He shall act as advisor to the various divisions of the Sheriffs Office relative to enforcement training upon request.

III.  Authority of Instructors

    A.    While on the range or in the classroom, the senior (ranking) instructor present is in command of all deputies, and all deputies must comply with the rules,

regulations and orders given by the Instructor while participating in such exercises.

B.   Any deputy who fails to comply with rules, regulations and/or orders given by the Instructor shall be asked to leave the range or classroom and shall be reported to the Sheriff, Chief of Operations and their supervisor.

IV.   Classification of Deputies for Qualification and Training

A.   Enforcement Qualified Personnel:

1.   Deputies whose duty assignment requires that they be armed and involved in enforcement activities (Uniform Patrol, Detectives, Juvenile, Warrants, Sheriffs Reserve, Transportation).

2.   Deputies who wish to assist with enforcement duties, perform armed security work, or go armed for any purpose and have satisfactorily completed required enforcement training.

3.   Administration Personnel.

B.   Non-Enforcement Personnel:

1.   All deputies who are not required to be armed or participate in enforcement activities and who have not satisfactorily completed enforcement qualification training are "Non-Enforcement" personnel and, as such, shall not be armed either on or off-duty or be permitted to participate in any activity requiring enforcement qualified personnel.

C.   If a deputy carries a firearm or defensive impact weapon for any purpose (off-duty security work, etc.) he/she shall be considered as being an "Enforcement" classification, and must meet the requirements of that classification.

V.   Enforcement Training & Qualification Required

A.   All deputies in "Enforcement" classification shall, as a minimum, satisfactorily complete, prior to receiving authorization to be armed:

1.   Approved basic law enforcement training which includes the following courses:

a.   La. Criminal Code.
b.   La. Code of Criminal Procedure
c.   Arrest & Booking Procedures
d.   Crisis intervention techniques
e.   La. P.O.S.T. Council Police Firearms Training Course (or acceptable substitute) with qualifying scores on range and written tests.

        f.      La. P.O.S.T. Council Police Defensive Tactics course which includes:

            Baton Certification (PR-24 and/or straight baton)
            Handcuffing Certification
            Weapon Retention
            Punch/Block/Kick
            Downfighting
            Body Search
            Escapes & Releases
            Compliance and Control Techniques

        g.      "Patrol" Qualification will include Defensive Driving Course and Police Emergency Driving Course

    B.      In order to retain "Enforcement" qualification, all deputies must satisfactorily participate in "In-Service" re-trainers as determined to be necessary.

VI.    Weapons Qualifications Required

    A.      Deputies must qualify and maintain current qualification with any and all weapons (firearms, batons, etc.), which they carry on and/or off-duty.

    B.      Deputies carrying weapons on and/or off-duty with which they have not qualified or which do not meet office requirements are acting contrary to office policy and shall subject themselves to disciplinary action and the loss of civil and criminal defense in the event of an incident resulting from their use or carrying of the weapon(s).

VII.   Penalties

    A.      Failure of deputies to participate in and satisfactorily perform the required training/qualification exercises shall be cause for disciplinary action, which may include dismissal, suspension, demotion or re-assignment.

In the event the Sheriff decides to convene a shooting review, the case shall be concluded by the Detective Division forwarding a letter of exoneration to the investigated officer or officers with copies to the concerned section.

**OPERATIONS ORDER NUMBER 703**
**CANINE POLICY AND PROCEDURE**

I.    Policy

Because of a superior sense of smell and hearing and potential aggressiveness, the trained law enforcement canine is a valuable supplement to police manpower. However, utilization of canines requires adherence to procedures that properly control their use of force potential and that channel their specialized capabilities into legally acceptable crime prevention and control activities.

II.    Definition:

Canine Team:  An officer handler and his assigned police canine.

III.    Procedure

A.    Canine Unit Utilization

1.    Canine teams are available on a 24-hour, on-call basis to conduct building searches for offenders in hiding; assist in the apprehension and/or arrest or prevent the escape of serious or violent offenders; protect officers or others from death or injury; crowd control; to track and/or apprehend suspects or locate lost, hidden or missing persons, locate hidden instrumentalities or evidence of a crime; and detect the presence of concealed narcotics; or any other use that would, in the officer handler's judgement, be in the best interest of safety and law enforcement practices and goals.

2.    Canine teams should not be used to respond to minor complaints but may engage in assignments not listed here with the approval of a canine unit supervisor.

3.    Canine handlers are responsible for determining whether a situation justifies canine use and the appropriate tactical measures that should be taken. Where the on-scene supervisor disagrees with the handler's tactical assessment, the canine unit supervisor shall be notified. Where time does not permit such notification, the directions of the canine handler shall be followed.

4.    Police canines shall not be handled or given commands by anyone other than the assigned handler. Should the assigned handler be injured or otherwise unable to command the canine, another canine handler shall be contacted for assistance.

5.    Canine team assistance shall be requested from patrol officers through the communications center to the canine officer on duty, if not, the communications dispatcher shall then forward requisite information concerning the incident to the canine unit.

6.    Officers requesting the assistance of a canine team when no teams are on-duty shall first notify their supervisor, who will then make a decision to call out canine.

B.    Canine Bites and Injuries

1.    Use of specially trained police canines for law enforcement responsibilities constitutes a real or implied use of force. In this as in other cases, officers may only use that degree of force that reasonably appears necessary to apprehend or secure a suspect as governed by the office's use of force policy. In all instances where a canine is deployed in a tactical situation, an incident report shall be submitted. Whenever a canine bites an individual, whether or not in the line-of-duty, the handler shall:

    a)    Summon a canine supervisor if available;

    b)    Examine the affected area to determine the seriousness of the bite or injury;

    c)    Obtain medical treatment for the person-medical personnel shall examine the affected area irrespective of the perceived seriousness of the bite or injury;

    d)    Complete a Use of Force form whenever it has been alleged that a canine has bitten or otherwise injured an individual. The report must detail the circumstances surrounding the incident, the identity of the individual involved and any witnesses, the extent of injuries if known, and measures taken in response to the incident. The original report shall be filed in accordance with the office's use of force policy.

C.    Building Searches for Suspects in Hiding

1.    A primary use of office canines is for locating suspects in buildings or related structures where search by officers would create an unnecessary risk. These searches shall be governed by the following:

    a)    The building perimeter shall be secured by patrol personnel;

b)    Whenever possible, the building's owner should be contacted to determine whether there may be tenants or others in the building and to ascertain the building's layout.

c)    When a canine building search is anticipated, officers will not conduct a preliminary search of the premises as this will interfere with the canine's ability to discriminate scents.

d)    The on-scene supervisor shall also take the following steps in preparation for the canine search:

   (1)   Evacuate all tenants, workers or others from the facility
   (2)   Request (if possible) that all air conditioning, heating or other air-blowing systems be shut off so as not to interfere with the canine's scent.

e)    Upon entrance to the building, all exits should be secured, and communications limited to those of a tactical nature.

f)    The canine should be unleashed during a building search unless there is an imminent risk of injury to innocent persons within the facility.

g)    The canine should not be used to search facilities that contain substances potentially harmful to the animal unless overriding risk to human life is present.

h)    Before commencing the search, the handler shall loudly announce and repeat the statement that there are police officers on the premises and that a trained police canine will be released if the individual does not surrender. A reasonable amount of time shall be allowed for the suspect to respond. This warning shall be repeated on each level of multilevel structures.

i)    When apprehending suspects in these or related circumstances, canines shall be commanded to disengage as soon as the suspect is subdued or readily complies with officer direction.

D.    Crowd Control

   1.    Canine teams shall not be used for crowd control at peaceful demonstrations.

   2.    Canine teams may be used for crowd control when:

      a)    Large crowds endanger the protection of evidence at crime scenes;

b)     Attempts by uniform officers to preserve the peace have failed; or

c)     No other means are available to protect life or property.

3.     In these situations, canines shall:

a)     Be short leashed at all times unless unleashing the canine becomes absolutely necessary to protect an individual from serious injury or death; and

b)     Not initiate any offensive action, unless to guard against imminent loss of life or serious bodily injury.

4.     During a riot or other major unauthorized gatherings that cannot be controlled by other means, canine teams may be used for crowd control upon the approval of the Incident Commander.

IV.    Tracking

A.     Police canines are available to track missing persons or suspects, or to locate evidence that the officer has reason to believe has been abandoned or hidden in a specified open area. Such searches are subject to the following conditions and limitations:

1.     When officers are pursuing suspects and contact with the suspect is lost, the officer, prior to summoning a canine team shall:

a)     Stop and pinpoint the location where the suspect was last seen;
b)     Shut off engines of vehicles n the area if possible; and
c)     Avoid vehicle on foot movement in the area where the suspect or subject was last seen.

2.     Canines used for tracking persons should remain on a leash or tracking lead of sufficient length to provide a reasonable measure of safety to the subject of the search without compromising the canine's tracking abilities.

3.     Canine teams should not be used to locate small children unless there is reasonable suspicion of foul play or a belief that serious bodily harm or death will occur if the child is not located immediately. Where the use of a canine is deemed necessary, the risks of injury to the subject shall be explained to the parents or next of kin and their approval obtained to use the dog.

4.     Canine teams should not be used to apprehend anyone suspected to be under the influence of drugs or alcohol if no other crime is involved, or the met ally disturbed if no crime is involved.

5.      On-scene supervisory personnel shall:

      a)      Secure the perimeter of the area to be searched; and

      b)      Secure the integrity of the area to be searched by keeping all personnel out of the area.

V.      Tracking

A.      Use of Narcotic Dogs in a drug detection capacity is authorized in the following situations and under the following conditions:

1.      Random exploratory sniffing of luggage, packages or other inanimate objects may be conducted in public facilities such as airports, train stations, bus or marine terminals, as authorized by the canine supervisor and or Sheriff.

      a)      Exploratory sniffing in these facilities shall be conducted with the advance knowledge and consent of the appropriate facility manager.

      b)      Exploratory sniffing shall be conducted without interference or annoyance to the public or interruption of facility operations.

2.      Field officers may detain specific checked luggage or related items for purposes of requesting a canine sniff if reasonable suspicion exists but may not detain the items so long as to interfere with the owner's scheduled travel.

      a)      When a drug detection canine alerts to luggage or related items, in this or other circumstances, a warrant or consent to search must be obtained before it is opened unless exigent circumstances exist to conduct an on-site search.

3.      The use of drug detection canines in public schools is permitted only when:

      a)      The school's principal or designated authority requests or approves use of the canines;

      b)      There is reasonable suspicion to believe that illegal narcotics are being distributed and or consumed on the premises such that the interests of the school are being unacceptably compromised; and

      c)      The search is limited to inanimate objects in public areas and the exterior of student lockers unless reasonable suspicion exists to

gain admission to lockers and related areas where there is a reasonable expectation of privacy.

4.    Sniffs of the exterior of residences, either individual dwellings or the common areas of multiple unit dwellings, are not permitted without a search warrant or search waiver, oral or written.

5.    Drug-sniffing canines may be used to sniff motor vehicles when:

   a)    Reasonable suspicion exists to believe the operator or passengers are in possession of illegal narcotics; or

   b)    During a valid vehicle stop, the canine is used to sniff the vehicle's exterior in an exploratory manner. Unless the canine alerts to the vehicle, the operator may not be detained longer than necessary to conclude the business associated with the initial stop.

6.    Canine searches of vehicle interiors may be conducted only with a search arrant, search waiver (oral or written) or following an alert by the canine on a portion of the vehicle's exterior.

7.    During the use of the detector dog, the Narcotic Dog handler will assume charge of the search area. Upon the completion of the initial search by the Narcotic Detector Dog, all information and search area will come under the control of the narcotic officers.

8.    Once the decision has been made to conduct a search by a drug-sniffling canine during a vehicle stop, the search should be conducted as soon as possible to avoid detaining the operator longer than necessary. Once the canine handler has been contacted and has consented to conduct the search, the investigating officer should;

   a)    Park the police vehicle and other vehicles at least 30 feet away from the vehicle being searched to avoid contaminating scents;

   b)    Turn off the vehicle being searched; and

   c)    If possible, close all windows and doors on the vehicle being searched.