# EXHIBIT 17

TWENTY-FIRST JUDICIAL DISTRICT COURT

PARISH OF LIVINGSTON

STATE OF LOUISIANA

. . . . . . . . . . . .

| | | |
|---|---|---|
| STATE OF LOUISIANA | : | #124684 |
| VERSUS | : | |
| ALEXANDER CLARK | : | DIVISION: "P" |

. . . . . . . . . . . .

### *MISDEMEANOR TRIAL*

Testimony and Notes of Evidence, taken in the above-entitled and numbered cause, before the **HONORABLE WILLIAM BURRIS**, Judge presiding on the 4th day of May, 2023.

APPEARANCES:

   **REPRESENTING THE STATE OF LOUISIANA:**
        BRETT SOMMER, ESQUIRE
            Assistant District Attorney

   **REPRESENTING THE DEFENDANT:**
        MAYA FLOWERS, ESQUIRE

**REPORTED BY:**

        **AMANDA B. WILDEY, CCR**
        OFFICIAL COURT REPORTER
        IN AND FOR THE PARISH OF LIVINGSTON

**AMANDA B. WILDEY**
**CERTIFIED COURT REPORTER**
20104 HWY 40
Loranger, LA 70446
(985) 320-9080



LPSO000228

**INDEX**

COVER PAGE:                                                          1

COLLOQUY:                                                            3

DIRECT EXAMINATION OF DETECTIVE HOTARD BY MR. SOMMER:    7

CROSS-EXAMINATION OF DETECTIVE HOTARD BY MS. FLOWERS:   15

DIRECT EXAMINATION OF DEPUTY BOWDEN BY MR. SOMMER:      31

CROSS-EXAMINATION OF DEPUTY BOWDEN BY MS. FLOWERS:      33

REPORTERS CERTIFICATE:                                              44

LPSO000229

**EXHIBITS:**

                                                            **PAGE**

"State's Exhibit A"  Dash-cam video:                        12

LPSO000230

```
 1          Mr. Sommer:

 2                      Judge, it's going to be _State versus Alex_

 3                      _Clark_ on page four.  There's one housekeeping

 4                      matter, Judge.  He's charged, just so you know

 5                      because it didn't make the docket, with count

 6                      one, resisting an officer, and count two,

 7                      misdemeanor obstruction of justice.  I think we

 8                      need to arraign him on the misdemeanor

 9                      obstruction of justice charge that was placed

10                      on an amended bill in March.  He has not been

11                      arraigned on it because we did a I.A., stay at

12                      that time.

13          The Court:

14                      Okay.  How does he plead on that?

15          Ms. Flowers:

16                      Not guilty, Your Honor.

17          The Court:

18                      Okay.  Now, is it out of the same

19                      circumstances?

20          Mr. Sommer:

21                      Yes, Your Honor, all the same.  No new

22                      evidence or no new discovery was turned over.

23                      It was all on the same course of action.

24          The Court:

25                      Okay.  We'll try both of them together

26                      then.

27          Ms. Flowers:

28                      Okay, Your Honor.

29          The Court:

30                      Make your appearances.

31          Mr. Sommer:

32                      It's the same bill, Judge.  I hand-wrote
```

LPSO000231

1          it on so it's the same docket number.

2  Ms. Flowers:

3          I didn't get to appear.  Maya Flowers,

4          Your Honor, here on behalf of the defendant,

5          Alex Clark.

6  The Court:

7          Okay.  Thank you, ma'am.  Go ahead and

8          call your first witness.

9  Mr. Sommer:

10          And just a brief opening, Judge.  It's a

11          resisting an officer and obstruction of justice

12          charge.  Judge, the State's going to put on two

13          witnesses, two law enforcement officers as well

14          as show you the dash cam incident.

15          Judge, the State believes the evidence is

16          going to show that Mr. Clark was stopped

17          pursuant to a motor vehicle violation.  Kind of

18          standard occurrences from there.

19          The arresting officer was doing some

20          investigation, thinks there may be more

21          criminal activity afoot.  In the course and the

22          scope of speaking with the defendant, who

23          eventually exits the vehicle and is sitting on

24          the back, a search is conducted.  While one of

25          the officers searched the pockets there was a

26          dollar bill.  The officer begins looking at the

27          dollar bill which he believes may have some

28          evidence of narcotics.

29          That dollar bill is snatched from the

30          officer's hands which then results in the

31          officers grabbing the defendant's hands and

32          there's some slight physical resisting at that

LPSO000232

1                point, Judge.  So the State's going to be

2                asking you to find him guilty of a misdemeanor

3                resisting and a misdemeanor obstruction.

4    The Court:

5                Okay.  Do you wish to make an opening

6                statement?

7    Ms. Flowers:

8                Sure, Your Honor, just briefly.  This case

9                all began with nothing because there was no

10               actual traffic violation.  My client was at a

11               marked red traffic light signal.  He made a

12               green turn from a green turn only lane with a

13               green arrow and pulled over to get gas at a gas

14               station.

15                The officer was not even following behind

16               my client at the time that he made the green

17               traffic signal so he wouldn't have even been

18               able to see from his viewpoint whether or not

19               the signal was on or not, but my client's

20               signal was on.

21                In any event, the defense plans to show in

22               this case that the State cannot prove its

23               burden because to resist arrest you must first

24               make a lawful arrest.  To make a lawful arrest

25               you must first negate lawful stop and in this

26               case none of the above factors were in play,

27               and even after my client was detained there was

28               no probable cause or no evidence of criminal

29               activity.

30                The defense intends to show that the State

31               cannot meet its burden in any way, shape or

32               form.  This was simply a fishing expedition and

LPSO000233

```
 1                      the fact that there's no underlying cause of

 2                      arrest with the exception of resisting arrest

 3                      is proof positive of that point.  Thank you.

 4         The Court:

 5                         Okay.  Call your first witness.

 6         Mr. Sommer:

 7                         The State calls Sean Hotard.

 8

 9         (Detective Sean Hotard, after having been first duly

10         sworn, did testify to the following:)

11

12    Direct Examination by Mr. Sommer:

13    Q.   Would you state your name and place of employment for the

14    record, please?

15    A.   Detective Sean Hotard, Livingston Parish Sheriff's

16    Office, armed robbery and burglary division.

17    Q.   So what are you doing right now?  What is your current

18    assignment?

19    A.   Armed robbery and burglary division.

20    Q.   How long have you been with the sheriff's office.

21

22         Ms. Flowers:

23                         Brief objection, Your Honor.  Mr. Hotard

24                      has a report sitting in front of him.

25         The Court:

26                         Okay.  He can't use it unless under _State_

27                      _versus Tharpe_, it's provided to the defense

28                      any time he refers to it, so that's the way it

29                      is.  If he has to refer to it then the defense

30                      has a right to look at it under _State versus_

31                      _Tharpe_.

32         Mr. Sommer:
```

LPSO000234

1               Ok.

2      The Witness:

3               Not a problem.

4

5  Direct Examination by Mr. Sommer:

6  Q.   So how long have you been with the Livingston Parish

7  Sheriff's Office?

8  A.   Approximately eight years now.

9  Q.   What were some of your assignments previously?

10  A.   I started out in the detention center.  I worked there

11  for close to four and-a-half years.  And then I worked uniform

12  patrol for just over three, and now I'm currently about a

13  month into the burglary division.

14  Q.   Were you so employed on May 24th, 2021?

15  A.   That's correct.

16  Q.   On that same date did you ultimately arrest a Mr. Alex

17  Clark?

18  A.   Yes, sir.

19  Q.   Do you see Mr. Clark in the courtroom today?

20  A.   I do.  He's seated here to my left in a yellowish shirt

21  (Indicating).

22

23      Mr. Sommer:

24               Judge, I just ask that the record reflect

25               he has identified the defendant in open court.

26

27  Direct Examination by Mr. Sommer:

28  Q.   Could you inform The Court how you came into contact with

29  Mr. Clark?

30  A.   Yes, sir.  I was patrolling around my assigned area of

31  Livingston Parish and during this time I observed a traffic

32  violation and I made a traffic stop on Mr. Clark's vehicle,

1    and that's how I made contact with him.

2    Q.    Okay.  I'm going to ask you to be a little more

3    descriptive.  Where did you first see Mr. Clark?

4    A.    Eugene Street when you approach 190 in Denham Springs off

5    of 16, it runs Eugene Street to 190.  He was making a right-

6    hand turn onto 190, and at that time he did not use a signal

7    and at that time I then approached the vehicle with my lights

8    and sirens and initiated a traffic stop as he had pulled into

9    a gas station parking lot.

10   Q.    So he was on Eugene Street.  And is that a lighted

11   intersection?

12   A.    There is some lighting, yes.  It's not any specific

13   street lights on the side of the street.  There's businesses

14   all around.

15   Q.    So on Eugene Street is that a intersection with traffic

16   signals?

17   A.    Oh, yes.  I'm sorry.

18   Q.    And so he was on Eugene Street?

19   A.    Correct.

20   Q.    And he made a right onto?

21   A.    Florida.

22   Q.    Another named highway.

23   A.    Correct.

24   Q.    And so -- without using a signal.

25   A.    Correct.

26   Q.    And so based on that you initiated a traffic stop.

27   A.    Yes, sir.

28   Q.    What happened from there?

29   A.    Once the traffic stop was initiated I approached the

30   vehicle and I identified myself and the reason for the stop.

31   Then Mr. Clark was identified.  When I returned I detected the

32   obvious odor of marijuana from the vehicle.  I had asked Mr.

LPSO000236

1  Clark to exit the vehicle.  He had sat on the tailgate of his

2  truck.  I went back to my patrol vehicle to conduct a warrants

3  check and status of his drivers license.  During this time

4  Assistant Deputy Taylor Bowden, he came to assist.  He had

5  spoke with the passenger of the vehicle, gaining his

6  information as well, where he had learned that the passenger

7  of the vehicle did admit that they had earlier smoked

8  marijuana inside of this vehicle.  At this time we initiated a

9  search of this vehicle.

10

11     Ms. Flowers:

12                Objection, Your Honor.  There's nothing in

13                the report listing any information about the

14                passenger.  And that conversation was between

15                not the witness -- but it's hearsay because the

16                conversation that he's speaking of was between

17                another officer and the passenger.  Mr. Hotard

18                wasn't present for that conversation.

19     The Court:

20                At this time I'm going to sustain the

21                objection without a foundation being laid.

22     Ms. Flowers:

23                Thank you, Your Honor.

24     Mr. Sommer:

25                Thank you, Judge.

26

27  Direct Examination by Mr. Sommer:

28  Q.   So what was the next step that you personally took in the

29  investigation?

30  A.   We conducted a search of the vehicle which did not yield

31  any results other than a small copper brillo pad which is

32  commonly used in the ingestion of crack cocaine.  So we went

1  back to Mr. Clark and asked him if he possessed anything on

2  his person, any illegal items, which he of course said, "No."

3  He was asked to empty his pockets.  He emptied all but one

4  pocket and in that one pocket was a $20.00 bill, is what it

5  was, and inside that $20.00 bill -- it was folded, and as I

6  unfolded it there was a rock-like substance, white rock-like

7  substance wrapped up in the $20.00 bill.  This was also

8  observed by the other deputy.  And when we confronted Mr.

9  Clark about the substance he had snatched it out of my hands,

10 which caused whatever evidence to be inside the $20.00 bill to

11 be lost.

12      At that time we attempted to detain Mr. Clark in

13 handcuffs, which he actively resisted our efforts, but we were

14 able to overpower him and place his hands behind his back and

15 place him in handcuffs.

16 Q.   Okay.  I want to talk about the dollar bill.  So how long

17 have you been in uniform patrol?

18 A.   Excuse me, I'm sorry?

19 Q.   How long have you been in uniform patrol?

20 A.   At that time I had been in uniform patrol over two years.

21 Q.   Okay.  And you've made a lot of narcotics arrests in that

22 time?

23 A.   Yes, sir.  I've made multiple narcotics arrests myself as

24 well as being involved in others.

25 Q.   And so based on your training and experience is narcotics

26 being concealed within currency something you consistently

27 see?

28 A.   Absolutely.

29 Q.   And so ultimately you don't know whether or not that

30 white substance was C.D.S. or not.

31 A.   Correct.

32 Q.   But you were just kind of investigating that.

1  A.  Absolutely, yes, sir.

2  Q.  When Mr. Clark snatched the dollar bill out of your hand

3  do you think that hindered your investigation?

4  A.  Yes, sir.

5  Q.  Okay.  Did you and I previously meet --

6

7      Mr. Sommer:

8              Judge, I'll show defense what I've marked

9          as "Exhibit A."

10

11  (Approaches witness and tenders disc).

12

13  Direct Examination by Mr. Sommer:

14  Q.  I'm going to hand you what I've marked for identification

15  purposes as "Exhibit A."  Do you recognize that?

16  A.  (Peruses disc).  Yes, sir.

17  Q.  All right.  And that is a disc, correct?

18  A.  Yes, sir, that is correct.

19  Q.  What is contained within that disc?

20  A.  On this disc was the dash-cam footage of the traffic stop

21  and the investigation.

22  Q.  And you're aware of that because you and I have

23  previously met and you've watched that disc, is that right?

24  A.  Yes, sir.

25  Q.  Okay.  And is that your initials on it?

26  A.  Absolutely, yes, sir.

27

28      Mr. Sommer:

29              So Judge, with that I'll offer, file and

30          introduce "State Exhibit A," the dash-cam of

31          this incident.

32      The Court:

1          Any objection?

2     Ms. Flowers:

3          No, Your Honor.

4     The Court:

5          Let it be introduced.

6     Mr. Sommer:

7          So Judge, I'm going to go ahead and ask to

8          publish this now and I can move the big screen

9          over for you to see it and either me and Ms.

10         Flowers can move or it's also going to pull on

11         mine --

12    The Court:

13         I can move.  That's all right.  I'll watch

14         it.

15

16 (Whereupon the dash-cam video was played in open court).

17

18    Mr. Sommer:

19         Judge, I think the State and the defense

20         will enter into a stipulation that there's

21         nothing relevant on the clips 6 thru 10 of

22         "State A."

23    Ms. Flowers:

24         So agreed, Your Honor.

25    Mr. Sommer:

26         You want me to leave this up, right?

27    Ms. Flowers:

28         Yes.

29

30 Direct Examination by Mr. Sommer:

31 Q.  Just a few questions about the video.  When Mr. Clark was

32 sitting on the back of the truck was he detained?

1   A.   Yes, sir.

2   Q.   Was he free to leave?

3   A.   No, sir.

4   Q.   At what point did you Mirandize him?

5   A.   This was right before we conducted the search of the

6   vehicle.

7   Q.   Okay.

8   A.   While he was sitting on the tailgate.

9   Q.   Did you take any other steps in this investigation?

10   A.   There was a -- we conducted a warrants check in the

11   computer.  He was ran through L.P.S.O. dispatch.

12   Q.   Okay.  Let me ask you this, when your back was turned to

13   us in that video, that's when you were looking at a dollar

14   bill?

15   A.   Yes, sir.

16   Q.   And what were you looking for?

17   A.   When you started to unfold it because it was folded in a

18   peculiar kind of way -- usually money isn't find folded so

19   tightly.  As I began unfolding it there was a substance, a

20   white rock-like substance, particulates.

21   Q.   And so after the defendant reached for it or grabbed it

22   what happened after that?

23   A.   After he reached out and he snatched it from my hands at

24   that time we grabbed a hold of him in an attempt to regain the

25   suspected or potential narcotics from his hand and detained

26   him into handcuffs.

27   Q.   So at that time you were going to detain him in

28   handcuffs.

29   A.   Correct.

30   Q.   And was he actively resisting that?

31   A.   Yes, sir.

32   Q.   Could you just kind of describe how he was actively

1    resisting?

2    A.   He was actively trying to pull his hands away and prevent

3    them from being placed behind his back.

4    Q.   Okay.  That's all the questions I have for you.  Just

5    answer anything in cross.

6    A.   Yes.

7

8        The Court:

9                    Cross?  Let me ask a question.  The dash-

10                   cam, is that only activated when you turn on

11                   your lights or is that manually turned on?

12       The Witness:

13                   It does automatically activate whenever

14                   you turn on the lights but we can manually

15                   activate it by the recorder that we wear on our

16                   belts.

17       The Court:

18                   And in this instance it was the lights?

19       The Witness:

20                   The lights that activated it, yes, sir.

21       The Court:

22                   Okay.

23

24   Cross-examination by Ms. Flowers:

25   Q.   So in line with the same questioning, did you have body

26   camera on that day?

27   A.   No, we do not wear body cameras.

28   Q.   Okay.

29

30       Ms. Flowers:

31                   And that was just a cursory question, Your

32                   Honor.

LPSO000242

1    Cross-examination by Ms. Flowers:

2    Q.    So on the day on the 24th you say you were patrolling

3    your area.  What's your area consist of?

4    A.    At that time I was assigned to what we call the south

5    run, which is south of 190 and parts of Highway 190 that goes

6    to the parish line.  This is inside of -- we do cover the city

7    limits also as part of the parish, which it outlines going

8    southbound.  We go as far over as Satsuma Road on I-12.  We

9    cover south of 190 basically from Satsuma to the parish line

10   in Baton Rouge.

11   Q.    Got you.  And I'm a Denham girl so I can say that.  Where

12   are you from?

13   A.    I am from Livingston.

14   Q.    You're from Livingston parish.  So I'm sure if you're

15   from Livingston parish you're familiar with the traffic

16   signals and the flow of traffic in that area, correct?

17   A.    That's correct.

18   Q.    So on the night in question were you driving in front or

19   behind Mr. Clark?

20   A.    Behind.

21   Q.    You were driving behind Mr. Clark.

22   A.    Uh-huh (affirmative response).

23   Q.    And when you were driving behind Mr. Clark was Mr. Clark

24   coming from Eugene Street or did you follow him from a

25   different area?

26   A.    From what I can recall he was on Eugene Street.

27   Q.    Eugene Street, the little portion of it, is very small,

28   because like I said if you're from Livingston parish you

29   remember when they changed Range Avenue and so Eugene Street

30   is probably about this long (indicating), so you couldn't have

31   actually been following him very long, could you?

32   A.    I believe it's a little longer than that.

1    Q.    Well, I mean, obviously --

2    A.    Well, you say, "that long," it's close to, what, an

3    eighth of a mile.

4    Q.    Okay.  And where did Mr. Clark come from before he was on

5    Eugene Street?

6    A.    That I do not know.

7    Q.    Mr. Clark's contention was always that he turned from

8    Martin Luther King Drive onto Eugene.

9

10       Mr. Sommer:

11                    Judge, I would object.  She's asked the

12              questions that he would know not necessarily

13              the defendant's contentions.

14       Ms. Flowers:

15                    I just didn't get a chance to finish it,

16              but I'll rephrase the question.

17       The Court:

18                    Finish your question.

19       Ms. Flowers:

20                    Yes.

21

22    Cross-examination by Ms. Flowers:

23    Q.    So if Mr. Clark had turned from Martin Luther King Drive

24    onto Eugene Street how would you have been able to be behind

25    him on Eugene based on the way that Eugene Street is set up?

26    A.    Because he would have pulled out before I made it to that

27    intersection.

28    Q.    The intersection of Florida and Eugene?

29    A.    Right.  If yo come off of --

30    Q.    Martin Luther King.

31    A.    -- and he made a right-hand turn, correct?

32    Q.    Yes.

-17-                                          LPSO000244

1    A.    On Eugene.

2    Q.    Yes.

3    A.    Right.  I would have been somewhere behind that maybe.  I

4    wasn't watching his vehicle in particular.  I was watching all

5    of traffic at that time.

6    Q.    From what location, though?

7    A.    While driving on Eugene.

8    Q.    So if you're driving up Eugene and you're somewhere

9    behind where you're watching all of traffic but Mr. Clark

10   makes a right turn onto Eugene, how would you have been able

11   to see if there was other traffic before you got there or what

12   his turn signal was doing?  Because that's what you said it's

13   a very short intersection.

14   A.    The violation was when he was turning onto Florida.

15   Q.    I understand that the violation that you're alleging was

16   that he was turning onto Florida, but isn't there a marked red

17   traffic signal at that intersection?

18   A.    Yes.

19   Q.    So if Mr. Clark had a green arrow to turn right at the

20   traffic signal what would the violation have been?

21   A.    Failure to signal.

22   Q.    Is there a requirement under the Louisiana law that you

23   signal if you have a green marked traffic signal on a one way

24   direction street when you're making a right turn?

25   A.    There was never a signal to be in the lane or make the

26   turn.  You have to use a signal.

27   Q.    The lane only turns.

28   A.    Correct.  You still have to signal.

29   Q.    Under what law?

30   A.    The law -- I don't know the specific title, the numerics

31   of it, failure to signal.

32   Q.    And the reason why I'm asking is if you're stopping

-18-                                      LPSO000245

1  someone for failure to signal but if you don't know that a

2  green traffic signal that's not even required based on the

3  logistics of this, would you have had a right to stop Mr.

4  Clark?

5  A.   He didn't use his signal.

6  Q.   Mr. Clark alleges that he did use his signal, but also

7  that -- when you're saying you were on Eugene Street, if

8  you're coming up Eugene Street, Mr. Clark has made the right

9  turn from Martin Luther King Avenue, you've just said that he

10  probably must have gotten there before you, before you had a

11  chance to see him, how could you have even seen what was

12  happening with the back of his truck?

13  A.   He could have.  Now, was I watching his vehicle in

14  particular?  I was watching all of traffic.  The violation

15  that I saw was when he was making his turn from Eugene onto

16  Florida.

17  Q.   When he had already started to make the turn at what

18  point did you even see the signal if you were watching all of

19  traffic?

20  A.   While I was watching the traffic I also saw his vehicle

21  making a right turn without a signal.

22  Q.   Okay.  So can you play the very beginning of this first

23  clip for me?

24

25  (Whereupon the dash-cam was played in open court).

26

27  Cross-examination by Ms. Flowers:

28  Q.   In the video Mr. Clark was exiting the gas station as you

29  were pulling up, correct?

30  A.   He was entering the gas station.

31  Q.   Can you play it again?

32

-19-                                LPSO000246

1   (Whereupon the dash-cam was played in open court).

2

3   Cross-examination by Ms. Flowers:

4   Q.   In the video Mr. Clark was leaving from one pump.  He was

5   exiting the gas station.

6   A.   No.  I watched him pull into the parking lot.

7   Q.   So in the video his vehicle wasn't moving and he wasn't

8   stopping as you were pulling up.

9   A.   I'm sorry, could you repeat that.

10

11      Ms. Flowers:

12                      I'm sorry.  One last time.

13

14  (Whereupon the dash-cam was played in open court).

15

16  Direct Examination by Ms. Flowers:

17  Q.   In this video his vehicle is going towards the exit of

18  the parking lot when you pull up behind him with your lights

19  on.

20  A.   Uh-huh (Affirmative response).  He was moving through the

21  parking lot --

22  Q.   And as you stated --

23

24      Mr. Sommer:

25                      Judge, I'd just object.  I ask that she

26              allow him to answer the question she's asking.

27      The Court:

28                      Let him finish his answer.

29      Ms. Flowers:

30                      I'm sorry.

31      The Witness:

32                      He's moving through the parking lot.

-20-                                              LPSO000247

1    Cross-examination by Ms. Flowers:

2    Q.    Now, it was your testimony when Your Honor asked, that

3    the dash cam comes on when the lights come on.

4    A.    Right.

5    Q.    You previously testified that Mr. Clark pulled over

6    because you turned your lights on to stop him.

7    A.    No.  He pulled into the parking lot in what I believe was

8    possibly an attempt to evade, but I initiated my lights

9    signaling that I am making a traffic stop on him as I pulled

10   into the parking lot also.  I didn't have to catch up to him.

11   Q.    But previously your testimony was that Mr. Clark pulled

12   over because you turned on your traffic signal and stopped

13   him.

14   A.    I believe I said I conducted the traffic stop.

15   Q.    Okay.  Moving forward, you testified that when you walked

16   up to the vehicle you told Mr. Clark the reason for stopping

17   him was --

18   A.    Failure to signal.

19   Q.    And then at this point in the video --

20

21        Ms. Flowers:

22                        Obviously the video is rather long, Your

23                Honor.  It takes a long time for anything to

24                happen.

25

26   Cross-examination by Ms. Flowers:

27   Q.    At what point did you decide Mr. Clark to exit the

28   vehicle?  I'm asking what circumstances from your prospective,

29   not time wise, obviously.

30   A.    My reason for asking him to?

31   Q.    Yes.

32   A.    Well, during the traffic stop you can ask him to exit the

LPSO000248

1    vehicle, but in this case it was because the odor of marijuana

2    was detected.

3    Q.   Did you mention that to Mr. Clark?

4    A.   Not at that time.

5    Q.   So you asked him with no explanation or response to exit

6    his vehicle and sit on the truck and did he comply?

7    A.   Yes.

8    Q.   Thank you.  You asked Mr. Clark for his license and

9    registration.  Did he comply?

10   A.   He was able to give me his license from what I can

11   recall, but I don't think he was able to provide registration.

12   I think he had some other paperwork in the vehicle.

13   Q.   Everything that you requested of Mr. Clark, did he

14   comply?

15   A.   No.

16   Q.   At this point in the video had there been anything when

17   you asked him to -- from the point that you stopped the

18   vehicle to him sitting on the bed of the truck did he not

19   comply with any of your directions?

20   A.   When you say -- I'm sorry.  He wasn't unable to provide

21   some of the paperwork that was requested.

22   Q.   However when you asked for paperwork he provided what he

23   could at the time?

24   A.   Correct.

25   Q.   Thank you.

26

27       Ms. Flowers:

28              And Your Honor, I'll play the video first

29              and then I'll go back and ask the question so

30              you don't have to keep getting up and down.

31

32   (Whereupon the dash-cam was played in open court).

-22-                                    LPSO000249

1  Cross-examination by Ms. Flowers:

2  Q.   So we're skipping a little bit ahead here.  At this point

3  in the video because there's no dash cam is it normal when you

4  allegedly detain someone that you allow them to move about

5  freely?

6  A.   Just because somebody's detained doesn't mean they have

7  to be physically detained.

8  Q.   I understand that.  I'm asking what your normal protocol

9  is for detainment.

10  A.   It's case-by-case.

11  Q.   Okay.  And previously a few moments ago I asked you if

12  you mentioned to Mr. Clark that you had a sense or smell of

13  odor or anything so that he would have any idea why he was

14  being asked to sit on the back of the truck and you stated

15  "No," correct?

16  A.   I'm sorry.  Can you repeat that one more time?

17  Q.   You asked Mr. Clark to exit the vehicle and sit on the

18  back of the truck.  You mentioned that in your mind you sensed

19  the smell of odor but you never communicated anything about

20  your suspicion of drugs or drug activity to Mr. Clark.

21  A.   Not at the time he was asked to sit on the tailgate, no.

22  Q.   At what point was Mr. Clark placed under detainment?

23  A.   When the traffic stop was initiated.

24  Q.   So Mr. Clark was detained at the time the traffic stop

25  was initiated but he was detained for a traffic stop.  At what

26  point did you communicate to him the purpose of the stop

27  changed?

28  A.   This was when he was advised of his rights and informed

29  that I could detect the odor of marijuana from his vehicle.

30  Q.   Where did that take place?  We have no sound, so you

31  would have to tell us at what point.

32  A.   This would have been after I had exited my patrol vehicle

1    after doing a warrants check and a status of his drivers

2    license check.

3    Q.   And I just want to confirm there were no outstanding

4    warrants or any issues with his drivers license, correct?

5    A.   No outstanding warrants as far as I can remember.  The

6    drivers license situation, I do not recall specifically what

7    the status was.

8    Q.   Well, you didn't charge him with anything dealing with

9    this --

10   A.   Right, right, right.

11   Q.   And in fact you didn't actually charge him with the

12   traffic violation, did you?

13   A.   Yes, I did.

14   Q.   Okay.

15   A.   It was in the summons.

16   Q.   Thank you.  So Mr. Clark was detained.  He was allegedly

17   given Miranda rights, which we have no evidence of, and

18   Louisiana does have a form that we usually ask people to sign

19   when we're given them Miranda rights, correct?

20   A.   Not in the field typically, no.  Not in the commission of

21   a traffic investigation.

22   Q.   So again, you continue to say "traffic investigation,"

23   however a traffic signal normally someone would just be given

24   a ticket and dismissed, correct?

25   A.   Not unless the traffic investigation leads to a criminal

26   investigation.

27   Q.   And for a traffic investigation to lead to a criminal

28   investigation at no time did Mr. Clark give you consent to

29   search his vehicle, did he?

30   A.   I had probable cause.

31   Q.   That's not what I asked.  I asked did he give you consent

32   at any time?

-24-                                    LPSO000251

1   A.   No.

2   Q.   And for you to have probable cause to search, the

3   probable cause that's incident to arrest allows you to search

4   very specific things, correct?

5   A.   When you're talking about search incident to arrest we

6   had probable cause if there was narcotics inside the vehicle.

7   And it's a search of the vehicle.

8   Q.   If you had probable cause that there were narcotics in

9   the vehicle then the type of search that you would normally do

10  would be to get a warrant to search the vehicle, correct?

11  A.   No, ma'am.  That's a vehicle exception.

12  Q.   I understand that there's a vehicle exception based on

13  exigent circumstances, but I'm trying to get you to explain to

14  me what those are and where they exist here.

15  A.   At any point in time the vehicle was running the vehicle

16  could have been moved.  It was unreasonable to apply for a

17  search warrant at that time when we had probable cause to

18  search the vehicle.

19  Q.   For a vehicle to be moved Mr. Clark would have had to be

20  in a position to be in control of the vehicle.  You had him

21  detained on the back of the car.  So again, it wasn't in a

22  search area and _Arizona v. Gant_ specifically asks for that so

23  would --

24

25      Mr. Sommer:

26                  Judge, I'm going to object.  I think we're

27             getting more into legal arguments than as to

28             facts specific to the --

29      The Court:

30                  Sustained.  Just ask questions.

31      Ms. Flowers:

32                  Okay.  And I apologize.  I was following

-25-                                          LPSO000252

1        the witnesses lead on that one.  He is very

2        strong on that.

3

4    Cross-examination by Ms. Flowers:

5    Q.   We get to the point where you've asked Mr. Clark to take

6    off his socks and shoes.  Again, did he consent to any of

7    these searches?

8    A.   At this point he was detained for suspicion of a criminal

9    activity and he was frisked.  He was asked to empty his

10   pockets and he did consent.  He emptied his pockets.

11   Q.   He emptied his pockets pursuant to a lawful demand.  Mr.

12   Clark followed all of your demands up until that point,

13   correct?

14   A.   Right.  Until -- there was other items in his pockets.

15   Q.   And it seems as though as he was taking --

16

17       Ms. Flowers:

18                       If you would play the video.  You can hit

19                   play.  Sorry, Your Honor, this is the last one.

20

21   (Whereupon the dash-cam was played in open court).

22

23       Ms. Flowers:

24                       Rewind it just a little bit.

25

26   Cross-examination by Ms. Flowers:

27   Q.   As Mr. Clark is taking the items out of his pockets you

28   all are also reaching to, I guess we'll call it, aid him in

29   the removal of the items?

30   A.   If that's what you want to call it.

31   Q.   So you previously just testified that Mr. Clark didn't

32   take out of his pockets but he didn't actually have an

1  opportunity because as he was trying to remove things you all

2  were also taking things from him as well, correct?

3  A.   That's here at this time (indicating).

4  Q.   And at this time is when you take the dollar bill that's

5  an issue from Mr. Clark?

6  A.   I'm sorry, "an issue"?

7  Q.   The dollar bill at issue from Mr. Clark.

8  A.   It's a $20.00 bill, but yes.

9  Q.   Well, the billfold, the $20.00 bill.

10  A.   The U.S. currency, correct.

11  Q.   Yes, the U.S. currency.  And it looks like you're

12  inspecting the currency currently, correct?

13  A.   Correct.

14  Q.   So you had an opportunity to unfold and look at the

15  currency currently?

16  A.   I'm currently doing so in this (indicating).

17  Q.   And as we're watching this -- so that means you had it in

18  your hand for a pretty good period of time for something

19  that's only six inches.  You had an opportunity to look at it

20  on both sides.

21  A.   Well, I didn't want to flip it over and dump any of the

22  evidence that was potentially there.  I wouldn't have flipped

23  it over and looked at it.

24  Q.   At the time Mr. Clark retrieved the bill back from you

25  you had an opportunity to look at the bill, correct?

26  A.   Yes.

27  Q.   Thank you.  Now, when you say Mr. Clark was moving his

28  arms to resist arrest, Mr. Clark isn't -- he's got a young

29  spirit but he isn't the youngest man.  Did you know how old

30  Mr. Clark was?

31  A.   I didn't know his exact age.  I knew that he was older

32  than I was.

LPSO000254

1  Q.    Yes.  And when he got out of the vehicle he used a little

2  bit of a limp.  Did he look like he was in fighting shape?

3  A.    No.

4  Q.    And the entire resisting where you were saying he was

5  moving his arms or trying not to do so, could it just have

6  been possible that the angle that he was put at he just

7  involuntarily moved because it's not exactly comfortable for a

8  60-plus year old man to be flipped over quickly?

9  A.    Never from my experience has it been that difficult for

10  anybody to put their hands behind their back unless they were

11  physically resisting.

12  Q.    And yet you were able to get the entire arrest done

13  within, I'd say, a 15 second -- I'm going to rewind it just

14  one last time to that exact moment.

15

16  (Whereupon the dash-cam was played in open court).

17

18  Cross-examination by Ms. Flowers:

19  Q.    So if you look at it he's bent over clearly and it just

20  looks like his right arm fell down for a moment.  Where is the

21  long period of like tussling that you were speaking of prior

22  to the video being shown?

23  A.    I don't believe I said there was a long period of

24  tussling.

25  Q.    You said it took some time to get him under control.  You

26  had to get some backup to get him under control.

27  A.    Right.  He was physically resistant so his hands didn't

28  just go behind his back as somebody that was not resisting.

29  Q.    Is it possible that you just happened to drop Mr. Clark's

30  right arm for a moment and had to pick it back up?

31  A.    No.

32  Q.    Mr. Clark had both arms behind his back, he was bent,

1 over and you had his right arm in your hand.  His right arm

2 dropped down for a second and you re-grabbed his right arm and

3 he was back in control within less than five seconds, correct?

4 A.   He was physically resistant, but yes, it didn't take us

5 long to get his hands back behind his back.

6 Q.   But the initial arrest you had both of his hands behind

7 his back and he bent over and there was no opposition or force

8 from him, correct?

9 A.   No, there was force.  He was still trying to move his

10 arms from our grasp.

11 Q.   Thank you.

12

13     Ms. Flowers:

14                    Nothing further, Your Honor.

15     The Court:

16                    Redirect?

17     Mr. Sommer:

18                    Judge, just briefly.

19

20 Redirect examination by Mr. Sommer:

21 Q.   Deputy Hotard, you were asked on cross-examination about

22 the initial stop.  Ultimately at some point were you able to

23 observe the rear of Mr. Clark's vehicle?

24 A.   Yes.

25 Q.   Okay.  Was he on a named street?

26 A.   Yes.

27 Q.   Did you observe him turn from a named street onto another

28 named street?

29 A.   Yes.

30 Q.   Did he use a turning signal in making that turn?

31 A.   No.

32 Q.   Okay.  Ultimately were you finished looking at the

1  currency during this investigation when Mr. Clark took it out

2  of your hands?

3  A.    No, I was not completed.

4  Q.    Did you tell him he could have it back?

5  A.    Negative.

6  Q.    Did that effect your investigation?

7  A.    Yes, sir.

8  Q.    At some point did you attempt to put handcuffs on Mr.

9  Clark?

10  A.    Yes, sir.

11  Q.    Did he offer physical resistance in you putting the

12  handcuffs on him?

13  A.    Yes, he was physically resistant, absolutely.

14

15      Mr. Sommer:

16                  That's all I have.

17      The Court:

18                  Okay.  You may step down.

19      The Witness:

20                  Thank you.

21      The Court:

22                  Call your next witness.

23      Mr. Sommer:

24                  Judge, the State calls Deputy Taylor

25              Bowden.

26      Ms. Flowers:

27                  Your Honor, my client is requesting a

28              brief recess to go to the restroom.

29      The Court:

30                  That's fine.  We'll take a five minute

31              recess.

32

                                    LPSO000257

1    (Off the record).

2

3        (Deputy Taylor Bowden, after having been first duly

4        sworn, did testify to the following:)

5

6    Direct Examination by Mr. Sommer:

7    Q.    Please state your name for the record.

8    A.    Deputy Taylor Bowden.

9    Q.    How long have you been with Livingston Parish Sheriff's

10   office?

11   A.    Eight years.

12   Q.    All with uniform patrol?

13   A.    I worked almost five years in corrections at the

14   detention center and the rest has been uniform patrol.

15   Q.    Were you so employed on May 24th, 2021?

16   A.    Yes, I was.

17   Q.    Ultimately were you involved in an investigation that led

18   to the arrest of an Alex Clark?

19   A.    Yes, I was.

20   Q.    Do you see Mr. Clark in the courtroom?

21   A.    Yes, I do.  He's right here sitting left of counsel

22   (indicating).

23

24       Mr. Sommer:

25                    Judge, I ask that the record reflect he

26                has identified the defendant.

27

28   Direct Examination by Mr. Sommer:

29   Q.    Could you tell The Court how you became involved in that

30   investigation?

31   A.    Yes, sir.  I was partners with Deputy Sean Hotard and I

32   heard him conduct a traffic stop and I went to his location to

-31-                                           LPSO000258

1    just assist.

2    Q.   When you say you heard a traffic stop what do you mean?

3    A.   He called out a traffic stop over the radio.

4    Q.   And so you just went by to assist?

5    A.   Yes.

6    Q.   All right.  What happened when you arrived?

7    A.   When I arrived I went up, I was standing there listening

8    to Deputy Hotard speak with Mr. Clark.  I observed a passenger

9    in the vehicle.  And when I observed the passenger I

10   approached the passenger and spoke with him for a brief moment

11   where I also detected the odor of marijuana omitting from the

12   interior compartment of the vehicle.  After that Deputy Hotard

13   conducted his investigation and I went back to his unit, and

14   then it went into everything else.

15   Q.   Okay.  And so when Deputy Hotard -- I'm kind of fast-

16   forwarding a little bit.  When Deputy Hotard was looking at

17   the dollar bill you were just kind of standing there with him?

18   A.   Yes, sir.

19   Q.   What did you observe coming from that point going

20   forward?

21   A.   Whenever Deputy Hotard had the currency with the

22   suspected narcotics in it, I was standing kind of, you know,

23   adjacent to them and I was looking over there and I could see

24   the white rock-like substance with apparent clear crystals,

25   and from my knowledge, training and experience it appeared to

26   be crack cocaine concealed inside the U.S. currency.  And

27   that's when Mr. Clark attempted to snatch the currency out of

28   Deputy Hotard's hand.

29   Q.   Upon seeing that what actions did you take?

30   A.   Whenever Mr. Clark went to snatch the currency out of

31   Deputy Hotard's hand we went to control Mr. Clark to place him

32   into handcuffs and as we did that he was physically resisting.

                                        LPSO000259

1    You know, I had a good grip on his arm and I still had to put

2    his arm behind his back and had to force him.  He was actively

3    trying to push away from both of us and was physically

4    resisting.

5    Q.    Okay.  So you were trying to move his arm one way.

6    A.    Yes, towards the middle of his back the same way, and

7    then Deputy Hotard's trying to move the other arm to the

8    middle of the back, so the common goal is him being physically

9    restrained.

10   Q.    And while you were doing that you felt resistance of him

11   moving his arm the opposite direction?

12   A.    Absolutely.

13   Q.    That's all I have for you, Deputy.  Just answer anything

14   from counsel.

15   A.    Yes, sir.

16

17        Ms. Flowers:

18                       I'm going to be really brief, Your Honor.

19                   We don't need to belabor the point.

20

21   Cross-examination by Ms. Flowers:

22   Q.    Really quickly you said you spoke to the other passenger

23   in the vehicle and then at that point you went back to the

24   vehicle and you were inside of the -- you weren't on the

25   screen for a period of time.  Could you just briefly state

26   where you were during that period of time?

27   A.    I believe I was just standing on the side of Deputy

28   Hotard's unit.

29   Q.    Okay.  So could you hear any conversation between Deputy

30   Hotard and Mr. Clark?

31   A.    From when he was at the tailgate?

32   Q.    When he was at the tailgate.

                                     LPSO000260

1   A.   I don't really recall from that side.  It's been a very

2   long time on that.

3   Q.   Got you.  So you couldn't affirmatively say whether

4   Deputy Hotard had given him his Miranda rights or whether or

5   not he discussed what he was searching for or any of that kind

6   of stuff?

7   A.   I don't recall.  I was far away from there.  I couldn't

8   hear that part, but from working with Deputy Hotard and

9   working with me --

10   Q.   I want just to stick to the --

11   A.   No, that's what happened.

12   Q.   And then when you came back you aided Deputy Hotard in

13   the search of Mr. Clark at that point?

14   A.   Yes.

15   Q.   Okay.  Was Mr. Clark compliant in any request that you

16   had heard prior to the dollar bill situation or $20.00 bill

17   situation?  From your perspective had Mr. Clark been compliant

18   the entire time?

19   A.   Up until that point, yes.

20   Q.   And Deputy Hotard actually had the bill, he had it open

21   and had an opportunity to look at the bill for a period of

22   time before Mr. Clark took the bill back, correct?

23   A.   Yes.

24   Q.   Also, did you notice what Mr. Clark was wearing that

25   night?

26   A.   White shirt and pants.

27   Q.   Was it clean and fresh or what was the condition of it?

28   A.   He looked like he had been working.

29   Q.   Yes, he looked like he had been working.  And from the

30   truck, because I noticed that you did go into the vehicle,

31   search the vehicle and search the truck, did you notice any

32   supplies or any type of things in the truck?

LPSO000261

1    A.   He had tools.

2    Q.   He had tools.  Were they consistent with any line of work

3    that you would know of?

4    A.   Just miscellaneous just tools, like handyman tools and

5    stuff like that.

6    Q.   So it's possible that he would have dust and other things

7    on him because it looked like he had been at work that day?

8    A.   Yes.

9    Q.   Thank you.  So there could have been another reason that

10   the dollar bill wasn't perfectly clean besides the fact that

11   -- or any other residues could have been found on there,

12   correct?

13   A.   Dust doesn't glisten with a baking soda texture and does

14   not resemble crack cocaine.

15   Q.   Well, I don't do crack, so I will not say anything that

16   will --

17   A.   I do investigations that involve crack cocaine and that's

18   what it looks like.

19   Q.   Yes.  But the alleged rocks that may or may not have been

20   found, you were not able to actually find any of them.  Did

21   you all seize the dollar bill?  Did you have it tested to see

22   if there was anything on it?

23   A.   That would be a question for Deputy Hotard.  I did not

24   construct the report or the evidence.

25   Q.   Got you.  So you briefly saw something that may have been

26   something then it may have not been something and at that

27   point you arrested Mr. Clark?

28   A.   For resisting.  He was not charged with possession of

29   crack cocaine.

30   Q.   Thank you.  This is my last question.  At the point that

31   you grabbed Mr. Clark's arm he was standing upright and he had

32   to be -- to put someone's arm behind their back you normally

LPSO000262

1    lean them forward, correct?

2    A.    Slightly, yes.

3    Q.    Slightly.  So if someone's not used to that position do

4    people sometimes move as you all are doing this?

5    A.    It's one thing to move --

6    Q.    I'm just asking if people move.  Very specific.

7    A.    No.  No, they don't.

8

9        The Court:

10                        He can explain.

11        Ms. Flowers:

12                        Okay, go ahead.

13        The Witness:

14                        Thank you, Your Honor.  It is one thing to

15                slightly move or to be like, "Hey, I have an

16                issue."  He was physically resisting, and that

17                was very prevalent on the video.

18

19    Cross-examination by Ms. Flowers:

20    Q.    Understood, what you're stating, but you never had an

21    issue -- I won't use the word "issue," because I don't want it

22    to be subjective.  Once you had Mr. Clark's arm that you were

23    holding behind his back that arm never came from behind his

24    back, correct?

25    A.    He was pushing against me.

26    Q.    Specifically, once you had Mr. Clark's arm behind his

27    back that arm never came from behind his back, correct?

28    A.    No, because I had to have physical control of him.

29    Q.    Because you had physical control of him.

30    A.    Because he was resisting.

31    Q.    Thank you.

32

1     Ms. Flowers:

2           No further questions, Your Honor.

3     The Court:

4           Redirect?

5     Mr. Sommer:

6           No redirect, Your Honor.

7     The Court:

8           Call your next witness.

9     Mr. Sommer:

10          Judge, the State rests.

11    Ms. Flowers:

12         We're just going to do a closing argument.

13       We're not going to continue with it.

14    The Court:

15         Okay.

16    Mr. Sommer:

17         Judge, just briefly, I believe the

18        testimony showed that Mr. Clark was stopped

19        after a traffic violation, failure to signal.

20        That's a 32:104.  A investigation was started,

21        in the course and scope of that Deputy Hotard

22        was looking at a dollar bill.  That dollar bill

23        was snatched from his hands while he was still

24        looking at it.  Judge, I believe that's the

25        basis for the misdemeanor obstruction.

26        After that dollar bill was snatched out of

27        his hands they attempt to restrain Mr. Clark in

28        handcuffs.  He actively resists.  It's not a

29        massive resisting, it's not an all-out brawl,

30        it's not an all-out fight.  I don't think that

31        the law requires that, Judge.  It's any

32        resistance to a lawful detainment or arrest

LPSO000264

1    from somebody acting in their capacity as a law

2    enforcement officer.  That's what happened

3    here.

4        Judge, there was a level of resisting

5    during a lawful detainment.  I would ask that

6    you find him guilty of obstruction and guilty

7    of misdemeanor resisting.

8  Ms. Flowers:

9        Briefly, the law requires intent for both

10    obstruction and resisting arrest.  Moving

11    during an arrest or not being the easiest

12    person to get your hands behind your back or an

13    officer dropping an arm in the process of an

14    arrest that as we saw from the video, Your

15    Honor, took place in ten seconds, is not

16    resisting.  You have to have the intent to be

17    actively resisting arrest.  Moving because

18    you're uncomfortable -- Mr. Clark is a 65 year

19    old man.  He's played football, baseball --

20  Mr. Clark:

21        Sixty-eight.

22  Ms. Flowers:

23        Excuse me, 68 year old man.  He is very

24    proud of his age.  He was forced downward very

25    quickly.  As you can probably see in the video

26    he was pulled backwards, forced downward very

27    quickly, and one arm came down for less than

28    half a second.  Someone involuntarily moving

29    because they're uncomfortable being arrested --

30    you have to have the intent to resist an

31    arrest.  He was not intending to resist arrest

32    just because he wasn't the most easiest person,

LPSO000265

1  according to the officer's testimony, to get

2  down, and the whole resist, of some sort,

3  lasted less than 15 seconds.

4      To obstruct justice you have to be

5  intending to remove or to conceal evidence that

6  you know has some type of crime.  Mr. Clark is

7  a drywaller and construction worker who had

8  been working all day with paint.  He wasn't

9  clean.  There was residue everywhere.  And this

10  detainment lasted over 20 minutes over what was

11  alleged to be a signal violation when Mr. Clark

12  wasn't even stopping for an officer.  He had

13  pulled over to get gas and was leaving when he

14  was stopped in the first place.

15      This was a pre-textual stop of an

16  overzealous officer who kept trying to find

17  something to the point that he was looking at

18  Mr. Clark's heart medicine trying to turn it

19  into what it isn't.  While he may not have been

20  the easiest person to arrest, you have to

21  actually have intent, and the State has not

22  proven its case that Mr. Clark intended to

23  resist arrest or to obstruct justice in any

24  way.  Thank you, Your Honor.

25  Mr. Sommer:

26      And Judge, just brief rebuttal closing,

27  Judge, as you know argument by attorneys is

28  just merely that, argument and not evidence.

29  There was no evidence presented to support

30  counsel's argument.  The evidence that was

31  presented in this court clearly showed that

32  while the officers were attempting to arrest

                                    LPSO000266

1          Mr. Clark he provided physical resistance.

2             It's not a massive amount of physical

3          resistance, but it is physical resistance,

4          Judge.

5             Intent is an intangible object.  It's not

6          some item that I can produce or some exhibit

7          that I can show you, so we have to use our

8          common sense and look at the circumstances.

9          Judge, if the officers are trying to put Mr.

10        Clark's hands behind his back and they feel the

11        force of him moving them down, Judge, using

12        your common sense that can tell you that he's

13        actively moving his hand and he is resisting

14        that arrest.

15           The law doesn't require me to prove that

16        he resisted arrest for 15 minutes or for some

17        amount of time, it asks that there is any

18        lawful resistance or obstruction to a lawful

19        detention or a lawful arrest.

20           Mr. Clark was detained, they attempted to

21        arrest him, and he resisted.  Judge, I would

22        also submit that when Deputy Hotard's looking

23        at that dollar bill, as I sit here today the

24        dust on that dollar bill could well have been

25        drywall as counsel told you.  The issue is we

26        don't know what it is because it was snatched

27        out of the officer's hand while he was still

28        investigating it.  And so, Judge, when you

29        snatch an item out of an officer's hand during

30        his investigation I would submit to you that

31        that fits as a misdemeanor obstruction of

32        justice.

LPSO000267

1          I think this is a minor traffic

2     investigation that really would have led to

3     much to do about nothing but for Mr. Clark's

4     actions at the very end of this when he

5     snatched that dollar bill out of Deputy

6     Hotard's hands while he was still looking at it

7     and then resisted.

8          As counsel pointed out and I'll submit,

9     Mr. Clark complied the entire time.  He was

10    compliant the whole time and everything was

11    moving in the course and scope of a normal

12    stop.  And he was probably not far from being

13    let go I would think, or even if he was

14    arrested for who knows what and that substance

15    is drywall, then there's no case.  But based on

16    his actions, jerking that dollar bill out of an

17    officer's hands while he's investigating it,

18    that's what changed this entire encounter from

19    a minor vehicular traffic stop to a misdemeanor

20    obstruction of justice and resisting arrest.

21          Judge, I believe it fits both elements of

22    14:130.1 and 14:108, and I ask that you find

23    him guilty of both.

24  The Court:

25          First of all, when it comes to matter of

26    probable cause for the traffic stop I find that

27    there is, reading 32:104, turning movements,

28    any turn, even if it does have a green arrow

29    and being in the lane it's still required, so I

30    find there was probable cause to make the

31    initial stop.

32          I also find that upon ascertaining or

-41-                                    LPSO000268

1           smelling marijuana that there was probable

2           cause to continue the investigation.  I also

3           find that the defendant, under obstruction of

4           justice it says, "Tampering with evidence with

5           the specific intent of distorting the results

6           of any criminal investigation or proceeding."

7           And then further on, "Tampering with evidence

8           shall include the intentional alteration,

9           movement or removal or addition of any object

10          or substance."  I find him guilty of the

11          obstruction of justice.

12               Really on the resisting I have some doubt

13          on that as to the amount of resistance that he

14          did, so I find him not guilty of that, but I

15          find him guilty of obstruction of justice.

16     Mr. Sommer:

17               Thank you, Judge.  I think we can do

18          sentencing today.

19     The Court:

20               Okay.

21     Mr. Sommer:

22               Whatever would be good, obviously, to the

23          Court.  I'm not asking for any jail time or

24          anything, but misdemeanor probation or

25          unsupervised, anything is fine with the State.

26     The Court:

27               I'm going to sentence him to six months in

28          the parish jail but I'm going to suspend that

29          and I'm going to place him on one year

30          unsupervised probation.  And as a condition of

31          probation he'll have to pay a fine of $350.00

32          plus court cost, not violate any criminal law

LPSO000269

```
 1                    of the State of Louisiana, locally or federal
 2                    or municipal laws.  I am doing it as an
 3                    unsupervised probation therefore I'm going to
 4                    order that he come back for a monitoring on --
 5        Ms. Flowers:
 6                         Six months?
 7        The Court:
 8                         Well, let's do it in about three months.
 9                    And he'll need to pay it by that time.
10        Mr. Sommer:
11                         Thank you, Judge.
12        The Court:
13                         Thank you.
14        Ms. Flowers:
15                         Do we have to give him notice?
16        Mr. Sommer:
17                         Do we have a date?  I don't have a
18                    calendar.
19        Ms. Flowers:
20                         September please.
21        Mr. Sommer:
22                         September.  We have the seventh or the
23                    fourteenth.
24        Ms. Flowers:
25                         Fourteenth.
26
27
28
29             (Whereupon this matter was concluded).
30
31
32
```

LPSO000270

## REPORTER'S CERTIFICATE

This certification is valid only for a transcript accompanied by my original signature and original required seal on this page.

I, **AMANDA WILDEY**, Official reporter in and for the State of Louisiana, employed as an Official Court Reporter by the 21st Judicial District Court, Parish of Livingston for the State of Louisiana, do hereby certify that this testimony was reported by me in the voice recording reporting method, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding;

That the transcript has been prepared in compliance with the transcript format guidelines required by statute, or by rules of the board, or by the Supreme Court of Louisiana;

That I am not of counsel, not related to counsel or the parties herein, nor am I otherwise interested in the outcome of this matter.


AMANDA B. WILDEY, C.C.R.
OFFICIAL COURT REPORTER
21ST JUDICIAL DISTRICT COURT
CERTIFICATE NUMBER:  99076

LPSO000271