# EXHIBIT 22

<u>DECLARATION OF DANIEL J. BUSKEN</u>

I, Daniel J. Busken, declare as follows:

1.    I am a former police chief with over 35 years of law enforcement experience, and I have been designated as an independent expert witness on behalf of Plaintiff, Alexander Clark, in the matter *Clark v. Hotard, et al..,* 3:22-CV-00326 (M.D. La.). This declaration is submitted in support of Plaintiff's Opposition to Defendants' Motions for Summary Judgment. I have personal knowledge of the matters contained in this declaration and if called to testify to them could and would do so competently.

2.    Attached hereto as Exhibit A is a true and correct copy of the June 18, 2025 Expert Report of Daniel J. Busken, which sets forth my initial expert opinions in the above matter. Also attached hereto as Exhibit B is a true and correct copy of my July 18, 2025 Rebuttal Expert Report of Daniel J. Busken, which sets forth my rebuttal expert opinions in the above matter.

3.    If called to testify at trial, I attest that I will testify to the matters set forth in these Reports.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 20th day of October 2025, at Athens, Alabama.

*Daniel J. Busken*
<span style="font-size:small">Daniel J. Busken (Oct 20, 2025 16:47:00 CDT)</span>

_____

Daniel J. Busken

# Exhibit A to Declaration of Chief Dan Busken: Expert Report of Chief Dan Busken

**EXPERT WITNESS REPORT**
**REVIEW OF MATERIALS AND OPINIONS**


**ALEXANDER CLARK**

**v.**

**DEPUTY JEAN HOTARD, ET AL.**

**Case NO. 03:22-CV-326-JWD-RLB**


**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**


June 18, 2025


Prepared for:

Attorneys for Alexander Clark
Southern Poverty Law Center
Social Justice Legal Foundation
ACLU of Louisiana


*Daniel J. Busken*
Daniel J. Busken (Jun 18, 2025 16:49 CDT)
_____
Daniel J. Busken

BUSKEN REPORT – CLARK V. HOTARD ET AL.

# TABLE OF CONTENTS

## ALEXANDER CLARK

### v.

## DEPUTY JEAN HOTARD, ET AL.

### Case NO: 03:22-CV-326-JWD-RLB

### UNITED STATES DISTRICT COURT

### MIDDLE DISTRICT OF LOUISIANA

I.   SUMMARY OF OPINIONS ................................................................................................4
II.  EXPERIENCE ...............................................................................................................4
        Education and Training – Summary ..................................................................8
        Assignment and Compensation.......................................................................8
        National Standards – Best Practices - Regarding this Incident .........................9
              *Handcuffing* ..........................................................................................*9*
        The Account Provided by Plaintiff – Alexander Clark .......................................14
        The Account Provided by Defendant – Officer Sydney McCullough ..................14
III. INCIDENT SUMMARY – DISCUSSION ...........................................................................16
IV.  OPINIONS...................................................................................................................20
        Handcuffing...................................................................................................21
        Racial Profiling................................................................................................23
V.   REFERENCES ..............................................................................................................27
VI.  DOCUMENTS AND RECORDINGS REVIEWED................................................................27
VII. ATTACHMENTS ...........................................................................................................28
        EXHIBIT A.......................................................................................................29
        EXHIBIT B.......................................................................................................36
        EXHIBIT C.......................................................................................................40

June 18, 2025

Attorneys for Alexander Clark
Southern Poverty Law Center
Social Justice Legal Foundation
ACLU of Louisiana


RE:    Expert Opinions of Daniel J. Busken


I am providing this report following your request that I review documents and materials and offer expert opinions related to the case: **ALEXANDER CLARK v. DEPUTY JEAN HOTARD, ET AL.** - a civil rights case related to alleged violations of state and federal law committed during a traffic stop on May 24, 2021. Plaintiff Alexander Clark initially sued the Livingston Parish Sheriff's Office (LPSO) and several individual Defendants. The current defendants include Jean Hotard, Calvin Taylor Bowden, Jason Ard, Sydney McCullough, J. Shannon Womack, and the City of Denham Springs. This incident occurred at 222 South Florida Avenue within the city limits of Denham Springs, Louisiana.

My review included case filings, police reports, deposition transcripts, other discovery materials, and research. A list of reference documents and research is included in this report, as well as the records and documents made available for my review. The materials reviewed are the type typically relied upon by consultants and experts when conducting an analysis or review of police-involved incidents. The materials provided me with sufficient relevant data to develop my opinions to a reasonable degree of professional certainty, based on the currently available information. Should additional information come to light, I reserve the right to amend my opinions based on additional information.

3

BUSKEN REPORT – CLARK V. HOTARD ET AL.

## I.   __SUMMARY OF OPINIONS__

According to generally accepted police standards and the training police officers should receive throughout their career, officers are trained that, subsequent to handcuffing, the handcuffs should be double-locked and checked for proper fit. It would have been appropriate according to recognized best practices for Deputy Jean Hotard to position Alexander Clark in front of his police vehicle, and in from of Hotard's dash camera, to check the handcuffs for proper fit and ensure the handcuffs were double-locked. This would have also given Mr. Clark the opportunity to tell Deputy Hotard about any discomfort or pain the handcuffs were causing. Additionally, this would have provided evidence that this procedure was completed.

It would appropriate for a law enforcement agency to view and analyze Racial Profiling data to ensure officers are following the policy. Merely compiling numbers and filing them away without any thoughtful analysis or auditing serves no purpose, nor does it serve the purpose intended by the policy, which is an examination in an effort to discover any racial profiling.

## II.   __EXPERIENCE__

My law enforcement experience includes 35 years of service to communities in Missouri, Alabama, and Texas. I began my career in University City, Missouri in 1983. I served University City as a police officer, field-training officer, and investigator. My duties as a police officer included vehicular and foot patrol of a designated district within the community, traffic law enforcement including response and investigation of traffic accidents, and routine and emergency response to a wide variety of calls for service. These duties also included arrests, initiating pursuit of offenders (either on foot or using a police vehicle when necessary), preliminary investigations of minor offenses, and in-depth investigations of serious offenses.

4

These duties often resulted in criminal charges filed against defendants and required my testimony in municipal, state, or federal courtrooms.

I served as a Field-Training Officer (FTO) during the time I worked for the University City Police Department. I trained several new police officers during this four-year span, serving as an FTO. This training included mentoring new police officers on officer safety, emergency vehicle operations, de-escalation, use of force, impact weapons, arrest, and control and restraint tactics, including tactics necessary during violent encounters. Additionally, in this role as an FTO, I guided and evaluated the performance of these new police officers to ensure each had a thorough understanding of laws and how they relate to police work, understood how their classroom training translated to working on the street as a police officer, and understood how to practically apply police department policy, procedures, and guidelines into the role of a police officer. Field training prepares a new police officer to work without direct supervision. After six years as a patrol officer and FTO, I was assigned to an undercover narcotics assignment.

I served as a narcotics investigator for almost four years. For three of these years, I was assigned to a multi-jurisdictional drug task force. I received training for this assignment from the Drug Enforcement Administration (DEA), with additional narcotics-related training throughout the duration of this assignment. As a narcotics investigator, my duties included gathering intelligence about who was purchasing and selling illegal narcotics, intelligence about the locations where these transactions were occurring, numerous undercover drug purchases, and the preparation of numerous search warrants for a wide variety of criminal behaviors. My duties in this assignment also included training new investigators. I served as a field commander during my assignment to the narcotics task force. These narcotics duties often resulted in criminal

charges and required testimony in a municipal, state, or federal courtroom, coordination with both state and federal prosecuting attorneys, as well as cooperation with federal law enforcement agencies, including the FBI, DEA, and the U.S. Marshals Service. I have many years of experience managing investigators assigned to local or federal task forces operating under a Memorandum of Understanding (MOU). I left the University City Police Department in December 1992, when I accepted the position of Chief of Police in Crystal City, Missouri.

I served as (1) Chief of Police in Crystal City, Missouri from 1993 – 2000; (2) Chief of Police in Madison, Alabama from 2000 – 2009; (3) Chief of Police in Greenville, Texas from 2010 – 2019; (4) Interim Chief of Police in Argyle, Texas from September of 2019 – January of 2020; and (5) the Civilian Administrator/Interim Chief of Police in Del Rio, Texas from May of 2021 – September of 2021. In each of these assignments, I had responsibility for the oversight of the entire police department including administration, training, records management, operations, patrol, jail or holding facility, and investigations, including considerable time developing and implementing policies and procedures to guide the organization, investigating officer misconduct, and determining discipline, as well as developing the scope and content of officer training. I have developed two police officer field training manuals during my administrative career.

I was also a member of the Texas Police Chiefs Association Recognition Committee. As a member of this committee, I helped establish standards regarding all aspects of operating a modern law enforcement agency. In addition, this committee reviews compliance with standards for law enforcement agencies throughout the state of Texas that voluntarily choose to pursue recognized status, and those agencies seeking re-recognition. This is now referred to as an accreditation program.

BUSKEN REPORT – CLARK V. HOTARD ET AL.

Additionally, I received certification as a Force Analyst through the Force Science Institute. This certification program instructs participants about police officer performance under stress, action and reaction time, memory, and decision-making during complex, rapidly unfolding encounters. I have also completed the Realistic De-escalation Instructor Course through the Force Science Institute. This course examines the complex concept of de-escalation and the various elements that must be considered to determine whether de-escalation is feasible and effective.

Presently, I am and have previously been retained as a police practices expert by several attorneys and law firms in police procedures and/or civil rights litigation. This retention typically includes reviewing a case file, conducting research, preparing an affidavit or report, and providing testimony at a deposition or a trial. I have been retained by attorneys and firms representing plaintiffs, defendants, individual police officers, or the jurisdiction employing the police officer.

My current CV and a list of cases in which I have testified, either at a deposition or trial, for at least the last four years, are attached to this report. (See Exhibits A and B). With 25 years of experience as a police chief during my 35-year law enforcement career, and my experience researching and reviewing police practices cases nationwide for many years, I have 42 years of relevant law enforcement experience. I have reviewed thousands of incidents involving police procedures, training, and field operations over the course of my career in law enforcement. Therefore, my experience provides the specialized knowledge an expert must possess to offer opinions regarding this case. These reviews generally include an examination of the events preceding and during the incident, actions of those involved, and the outcome from the police

practices perspective regarding department policies, consistency, or inconsistency with police tactics and how police officers are trained, relevant laws, and generally accepted police practices.

### Education and Training – Summary

Daigle Law – Use of Force Summit, 2020, 2023
Force Science Institute – Realistic De-Escalation Instructor's Course, 2020
Force Science Institute – Use of Force Analyst Certification Course, 2016
MBA – Criminal Justice Specialization, Northcentral University – 2014
Master's Degree – Public Administration – St. Louis University – 1994
FBI Law Enforcement Executive Development (LEEDS) – 2003
FBI National Academy – Session 184 - 1996
Drug Enforcement Administration (DEA) Investigator Course - 1988
Bachelor of Science in Business Administration - Culver-Stockton College – 1983
Advanced Management and Operational Training:
    IACP – Administering the Small Law Enforcement Agency
    IACP – Professional Policies and Procedures for Modern Law Enforcement
    Yearly Management and Leadership Training through various Police Chiefs Associations
    FEMA Incident Command Training
    Former Police Officer Certification in Missouri and Alabama
    Master Peace Officer Certification Texas (Retired)

### Assignment and Compensation

I was retained on behalf of the Plaintiff. I was asked to review the case file documents and provide opinions related to police practices and proper handcuffing procedures (including whether these officers acted in accordance with best practices). Additionally, I was asked to provide an opinion regarding what a law enforcement agency is expected to do once racial profiling data is compiled.

I am compensated for the time required to review case file documents, conduct research related to the specific assignment and development of opinions, and for the time required to prepare this report. My compensation is not dependent on the substance of my opinions. My current Fee Schedule is attached to this report as Exhibit C.

**National Standards – Best Practices - Regarding this Incident**

The International Association of Chiefs of Police (IACP) is the largest professional law enforcement organization in the world. The IACP publishes documents related to training and law enforcement organization policy, as well as a wide range of other topics. I have been a member of the IACP since 1993 and am now considered a "Life Member" of this organization. Throughout my administrative career, I have referenced IACP documents when drafting police department policies, as these documents frequently represent relevant research, extensive experience with the topic, and recognized best practices within the law enforcement profession. I will reference documents published by the IACP in this report. The best practices identified below are also in line with my understanding of best practices based on my 35-year law enforcement career.

### *Handcuffing*

The IACP provides guidance through a Model Policy regarding the Transportation of Prisoners. In this Policy, IACP instructs, "2. Officers shall handcuff (double-locked) all prisoners with their hands behind their back and palms facing outward."[1] Officers learn through training that handcuffs should be double-locked and gapped to prevent further tightening, which can affect the nerves around a person's wrists. When the palms are facing outward, it is harder for the person in the handcuffs to manipulate the locking mechanism. "Gapped" refers to having enough space to insert a fingertip between the handcuff and the wrist of the person handcuffed. This proper amount of a gap is intended to ensure the handcuffs are not too tight, so as to not interfere with the nerves near the person's wrists. The intention of the proper gap and double-

---

[1] International Association of Chiefs of Police, *Transportation of Prisoners*, 1.

BUSKEN REPORT – CLARK V. HOTARD ET AL.

locking is to prevent additional tightening of the handcuffs, which is known to cause pain and discomfort.

Research has determined that "Overly tight handcuffs or movements by the detainee can cause the strands to compress blood vessels and nerves. The superficial radial nerve is particularly susceptible to compression as it runs along the outside of the radius bone at the wrist. Handcuff neuropathy due to prolonged compression results in numbness in the fingers, which can impair dexterity and the ability to detect harmful situations like touching sharp objects or burning heat. Severity of nerve damage is related to handcuff tightness, length of time under compression, and the amount of force applied against the handcuffs by the detainee. Studies demonstrated that constant compression of 60 mm Hg (approximately 1 PSI) pressure to a nerve can cause total functional loss after 150 minutes and that constant compression of even 30 mm Hg (approximately ½ PSI) reduces nerve function by 50% after 210 minutes."[2]

LPSO policy instructs deputies regarding the use of handcuffs on arrested persons. This policy includes, "[t]he Doublelocking device will be used when handcuffing a prisoner."[3] Additionally, and for reference purposes, the New Orleans Police Department policy regarding **HANDCUFFING TECHNIQUE** also emphasizes that handcuffs should be double locked. "Officers shall ensure that handcuffs are applied in accordance with the approved method. The approved method of properly placing and securing handcuffs on a subject is with the subject's hands behind the back, thumbs pointing up, and the palms out. In all cases, handcuffs shall be double locked.

---

[2] "The Rap Sheet on Restraints," *The Verdict*, no. 174 (Fall 2022): 54, https://gtdscientific.com/wp-content/uploads/2022/08/GTDScientific_TLABC_The-Verdict_Issue174_Content-R6-53-55.pdf.
[3] LPSO000014.

BUSKEN REPORT – CLARK V. HOTARD ET AL.

If handcuffs are put on in any other manner, the officer(s) shall reapply the handcuffs in the approved manner if and when it is safe to do so and as soon as it is safe to do so."[4]

Deputy Bowden testified that handcuffing training is part of SSGT (Defensive Tactics Training), which is covered during yearly refresher training.[5] According to the Louisiana Commission on Law Enforcement and Administration of Criminal Justice website, officers in Louisiana receive 4 hours of Officer Survival training each year.[6] This should be the block of training where officers are reminded of the proper procedures regarding handcuffing and the need to ensure the handcuffs are double-locked and gapped. "Handcuffing is a skill that can be perishable or could be so repetitive that officers may get sloppy. Therefore, handcuffing drills should be practiced with a qualified instructor at least once per year."[7]

According to the file documents, Deputy Hotard received certificates indicating he completed the Vanguard Level Two Student Certification Course on September 17, 2015, and April 19, 2017. According to the Vanguard website,[8] SSGT Vanguard Level Two includes, "**Strategic Handcuffing & Transport – deploying and applying handcuffs to a subject in the standing, kneeling and prone positions. Also, the safe and proper transport procedure of a restrained subject,**" is included in this training.

---

[4] New Orleans Police Department, *Chapter 1.3.1.1: Handcuffing and Restraint Devices*, effective May 10, 2020, https://nola.gov/nola/media/NOPD/Policies/Chapter-1-3-1-1-Handcuffing-and-Restraint-Devices-EFFECTIVE-5-10-20.pdf.
[5] Deposition of Deputy Calvin Bowden, 63.
[6] Louisiana Commission on Law Enforcement and Administration of Criminal Justice, accessed June 10, 2025, https://lcle.la.gov/.
[7] Objectively Reasonable. "When Can Handcuffing be Considered Excessive Force?" August 2, 2021, https://www.objectivelyreasonable.com/2021/08/02/when-can-handcuffing-be-considered-excessive-force/.
[8] Strategic Self-Defense & Gunfighting, "About Us," accessed June 10, 2025, https://gossgt.com/pages/about-us.

BUSKEN REPORT – CLARK V. HOTARD ET AL.

Handcuffs provide the control necessary to ensure the overall safety of both the detainee and the arresting officer; however, officers learn through training that handcuffs can also cause injuries. Research was conducted to understand how handcuff neuropathy occurs and what can be done to prevent it. GTD Scientific, Inc. was engaged to conduct a study to compare the risk of handcuff neuropathy with various handcuff designs. This research determined:

- Failure to engage the double-lock effectively can result in inadvertent increased tightening, leading to nerve compression injuries known as handcuff neuropathy.

- Overly tight handcuffs or movements by the detainee can cause the strands to compress blood vessels and nerves.

- A study demonstrated the difference between a firm fit and exceeding nerve injury thresholds; in some cases, it required only a single click.[9]

The GTD Scientific research was published in the *Journal of Forensic Biomechanics*. This research concluded that the "Risk of injury to the superficial radial nerve can be significantly reduced with a handcuff design that prevents over tightening, such as the automatic double lock implemented in the Spider Cuff. Although over tightened handcuffs can produce pressure which exceeds the threshold for risk of superficial radial nerve injury, manipulation of the handcuffs by a detainee also poses a risk for nerve injury. It is important to ensure that the individual responsible for fastening the handcuffs is trained to appropriately limit the tightness of the handcuffs and that the detainee is made aware of the risk of nerve injury posed by struggling after handcuffs have been fastened around the wrists."[10] (Emphasis Added).

---

[9] "The Rap Sheet on Restraints," *The Verdict*, no. 174 (Fall 2022): 54, https://gtdscientific.com/wp-content/uploads/2022/08/GTDScientific_TLABC_The-Verdict_Issue174_Content-R6-53-55.pdf.
[10] *Preventative Measures to Reduce Incidence of Handcuff Neuropathy*, 5.



"Officers learn through training that an allegation of excessive force can result from tight handcuffs. Officers must check that handcuffs are double locked and gapped for every suspect who is handcuffed. If possible, the handcuffing and subsequent checks should be captured on body or cruiser camera to refute claims of excessive force as occurred in this case." *Hughey v. Easlick*, No. 20-1804, (6th Cir. 2021). "When officers are utilizing video, the officer should narrate that he is double-locking and checking the gap of the handcuffs. In the moment, it will be clumsy to articulate such routine actions, but it will go far to protect the officer and agency against false claims."[12]

---

[11] "The Rap Sheet on Restraints," *The Verdict*, no. 174 (Fall 2022), https://gtdscientific.com/wp-content/uploads/2022/08/GTDScientific_TLABC_The-Verdict_Issue174_Content-R6-53-55.pdf.
[12] Objectively Reasonable. "When Can Handcuffing be Considered Excessive Force?" August 2, 2021, https://www.objectivelyreasonable.com/2021/08/02/when-can-handcuffing-be-considered-excessive-force/.

### The Account Provided by Plaintiff – Alexander Clark

Through his complaint in this civil action, Alexander Clark alleges that Deputies Hotard and Bowden wrenched his arms behind him to apply handcuffs, and the level of aggression from the Defendant officers was unwarranted as Mr. Clark was significantly overpowered and compliant.[13] Defendant McCullough engaged in the forceful arrest of Mr. Clark using her hands and arms to apply pressure on Mr. Clark's neck.[14] Mr. Clark alleges he asked Defendant Hotard to loosen the handcuffs because he was in severe pain. Defendant Hotard refused, and Mr. Clark was placed into Hotard's police car.[15]

Mr. Clark alleges that he was handcuffed in the police cruiser for 15 minutes while the officers continued to search for crack cocaine. Deputy Hotard testified it was a 20-minute drive (approximately) from the location of the arrest to the Detention Center.[16] Jail deputies remove the handcuffs after a prisoner is searched.[17]

### The Account Provided by Defendant – Officer Sydney McCullough

Denham Springs Officer Sydney McCullough (now a Sergeant) participated in the use of force involving Mr. Clark. McCullough did not prepare a report following her involvement in the use of force to arrest Alexander Clark, nor was McCullough's involvement noted in the incident report prepared by Deputy Hotard.

---

[13] *First Amended Complaint*, 12.
[14] Ibid., 13.
[15] Ibid., 15.
[16] Deposition of Deputy Jean Hotard, 169.
[17] Ibid., 162.

During her Deposition, Sergeant McCullough testified regarding an email that is included in the file documents.[18] This email states  McCullough was not involved in this use of force and "Sergeant Sydney McCullough happened to be in the area when Livingston Parish Sheriff's Office made the stop. Sergeant McCullough pulled up on the scene and asked if the deputies needed help." Sergeant McCullough stated that "They responded no and she was sent on another call."[19]

Sergeant McCullough now admits, after she watched the video, the previous information regarding her not being involved was inaccurate information. According to McCullough's testimony, "And, you know, of course it's not accurate,"[20] referring to this email.

Sergeant McCullough admits physical contact with Mr. Clark during this arrest. (see McCullough's deposition testimony and the SCREENSHOTS below.)

1·Q.· ·Got it.· So you remembered -- so the next
·2· question on Page 5, it says, "On May 24th or 25th,
·3· 2021, did you make physical contact with or
·4· communicate orally with Plaintiff Alexander Clark?"
·5· · · · · · And your response is, "Sergeant McCullough
·6· placed her hand out onto the back shoulder/arm area
·7· of Mr. Clark." So you were able to recall that
·8· without watching video of the incident?
·9· · · ·A.· ·Yes, ma'am.· I remember, you know,
10· extending my arm.· And I do that often.· I'm like,
11· hey -- like, I just -- it's a habit.· And I -- I
12· remember, you know -- I didn't have like, you know,
13· hey, come here and grab, you know, Mr. Clark, hey,
14· you know, and place my hand on him.
15· · · · · · I know at the time, I have arm and stuff,
16· but after watching that dash cam recently, it was
17· more right here, the shoulder blade area or -- I'm
18· sorry, the upper -- whatever this is, trapezoid
19· area.
20· · · · · · So, I mean, I wasn't, you know, perfectly

---

[18] Deposition of Sergeant Sydney McCullough, Exhibit 3.
[19] Deposition of Sergeant Sydney McCullough, 99-100.
[20] Ibid.

BUSKEN REPORT – CLARK V. HOTARD ET AL.

21· accurate because I remember putting my hand out and,
22· you know, you know, like -- like that, but not -- I
23· -- I thought it was the arm and it was not.· It was
24· more up here.
25· · · ·Q.· ·And so -- and by "up here," you're
pg 104
1· referring to the kind of side neck to shoulder that
·2· --
·3· · · ·A.· ·The -- between the neck --
·4· · · ·Q.· ·-- connects with the shoulder?
·5· · · ·A.· ·Yes, ma'am.· Trapezoid -- traps, I guess.[21]

III.    **INCIDENT SUMMARY – DISCUSSION**

This incident summary is derived from case file documents that provide details of a traffic

stop conducted by Livingston Parish Deputy Hotard. The incident that is the focus of this civil

action began with a traffic stop on May 24, 2021. This traffic stop and subsequent arrest occurred

in the parking lot of a gas station/convenience store located at 222 South Florida Avenue in the

city limits of Denham Springs, Louisiana. The traffic stop, conducted by Deputy Jean Hotard

(Hotard), occurred at 23:28 Hours (11:28 pm) according to the incident report.[22]

Plaintiff Alexander Clark was driving his white 2002 Chevrolet pickup truck, and Norwood

Cobbs[23] was the front seat passenger. Allegedly, Mr. Clark made a right turn without signaling

prior to the traffic stop. Hotard allegedly then "detected the obvious odor of marijuana emitting

from the vehicle and an unlabeled bottle of pills sitting in the cupholder,"[24] during the

subsequent traffic stop. Hotard advised Mr. Clark to step to the rear of his truck prior to the

---

[21] Deposition of Sergeant Sydney McCullough, 103:1 - 104:5.
[22] Approved Incident Report, W. Baton Rouge Sheriff, Defendants' Response 601.
[23] Deposition of Alexander Clark, 56.
[24] Deputy Jean Hotard - Incident Report, LPSO000057.

BUSKEN REPORT – CLARK V. HOTARD ET AL.

arrival of Deputy Bowden. Deputy Hotard then returned to his patrol vehicle to check the status of Mr. Clark's driver's license and vehicle.

There is no body camera evidence capturing when Deputy Hotard returned to his vehicle. There is video footage from Deputy Hotard's in-car camera. However, there is no audio from this recording. There is also video footage from Deputy Bowden's in-car camera, with audio, however due to the positioning of Bowden's vehicle, only portions of the incident were recorded on video.

Deputy Hotard reported that following the computer check of Mr. Clark's vehicle and license, he returned to Mr. Clark and advised him of his rights per Miranda. Mr. Clark denied having any illegal substances in his truck. Deputy Hotard testified that the non-narcotic pills in the unlabeled bottle were identified as gout medicine.[25]

Deputy Hotard and Deputy Bowden then searched the truck. Deputy Hotard testified that the basis for the search was the odor of marijuana. However, no marijuana was recovered during the search.[26] According to the Incident Report, "a small piece of a copper scrubbing pad, which is commonly used as a filter when ingesting crack cocaine,"[27] was located during the search.

Following the search of the truck, the deputies questioned whether Mr. Clark was concealing anything on his person. Mr. Clark had a "balled-up $20.00 bill" inside one of his pockets, which Deputy Hotard reported, "This is common that narcotic users will conceal narcotics inside US currency."[28]

---

[25] Deposition of Deputy Jean Hotard, 144.
[26] Ibid., 144.
[27] Deputy Jean Hotard - Incident Report, LPSO000057.
[28] Ibid.

Deputy Hotard reported that when he was unfolding the $20.00 bill, he "observed what appeared to be possibly the residue of crack cocaine." Mr. Clark denied that anything was inside the bill. Deputy Hotard reportedly questioned Mr. Clark further about the substance Hotard allegedly observed and whether the substance was narcotics. Deputy Hotard reported that Mr. Clark "began angrily swiftly snatching the $20.00 bill out of my hands stating, "Give me my money back."[29]

Deputy Hotard and Deputy Bowden moved to place Mr. Clark in handcuffs. Both deputies were located behind Mr. Clark, with Hotard to the right and Bowden to the left. During the handcuffing process, Deputy Hotard reported, "Alexander (Clark) refused to place his hands behind his back and was forcefully placed in handcuffs."[30] Mr. Clark was either leaning forward or was forced forward by the handcuffing process, as his arms were being forced behind his back. As Mr. Clark leaned forward, Denham Springs Officer Sydney McCullough, who had arrived on the scene, moved toward Mr. Clark and the deputies.[31] Officer McCullough is observed approaching. Officer McCullough places her left hand on the back of Mr. Clark's neck as Mr. Clark is bent forward.

---

[29] Ibid.
[30] Ibid.
[31] *Video 1_2021-05_24_23_48-00_LELLIS.avi*, 02:36-02:41.

BUSKEN REPORT – CLARK V. HOTARD ET AL.



(SCREENSHOT @ 02:36).[32]



(SCREENSHOT @ 02:41)[33]

This occurs while Hotard and Bowden are in the process of handcuffing Mr. Clark. Officer McCullough has her left elbow on Mr. Clark's neck as Mr. Clark is still bent forward. Mr. Clark raises his head slightly, and Officer McCullough's left hand slides to Mr. Clark's left shoulder area. Officer McCullough is stepping away as the handcuffs are secured.

Deputy Hotard reported that Mr. Clark was secured in the rear of Deputy Hotard's patrol vehicle. Additionally, Deputy Hotard reported, "When Alexander (Clark) snatched the $20.00 bill

---

[32] *Video 1_2021-05_24_23_48-00_LELLIS.avi*, 02:36.
[33] *Video 1_2021-05_24_23_48-00_LELLIS.avi*, 02:41.

19

out of my hands, it caused the suspected narcotics to be lost on the concrete of the parking lot at the stop location."[34]

Deputy Hotard arrested Mr. Clark and transported him to the Livingston Parish Detention Center for booking. Mr. Clark was processed and given a misdemeanor summons #78228[35] for the violations:

32:104 - Failure to Signal

14:108 - Resisting an Officer

In addition to his allegation regarding handcuffing, according to his Complaint, Mr. Clark alleges the Livingston Parish Sheriff's Office engages in Racialized Policing Practices, which encourage race discrimination and unconstitutional policing. I will address this later in this report.

## IV.    **OPINIONS**

My area of expertise includes police standards, practices, and procedures. These opinions are based on my 42 years of relevant law enforcement experience, which includes many hours of education, training, and instruction. My opinions are also based on my knowledge of generally accepted police practices related to law enforcement procedures, experience from the perspectives of a police officer, field training officer, investigator, supervisor, as well as experience researching and reviewing police practices cases nationwide. Additionally, with my experience as a chief of police, I evaluate any allegations along with the relevant training, policies, and procedures to determine if this guidance was followed. This experience includes reviewing

---

[34] Deputy Jean Hotard - Incident Report, LPSO000057.
[35] LPSO000048.

BUSKEN REPORT – CLARK V. HOTARD ET AL.

police responses to a wide variety of incidents. In this case, I reviewed the documents and recordings listed at the end of my report.

The comments provided within this report are intended to assist the reader in understanding the information used to formulate my opinions. These opinions are based upon my review of the materials and research and are based upon the information I have received as of the date of this report. Additionally, I have provided the necessary information, documenting my general and specific qualifications, to provide expert testimony in this case based on my knowledge, skill, experience, training, and education.

My opinions are based upon a reasonable degree of professional certainty, and I reserve the right to amend my opinions if other evidence or different information becomes available. I may have additional opinions and/or reasoning depending upon what questions I am asked at deposition or trial. Any use of terms such as *reasonable, reasonableness, negligent, reckless, and duty* merely reflects my training and experience in applying reasonable standards of care to the conduct of a police officer and how officers understand and use those same terms. In using such terms, I am not attempting to offer legal opinions or conclusions. Instead, my review of legal precedent is intended to inform me of the clearly established law at the time of this incident from the perspective of a uniformed officer.

I understand I may be expected to offer testimony regarding my opinions, generally accepted police policies and procedures, the development of policies, procedures, and standards, including the purposes behind such policies, and the training generally provided to officers regarding rules, policies, and procedures.

**Handcuffing**

BUSKEN REPORT – CLARK V. HOTARD ET AL.

Officers learn through training that, subsequent to handcuffing, the handcuffs should be double-locked and checked for proper fit. This practice is extremely important in a case such as this, where the officers allege Mr. Clark resisted their attempts to arrest him and secure him in handcuffs. It is very easy to over-tighten the handcuffs, especially when there is real or perceived resistance. As was noted previously in this report, one click (one ratchet too tight - see previous diagram) can mean the difference between secure, properly fitting handcuffs and overly tight handcuffs that are painful and can lead to injury. Pressure over time, specifically pressure against nerves in and around the wrist of a person in handcuffs is what leads to injury.[36] There is no defined time limit, per say, regarding how long it takes for this injury to occur, which is why officers are instructed to check the fit and gap as soon as it is practical to do so.

Deputy Hotard testified he does not remember Mr. Clark telling him that the handcuffs were painful, but Hotard said, "It is pretty common that people complain about the handcuffs."[37] Deputy Hotard was asked what he typically does when people complain about the handcuffs? Hotard replied he checks to see if they are twisted or need to be re--adjusted or loosened, and, had Mr. Clark asked, "I would have checked."[38]

Based upon my previous experience and according to generally accepted police standards and the training police officers should receive throughout their career it would have been appropriate for Deputy Hotard to position Mr. Clark in front of his police vehicle to check the handcuffs for proper fit and ensure the handcuffs were double-locked. This would have also given

---

[36] "The Rap Sheet on Restraints," *The Verdict*, no. 174 (Fall 2022): 54, https://gtdscientific.com/wp-content/uploads/2022/08/GTDScientific_TLABC_The-Verdict_Issue174_Content-R6-53-55.pdf.
[37] Deposition of Deputy Jean Hotard, 155.
[38] Ibid., 156.

BUSKEN REPORT – CLARK V. HOTARD ET AL.

Mr. Clark the opportunity to tell Deputy Hotard about any discomfort or pain the handcuffs were causing.

Alexander Clark alleges "when he came back to the vehicle, I asked him if he could release these handcuffs, because my hand is hurting, you know."[39] Mr. Clark testified he had been in handcuffs for "Probably ten minutes."[40] Mr. Clark testified that the officer did loosen the handcuffs at that time. Assuming the account provided by Alexander Clark is correct, then he had been secured in the handcuffs, which were too tight, for ten minutes, which is enough time, based upon the research noted previously, to suffer an injury. Additionally, had Deputy applied the handcuffs properly, double-locked them, and checked the fit, there would have been no need, as Mr. Clark alleges, for Deputy Hotard to loosen the handcuffs after Mr. Clark was secured in them for ten minutes.

**Racial Profiling**

The Livingston Parish Sheriff's Office has a policy which informs employees regarding DISCRIMINATORY PRACTICES/RACIAL PROFILING.[41] "The purpose of this policy is to ensure that race, ethnicity, age, gender or sexual orientation shall not be the sole basis for detention, interdiction or other disparate treatment of any individual by any employee of the Livingston Parish Sheriff's Office. This policy constitutes the written policy contemplated by La. R.S. 32:398.10(E)." [42]

---

[39] Deposition of Alexander Clark, 73.
[40] Ibid., 74.
[41] LPSO000020.
[42] Ibid., 48; La. Rev. Stat. § 32:398.10(E).

BUSKEN REPORT – CLARK V. HOTARD ET AL.

Captain John Gillespie of the Denham Springs Police Department testified DSPD has a Biased Based Policing Policy, however was not aware when this policy came into effect.[43] Captain Gillespie testified no annual reports, required by policy, were submitted from 2021-2023.[44] Plaintiff's attorney provided me with the following Summary of Opinions provided by Sarah Abraham, another consultant in the current matter:

1.  My analysis of traffic stops conducted by LPSO in 2020 and 2021 shows a disproportionate number of traffic stops of Black people relative to the size of the Black population in Livingston Parish. Specifically, I find that 26.8% of the traffic stops were for Black people. However, based on the 2020 census, Black people make up only 7.9% of the total population in Livingston Parish and only 7.3% of the adult population. The disparity in the proportion of traffic stops of Black people relative to the proportion of the Livingston Parish population that is Black is statistically significant, i.e., unlikely to be due to chance alone.

2.  My analysis of LPSO police report data from 2020 and 2021 produced in this matter similarly shows a disproportionate number of police reports for Black people relative to the size of the Black population in Livingston Parish. Specifically, I find that 35.4% of the police reports were for Black people. However, as discussed above, Black people make up only 7.9% of the total population in Livingston Parish and only 7.3% of the adult population. The disparity in the proportion of police reports for Black people relative to the proportion of the

---

[43] Deposition of Captain John Gillespie, Exhibit 6, 51-52.
[44] Ibid., 55-56.

Livingston Parish population that is Black is statistically significant, i.e., unlikely to be due to chance alone.

3. I also conducted a sensitivity analysis to assess whether there are plausible alternative explanations for the observed racial disparity in traffic stops and police reports. I find no evidence that behavioral or demographic differences across races in Livingston Parish are likely to explain the statistically significant racial disparities in traffic stops or police reports that my analysis shows.[45]

The numbers compiled above were compiled by the Plaintiff's consultant based on raw data from LPSO. Black people comprise 7.9% of the Livingston Parish population, and 7.3% of the adult population, while the analysis above noted 26.8% of the traffic stops were for Black people and 35.4% of the police reports were for Black people. Thus, while comprising just under 8% of the parish's population, they account for a considerably higher percentage of stops and police reports. While this information alone does not provide context to better understand the dynamics which may drive these figures, and this table alone is insufficient to prove any systemic bias, this finding is simply presented as a summation of facts which emerged from the analysis of the data that was provided, and it certainly merits further analysis. I would be interested in reviewing additional data including physical force comparisons – black v. white and search comparisons – black v. white to determine if these percentages are significantly higher than their census percentages of their portion of overall stops. Again, the dynamics of the situations are not included in the data, but this finding would warrant further analysis. This analysis including a

---

[45] Abramson, Sarah. Expert Report for Plaintiff's Attorneys in *Clark v. Hotard et al.* June 18, 2025.

timely review of the numbers is precisely, in my opinion, what the Livingston Parish policy calls for when it instructs "Each supervising officer will continually examine all areas of law enforcement action under his/her purview in an effort to discover any racial profiling."[46] Based upon my previous experience leading a law enforcement agency that complied racial profiling statistics each year in compliance with requirements set by the state, it would appropriate to view and analyze this data to ensure officers are following the policy. Merely compiling numbers and filing them away without any thoughtful analysis or auditing serves no purpose, nor does it serve the purpose intended by the policy, which is an examination in an effort to discover any racial profiling.

---

[46] LPSO000021.

BUSKEN REPORT – CLARK V. HOTARD ET AL.

## V.    <u>REFERENCES</u>

Desmoulin, Geoffrey T., Marc-André Nolette, and Theodore E. Milner. "Preventative Measures to Reduce Incidence of Handcuff Neuropathy." *Journal of Forensic Biomechanics* 14, no. 6 (November 2023): Article 1000464.

*Hughey v. Easlick*, No. 20-1804 (6th Cir. 2021).

International Association of Chiefs of Police. Model Policy: Transportation of Prisoners. Washington, D.C.: IACP, 2015. https://www.theiacp.org/system/files/migrated/TransportationofPrisonersPolicy.pdf.

Louisiana Commission on Law Enforcement and Administration of Criminal Justice. "Requirements." 2016–2024. Accessed June 10, 2025. https://lcle.la.gov/programs/post/post-inservice-training-requirements/.

Louisiana Revised Statutes § 32:398.10(E).

New Orleans Police Department. *Chapter 1.3.1.1: Handcuffing and Restraint Devices*. Effective May 10, 2020. https://nola.gov/nola/media/NOPD/Policies/Chapter-1-3-1-1-Handcuffing-and-Restraint-Devices-EFFECTIVE-5-10-20.pdf.

Objectively Reasonable. "When Can Handcuffing Be Considered Excessive Force?" August 2, 2021. https://www.objectivelyreasonable.com/2021/08/02/when-can-handcuffing-be-considered-excessive-force/.

"The Rap Sheet on Restraints." The Verdict, no. 174 (Fall 2022): 54. https://gtdscientific.com/wp-content/uploads/2022/08/GTDScientific_TLABC_The-Verdict_Issue174_Content-R6-53-55.pdf.

## VI.    <u>DOCUMENTS AND RECORDINGS REVIEWED</u>

Abraham, Sarah. Expert Report Prepared for Plaintiff's Counsel in *Clark v. Hotard et al*. June 18, 2025.

Approved Incident Report, W. Baton Rouge Sheriff, Defendants' Response 601.

Dashcam video and audio recording of Mr. Clark's arrest.

Transcript of Deposition of Mr. Alexander Clark, dated February 26, 2025, with accompanying exhibits.

BUSKEN REPORT – CLARK V. HOTARD ET AL.

Transcript of Deposition of Deputy Calvin Bowden, dated December 9, 2024, with accompanying exhibits.

Transcript of Deposition of Deputy Jean Hotard, dated December 9, 2024, with accompanying exhibits.

Transcript of Deposition of Sergeant Sydney McCullough, dated February 26, 2025, with accompanying exhibits.

Transcript of Deposition of Captain John Gillespie, dated August 26, 2024, with accompanying exhibits.

Discovery records stamped LPSO000048 through LPSO000060.

First Amended Complaint, Dkt. 89, dated December 4, 2023.

Ruling and Order, Dkt. 136, dated October 1, 2024.

**VII.    <u>ATTACHMENTS</u>**

Exhibit A – Curriculum Vitae

Exhibit B – Previous Testimony

Exhibit C – Fee Schedule

BUSKEN REPORT – CLARK V. HOTARD ET AL.

# EXHIBIT A

BUSKEN REPORT – CLARK V. HOTARD ET AL.

## <u>CURRICULUM VITAE</u>

### DANIEL J. BUSKEN

MPA
MBA – CRIMINAL JUSTICE SPECIALIZATION
FBI-NATIONAL ACADEMY GRADUATE
CHIEF OF POLICE (RET.)
POLICE PRACTICES EXPERT SERVICES – CONSULTANT
13311 Newby Plantation Ln.
Athens, AL 35613
903-456-1313
E-Mail – info@chiefdanbusken.com
Website – chiefdanbusken.com



BUSKEN REPORT – CLARK V. HOTARD ET AL.

## POLICE PRACTICES EXPERT EXPERIENCE

Retained as a police practices expert by both plaintiffs and defendants.
Provide testimony in pre-trial depositions and/or at trial in litigation for cases in federal and state courts, or through an administrative agency.
Litigation Consultant - work with attorneys to analyze and confidentially report on relevant factual issues requiring special expertise, either before or after litigation commences.
Provide written reports when required.

## QUALIFICATIONS AND EXPERIENCE - POLICE PRACTICES

**POLICE ADMINISTRATION**
**POLICY, PROCEDURES, STANDARDS**
**INTERNAL INVESTIGATIONS & DISCIPLINE**
**POLICE USE OF FORCE**
**POLICE PURSUIT & EMERGENCY VEHICLE OPERATION**
**POLICE DUTY TO PROTECT**
**NEGLIGENCE**
**CIVIL RIGHTS**
**WRONGFUL DEATH**
**911 CALL RESPONSE**
**DOMESTIC & FAMILY VIOLENCE**
**POLICE RESPONSE & RESPONSE INVOLVING MENTAL ILLNESS**
**ARREST, DETENTION, SEARCH & SEIZURE**
**EXCITED DELIRIUM & RESTRAINT ASPHYXIA**
**AMERICANS WITH DISABILITIES ACT**
**DISCRIMINATION REGARDING EMPLOYMENT & ENFORCEMENT**

## LAW ENFORCEMENT CONSULTANT EXPERIENCE

City of Palestine, TX.         Limited Assessment of Police Department (2014).
Interviewed several police department employees, elected officials, and community members regarding the comprehensive operation of the police department. Prepared written document for the city manager and elected officials to consider prior to the selection of the next police chief.

City of Del Rio, TX.          Assessment Board Member/Chief of Police (2021).
City of Sherman, TX.         Assessment Board Member/Assistant Police Chief (2014).
City of Marshall, TX.         Assessment Board Member/Chief of Police (2014).
City of Shrewsbury, MO.     Assessment Board Member/Sergeant (2009).
Interviewed and assessed several candidates for promotion. Completed written assessment materials for the chief of police to consider prior completing the promotion process.

BUSKEN REPORT – CLARK V. HOTARD ET AL.

## EMPLOYMENT HISTORY

**CIVILIAN ADMINISTRATOR/INTERIM CHIEF OF POLICE**
Del Rio Police Department
Del Rio, TX.
May 2021 – September 2021

**INTERIM CHIEF OF POLICE**
Argyle Police Department
Argyle, TX.
September 2019 – January 2020

**CHIEF OF POLICE**
Greenville Police Department
Greenville, TX.
2010 – 2019

**CHIEF OF POLICE**
Madison Police Department
Madison, AL.
2000 – 2009

**CHIEF OF POLICE**
Crystal City Police Department
Crystal City, MO.
1993 – 2000

## EMPLOYMENT HISTORY (Continued)

**POLICE OFFICER – FIELD TRAINING OFFICER - INVESTIGATOR – FIELD COMMANDER**
University City Police Department
University City, MO.
1983 – 1992

## DUTIES AND RESPONSIBILITIES AS A CHIEF OF POLICE (Summary)

Led the Accreditation/Recognition process to ensure police department was in compliance with all applicable standards. Overall department leadership responsibility. Specific project management responsibility. Preparation of monthly and yearly progress reports detailing crime, enforcement, and prevention efforts. Policy and procedure review, development, and compliance. Quality control. Program development. Constant crime and trend analysis. Compliance with Federal, State, and Local regulations. Community and media relations. Budget and grant administration. Resource management and optimization. Employee relations,

BUSKEN REPORT – CLARK V. HOTARD ET AL.

discipline, training, and development. Strategic planning and focus for an environment that is constantly changing.

## POLICE DEPARTMENT POLICY AND PROCEDURE DEVELOPMENT - COMPLIANCE EXPERIENCE

Served as a municipal police officer for 35 years including 25 years as a chief of police.
Responsible for development of and compliance with progressive law enforcement policies and procedures.
Served on the Board of Directors of the Texas Police Chiefs Recognition Program. This program includes on-site audits and sets the standards for progressive and professional law enforcement practices throughout the State of Texas.
Directed research and development of many police department policies including:
Use of Force, De-escalation and Alternatives, TASER, Pursuit, Emergency Vehicle Operation, Crime Prevention, Recruitment, Canine Operations, Narcotics Enforcement, Tactical, Emergency Response, and Negotiations, Domestic Violence, Jail – Housing of Prisoners, Arrest, Detention, Search and Seizure.

## EDUCATION & PROFESSIONAL DEVELOPMENT

**Northcentral University** – MBA, Criminal Justice Specialization, 2014
**St. Louis University** – Master of Arts Degree, Public Administration, 1994
**Culver-Stockton College** – Bachelor of Science Degree, Business and Economics, 1983
**FBI National Academy** - Management & Leadership Training, 1996

## ADVANCED MANAGEMENT AND OPERATIONAL TRAINING:
IACP - Administering the Small Law Enforcement Agency
IACP - Professional Policies and Procedures for Modern Law Enforcement
FBI Law Enforcement Executive Development – 2003, 2006
Force Science Institute - Certification as a Use of Force Analyst, 2016
Americans for Effective Law Enforcement (AELE) – The Investigation, Management, and Use of Lethal and Less Lethal Force, 2021
Force Science Institute - Realistic De-escalation Instructor Course, 2020
Management and leadership training through various Police Chiefs Associations
FEMA Incident Command Training
Master Peace Officer Certification – Texas
Police Officer Certification – Alabama
Police Officer Certification – Missouri
Over 5,000 total hours of training and education according to TCOLE records – 2023

## ADDITIONAL TRAINING (SUMMARY)

BUSKEN REPORT – CLARK V. HOTARD ET AL.

Developing Policies and Procedures (1995), Community Oriented Policing & Problem Solving (1995), Physical Performance Standards for Law Enforcement, (1996), Workplace Harassment Prevention (1997), FBI Uniform Crime Reporting (1998), Police Records Management (1998), Police Leadership (1999), Organizational Transformation (1999), FBI Executive Development Seminar (2000), Drugs of Abuse (2001), Integrity Issues (2001), Racial Profiling Issues (2001), Mediation & Race Relations (2001), Ethics (2002), Employee Performance Appraisal (2003), Mediation and Conflict Management (2004), Commander's Role in Critical Incidents (2005), WMD Awareness for the Law Enforcement Executive (2005), Defensive Driving (2005), Asset Forfeiture (2006), Police Management (2007), Ethics and Police Executives (2007), G300 – Intermediate ICS (2007), G-400 Advanced ICS (2007), Liability Issues: Reducing Risk in Law Enforcement (2008), Legal Training for Supervisors (2008), Effective Strategies for Dealing with Mental Illness (2011), FEMA IS 700 Series Training (2012), TASER Use of Force, Risk

## ADDITIONAL TRAINING (SUMMARY - CONTINUED)

Management and Legal Strategies Seminar (2012), Sexual Harassment Training (2013), Officer Involved Shootings (2015), Domestic Violence (2015), Force Encounters Analysis: Understanding Human Performance During Critical Incidents (2015), Courtroom Testimony for Expert Witnesses (2019), Hazmat First Responder Awareness (2019), Civilian Interaction (2019), Advanced Defensive Driving Tactics (2019), Police Officer Anti-Bias (2019), Crowd Control (2019), Ambush Awareness & Preparation (2019), De-escalation and Minimizing Use of Force (2019), Legislative Legal Update (2019), AELE Webinar - Metallic Handcuffs, (2020), AELE Webinar - Distraction Devices, (2020), AELE Webinar - Law Enforcement Use of Force Accountability (2020), LEXIPOL Webinar – Duty to Intercede, (2020), Daigle Law Group (DLG) Use of Force Summit (2020), LEXIPOL Webinar – Use of Force – Policy or Tactics? (2021) – 87th Legislative Session Law Update, Advanced Human Trafficking, Use of Force Refresher, Legal Issues for Use of Force Instructors, Active Attack Event Response Leadership, Arrest, Search & Seizure, Civilian Response to Active Shooter Events Instructor, Use of Force in a Jail Setting, Daigle Law Group (DLG) Use of Force Summit, (2023), Texas Police Chiefs Annual Training Conference, (2024)

## AWARDS AND RECOGNITION

Texas Police Chiefs Association Recognition/Accreditation (2014 & 2018)
Innovation Award from Texas Police Chiefs Association (2012 & 2017)
Finalist for the Public Safety Award – Texas Municipal League (2012)
Finalist for the Webber Seavey Award for Quality in Law Enforcement – IACP/Motorola (2012)
Semi-Finalist for the Webber Seavey Award for Quality in Law Enforcement – IACP/Motorola (2014)
First Place Award – Texas Association of Municipal Information Officers (2012)
Agent of the Month Award – North County Municipal Enforcement Group (1989)
Medal of Commendation – Fraternal Order of Police (1986)
Police Commendation – Greenville, TX. (2014)
Certificate of Merit – Greenville, TX. (2017)

BUSKEN REPORT – CLARK V. HOTARD ET AL.

## PUBLICATIONS
"Lifesaving Audits – Auditing Police Patrol Vehicle Speeds." Summer, 2017 Issue of _Texas Police Chief Magazine,_ (co-author).

## PRESENTATIONS
"Police Excessive Force Litigation -The Supreme Court's Plumhoff Decision - Implications of Brown and Garner," Birmingham, Alabama Bar Association CLE, April 2015.

"Examining Police Use of Force Incidents," Greenville, TX., 2015.

"Investigating Civil Rights Violations by Law Enforcement." Inner Circle of Investigators (ICI), Educational Conference, Birmingham, AL., 2017.

## PROFESSIONAL MEMBERSHIPS & AFFILIATIONS (PAST AND PRESENT)
International Association of Chiefs of Police (IACP)  /  FBI National Academy Associates (FBINA) / Texas Police Chiefs Association / North Texas Police Chiefs Association / Alabama Police Chiefs Association  (AACOP) /  Missouri Police Chiefs Association (former Region I Vice-President)  / Family Violence Council  /  Rotary International  /  YMCA Board of Directors  /  Non-Traditional Learning Advisory Board  /  Chamber of Commerce  /  Partnership for a Drug-Free Community Board of Directors  /  President of the Board of Directors for Madison's Drugs Offer No Tomorrow Program (DON'T) /  Founding Member of Madison Police Foundation  /  Children's Advocacy Center Board / Drug-Free Greenville / Knights of Columbus / Chamber of Commerce Leadership Program  /  Texas Police Association (TPA)  /  Texas Municipal Police Association (TMPA)

BUSKEN REPORT – CLARK V. HOTARD ET AL.

# EXHIBIT B

BUSKEN REPORT – CLARK V. HOTARD ET AL.

## **PREVIOUS TESTIMONY – DANIEL J. BUSKEN**

Nia Mills v. William Allen Connelly, et al.
3:22-CV-00193- United States District Court – Middle District of Louisiana
Deposition – June 16, 2025

State of Alabama v. Luther Bernard Watkins, Jr.
63-CC-2019-002416.00 - Circuit Criminal Court - Tuscaloosa County, Alabama
Hearing - May 1, 2025

The Estate of Herman Whitfield, III v. The City of Indianapolis, Steven Sanchez, Adam Ahmad,
Matthew Virt, Dominique Clark, Jordan Bull, and Nicholas Mathew
1:22-cv-01246-SEB-MJD - United States District Court - Southern District of Indiana –
Indianapolis Division
Deposition April 7, 2025

State of New Hampshire v. Matthew Millar
217-2024-CR-00071 – Merrimack Superior Court
Deposition January 27, 2025

Diver v. Samaniego
2:23-CV-00005 - United States District Court – Northern District of Alabama – Southern Division
Deposition January 24, 2025

Tony Juraska v. Town of Wolcott, et al
X03 HHD-CV22-6153551-S – Connecticut Superior Court – Hartford
Deposition August 23, 2024

Frances Sorrell v. Jaquarious Lockhart and Dylan Harmon
12-CV-2022-900031.00 – Circuit Court – Chambers County Alabama
Deposition August 20, 2024

Edward Jones v. Fred Sloss, et al.
5:21-cv-00397 – United States District Court – Northern District of Alabama
Deposition June 21, 2024

Shavonda Brooks v. Brian Kahrs, Cherie' Blanchard, Joseph Lopinto
2:21-cv-02280 - United States District Court - Eastern District of Louisiana
Deposition February 20, 2024

Charisma Hannibal v. Sharmayne Ivory
4:22-cv-01330 - United States District Court – Southern District of Texas – Houston Division
Deposition December 14, 2023

BUSKEN REPORT – CLARK V. HOTARD ET AL.

**PREVIOUS TESTIMONY – DANIEL J. BUSKEN** (Continued)

Joe Gonzales v. United States of America, and United States Marshals Service
2:22-cv-00062 – United States District Court – Southern District of Texas
Deposition November 14, 2023. Trial – June 2, 2025.

John Mark Raudelunas v. City of Vallejo, Officer Jodi Brown
2:21-cv-00394 - United States District Court - Eastern District of California
Deposition September 19, 2023

Edward Johnson v. Brian Smith, Josh Stallons, and Edward Eastman
5:21-cv-00187-GNS-LLK – United States District Court – Western District of Kentucky
Deposition June 16, 2023

Jarrett Johnson v. City of Houston
2022-20647-215th District Court of Harris County, Texas
Deposition March 31, 2023

Bryan A. Harrison v. St Johns County Sheriff's Office, et. al.
3:21-cv-746 – United States District Court – Middle District of Florida – Jacksonville Division
Deposition – February 9, 2023

Raynaldo Markeith Sampy, Jr. v. Jonathan Price Rabb et.al.
6:19-cv-00580 – United States District Court – Western District of Louisiana – Lafayette Division
Deposition – February 6, 2023. Trial – December 20, 2023.

Douglas C. Martinson, II, as the personal representative of the estate of Jeffrey Parker, deceased. v. William Darby, City of Huntsville.
5:20-CV-00430-LCB - United States District Court - Northern District of Alabama - Northeastern Division
Deposition – September 28, 2022

Platt et al. v. Bernalillo County et al.
D-202-CV-2019-06285 – Second Judicial District Court – State of New Mexico - County of Bernalillo
Deposition – March 18, 2022. Trial – February 7, 2024.

Pettit v. Village of Granville.
2:18-cv-01718 – United States District Court – Southern District of Ohio
Deposition – January 20, 2022

BUSKEN REPORT – CLARK V. HOTARD ET AL.

**PREVIOUS TESTIMONY – DANIEL J. BUSKEN** (Continued)

Kimberly D. Ervin, as personal representative of Candi Jean Ward, deceased v. The City of Anniston, a municipal corporation in the State of Alabama, Daniel Price, individually and officially, Dustin Handling, individually, et al.

2016-CV-900205.00 - Circuit Court of Calhoun County, Alabama
Deposition - September 26, 2019

Mickey Crow Plaintiff, vs. City of Gadsden, Alabama et al., Defendants.
2017-CV-900918-CDR - Circuit Court of Etowah County, Alabama
Deposition - October 11, 2019

Don Prince and Carolyn Prince, Adoptive Parents of Brian C. Prince v. Chris Viesselman
1816-CV33631 - Circuit Court of Jackson County, Missouri – Kansas City
Deposition - December 18, 2019

BUSKEN REPORT – CLARK V. HOTARD ET AL.

# EXHIBIT C

BUSKEN REPORT – CLARK V. HOTARD ET AL.

04/2024

### DANIEL J. BUSKEN

POLICE PRACTICES CONSULTANT
&
EXPERT WITNESS SERVICES
13311 Newby Plantation Ln.
Athens, AL. 35613
903-456-1313
Website – chiefdanbusken.com
E-Mail – info@chiefdanbusken.com

### FEE SCHEDULE

**RETAINER - $3,250.00**
Non-refundable case preparation and review fee. Includes 10 hours of review, investigation, and case/report preparation @ $325.00 per hour. Additional fees are required for cases involving more time and resources.

**HOURLY RATE - $325.00**
Further case review, investigation, preparing reports, deposition preparation, travel.

**DEPOSITION - $3,000.00 - FOUR HOURS**
   (additional hours @ $375.00 per hour)

**COURT TESTIMONY - $3,500.00 PER DAY**

**SITE VISIT – (When Required) - TBD**

**TRAVEL & EXPENSES**
Reimbursement for expenses including airfare, rental car, hotel, copies, meals, mileage, etc.

Exhibit C                                                                                              41

# 2025.06.18 - Busken Report - Clark v Hotard et al

Final Audit Report                                                   2025-06-18

| | |
|---|---|
| Created: | 2025-06-18 |
| By: | Najia Zahir (najia.zahir@splcenter.org) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAYWLCWmfdBkFl7txGjVrXbaRyxOiYkYll |

## "2025.06.18 - Busken Report - Clark v Hotard et al" History

📄 Document created by Najia Zahir (najia.zahir@splcenter.org)
2025-06-18 - 9:36:24 PM GMT

✉️ Document emailed to Daniel Busken (info@chiefdanbusken.com) for signature
2025-06-18 - 9:36:35 PM GMT

📄 Email viewed by Daniel Busken (info@chiefdanbusken.com)
2025-06-18 - 9:41:29 PM GMT

✍️ Signer Daniel Busken (info@chiefdanbusken.com) entered name at signing as Daniel J. Busken
2025-06-18 - 9:49:31 PM GMT

✍️ Document e-signed by Daniel J. Busken (info@chiefdanbusken.com)
Signature Date: 2025-06-18 - 9:49:33 PM GMT - Time Source: server

✅ Agreement completed.
2025-06-18 - 9:49:33 PM GMT

**Adobe Acrobat Sign**

Exhibit B to Declaration of Chief Daniel Busken:
Rebuttal Expert Report of Chief Daniel Busken

# REBUTTAL
## EXPERT WITNESS REPORT
## REVIEW OF MATERIALS AND OPINIONS

## ALEXANDER CLARK

### v.

## DEPUTY JEAN HOTARD, ET AL.

## Case NO. 03:22-CV-326-JWD-RLB

### UNITED STATES DISTRICT COURT

### MIDDLE DISTRICT OF LOUISIANA

July 18, 2025

Prepared for:

Attorneys for Alexander Clark
Southern Poverty Law Center
Social Justice Legal Foundation
ACLU of Louisiana

*Daniel J. Busken*  7/18/2025
Daniel J. Busken

BUSKEN <u>REBUTTAL</u> REPORT – CLARK V. HOTARD ET AL.

July 18, 2025

Attorneys for Alexander Clark
Southern Poverty Law Center
Social Justice Legal Foundation
ACLU of Louisiana

RE:    Expert Opinions of Daniel J. Busken

      I am providing this rebuttal report following your request that I review the report of C. Scott Courrege that was submitted related to this case: **ALEXANDER CLARK v. DEPUTY JEAN HOTARD, ET AL.** - a civil rights case related to alleged violations of state and federal law committed during a traffic stop on May 24, 2021. Plaintiff Alexander Clark initially sued the Livingston Parish Sheriff's Office (LPSO) and several individual Defendants. The current defendants include Jean Hotard, Calvin Taylor Bowden, Jason Ard, Sydney McCullough, J. Shannon Womack, and the City of Denham Springs. This incident occurred at 222 South Florida Avenue within the city limits of Denham Springs, Louisiana.

      In his report, Mr. Courrege provides his opinions regarding pretext traffic stops. Police officers learn through training that cases such was *Wren*[1] allow officers to use minor violations as a pretext for investigating other potential criminal activity. Officers also learn that once the traffic violation is addressed, any additional detention must be justified through additional reasonable suspicion developed during the stop. As long as officers have a articulable suspicion

---

[1] Whren v. United States 517 U.S. 806 (1996). Accessed July 16, 2025 from: https://supreme.justia.com/cases/federal/us/517/806/

BUSKEN <u>REBUTTAL</u> REPORT – CLARK V. HOTARD ET AL.

or probable cause to believe that a traffic violation occurred, they may stop any vehicle to investigate the circumstances surrounding the traffic violation, however, officers learn that extending the detention without additional reasonable suspicion of criminal activity is not justified.

Deputies Hotard and Bowden both claimed they detected the odor of marijuana which they used as their basis to continue the traffic stop. Mr. Clark denies using marijuana and alleges racial bias contributed to extending the traffic stop. No realistic or legitimate law enforcement training would ever allow an officer to believe they were justified in extending the duration of a traffic stop based upon impermissible reasons such as the race of the person stopped or any related demographics.

Mr. Clark denies any traffic violation occurred.[2] If Mr. Clark is correct, then Deputy Hotard would not have had reasonable cause to believe any traffic violation occurred. If Deputy Hotard is correct, that a traffic violation occurred, then the searches that occurred following Hotard allegedly smelling the odor of marijuana would be justified. Apparently, this issue was not resolved at Mr. Clark's previous trial. The record from this trial does not indicate Mr. Clark was convicted for the traffic violation.

According to his report, Mr. Courrege believes the video "appears to debunk"[3] Mr. Clark's claim he did not resist arrest. I disagree. According to the video,[4]

- Deputy Bowden is applying a handcuff to Mr. Clark's left wrist.

- Deputy Hotard has his arms securing Mr. Clark's right arm behind Clark's back.

---

[2] Alexander Clark Trial, P. 6, Opening statement from Mr. Clark's attorney, "…there was no actual traffic violation."
[3] Courrege Report, P. 10.
[4] *Video 5_2021-05_24_23_48-00_LELLIS.avi*, 02:34-02:35

3

BUSKEN <u>REBUTTAL</u> REPORT – CLARK V. HOTARD ET AL.

- Mr. Clark is bent forward with the momentum from this position, rather than resistance, forcing him to move forward.

- Deputy Hotard changes his grip and Hotard moves his hand to Mr. Clark's upper arm, which coincides with Clark's right arm are moving forward. I attribute this movement to the momentum of the event and Deputy Hotard changing his grip, as opposed to active resistance.

Additionally, according to the trial transcript, the judge said, "Really on the resisting I have some doubt on that as to the amount of resistance that he did, so I find him not guilty of that, but I find him guilty of obstruction of justice."[5] Mr. Courrege believes these deputies used restraint during Mr. Clark's arrest, since they did not take Clark to the ground.[6]

Officers receive training regarding the force continuum. The continuum instructs officers on force options, which is generally a range between minimal force to deadly force. The option officers use must be reasonable as opposed to strictly following the continuum. Mr. Clark appears to be an older black male who limped based upon what I saw in the video. Therefore, in my opinion, the two officers (joined by a third officer) had other options including verbal commands, persuasion, and leverage/control that would have been appropriate prior to elevating the use of force to a takedown.

Mr. Courrege also provided an opinion regarding the allegation Officer McCullough choked Mr. Clark. Courrege identifies two types of recognized neck restraints, respiratory and vascular, which officers are trained upon. These two trained maneuvers are very different from

---

[5] Clark Trial Transcript, P. 42.
[6] Courrege Report, P. 17.

BUSKEN <u>REBUTTAL</u> REPORT – CLARK V. HOTARD ET AL.

what a non-trained civilian may experience. Mr. Clark alleges he was "being choked by that woman," (Officer McCullough).[7] While the video does not show Officer McCullough apply pressure to the side of Clark's neck or throat, <u>her body conceals her hand during a portion of her contact with Mr. Clark's neck.</u>[8] Mr. Courrege agrees "her elbow is near the back of his neck and her hand is near his shoulder," and "In my experience, a choke hold simply cannot be performed from the back of the neck with one hand as alleged."[9] Despite Mr. Courrege's experience, Mr. Clark, who has not been trained regarding traditional law enforcement neck restraints, believes he was choked <u>and the entire event is not captured on the video</u>. Mr. Clark was clearly in a vulnerable position – bent over with his hands being forced behind his back. Officers learn through training that using more force than is reasonable to apply handcuffs, as in this case pressure applied to Mr. Clark's neck, can lead to allegations of excessive force. I was not a witness to this event, nor was Mr. Courrege. We both only viewed the event on video – video that is limited due to the position of Officer McCullough. Whether Mr. Clark experienced Officer McCullough's arms and hands on his body and determined this was an attempt to choke him comes down to his testimony.

Mr. Courrege commented on disproportionate number of stops involving Black individuals relative to their proportion of the overall Livingston Parish population, which is detailed in the report prepared by Sarah Abraham. Mr. Courrege speculates these disproportionate numbers can be attributed to limited data provided by the LPSO and DSPD, mandates, deployment strategies, or a focus in certain areas due to crime trends or citizen-

---

[7] Clark Deposition, P. 100.
[8] *Video 5_2021-05_24_23_48-00_LELLIS.avi*, 02:36-02:42.

BUSKEN <u>REBUTTAL</u> REPORT – CLARK V. HOTARD ET AL.

reported concerns. The disproportionate numbers can also be the result of inappropriately applied pretext tactics resulting in the skewed numbers. There was nothing in the discovery documents I reviewed providing evidence of any deployment strategies, mandates, or a focus on crime in a certain area which would explain the disproportionate numbers in Dr. Abraham's findings.

Reiterating what I noted in my previous report, compiling statistics related to racial profiling – then, not following up with an audit (essentially doing nothing with the data) is worthless. DSPD Captain Gillespie testified audits were not completed in 2021, 2022, or 2023.[10]

LPSO policy prohibits racial profiling, disparate treatment of an individual on the basis of their racial or ethnic status and it is strictly prohibited by employees of the LPSO. Additionally, LPSO supervisors are  expected to continually examine areas under their purview in an effort to discover any racial profiling.[11] Racial Profiling concerns in law enforcement are nothing new. Departments  have been aware of these issues for years and have analyzed these numbers for years. LPSO should provide context for the raw number especially when the numbers are skewed. Based upon my experience with racial profiling data mandates, it would have been appropriate for LPSO to have had these numbers compiled and then analyze the data to ensure officers are following the policy. Through the discovery materials I have reviewed it is my understanding that while LPSO maintains a racial profiling policy, LPSO takes no action to implement that policy by compiling the numbers or analyzing the data. Merely compiling numbers and filing them away without any thoughtful analysis or auditing serves no purpose, nor does it serve the purpose

---

[10] Captain Gillespie Deposition, P. 71.
[11] LPSO Policy 406, LPSO 000020-21.

BUSKEN <u>REBUTTAL</u> REPORT – CLARK V. HOTARD ET AL.

intended by the policy, which is an examination in an effort to discover any racial profiling. Without further analysis the numbers speak for themselves.

Should additional information come to light, I reserve the right to amend my opinions based on additional information.