## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **ALEXANDER CLARK** | * **CIVIL ACTION NO: 3:22-cv-326-JWD-RLB** |
| | * |
| **VERSUS** | * **JUDGE: JOHN W. DeGRAVELLES** |
| | * |
| **JEAN HOTARD, ET AL** | * **MAGISTRATE JUDGE: RICHARD L.** |
| | * **BOURGEOIS** |

## REPLY MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

MAY IT PLEASE THE COURT:

Defendants, Jason Ard, Sheriff of Livingston Parish, State of Louisiana, Jean Hotard, and

Calvin Taylor Bowden ("defendants" or the "LPSO Defendants"), respectfully submit this Reply

Memorandum in Support of their Motion for Summary Judgment. Plaintiff has failed to show

that any genuine dispute of material fact precludes summary judgment in this case. Judgment in

favor of defendants is appropriate and their Motion for Summary Judgment should be granted.

**MOTION TO STRIKE DECLARATION OF MARJORIE MENZA (EXHIBIT 13)**

As an initial matter, defendants move to strike Exhibit 13 attached to plaintiff's

opposition memorandum, the Declaration of Marjorie Menza. Fed. R. Civ. P. 56(c)(2) permits a

party to "object that the material cited to support or dispute a fact cannot be presented in a form

that would be admissible in evidence." Rule 3.7 of the Louisiana Rules of Professional Conduct

states that "[a] lawyer shall not act as advocate at trial in which the lawyer is likely to be a

necessary witness unless: (1) the testimony relates to an uncontested issue; (2) the testimony

relates to the nature and value of legal services rendered in the case; or (3) disqualification of the

lawyer would work substantial hardship on the client."

Here, plaintiff is being represented by Ms. Menza. In opposition to summary judgment,

she has submitted a 3-page sworn declaration that contains 11 substantive paragraphs of

1

testimony related to this action. This testimony is submitted as affirmative evidence in support of plaintiff's claims. For example, Ms. Menza details conversations she had with undersigned counsel regarding the means in which the Livingston Parish Sheriff's Office stores its data, how that data is searched, how traffic citations are logged, and authenticating records, among other things.

In his opposition, plaintiff cites to Ms. Menza's testimony as affirmative evidence which he argues supports his claims. For example, plaintiff argues that

> "[W]hen asked about a data set that was broken down by race, counsel for Defendant LPSO could not produce those statistics without onerous work searching and redacting by hand. Defendant LPSO's response to Plaintiff's counsel indicated that their office had not looked at the statistics they have available for potential race-based discrimination, despite being notified that there was a racial discrimination problem in the department by Mr. Clark's complaint in the instant matter as well as his public records and discovery requests.[1]

Plaintiff cites to Ms. Menza's declaration in support of this argument. Thus, plaintiff is attempting to use information contained in Ms. Menza's affidavit to formally support his claims. Ms. Menza is acting beyond the role of an advocate here, and is serving as a witness.

The Louisiana Rules of Professional Conduct explicitly prohibit attorneys from appearing both as a witness and as counsel in the same proceeding. "The primary objective for the advocate-witness rule is the protection of the fact-finding process." *In re Moye*, 2010 WL 4809322, n. 15 (S.D. Tex. 2010). "[The] adversary system works best when the roles of the judge, attorneys, and of the witnesses are clearly defined. Any mixing of those roles inevitably diminishes the effectiveness of the entire system." *Id.*, *citing* Robert P. Schuwerk & John F. Sutton, Jr., A Guide to the Texas Disciplinary Rules of Professional Conduct § 3.08(1990); *Cottonwood Estates v. Paradise Builders*, 128 Ariz. 99, 102, 624 P.2d 296, 300 (1981).

---

[1] R. Doc. 194, p. 32.

In *Moye*, *supra*, the court struck an affidavit of an attorney for one of the parties which provided substantive evidence, noting that it violated ethical rules which prohibit an attorney from being a witness in a case. The same is true here. Ms. Menza cannot serve as both an advocate for plaintiff and a witness. Her declaration should be stricken.

### Reply Memorandum in Support of Motion for Summary Judgment

**I.    Plaintiff makes substantial misrepresentations in his opposition that are not supported by the evidence.**

Prior to addressing the specific arguments made by plaintiff in his opposition memorandum regarding the few claims remaining before the Court, defendants feel compelled to address the numerous misrepresentations made by plaintiff in his opposition memorandum which directly contradict the evidence.

For example, plaintiff makes the brazen claim that:

> Mr. Clark suffered an injury to his hand when Defendants Hotard and Bowden aggressively restrained and handcuffed him. The injury was severe, causing Mr. Clark pain and numbness, while impairing him from conducting daily activities. Further, Mr. Clark required surgery to repair two torn ligaments in his hand.[2]

Plaintiff goes on in the opposition to state:

> Mr. Clark can show that he received treatment for a broken hook of the hamate and two ruptured tendons. He received this treatment after the excessive force put on him by the LPSO Defendants, which included when Defendant Hotard grabbed his right hand behind him as he handcuffed Mr. Clark. The excessive force from the handcuffing exacerbated the pain from the traumatic blow to Mr. Clark's palm when the officers restrained him. Indeed, the only cause of injury to Mr. Clark's hand listed in his medical records is the reckless handcuffing by Defendant Hotard.[3]

In support of these contentions, plaintiff cites to Dr. Garon's deposition at page 20:9-18, where Dr. Garon simply states that plaintiff experienced "a fracture of the hook of the hamate . . . which

---

[2] R. Doc. 182-2, p. 21, citing plaintiff's own deposition testimony.
[3] R. Doc. 185-2, p. 22.

then, over time, caused some type of rubbing against the FDP tendon, causing it to fray and ultimately rupture", Dr. Garon's testimony explaining that "[t]he hook of the hamate would be very difficult to injure while you were in the act of handcuffing. It's way more common to get a direct blow to the palm of the hand, either from a fall or when someone is gripping a baseball bat or gripping a golf club," plaintiff's own deposition where he testified he had surgery after this incident, and plaintiff's medical records where he *subjectively* complained of pain following this incident.[4]

A reading of plaintiff's argument makes it appear that the evidence supports causation of plaintiff's injury/surgery from this incident. But plaintiff fails to reveal that Dr. Garon expressly and explicitly refused to causally connect plaintiff's injury with this incident. In fact, Dr. Garon rendered the opinion that plaintiff's injury, more likely than not, was caused by something other than this incident. To that end, Dr. Garon testified as follows:

> Q      . . . Can you say or do you know -- do you have an opinion regarding whether or not a fracture of the hook of the hamate could be caused by handcuffs being put on someone's wrist?
>
> A      That has been a little bit peculiar in this case. I'm not aware of anywhere in the literature where the act of handcuffing anyone would lead to a hook of the hamate fracture. The hook of the hamate is actually toward the inside of the palm and would be very difficult to injure while you were actually in the act of handcuffing.
>
> * * * * *
>
> Q.      . . . Are you able to render an opinion that more likely than not Mr. Clark's fracture of his hook of the hamate came from handcuffs being applied too tight?
>
> A      Let me make sure I've got that right. You're asking me if, more likely than not, the handcuff caused the fracture?
>
> Q      Correct.

---

[4] R. Doc. 185-194-18, p. 20:9-18.

A       I would say that's a false statement.

Q       So you would render the opinion of the opposite, right, that more likely than not handcuffing would not have caused the fracture, correct?

A       Correct.

Q.      Mr. Clark, obviously -- you know, in the process of being handcuffed, officers grabbed his hands and wrist to bring them behind his back. Would you be able to say whether or not that type of movement could have caused a fracture in the hook of the hamate?

                              * * * * *

A.      Like I said, it usually takes – to get to the hook of the hamate, it takes a direct blow to a very specific area in the palm. I think it would be unlikely to occur in that situation.

Q.      So then I'm going to ask the same questions again. You are unable to render the opinion that more likely than not grabbing of Mr. Clark's hands and wrists would have caused a fracture of the hook of the hamate, correct?

A.      Correct.

                              * * * * *

Q.      And in fact, you would render the opposite opinion. And that is that more likely than not, the grabbing of Mr. Clark's hands and wrist would not have caused the fracture of the hook of the hamate, correct?

                              * * * * *

A.      Correct.[5]

Thus, despite detailed and specific testimony from Dr. Garon specifically rejecting any causal link between this incident and plaintiff's injury, plaintiff argues the contrary in his opposition and insinuates that Dr. Garon related the injury.

        Similarly, plaintiff mischaracterizes the testimony and opinions of his own expert. Specifically, plaintiff claims that "LPSO intentionally discriminates against Black people and did

---

[5] Additional excerpts from the Deposition of Dr. Mark Garon, attached hereto as Exhibit F, p. 20:19-23:17

so against Mr. Clark," claiming that "a Black person driving in any part of Livingston Parish in 2020 or 2021 was nearly five times as likely to be stopped and ticketed by the deputies of LPSO."[6] To "support" this claim, plaintiff cited to pages 5 and 7 of the declaration and report of its expert, Sarah Abraham (R. Doc. 194-8).

However, Dr. Abraham did not, and could not, render the opinion that "a Black person driving in any part of Livingston Parish in 2020 or 2021 was nearly five times as likely to be stopped and ticketed by the deputies of LPSO." This is because Dr. Abraham did not review data relative to all traffic stops by LPSO in 2020 and 2021. Rather, the data reviewed by her was *very, very* limited. She reviewed data from traffic stops in 2020 and 2021 that included one of four offenses: License Plate Light Required, Switched License Plate, View Outward or Inward through Windshield/Window, and Failure to Signal, which she obtained by public records request from the clerk of court.[7] She additionally reviewed reports produced by the Criminal Patrol Division only (5 deputies) during this discovery in litigation which resulted from traffic stops for ten different offenses: License Plate Light Required, Switched License Plate, View Outward or Inward through Windshield/Window Failure to Signal, Improper Lane Usage, False Motor Vehicle Inspection Certificate, Headlights Required, Stop Sign/Yield Sign, Taillights Required, and Motor Vehicle Inspection Certificate Required.[8] Notably, this was **not** data regarding all stops for these offenses, but only stops which resulted in a report, which the expert knew to mean that the stop escalated in charges beyond that for which the person was stopped.[9] Thus, the expert understood that this was not data relative to all traffic stops, only those which resulted in additional charges.

---

[6] R. Doc. 194, p. 3.
[7] R. Doc. 194-8, p. 8, n. 11.
[8] R. Doc. 194-8, p. 9, n. 13.
[9] R. Doc. 194-8, p. 9.

In her deposition, the expert recognized these limitations on the data she received as well. Indeed, she recognized that her opinion regarding disproportionate stops was not based on an analysis of all stops made by LPSO, but only for those four offenses.[10] In fact, she testified under oath, "I do not have data all traffic stops that were conducting [sic] in Livingston Parish for that time."[11]

Similarly, although in her report she claimed that her " analysis of LPSO police report data from 2020 and 2021 produced in this matter similarly shows a disproportionate number of police reports for Black people relative to the size of the Black population in Livingston Parish," she agreed in her deposition that she could not possibly render that opinion relative to all police reports because her data was limited to only 5 deputies and 10 offenses.[12] Again, she was clear that she did "not have data to make an statistical assessment on all police reports generated by LPSO" and that she could not possibly, with the data she was provided, render such an opinion.[13]

Further, Dr. Abraham "didn't perform an analysis to make an assessment for any other candidate explanations for the disparity [she] identify in [her] report."[14] Indeed, she did not consider whether those stopped were non-residents of Livingston Parish, such as would travel on the highly trafficked Interstate 12 which passes through the Parish.[15] Nevertheless, she agreed it was completely possible that people from outside Livingston Parish would be driving vehicles in the parish and receive citations.[16]

Next, plaintiff's opposition seems to attribute racist motives to Deputy Bowden when he provided no such thing. In discussing his Title VI claim, plaintiff argues:

---

[10] Excerpts of the Deposition of Dr. Sarah Abraham, attached hereto as Exhibit G, pp. 37:12-38:3.
[11] Exhibit G, p. 38:12-15.
[12] Exhibit G, p. 68:15-69:3.
[13] Exhibit G, p. 68: 20-69:3.
[14] Exhibit G, p. 40:2-8.
[15] Exhibit G, p. 40:9-19.
[16] Exhibit G, p. 41:19-23.

> When asked directly if he felt the LPSO officers were being racist Mr. Clark replied that he believed they were asking questions about where the crack was in Mr. Clark's truck, which he believed to "[b]ecause they figure black people – all black people do drugs and everything." His account is backed up by the audio recording of the encounter, as well as Deputy Bowden's own testimony at deposition and admissions later in discovery.[17]

Once again, plaintiff is making it appear that the evidence supports something that it does not; specifically that Deputy Bowden's testimony and responses to requests for admission "backed up" Mr. Clark's statement that deputies believe "all black people do drugs and everything." To be clear, Deputy Bowden never said or even insinuated any such thing and the only person in this entire litigation who has even suggested a linkage between drug use and the Black population is plaintiff himself.

The deposition testimony cited by plaintiff merely shows that Deputy Bowden was singing a song with a lyric containing "Give me some crack" on the night of the incident.[18] He said nothing about race or drug use by the Black population either on the night of this incident or in deposition. Plaintiff's attempt to attribute these ideas to Deputy Bowden, much like the other mischaracterizations of evidence, should be rejected.

Defendants raise all of these issues to show that, when plaintiff claims "a Black person driving in any part of Livingston Parish in 2020 or 2021 was nearly five times as likely to be stopped and ticketed by the deputies of LPSO," and supports that statement with opinions from Dr. Abraham, he is mischaracterizing the evidence and distorting what the evidence actually shows. At best, Dr. Abraham's data supports her conclusions regarding traffic stops for only 4 specific offenses and her conclusions regarding reports for 5 deputies and 10 limited offenses.

---

[17] R. Doc. 194, pp. 27-28.
[18] R. Doc. 194-5, p. 125.

Absolutely nothing in the record—no evidence, opinions, testimony, or data—even remotely support the conclusion proffered by plaintiff. Indeed, nothing even remotely speaks to statistics regarding all of LPSO's stops of Black residents in relation to the Black population of the Parish, citing Black residents in relation to the Black population of the Parish, or the generation of reports regarding Black residents in relation to the Black population of the Parish. Rather, the supporting data is extremely limited in both scope of deputies and offenses. Plaintiff's representation in his opposition that the evidence demonstrates racial bias is simply not correct.

Plaintiff also continuously makes reference to actions taken by deputies that he at least insinuates were violative of his rights or support his claim for racial discriminations. That is, throughout the opposition, plaintiff continuously references a "prolonged and invasive warrantless search,"[19] and a "warrantless search of his truck"[20], yet this Court has already ruled that plaintiff cannot challenge the validity of the search.[21] Similarly, plaintiff argues that "Defendants have offered no evidence that the stop of Mr. Clark was for any reason besides racial discrimination," arguing that there is an issue of material fact as to whether there was probable cause to stop him for failing to signal and that the LPSO Defendants have not carried their "burden to prove a nondiscriminatory reason" for the stop.[22] Setting aside plaintiff's incorrect attempt to shift the burden to the LPSO Defendants to disprove plaintiff's allegations (indeed, plaintiff bears the burden of proving discrimination), again, this Court has already ruled that plaintiff cannot challenge the validity of the stop.[23]

---

[19] R. Doc. 194, p. 6.
[20] R. Doc. 194, p. 7.
[21] R. Doc. 136, p. 9.
[22] R. Doc. 194, p. 28.
[23] R. Doc. 136.

Indeed, the court has already foreclosed any argument that the stop was based on racial animus or discrimination, rather than probable cause. Specifically, the Court has explicitly ruled as follows in this case:

> Here, if Plaintiff succeeded in arguing that the stop, search, and force used during his arrest were all a result of intentional discrimination and "racial profiling" absent "any appropriate state interest", and that Defendants had "insufficient suspicion" to stop or search him, it could imply the invalidity of his stop, search, and ultimate arrest.[24]

Despite this, plaintiff continuously references a "warrantless search" and illegal stop in an attempt to relitigate these issues. Defendants do not have to carry any "burden to prove a nondiscriminatory reason" for the stop as the Court has already determined that plaintiff cannot pursue a claim that the stop was based on racial discrimination or racial profiling. Plaintiff's attempts to circumvent the Court's prior Ruling should be rejected.

Defendants respectfully ask the Court to hold plaintiff to the *evidence*, not his mischaracterization of the evidence. When the evidence is actually reviewed, it becomes abundantly clear that plaintiff's claims have zero merit. Defendants are entitled to summary judgment.

## II.    PLAINTIFF HAS FAILED TO CARRY HIS BURDEN OF OVERCOMING THE LPSO DEFENDANTS' QUALIFIED IMMUNITY.

Turning to the merits of plaintiff's opposition, plaintiff has failed to carry his burden of overcoming the LPSO Defendants' invocation of qualified immunity as it related to his excessive force claim. First, plaintiff takes issue with the LPSO Defendants' assertion that qualified immunity renders summary judgment "less rigid", claiming that this language appears nowhere in defendants' cited case, *Saucier v. Katz*, 533 U.S. 194 (2001). Defendants acknowledge that this citation was in error, but the legal principle is still very well-grounded. Indeed, though

---

[24] R. Doc. 136, pp. 9-10.

defendants incorrectly cited to *Saucier*, it was actually **this Court** which described the qualified immunity standard in this way in *Stogner v. Sturdivant*, No. CV 10-125-JJB-CN, 2012 WL 12897956 (M.D. La. July 19, 2012), *aff'd*, 515 F. App'x 280 (5th Cir. 2013). There, this Court described the qualified immunity standard as follows:

> The Supreme Court has developed a framework for analyzing cases where a defendant pleads qualified immunity. The Court has admonished that "[w]here the defendant seeks qualified immunity, a ruling on the issue should be made early in the proceedings ... where the defense is dispositive." *Saucier v. Katz*, 533 U.S. 194, 200 (2001). The privilege is an immunity from suit rather than a mere defense to liability, and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Id.* at 200-201 (internal citations and punctuation omitted). **It follows that the summary judgment standard is less rigid where the defendant pleads qualified immunity.** Denying "summary judgment any time a material issue of fact remains on the excessive force claim could undermine the goal of qualified immunity...." *Id.* at 202. Qualified immunity shields "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

*Id.* at * 3 (emphasis added). Thus, despite plaintiff's claim that this was "made-up language",[25] the language was not at all "made-up" but was admittedly incorrectly cited.

Nevertheless, plaintiff has surely failed to present evidence overcoming defendants' plea of qualified immunity. Despite plaintiff's exaggerated attempt to sensationalize this incident into something more than it was, defendants again refer to the Court to the video of this incident, which conclusively shows that no excessive force was used on plaintiff at any time by anyone.

As to the first element of the qualified immunity analysis, plaintiff was required to come forward with evidence showing that he suffered an injury that was the result of a use of force that was clearly excessive and the excessiveness was clearly unreasonable. *Manis v. Lawson*, 585

---

[25] R. Doc. 194, p. 11, n. 5.

F.3d 839, 843 (5th Cir. 2009).[26] In this case, as is depicted on the video, there is nothing excessive or unreasonable about the force used.

To be clear, the only force used in this case, as is clearly depicted in the video, is the grabbing of Mr. Clark's arms to put them behind his back for handcuffing. As defendants previously urged, there is no evidence of plaintiff being struck, punched, taken to the ground, tased, or any force other than pulling his arms behind his back for handcuffing. Plaintiff did not come forward with any evidence to refute what is depicted in the video or to show that there was some additional use of force that would support his claim. And as defendants further established, "[i]t is hornbook law that 'the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.'" *Buehler v. Dear*, 27 F.4th 969, 980–81 (5th Cir. 2022), *quoting Graham v. Connor*, 490 U.S. 386, 396 (1989); see also Fulton v. Staats, 41 N.Y. 498, 499 (1869) (Officers may "use as much force as [i]s necessary to make the arrest."). Moreover, "it is reasonable for an officer to attempt to grab a noncompliant suspect's arm in an attempt to handcuff the suspect." *Trammell v. Fruge*, 868 F.3d 332, 343 n.9 (5th Cir. 2017).

Plaintiff argues that he "did not resist the arrest, and thus there was no justification for the Defendants' use of physical force."[27] This argument is legally incorrect. Defendants had the right to arrest plaintiff which, by extension, justified physical force to apply handcuffs. This is "hornbook law." Plaintiff also cites his expert's statement that, "if the use of force that occurred during the handcuffing was not based on some reasonable threat, and it was instead based on

---

[26] Plaintiff has failed to prove even the first element of his claim; namely, an injury. As set forth above, Dr. Garon expressly rejected any notion that this incident caused his hand injury. Plaintiff also has no medical evidence to show that his hip injuries were caused by this incident. Since this case is easily dispensed with on the second two elements of the excessive force claim (use of force that is clearly excessive and the excessiveness being clearly unreasonable), defendants will not belabor the injury issue.

[27] R. Doc. 194. P . 19.

retaliation because he snatched the money back from them, I don't believe it would be appropriate to use force at that point . . ."[28] But there is absolutely no evidence to suggest that the use of force in this case was retaliatory. Rather, as is clearly depicted on the video, the use of force involved placing plaintiff in handcuffs—nothing more. Quite simply, plaintiff cannot show that his constitutional rights were violated.

Turning to the second prong of the qualified immunity analysis, plaintiff likewise cannot show that "every reasonable officer" would know that the use of force in this case was excessive. *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011). In an attempt to make such a showing, plaintiff cites to a plethora of cases which he claims are analogous to this case, but just like his characterization of the evidence, his characterization of these cases as analogous to this one is highly disingenuous.

To that end, plaintiff argues that "[c]ourts have held that actions such as Mr. Clark's constitute passive resistance and do not justify the use of force."[29] In support, plaintiff cites *Trammell v. Fruge*, 868 F.3d 332 (5th Cir. 2017), where, in response to plaintiff's pulling away while handcuffing, officers executed knee strikes, put the plaintiff in a headlock, tackled the plaintiff to the ground, and administered more knee strikes, resulting in mildly displaced right L1, L2, and L3 transverse process fractures. Plaintiff also cited to *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000), where the plaintiff pulled away when he was not even under arrest, and the officers tackled him to the ground, breaking his shoulder. Finally, plaintiff cited to *Bone v. Dunnaway*, 657 F.App'x 258 (5th Cir. 2016), where the plaintiff passively resisted, but the officer grabbed his face and slammed it into the ground. It should go without saying that the instant case is nothing like any of these. Each involved a vastly higher degree of

---

[28] R. Doc. 194, p. 20.
[29] R. Doc. 149, p. 19.

force than was used in this case, and plaintiff's attempts to support his case without calling out these distinctions should be rejected.

Plaintiff similarly cites to *Hanks v. Rogers*, 853 F.3d 738, 747 (5th Cir. 2017) for the proposition that "an officer violated the Fourth Amendment if he abruptly resorts to overwhelming force rather than continuing verbal negotiations with an individual who poses no threat or flight risk, who engages in, at most, passive resistance, and whom the officer stopped for a minor traffic violation." But in this case, as depicted on the video, no reasonable person could conclude that the LPSO Defendants used "overwhelming force" on Mr. Clark. In *Hanks*, the officer executed a "half spear" blow to the plaintiff's upper back, forcing the plaintiff onto the truck of his vehicle, resulting in contusions, acute strains, and bruised ribs, in response to the plaintiff taking a step when instructed to go to his knees. *Hanks* is nothing like the present case.

Plaintiff next cites to *Deville v. Marcantel*, 567 F.3d 156 (5th Cir. 2009). In *Deville*, in response to the plaintiff's refusal to roll her window down, the officers broke her glass and pulled her out of the vehicle and threw her up against the vehicle, resulting in a blow to her abdomen area and cuts to her head. Again, citation to this case is misplaced as the facts are nothing like what is presented here.

Plaintiff audaciously claims in his opposition that "Mr. Clark demonstrated behavior even milder and more compliant than that of the plaintiffs in *Hanks* and *Deville*, and yet it led to similarly aggressive actions by the Defendant Deputies as officers in those cases." This statement is simply absurd. What "similarly aggressive" actions did Deputies Hotard and Bowden take in this case? What actions were "similarly aggressive" to performing a "half-spear" blow into the rear of a vehicle as was the case in *Hanks*? What actions were "similarly aggressive" to breaking a car window, dragging a suspect out of the broken glass, and throwing the suspect up against the

window, as was the case in *Deville*? None. This case involved the least amount of force that could have possibly been used to place plaintiff in handcuffs, and nothing more.

Given that the case law so very clearly permits the use of force to handcuff a person under arrest, and given that the use of force in this case was no more than was necessary to accomplish the handcuffing, plaintiff has failed to show that the use of force in this case was so excessive that no reasonable officer would believe it to be justified. His cited cases are nothing like this case, all of which involved a much higher degree of force. Quite simply, plaintiff has failed to overcome the LPSO Defendant's invocation of qualified immunity.

### III.   PLAINTIFF HAS NOT SUPPORTED HIS STATE LAW CLAIMS WITH EVIDENCE.

As defendants established in their original memorandum, plaintiff cannot maintain any of his state law claims for reasons similar to those related to his federal law claims. Specifically, Louisiana law does not recognize a claim for assault or battery when it arises from an officer's use of "reasonable force" under the circumstances. *Ross v. Sheriff of Lafourche Parish*, <u>479 So.2d 506, 511</u> (La. App. 1st Cir.1985); *Penn v. St. Tammany Parish Sheriff's Office*, 2002-0893 (La. App. 1 Cir. 4/2/03), <u>843 So. 2d 1157, 1161</u>. For the reasons discussed, the use of force was reasonable in this case.

Plaintiff also cannot support a "negligent handcuffing" claim because his own treating physician has expressly rejected any notion that plaintiff's hand injuries could have been caused by this incident. The deposition testimony quoted above makes this abundantly clear.

Other than completely mischaracterizing Dr. Garon's testimony, plaintiff presents no argument in his opposition that would support a claim under Louisiana law for battery or "negligent handcuffing." These claims should be dismissed.

### IV.   PLAINTIFF HAS FAILED TO SHOW THAT HE HAS A VIABLE TITLE VI CLAIM.

Plaintiff's Title VI claim is easily dispensed with. As noted above, this Court has already concluded that if Plaintiff succeeded in arguing that the stop, search, and force used during his arrest were all a result of intentional discrimination and "racial profiling" absent it could imply the invalidity of his stop, search, and ultimate arrest.[30] Since "intentional discrimination" is an essential element of a Title VI claim, *Fennell v. Marion Indep. Sch. Dist.*, <u>804 F.3d 398, 408</u> (5th

---

[30] R. <u>Doc. 136, pp. 9-10</u>.

16

Cir. 2015), plaintiff is barred from asserting that claim pursuant to *Heck v. Humphrey*, 512 U.S. 477 (1994).

Plaintiff provides virtually no substantive argument as to why *Heck* should not bar the claim, aside from pointing out that the Court denied defendants' Motion to Dismiss on this issue. But, as defendants have noted, the Court did not conclude that *Heck* does not bar the claim. Rather, the Court simply noted that defendants had not pointed to any case where Title VI claims were barred by *Heck*, and it declined, at the Motion to Dismiss stage, to do so.

However, at this stage, allowing plaintiff's claims to proceed would be wholly incongruent with the Court's ruling. Again, the Court ruled unequivocally that allowing plaintiff to challenge the stop, search, and force by arguing that they were the result of intentional discrimination violates *Heck*. But that is precisely what plaintiff has to prove, and argues, in his opposition. There is no question that the claims are barred.

Nevertheless, and in any event, plaintiff fails to present any *evidence* which would support a finding of intentional discrimination. Plaintiff himself recognizes in his opposition that he must (1) prove intentional discrimination and (2) this requires an express policy of discrimination or evidence demonstrating that "the decision makers placed a substantial negative reliance on illegitimate criterion in reaching their decision."[31] Plaintiff has not brought forward evidence of any such policy or actions by a decision maker. That is, plaintiff has pointed to absolutely no evidence of any action by any policymaker or decision maker of LPSO that would constitute racial discrimination.

Plaintiff recognizes that "[t]he Court's inquiry into intentional race discrimination is essentially the same for in dividual actions brough under § 1981 and 1983, Title VI and Title

---

[31] R. Doc. 194, p. 24.

VII." Under § 1983, municipal liability requires (1) "a policymaker"; (2) "an official policy"; and (3) "a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001), *citing Monell v. Dep't. of Social Servs.*, 436 U.S. 658, 694 (1978).

In analyzing plaintiff's companion § 1983 claim plead in the Amended Complaint, the Court recognized that plaintiff's allegations of racial discrimination were not enough to survive the motion to dismiss stage. Specifically, the Court ruled that plaintiff's allegation that there is a custom "of over-policing and racial discrimination in issuing traffic citations" was insufficient to state such a claim. The Court went on to find that allegations that "Defendants Hotard and/or Bowden, acting through Defendant Sheriff Ard's direction and/or ratification, carried out this practice or custom of racial targeting when they stopped, seized, and continually detained Plaintiff on the unfounded basis of failure to use a turn signal[,]" "us[ed] excessive force," and charged Plaintiff with resisting arrest" were likewise insufficient. Finally, the Court found that an allegation that Defendant Ard "has actual or constructive knowledge of this practice and is deliberately indifferent" still failed to state such a claim.

Continuing, the Court held that although Plaintiff's complaint references statistics showing higher rates of traffic stops, citations, and resisting arrest charges for Black drivers in Livingston Parish than for white drivers (with plaintiff claiming that this shows a policy of intentional discrimination against Black people in Livingston Parish, plaintiff fails to allege a widespread, settled practice or custom sufficient to establish an official policy.

At this stage, plaintiff is essentially relitigating these issues, yet without any *evidence* to support the allegations that were baseless at the time they were plead. What evidence has plaintiff come forward with at this point to show that Sheriff Ard has actual or constructive

knowledge of a racially discriminatory policy or practice? What evidence has plaintiff come forward with to show that there was a widespread, settled practice or custom sufficient to establish an official policy of stopping Black persons at a higher rate than whites?

The simple answer is "none". Plaintiff has not come forward with any such evidence. His attempt to support these claims with the opinions of Dr. Abraham are futile. As set forth above, Dr. Abraham's opinions are based on incomplete data and information. Her statistics regarding citations speak to 4 offenses only. Her statistics regarding police reports speak to 5 deputies and 10 offenses. She did not consider or account for reasonable explanations for her findings, such as a review of whether the individuals stopped were actually residents of Livingston Parish.

Moreover, even if her analysis was sound (which it is was not), plaintiff has still failed to show that Sheriff Ard knew of a racial disparity in policing and failed to act. Instead, plaintiff uses an improper affidavit (as described above) to reach the conclusion that LPSO "had not looked at the statistics they have available for potential race-based discrimination, despite bring notified that there was a racial discrimination problem in the department by Mr. Clark's complaint in the instant matter . . ."[32]

First, this is not evidence of actual notice of racial discrimination by Sheriff Ard. Second, plaintiff cannot use his own complaint as a trigger for what LPSO should or should not have done with respect to racial discrimination. Mr. Clark's complaint is riddled with falsehoods and unsubstantiated allegations. Mr. Clark was convicted for the crimes arising from this event. This very Court has concluded that had plaintiff is barred from arguing that the stop, search, and force used on plaintiff was a result of racial profiling or discrimination.

---

[32] R. Doc. 194, p. 32.

It is nonsensical for plaintiff to argue that LPSO should be liable for racial discrimination because it did not pull racial statistics following his lawsuit. This logically makes zero sense. Plaintiff cannot argue both that Sheriff Ard knew of racial discrimination before his incident, and is liable because this incident was the event that provided him notice. Again, plaintiff's attempt to salvage his claim should be rejected.

Next, it must be noted that the cases cited by plaintiff in support of his Title VI claim, like others he cites, are inapposite. Indeed, plaintiff argues that "[t]he failure to investigate or pur and end to discrimination itself is evidence of deliberate indifference." In support, plaintiff cites *Sneed v. Austin Indep. Sch. Dist.*, 490 F.Supp.3d 1069 (W.D. Tex. 2020). However, in *Sneed,* the plaintiff shows that the defendant had actual notice of harassment prior to the incident at issue and failed to act ("Here, the record reflects that various AISD employees received reports of harassment affecting Plaintiff for years."). In this case, plaintiff has not produced on iota of evidence that Sheriff Ard had notice or reports of discrimination.

Plaintiff also cites to his two experts in an attempt to support his claim. The issues with Dr. Abraham's opinion were addressed in detail above; namely, that she fully admits that she is not and cannot render an opinion relative to all LPSO traffic stops because she didn't have that data. As for Dr. Busken, he agreed that Dr. Abraham's data was insufficient, expressly opining that her data was "is insufficient to prove any systemic bias."[33]

Finally, throughout his opposition, plaintiff attempts to support his racial discrimination claim by pointing to comments made by the deputies on the scene about crack cocaine and the one deputy singing a rap song with a cocaine lyric. As noted above, the only person who has drawn a link between crack usage and the Black community is plaintiff, and no one else. But

---

[33] R. Doc. 171-5, pp. 87:17-88:7.

even if the Court were to construe these statements as racially charged, it is still immaterial. The Title VI claim is pending against Sheriff Ard, as the policymaker for LPSO. Whatever the deputies may have said on the scene, it does not relieve plaintiff of his duty to prove (1) [an] appropriate person with authority, (2) had actual knowledge of discrimination, and (3) that person responded with deliberate indifference.'" *Washington v. Smith*, 639 F. Supp. 3d 625, 656 (E.D. La. 2022) (citations omitted).

All that plaintiff can present in this case is his subjective belief that he was discriminated against because of his race. But, a plaintiff's subjective belief of discrimination is insufficient to meet the pleading standard for Title VI claims. *Z.B. v. Irving Indep. Sch. Dist.*, No. 3:17-CV-2583-B, 2019 WL 2716504, at *4 (N.D. Tex. June 28, 2019), *aff'd sub nom. Bhombal v. Irving Indep. Sch. Dist.*, 809 F. App'x 233 (5th Cir. 2020) (ruling that plaintiff failed to allege facts showing intentional discrimination because her allegations did not connect the alleged discriminatory acts to the plaintiff's race or national origin); *Mohamed v. Irving Indep. Sch. Dist.*, 252 F. Supp. 3d 602 (N.D. TX. May 18, 2017) (dismissing Title VI claim because the plaintiff could not show that he was treated differently than other similarly situated students and the only evidence offered was his subjective belief that he had been discriminated against); *Fontaine v. Dallas Cnty. Cmty. Coll. Dist.*, No. 3:13-CV-3635-D, 2014 WL 6680711, at *5 (N.D. Tex. Nov. 25, 2014) ("To establish discrimination under Title VI, the mere fact that Plaintiff might believe that these acts were taken for discriminatory or [retaliatory] reasons is not enough.").

Plaintiff has failed to show that he was treated any differently than any other person similarly situated. He had failed to show that any actions were taken against him because of his race. In sum, he has failed to show any degree of intentional discrimination, and his Title VI claims should be dismissed.

CONCLUSION

Defendants respectfully request that their Motion for Summary Judgment be granted, and that all claims asserted against them be dismissed, with prejudice.

Respectfully submitted,

**LIVINGSTON PARISH SHERIFF'S OFFICE**
20300 Government Blvd.
Livingston, LA 70754
P: 225-686-2241
E: dgremillion@lpso.org

*/s/Druit G. Gremillion, Jr.*
**Druit G. Gremillion, Jr. (La. Bar Roll No. 33867)**

***Counsel for Jason Ard, Calvin Taylor Bowden, and Jean Hotard***