## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

ALEXANDER CLARK

VERSUS

JEAN HOTARD, ET AL.

CIVIL ACTION

NO. 22-326-JWD-RLB

## RULING AND ORDER

This matter comes before the Court on the *Motion for Summary Judgment* (Doc. 171) ("*MSJ*") filed by Defendants, Jason Ard, Sheriff of Livingston Parish, State of Louisiana ("Sheriff Ard"); Deputy Calvin Taylor Bowden ("Bowden"); and Deputy Jean Hotard ("Hotard") (collectively, the "LPSO Defendants"). Plaintiff Alexander Clark ("Plaintiff" or "Clark") opposes the motion. (Doc. 184-2.) LPSO Defendants have filed a reply memorandum. (Doc. 202.) In response, Plaintiff filed a *Notice of Motion and Motion for Leave to File Opposition to Motion to Strike and Surreply to Defendant's Reply Brief* (Doc. 203), which the Court grants. Oral argument is not necessary. The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, Defendants' *MSJ* is granted, and all of Plaintiff's remaining claims against LPSO Defendants are dismissed with prejudice.

## I.    RELEVANT FACTUAL BACKGROUND

### A.  Introduction

The *First Amended Complaint* ("*FAC*") (Doc. 89) alleges that, on May 24, 2021, "law-enforcement officers from Livingston Parish and Denham Springs stopped, searched, detained, harassed, and brutalized Alexander Clark, without probable cause, leaving him severely injured and unable to earn a living for more than two years." (*FAC* ¶¶ 2, 32, Doc. 89.) *FAC* asserts claims

against the LPSO Defendants and against certain individuals associated with the City of Denham Springs ("DS Defendants").[1] Plaintiff has settled his claims against the DS Defendants, (Docs. 229, 230, 232, 233), so Plaintiff's only remaining claims are against the LPSO Defendants.

LPSO Defendants responded to the *FAC* by filing a motion to dismiss under Rule 12(c). (Doc. 100.) LPSO Defendants argued that the claims were either barred by *Heck v. Humphrey*, 512 U.S. 477 (1994), as a result of Plaintiff's conviction for obstruction of justice arising from the stop or for failure to state a viable claim. (*See* Doc. 100-1; *see also* LPSO Defendants' *Statement of Uncontested Material Facts* ("*SUMF*") ¶ 1, Doc. 171-2; *Plaintiff's Opposing Statement of Material Facts* ("*POSMF*") ¶ 1, Doc. 194-1 (admitting fact of obstruction of justice conviction but denying its relevance).)

On October 1, 2024, the Court issued written reasons dismissing most of Plaintiff's claims against LPSO Defendants. (Doc. 136.) Specifically, the Court resolved Plaintiff's claims as follows:

| Counts | Claim | Defendant(s) | Disposition |
|---|---|---|---|
| Count One | Section 1983 (Fourth Amendment) False Arrest | Hoard and Bowden | *Heck*-Barred |
| Count Two | La. Civ. Code art. 2315 False Arrest | Hotard and Sheriff Ard | *Heck*-Barred |
| Count Three | La. Const. Art. I, § 5 & La. Civ. Code art. 2315 Excessive Force / Battery | Hotard, Bowden, and Sheriff Ard | Not Considered |
| Count Four | Section 1983 (Fourth Amendment) Excessive Force | Hotard, Bowden, and McCullough | Not Considered |
| Count Five | La. Civ. Code art. 2315 Negligent Handcuffing | Hotard and Sheriff Ard | Not Considered |

---

[1] The DS Defendants include: (1) the City of Denham Springs itself (the "City"); (2) the Denham Springs Police Chief Shannon Womack ("DS Police Chief"); and (3) an officer with the Denham Springs Police Department ("DSPD") named Sydney McCullough. (*Id.* ¶¶ 1, 18–20.)

| Count Six | Section 1983 (Fourth Amendment), La. Const. Art. I, § 5, and La. Civ. Code art. 2315 Unreasonable Search of Persons & Invasion of Privacy | Hotard, Bowden, and Sheriff Ard | *Heck*-Barred |
|---|---|---|---|
| Count Seven | Section 1983 (Fourth Amendment) Bystander Liability | McCullough (DSPD Deputy) | Not Considered |
| Count Eight | Section 1983 (Fourth Amendment— *Monell*) Excessive Force | Sheriff Ard | Dismissed for Failure to State a Claim |
| Count Nine | Section 1983 (Fourth Amendment— *Monell*) Failure to Investigate Excessive Force | Sheriff Ard | Dismissed Failure to State a Claim |
| Count Ten | Section 1983 (Fourth Amendment— *Monell*) Excessive Force | DP Police Chief | Not Consideed |
| Count Eleven | Section 1983 (Fourth Amendment) and La. Const. Art. I, § 3 Denial of Equal Protection | Sheriff Ard and Hotard | *Heck*-Barred |
| Count Twelve | 42 U.S.C. § 2000d *et seq.* (Title VI) Intentional Race Discrimination | Sheriff Ard | NOT *Heck*-Barred |
| Count Thirteen | Section 1985(3) and Section 1983 (Fourteenth Amendment) Conspiracy to Violate Equal Protection | Hotard, Sheriff Ard, DS Police Chief, and the City | *Heck*-Barred |

Thus, the only remaining claims are: (1) against Hotard: Counts Three, Four, and Five—that is, excessive force under federal law and battery and negligent handcuffing under state law; (2) against Bowden: Counts Three and Four—that is, excessive force and battery; and (3) against Sheriff Ard: vicarious liability under state law and Count Twelve—that is, a Title VI claim for intentional discrimination.

### B. The Traffic Stop Before the Use of Force

On May 24, 2021, around midnight, Hotard stopped Plaintiff at a gas station in Denham Springs for failing to use his turn signal. (*Pl. Stat. of Material Facts* ("*PSMF*") ¶ 1, Doc. 194-1; Hotard Dep. 118, Doc. 189-3.) Plaintiff was cooperative as Hotard and Bowden questioned him and searched his truck for over twenty minutes. (*See* 3_12021-05-2423-28-36LELLIS.avi ("Video 1"); 4_12021-05-2423-38-00LELLIS.avi ("Video 2"); 5_12021-05-2423-43-00LELLIS.avi ("Video 3"); 6_12021-05-2423-48-00LELLIS.avi ("Video 4") at 0:00–2:25).

During the search, Bowden sang to himself the lyrics of a rap song by Gucci Man, saying specifically "Give me some crack." (Bowden Dep. 125, Doc. 184-7.) Bowden also sang portions of a song "Crack" by 2 Chainz during portions of the stop. (Doc. 184-8 at 2.)

Hotard testified that Plaintiff and the car smelled like marijuana. (Hotard Dep. 145, Doc. 184-5.) However, Hotard did not use any field test wipes on any items he questioned Plaintiff about, such as Plaintiff's gout medication, Plaintiff's tools, or Plaintiff's $20 bill. (Hotard Dep. 146–148, Doc. 184-5.)

The officers examined Plaintiff's $20 bill, purportedly for drugs, and Bowden said, "Oh that might actually be sheetrock. That might be sheetrock." (Bowden Dep. 115, Doc.189-5; 24_12021-05-2500-19-00CBOWDEN.avi ("Bowden Video"), at 1:34).) Someone replied, "Yeah, but them granules, that ain't sheetrock. Sheetrock ain't shiny granules," and Bowden testified that was true. (Bowden Dep. 115, Doc. 189-5.)

### C. The Use of Force

Video 4 depicts the use of force. Plaintiff appears to yank the $20 bill from one of the officer's hands. (Video 4 at 2:25–2:27.) The officers then grab both of Plaintiff's arms and place them behind his back. (*Id.* at 2:27–2:33.) Plaintiff breaks his arms away at one point before the

officers return Plaintiff's arms to behind his back. (*Id.* at 2:33–2:41.) Plaintiff is then handcuffed, (*id.* at 2:41–2:59), and patted down, (*id.* at 3:00–3:45), before being placed in the back of the patrol car, (*id.* at 3:45–4:10).

Thus, as LPSO Defendants argue, at no time did Hotard or Bowden (a) take Plaintiff to the ground; (b) strike, kick, or punch Plaintiff; or (c) draw any weapons on Plaintiff. (*See id.* at 2:25–3:45.) Plaintiff claims that the deputies pushed him against the truck prior to handcuffing, (Doc. 194-1 at 2), but (a) the video shows that Plaintiff is either pushed back onto the tailgate of the truck, or sits on the tailgate, as the officers attempt to handcuff him, and (b) any such contact with the truck is minor and brief. (*Id.*)

On the whole, the use of force lasted, at most, 35 seconds from the deputies' initial effort to handcuff Plaintiff to when they finish handcuffing him. (*Id.* at 2:25–2:59.) In fact, it appears that Plaintiff stops struggling about 15 seconds after the initial contact. (*Id.* at 2:25–2:41.)

Additionally, the Court notes that, in his *PSMF*, Plaintiff asserts that "Defendants Bowden and Hotard gave Mr. Clark no time to comply with verbal commands to place his hands behind his back." (*PSMF* ¶ 6, Doc. 194-1.) However, Plaintiff cites for this proposition two seconds of video from Ex. 7, 1_2021-05-25_00-14-00_CBOWDEN at 0:55–0:57. (*PSMF* ¶ 6, Doc. 194-1.) This exhibit was not uploaded into JERS or otherwise submitted by Plaintiffs. (*See* JERS Confirmation, Doc. 188-1.) The Court also notes that the other Bowden Video in evidence does not even show the use of force. Nevertheless, the Court assumes for purposes of this *MSJ* that the missing video shows what Plaintiff represents, as it ultimately does not affect the outcome of the motion.

### D. The Handcuffing

The parties dispute certain facts about Plaintiff's handcuffing. Hotard testified that, when he applied the handcuffs to Clark, he would have checked that the handcuffs were not applied too

tightly and would have double locked the handcuffs to ensure that they did not tighten onto his wrists following his application. (Hotard Decl. ¶ 5, Doc. 171-3.)

Plaintiff testified that when Hotard came back to the vehicle, Plaintiff asked him if he could release the handcuffs because his hand was hurting. (Clark Dep. 73, Doc. 171-6.) Plaintiff stated that "probably ten minutes" passed between the time he was put in the back of the unit and when he had that discussion with Hotard. (*Id.* at 73–74.) Hotard did loosen the handcuffs at that time. (*Id.* at 74.) Plaintiff asked him to release the cuffs on him because he had no feeling in his hand; Plaintiff said he felt the pain in his right hand after the handcuffs were put on, but he could not say exactly when he realized his hand was broken. (*Id.* at 74.)

One of Plaintiff's experts, Daniel Busken, testified that, "had Deputy [Hotard] applied the handcuffs properly, double-locked them, and checked the fit, there would have been no need, as Mr. Clark alleges, for Deputy Hotard to loosen the handcuffs after Mr. Clark was secured in them for ten minutes." (Doc. 183-3 at 26.) Busken further stated that, if Clark['s] account is correct, then he had been secured in the handcuffs, which were too tight, for ten minutes, which is enough time, based upon the research noted previously [in the report], to suffer an injury." (Doc. 183-3 at 26.) The injury referenced is "handcuff neuropathy" and "compress[ed] blood vessels and nerves." (*Id.* at 15.)

However, Plaintiff's doctor was specifically asked if, more likely than not, the handcuff caused the fracture in Plaintiff's hand. (Dr. Garon Dep. 21, Doc. 171-7.) Dr. Garon said that was a false statement; that is, more likely than not the handcuffing would not have caused the fracture. (*Id*. at 21–22.) Dr. Garon was also asked whether, more likely than not, the deputies' act of grabbing Plaintiff's hands and wrist to bring them behind his back would have caused a fracture in the hook of the hamate (i.e., a bone in his hand), and the doctor said it would be "unlikely to

6

occur in that situation" because "it takes a direct blow to a very specific area in the palm." (*Id*. at 22.)

### E. Salient Facts to the Discrimination Claim

The parties spill much ink over Plaintiff's discrimination claim, and the Court will summarize those arguments below. For present purposes, however, the Court will focus on one aspect of that claim, which the Court finds dispositive: deliberate indifference.

To support this requirement, Plaintiff principally relies on the declaration of Marjorie J. Menza, who is one of Clark's attorneys. (Doc. 184-11.) LPSO Defendants object to this declaration as a whole in their reply memorandum, (Doc. 202), and the Court will address this motion to strike below.

For now, the Court summarizes Menza's declaration as follows: Menza describes efforts Plaintiff's counsel has made to obtain data regarding department-wide traffic citation practices for the LPSO. (Menza Decl. ¶ 2, Doc. 184-11.) Plaintiff made a substantially similar public records request to the LPSO. (*Id.* ¶ 3.) Plaintiff issued these requests for production and public records requests on December 23, 2024—over two and a half years after this suit was filed on May 19, 2022, (*id.* ¶¶ 2–3), and over three and a half years after Plaintiff's encounter with the LPSO Defendants, (*PSMF* ¶ 1, Doc. 194-1; Hotard Dep. 118, Doc. 189-3).

The declaration continues by describing the back and forth between Plaintiff's counsel and LPSO Defendants' attorney regarding the scope, feasibility, and burden of these requests. (Menza Decl. ¶¶ 4–7, Doc. 184-11.) LPSO Defendants' counsel explained that LPSO "does not have an electronic means to search, sort and produce its traffic related incident reports by race and instead, [LSPO's attorney] would have to print out reports, redact necessary data as well as manually enter them into an excel sheet in order for the data to be statistically analyzed." (*Id.* ¶ 7.) Traffic

violations where only a traffic ticket is issued by the deputy are scanned by the Sheriff's secretary before being sent to the District Attorney, but they are not otherwise maintained in a searchable database by the LPSO. (*Id.* ¶ 8.) Menza then says she worked with another ACLU lawyer and Plaintiff's other attorneys to "identif[y], via additional public records requests, traffic tickets issued and available at the Livingston Parish Courthouse for printing." (*Id.* ¶ 9.) The ACLU lawyer "then printed out at the Courthouse scans all LPSO-issued traffic tickets from 2020 and 2021, which were then sent to Plaintiff's expert, Dr. Sarah Abraham, for statistical analysis." (*Id.* ¶ 10.) These documents were then provided to the LPSO. (*Id.* ¶ 11.) Plaintiff argues in his *Opposition* that all of this shows that the LPSO "had not looked at the statistics they have available for potential race-based discrimination, despite being notified that there was a racial discrimination problem in the department by [Plaintiff's] complaint in this instant matter as well as public records and discovery requests." (Doc. 194 at 32.)

Plaintiff also bases his deliberate indifference argument on Busken's supplemental report. Busken there asserts:

> Based upon my experience with racial profiling data mandates, it would have been appropriate for LPSO to have had these numbers compiled and then analyze the data to ensure officers are following the policy. Through the discovery materials I have reviewed it is my understanding that while LPSO maintains a racial profiling policy, LPSO takes no action to implement that policy by compiling the numbers or analyzing the data. Merely compiling numbers and filing them away without any thoughtful analysis or auditing serves no purpose, nor does it serve the purpose intended by the policy, which is an examination in an effort to discover any racial profiling. Without further analysis the numbers speak for themselves.

(Doc. 183-3 at 52–53.) Plaintiff argues in his *Opposition*, "The LPSO defendants had all of the data necessary to see and correct racially biased policing in the department and chose not to, thereby acting with deliberate indifference." (Doc. 194 at 32.)

8

## II.    RULE 56 STANDARD

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure, which states that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

Thus, "[a] movant for summary judgment need not set forth evidence when the nonmovant bears the burden of persuasion at trial." *Wease v. Ocwen Loan Servicing, L.L.C.*, 915 F.3d 987, 997 (5th Cir. 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("we find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim.")). "The moving party may meet its burden to demonstrate the absence of a genuine issue of material fact by pointing out that the record contains no support for the non-moving party's claim." *Id.* (citing *Stahl v. Novartis Pharmaceuticals Corp.*, 283 F.3d 254, 263 (5th Cir. 2002)).

If the mover bears his burden of showing that there is no genuine issue of fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . . The nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (cleaned up). The non-mover's "burden is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (cleaned up).

9

Additionally, "[w]hen evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court." *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003) (citing *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 916 (5th Cir. 1992)). "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Id.* (citing, *inter alia*, *Ragas*, 136 F.3d at 458). *See also Nissho–Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1307 (5th Cir. 1988) (it is not necessary "that the entire record in the case . . . be searched and found bereft of a genuine issue of material fact before summary judgment may be properly entered"); *cf. United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

Ultimately, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citation omitted).

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion. Indeed, even if the moving party comes forward with an abundance of evidence supporting its theory of the case, the nonmoving party may nevertheless defeat the motion by countering with evidence of its own, which, if credited by the fact-finder, would entitle the nonmoving party to a verdict in its favor. Or, the non-moving party can defeat the motion by demonstrating that the evidence tendered by the moving party is itself laced with contradictions of [material] fact.

*Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263–64 (5th Cir. 1991) (cleaned up).

10

However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record [(as, for instance, by a video)], so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). *See also id.* at 380–81 ("Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.").

## III.    DISCUSSION

### A.  Section 1983 Excessive Force Claim

#### 1.  *Parties' Arguments*

##### a.    LPSO Defendants' Original Memorandum (Doc. 171-1)

LPSO Defendants begins by arguing that Hotard and Bowden are entitled to summary judgment on Plaintiff's excessive force claim. (Doc. 171-1 at 10.) These defendants emphasize that "it has been conclusively decided that the arrest in this case was valid and warranted" because Plaintiff was convicted of Obstruction of Justice and because the Court already ruled, through its finding about *Heck*, that the arrest was supported by probable cause. (*Id.* at 10–11.) Moreover, it is per se reasonable to use handcuffs and apply some degree of physical coercion to effectuate an arrest based on probable cause. (*Id.* at 11 (citations omitted).) Further, LPSO Defendants had the right to grab Clark's arm to try to handcuff him. (*Id.* at 11–12.)

LPSO Defendants then take those premises and apply them to the video in evidence; they say that no reasonable jury could conclude that the use of force was excessive, and "certainly, not every reasonable officer could conclude" same. (*Id.* at 12.) The Court should reach this conclusion, even when construing the video in a light most favorable to Plaintiff. (*Id.*) LPSO Defendants say

11

the force was only applied for about 25 seconds, was minimal, and was limited to what was necessary to secure Plaintiff in handcuffs. (*Id.* at 12–13.)

LPSO Defendants then argue that Hotard and Bowden are entitled to qualified immunity. "[T]he only force used in this case by [the] Deputies . . . was their grabbing of plaintiff's wrists to place his hands behind his back for handcuffing. Plaintiff cannot come forward with any case to suggest that such force is objectively unreasonable, let alone to establish this 'beyond debate.'" (*Id.* at 14.) The officers did not take plaintiff to the ground, did not place him against the vehicle or another object, did not punch, kick, or strike plaintiff, and did not draw any weapons. (*Id.*) "This was, quite literally, the least amount of force the deputies could have possibly used to place plaintiff in handcuffs. The deputies did nothing more than take plaintiff's wrists and draw his arms behind his back." (*Id.*) As a result, LPSO Defendants say, this claim should be dismissed. (*Id.*)

b.   Plaintiff's Opposition (Doc. 194)

Plaintiff responds that his "constitutional rights were violated during his interaction with the LPSO." (Doc. 194 at 11.) Plaintiff focuses on the *Graham* factors. (*Id.* at 12.) First, the nature of the crime is disputed; LPSO Defendants argue they engaged in a search for drugs while Plaintiff says the search was pretextual. (*Id.*) There's also a question of fact on whether Plaintiff was a threat, particularly in light of his conduct during the lengthy search of his truck and the presence of multiple officers. (*Id.* at 12–13.) Plaintiff was also not actively resisting or trying to flee; Plaintiff asserts that he "had endured approximately 12 minutes of a warrantless search of his person, jeering by the Defendant Deputies, and several searches of his person without attempting to flee or resist at any point." (*Id.* at 13.)

Plaintiff next argues that LPSO Defendants could not have reasonably believed their conduct was lawful. (*Id.* at 13–14.) Plaintiff specifically cites to and discusses *Hanks v. Rogers*,

853 F.3d 738 (5th Cir. 2017), and *Deville v. Marcantel*, 567 F.3d 156 (5th Cir. 2009), in support of his position. (*Id.* at 14–15.) Plaintiff highlights how (a) the stop was initiated for a minor traffic violation; (b) there was no reasonable fear of flight; (c) Plaintiff was left unattended, indicating no concern for a weapon; (d) Plaintiff complied before the use of force, including by exiting the vehicle and allowing his person and pockets to be searched four times; (e) Plaintiff was elderly and had a visible limp; and (f) LPSO Defendants used force rather than attempting to speak with him, de-escalate the situation, or pursue some lesser alternative. (*Id.* at 14–16.)

Plaintiff then asserts that Hotard and Bowden are not entitled to qualified immunity. (*Id.* at 16–17.) Plaintiff reiterates that this case involved a minor traffic violation and a misdemeanor conviction for obstruction of justice for taking his $20 bill back from Hotard, after a lengthy vehicle search and several derogatory comments by Hotard. (*Id.* at 17–18.) Again, Plaintiff was not a flight risk, and he was not resisting. (*Id.* at 18–19 (citing *Trammell v. Fruge*, 868 F.3d 332 (5th Cir. 2017); *Goodson v. City of Corpus Christi*, 202 F.3d 730 (5th Cir. 2000); *Bone v. Dunnaway*, 657 F. App'x 258 (5th Cir. 2016)).) Plaintiff also relies on his expert, who testified that the use of force was retaliatory. (*Id.* at 20.) For all these reasons, Plaintiff says, the *MSJ* should be denied on this issue. (*Id.*)

### c.   LPSO Defendants' Reply (Doc. 202)

LPSO Defendants respond that Plaintiff fails to carry his burden of overcoming qualified immunity. (Doc. 202 at 10.) "Despite plaintiff's exaggerated attempt to sensationalize this incident into something more than it was, defendants again refer to the Court to the video of this incident, which conclusively shows that no excessive force was used on plaintiff at any time by anyone." (*Id.* at 11.) Plaintiff first notes that there is no evidence of any injury; Plaintiff's doctor rejected the idea that the incident caused injury to his hand, and there is no medical evidence that his hip

13

injuries were caused by the incident. (*Id.* at 12 n.26.) However, LPSO Defendants do not "belabor the injury issue" since Plaintiff's claim falls on the other two requirements for excessive force. (*Id.*)

LPSO Defendants reiterate that they have the right to use some amount of physical coercion to effectuate a valid arrest, including by grabbing a noncompliant suspect's arm. (*Id.* at 12.) These defendants next dispute the argument that they weren't entitled to use force, as they had the right to arrest Plaintiff and the right to use force flows from that. (*Id.*) There is no evidence to support the argument that the arrest was retaliatory, and, in any event, the force amounted only to "placing plaintiff in handcuffs—nothing more. Quite simply, plaintiff cannot show that his constitutional rights were violated." (*Id.* at 13.)

LPSO Defendants also argue that Hotard and Bowden are entitled to qualified immunity. (*Id.*) LPSO Defendants describes Plaintiff's characterization of his authority "highly disingenuous." (*Id.*) LPSO Defendants then distinguish *Trammell*, *Goodson*, *Bone*, *Hanks*, and *Deville*. (*Id.* at 13–14.)

> Given that the case law so very clearly permits the use of force to handcuff a person under arrest, and given that the use of force in this case was no more than was necessary to accomplish the handcuffing, plaintiff has failed to show that the use of force in this case was so excessive that no reasonable officer would believe it to be justified. His cited cases are nothing like this case, all of which involved a much higher degree of force. Quite simply, plaintiff has failed to overcome the LPSO Defendant's invocation of qualified immunity.

(*Id.* at 15.)

### d.  Plaintiff's Surreply (Doc. 203-2)

Plaintiff's surreply deals only with the discrimination claim, (*see* Doc. 203-2), so Plaintiff offers no new arguments on the issue of excessive force.

### 2. *Applicable Law*

#### a. Qualified Immunity Generally

"Qualified immunity shields government officials performing discretionary functions from civil damages liability 'as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'" *Crittindon v. LeBlanc*, 37 F.4th 177, 185 (5th Cir. 2022) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)). "Determining whether an officer is entitled to qualified immunity requires a two-step inquiry." *Id.* "First, we ask whether the officer's alleged conduct has violated a federal right. Second, we ask whether the right in question was clearly established at the time of the alleged violation, such that the officer was on notice of the unlawfulness of his or her conduct." *Id.* at 185–86 (cleaned up). Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

#### b. Constitutional Violation

As to the first prong of qualified immunity, "[w]here, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons . . . against unreasonable . . . seizures' of the person." *Graham v. Connor*, 490 U.S. 386, 394 (1989). "To prevail on an excessive force claim, a plaintiff must establish: '(1) injury[,] (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable.'" *Freeman v. Gore*, 483 F.3d 404, 416 (5th Cir. 2007) (Dennis, J.) (quoting *Tarver v. City of Edna*, 410 F.3d 745, 751 (5th Cir. 2005)).

"Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (cleaned up). "Excessive force claims are necessarily fact-intensive; whether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.'" *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (quoting *Graham*, 490 U.S. at 396) (citing *Brosseau v. Haugen*, 543 U.S. 194, 201 (2004) (observing that this "area is one in which the result depends very much on the facts of each case")). "Factors to consider include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (quoting *Graham*, 490 U.S. at 396). "[T]he question is 'whether the totality of the circumstances justifie[s] a particular sort of . . . seizure.'" *Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)).

"As in other Fourth Amendment contexts . . . , the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397 (citations omitted). "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id.*

Additionally, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment."

16

*Id.* (cleaned up). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

"Handcuffing is a generally accepted technique to conduct an arrest." *Scott v. City of Mandeville*, 69 F.4th 249, 256 (5th Cir. 2023) (citing *Fisher v. City of Las Cruces*, 584 F.3d 888, 896 (10th Cir. 2009) ("[I]n nearly every situation where an arrest is authorized . . . handcuffing is appropriate." (citation omitted)). Further, "minor, incidental injuries that occur in connection with the use of handcuffs to effectuate an arrest do not give rise to a constitutional claim for excessive force." *Id.* (citing *Freeman*, 483 F.3d at 417 (citations omitted)). "[A] standard police technique becomes excessive if the surrounding circumstances . . . would put a reasonable officer on notice that an arrestee was particularly susceptible to injury from the standard maneuver." *Id.* at 257 (cleaned up).

Thus, for instance, in *Scott*, the officer "was performing a routine handcuffing technique when [the plaintiff] began to pull away from his grasp as he repeatedly instructed her to stop turning away from him." *Id.* "The officers then increased their use of force by lifting [plaintiff's] twisted right arm and bending her over the police car. This limited use of force was a response to [plaintiff's] perceived resistance and was not clearly unreasonable under the circumstances." *Id.* Moreover, the officers were not on notice the plaintiff would suffer an injury from the handcuffing; though the plaintiff had told the officers that he had recently had a surgery, it was "far from obvious that the officers would be on notice that [the plaintiff] would be injured if they handcuffed her because of that surgery," particularly when she "had kept her hands above her head for a significant amount of time prior to the arrest and had not shown any visible signs of injury before the arrest."

17

*Id.* "The officer's limited use of force (in such a short time frame) to restrain [plaintiff] and place her in handcuffs as a response to [her] perceived resistance does not amount to excessive force." *Id.*

Additionally, "it is hornbook law that 'the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.'" *Buehler v. Dear*, 27 F.4th 969, 980–81 (5th Cir. 2022) (quoting *Graham*, 490 U.S. at 396; and then quoting *Fulton v. Staats*, 41 N.Y. 498, 499 (1869) (Officers may "use as much force as [i]s necessary to make the arrest."). And, when evaluating whether an arrestee is resisting, the Court "must measure the force used under the facts as a reasonable officer would perceive them, not necessarily against the historical facts." *Id.* at 984 (quoting *Griggs v. Brewer*, 841 F.3d 308, 313 (5th Cir. 2016)). Further, "it is reasonable for an officer to attempt to grab a noncompliant suspect's arm in an attempt to handcuff the suspect[.]" *Trammell*, 868 F.3d at 343 n.9 (finding one officer was entitled to qualified immunity when his "only involvement in the altercation was apparently an attempt to grab [the plaintiff's] left arm" and when there was no injury alleged from that officer's conduct).

### c. Clearly Established

Again, "[b]ecause the focus is on whether the officer had fair notice that [his] conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Tucker v. City of Shreveport*, 998 F.3d 165, 173 (5th Cir. 2021) (quoting *Brosseau*, 543 U.S. at 198). "Clearly established law is determined by controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *Id.* (quoting *Clarkston v. White*, 943 F.3d 988, 993 (5th Cir. 2019)). "For conduct to be objectively unreasonable in light of clearly established law, there need not be a case directly on point, but 'existing precedent must have placed the statutory or constitutional question beyond

debate.'" *Id.* at 173–74 (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017); *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)).

> Specificity is especially important in the Fourth Amendment context, where the [Supreme] Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. . . . Sufficiently specific precedent involving similar facts can help move a case beyond the otherwise hazy border between excessive and acceptable force and thereby provide an officer notice that a specific use of force is unlawful. Otherwise, qualified immunity protects actions in the hazy border between excessive and acceptable force. Thus, qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. . . . In short, when properly applied, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law. Consequently, qualified immunity is justified unless *no* reasonable officer could have acted as the defendant officers did here, or *every* reasonable officer faced with the same facts would *not* have [acted as the defendant officers did].

*Id.* at 174–75 (cleaned up).

### 3.  *Analysis*

Having carefully considered the matter, the Court finds that Hotard and Bowden are entitled to qualified immunity. In sum, Plaintiff has not established that every reasonable officer would know, beyond debate, that their conduct was unlawful under clearly established law.

The Court agrees with LPSO Defendants' assessment of the caselaw: (1) "[h]andcuffing is a generally accepted technique to conduct an arrest," and, it "is appropriate . . . in nearly every situation where an arrest is authorized," *Scott*, 69 F.4th at 256 & n.24 (cleaned up); (2) "the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it," *Buehler*, 27 F.4th at 980–81; and (3) "it is reasonable for an officer to attempt to grab a noncompliant suspect's arm in an attempt to handcuff the suspect[.]" *Trammell*, 868 F.3d at 343 n.9. *See also* Doc. 171-1 at 14 (summarizing this law).

19

The video shows that Hotard and Bowden acted reasonably within this framework. As the Court explained in its earlier ruling, Plaintiff was convicted of obstruction of justice, and this means that, under *Heck*, Plaintiff is barred from disputing that there was probable cause to arrest him for yanking the $20 bill from the officer. (*See* Doc. 136 at 8–9.) The only force used was to effectuate the handcuffing, and no reasonable juror could conclude that there was anything out-of-the-ordinary about it. (Video 4 at 2:25–2:59.) All reasonable jurors would conclude from the video that (a) Plaintiff resisted the officers' lawful handcuffing, "albeit mildly," *Buehler*, 27 F.4th at 984; (b) the LPSO Defendants did not strike, kick, or punch Plaintiff; (c) they did not draw their weapons on him; (d) Plaintiff made contact with the truck, but only "mildly" and as a result of his resisting the officer's lawful actions; and (e) the entire use of force (such as it was) lasted, at most, 35 seconds. (*See* Video 4 at 2:25–2:59.)

Plaintiff argues that certain *Graham* factors weigh in his favor, such as the fact that the traffic stop and obstruction charge were minor and such as the fact that Plaintiff did not pose an immediate threat. (*See* Doc. 194 at 12–13.) However, the Court finds that Plaintiff has failed to identify a sufficiently similar case holding that Hotard and Bowden's conduct was, beyond debate, unlawful.

Indeed, the Court finds that this case is easily distinguishable from the cases Plaintiff relies upon; in those decisions, the officers applied considerably greater force. For instance, in *Hanks*, the Fifth Circuit found that questions of fact precluded summary judgment when a plaintiff was stopped for a minor traffic violation and "took a small lateral step with his left foot" which was "not accompanied by any obvious signs of violence or flight" but the officer then "administered [a] 'half spear' . . . physical takedown" which resulted in "contusions, acute strain, and bruised ribs" 853 F.3d at 745–46. Likewise, in *Deville*, there was a "'minor traffic violation,' . . . no signs

20

of flight or threat," and plaintiff's "'resistance was, at most, passive in that she merely refused to leave her grandchild and exit the vehicle until [her husband] came to get the child,'" but the officer "'engaged in very little, if any, negotiation with [the plaintiff]—and . . . instead quickly resorted to breaking her driver's side window and dragging her out of the vehicle.'" *Hanks*, 853 F.3d at 748 (quoting *Deville*, 567 F.3d at 167–68).

Unlike *Hanks* and *Deville*, here, Plaintiff was not tackled or dragged from the broken window of a vehicle; rather, the undisputed evidence from the video shows that LPSO Defendants simply grabbed Plaintiff's arms and attempted to effectuate a lawful arrest. For the same reasons, the other decisions cited by Plaintiff are distinguishable. *See Trammel*, 868 F.3d at 343 ("the law at the time of Trammel's arrest clearly established that it was objectively unreasonable for *several officers to tackle* an individual who was not fleeing, not violent, not aggressive, and only resisted by pulling his arm away from an officer's grasp." (emphasis added)); *Bone*, 657 F. App'x at 260 (questions of fact preclude summary judgment for excessive force claim where plaintiff "refused to sign [a] summons, . . . turned around to walk away[,]" and the officer "then 'forcefully' grabbed [the plaintiff] and 'violently' *slammed* her face against a nearby window." (emphasis added)); *Goodson*, 202 F.3d at 740 (reversing grant of qualified immunity where plaintiff "suffered a broken shoulder as a result of being *tackled* by [the officers], who lacked reasonable suspicion to detain or frisk him and from whom he was not fleeing." (emphasis added)).

Rather, again, this case is much closer to the officer in *Trammel* who was entitled to qualified immunity and whose "only involvement in the altercation was apparently an attempt to grab [the plaintiff's] left arm." *Trammel*, 868 F.3d at 343 n.9. The Court concluded that "it [wa]s reasonable for an officer to attempt to grab a noncompliant suspect's arm in an attempt to handcuff the suspect[.]" *Id.*

21

Ultimately, "[a] constitutional violation does not occur every time an officer touches someone." *Carter v. Dupuy*, 173 F.4th 561, 564 (5th Cir. 2026) (citing *Ikerd v. Blair*, 101 F.3d 430, 434 (5th Cir. 1996)).

> [A]t the end of the day, the touchstone of our inquiry is simply the reasonableness of the force employed. To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of . . . officials, giving them fair leeway for enforcing the law in the community's protection. Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.

*Buehler*, 27 F.4th at 981 (cleaned up).

Here, as LPSO Defendants argue, "[t]his was, quite literally, the least amount of force the deputies could have possibly used to place plaintiff in handcuffs." (Doc. 171-1 at 14.) The Court agrees. At the very least, Plaintiff has not demonstrated that "*no* reasonable officer could have acted as the defendant officers did here, or *every* reasonable officer faced with the same facts would *not* have [acted as the defendant officers did]." *Tucker*, 998 F.3d at 174. As a result, the *MSJ* will be granted on this issue, and Plaintiff's excessive force claims will be dismissed with prejudice.

## B. Intentional Discrimination

### 1. Parties' Arguments

#### a. LPSO Defendants' Original Memorandum (Doc. 171-1)

LPSO Defendants argue that the Title VI claim should be dismissed in part for reasons given in the Court's ruling on their motion to dismiss. (Doc. 171-1 at 14–15.) First, they say the claim is barred by *Heck*. (*Id.* at 15.) Second, they claim that Plaintiff lacks sufficient evidence to support the claim. (*Id.*)

As to the former, LPSO Defendants explain that the Court dismissed Plaintiff's Fourteenth Amendment/denial of equal protection claim as *Heck*-barred and stated:

if Plaintiff succeeded in arguing that the stop, search, and force used during his arrest were all a result of intentional discrimination and "racial profiling" absent "any appropriate state interest", and that Defendants had "insufficient suspicion" to stop or search him, it could imply the invalidity of his stop, search, and ultimate arrest.

(*Id.* at 15–16 (quoting Doc. 136 at 9–10).) However, the Court declined to dismiss the Title VI claim because "[d]efendants do not cite to any binding precedent applying a *Heck* bar to Title VI claims" and because the Court was unaware of Fifth Circuit precedent doing so. (*Id.* at 16 (quoting Doc. 136 at 10).) While the Court was correct that there is no binding Fifth Circuit case on point, the same reasoning applies because: (a) the Court said the equal protection claim was barred in part because it depended on a finding of intentional discrimination, and (b) Title VI also requires a finding of intentional discrimination. (*Id.* (citations omitted).) Similarly, the Fifth Circuit has recognized that the standard for equal protection and Title VI is the same. (*Id.* at 17.) Thus, "[b]ecause Title VI requires proof of the same intentional discrimination, success on this claim would necessarily imply the invalidity of plaintiff's conviction, warranting dismissal here." (*Id.*)

LPSO Defendants next argue that Plaintiff lacks evidence to support this claim. (*Id.*) They say Plaintiff must prove that Sheriff Ard "knew of the intentional discrimination but refused to stop it despite having authority to do so." (*Id.* at 18 (quoting *Mandawala v. Ne. Baptist Hosp.*, 16 F.4th 1144, 1150 (5th Cir. 2021)).) This is required when the Plaintiff failed to allege a sufficient policy of discrimination, and, here, the Court reached that conclusion at the Rule 12 stage. (*Id.*) "[P]laintiff has absolutely no evidence that Sheriff Ard had actual knowledge of discrimination and responded with deliberate indifference." (*Id.*) Plaintiff's expert Mr. Busken concluded that the information provided by plaintiff's expert economist "alone does not provide context to better understand the dynamics which may drive these figures, and this table alone is insufficient to prove any systemic bias." (*Id.* at 19 (quoting Busken Dep. 87–88, Doc. 171-5).) Thus, Plaintiff cannot

23

establish that Sheriff Ard knew of intentional discrimination. (*Id.*) LPSO Defendants compare this case to *Washington v. Smith*, 639 F. Supp. 3d 625 (E.D. La. 2022), as, there, the plaintiffs also relied on statistical disparities between arrest and incarceration rates of African American and Caucasians in Louisiana, among other things, and the Eastern District purportedly dismissed the claim because the plaintiffs failed to allege that the Sheriff acted with deliberate indifference. (*Id.* at 19–20.)

b.   Plaintiff's Opposition (Doc. 194)

Plaintiff acknowledges that he must prove intentional discrimination and that Title VI's bar on discrimination is based on the Equal Protection Clause. (Doc. 194 at 23–24 (citations omitted).) But Plaintiff argues that he has made a prima facie case of discrimination and that LPSO Defendants misconstrue his statistical evidence. (*Id* at 26.) Plaintiff says his expert "Dr. Sarah Abraham provides statistical evidence that the LPSO Defendants demonstrated a clear pattern of racial discrimination through their policing practices." (*Id.*) Here, the search and use of force were both conducted with racial animus, says Plaintiff. (*Id.*) Dr. Abraham also provided statistical evidence and a report purporting to show that "LPSO engages in racist policing practices by pulling over and 'up-charging' Black people at disproportionate rates." (*Id.* at 27.) Plaintiff also described the discriminatory nature of the police conduct in his deposition. (*Id.*)

Plaintiff next asserts that LPSO Defendants also fail to provide a nondiscriminatory reason for initiating the traffic stop, as there's a question of fact as to whether Plaintiff committed a traffic violation or was convicted of such a crime. (*Id.* at 28.) Further, statistical evidence undercuts such a claim. (*Id.* at 29.) Plaintiff's expert, Mr. Busken, conceded that statistics alone do not prove systemic bias, but (a) that is not Plaintiff's burden, and (b) Plaintiff points to other facts to support his position. (*Id.*) *Washington* is ultimately distinguishable because Plaintiff does not rely on a

single conclusory statement but "on statistical evidence, racist remarks during the stop, and excessive force in arresting him, all building a case that provides ample evidence to create a genuine issue of material fact such that the evidence should be heard by the trier of fact." (*Id.* at 30.)

Plaintiff then argues that his Title VI claim is not *Heck*-barred. (*Id.*) Here, Plaintiff relies entirely on the Court's prior ruling and urges that LPSO Defendants have offered no new evidence to change that. (*Id.* at 30–31.) As a result, this is further evidence of discrimination. (*Id.* at 31.)

Finally, Plaintiff contends that LPSO Defendants were deliberately indifferent. (*Id.*) According to Plaintiff, the failure to investigate or end discrimination is evidence of deliberate indifference, and, here, LPSO Defendants have been on notice for over three years, since Plaintiff filed his complaint in May of 2022. (*Id.*) Moreover, LPSO Defendants could have learned about the racism from their own data, but they stated that such statistics could not be produced without onerous work searching and redacting. (*Id.* at 31–32 (citing *Sneed v. Austin Indep. Sch. Dist.*, 490 F. Supp. 3d 1069, 1088 (W.D. Tex. 2020) (citing *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 654 (1999)).) Plaintiff here relies on Menza's declaration to assert that:

> Defendant LPSO's response to Plaintiff's counsel indicated that their office had not looked at the statistics they have available for potential race-based discrimination, despite being notified that there was a racial discrimination problem in the department by Mr. Clark's complaint in this instant matter as well as his public records and discovery requests. Mr. Busken also opines that LPSO's failure to audit its treatment of Black people, despite such stark statistical disparities, was inappropriate: * * * The LPSO defendants had all of the data necessary to see and correct racially biased policing in the department and chose not to, thereby acting with deliberate indifference.

(*Id.* at 32 & nn.91–92).)

25

c.  LPSO Defendants' Reply Memorandum (Doc. 202)

LPSO Defendants reply first by moving to strike Menza's declaration. (Doc. 202 at 1.) In sum, these defendants urge that the Louisiana Rules of Professional Conduct prohibit an attorney from serving as both a witness and counsel in the same case. (*Id.* at 1–3.)

LPSO Defendants then object to Plaintiff allegedly mischaracterizing Dr. Abraham's testimony. (*Id.* at 6.) LPSO Defendants detail various ways Plaintiff exaggerated Dr. Abraham's report and testimony. (*Id.* at 6–9.) LPSO Defendants also maintain that Plaintiff misconstrues Bowden's testimony and the extent to which it purportedly supports a finding of discrimination. (*Id*. at 8.)

Moreover, Plaintiff attacks the nature of the search and stop, but this Court has already found that Plaintiff cannot challenge the validity of the stop based on racial animus or discrimination due to *Heck*. (*Id.* at 8, 16.) LPSO Defendants argue that "Plaintiff provides virtually no substantive argument as to why *Heck* should not bar the claim, aside from pointing out that the Court denied defendants' Motion to Dismiss on this issue." (*Id.* at 17.) But, as LPSO Defendants argue, allowing the claims to proceed would be "wholly incongruent" with the Court's prior ruling. (*Id.*)

In any event, LPSO Defendants assert that Plaintiff has no evidence to support his claim. (*Id.*) Plaintiff acknowledges that he must prove intentional discrimination and that the standards are comparable to § 1983. (*Id.* at 17–18 (citation omitted).) This includes establishing a policy and a violation of constitutional rights whose moving force is the policy. (*Id.* at 18 (citation omitted).) But the Court already concluded in his prior ruling that Plaintiff's allegations did not survive the motion to dismiss stage. (*Id.*)

> At this stage, plaintiff is essentially relitigating these issues, yet without any evidence to support the allegations that were baseless at

> the time they were plead. What evidence has plaintiff come forward with at this point to show that Sheriff Ard has actual or constructive knowledge of a racially discriminatory policy or practice? What evidence has plaintiff come forward with to show that there was a widespread, settled practice or custom sufficient to establish an official policy of stopping Black persons at a higher rate than whites?
>
> The simple answer is "none". Plaintiff has not come forward with any such evidence. His attempt to support these claims with the opinions of Dr. Abraham are futile.

(*Id.* at 18–19.)

"Moreover, even if her analysis was sound (which it [ ]was not), plaintiff has still failed to show that Sheriff Ard knew of a racial disparity in policing and failed to act." (*Id.* at 19.) The Menza declaration purports to show that Sheriff Ard did not look at the data despite notice, but:

> First, this is not evidence of actual notice of racial discrimination by Sheriff Ard. Second, plaintiff cannot use his own complaint as a trigger for what LPSO should or should not have done with respect to racial discrimination. Mr. Clark's complaint is riddled with falsehoods and unsubstantiated allegations. Mr. Clark was convicted for the crimes arising from this event. This very Court has concluded that [the] plaintiff is barred from arguing that the stop, search, and force used on plaintiff was a result of racial profiling or discrimination.
>
> It is nonsensical for plaintiff to argue that LPSO should be liable for racial discrimination because it did not pull racial statistics following his lawsuit. This logically makes zero sense. Plaintiff cannot argue both that Sheriff Ard knew of racial discrimination before his incident, and is liable because this incident was the event that provided him notice. Again, plaintiff's attempt to salvage his claim should be rejected.

(*Id.* at 19–20.) LPSO Defendants say Plaintiff's reliance on *Sneed* is misplaced because, purportedly, there, plaintiff had actual notice of the harassment before the incident and yet failed to act. (*Id.* at 20.)

LPSO Defendants also dispute Plaintiff's reliance on Bowden singing the rap song and making comments about cocaine; "the only person who has drawn a link between crack usage and the Black community is plaintiff, and no one else." (*Id.*) But, LPSO Defendants say, such comments are ultimately immaterial because the claim is made against Sheriff Ard, and Plaintiff must show knowledge and deliberate indifference. (*Id.* at 21.) Subjective belief in discrimination is not enough. (*Id.* (citations omitted).)

### d.    Plaintiff's Opposition to Motion to Strike (Doc. 203-1) and Surreply (Doc. 203-2)

Plaintiff opposes LPSO Defendant's motion to strike the Menza declaration on the grounds that (a) such motions are no longer permitted on summary judgment, (Doc. 203-1 at 8–9); and (b) the declaration contains no inadmissible testimony because (i) the bar to attorney testimony does not apply in pretrial matters, and (ii) the Louisiana Rules of Professional Conduct make this distinction, (*id.* at 9–12).

As to the surreply, Plaintiff says that LPSO Defendants' entire position "boil[s] down to a single claim: that Dr. Abraham did not analyze the entire universe of ticket data from traffic stops made by LPSO deputies in Livingston Parish." (Doc. 203-2 at 2–3.) But Plaintiff responds that this "ignores the concepts of sampling and significance testing," which courts have recognized are "valid methodologies." (*Id.* at 3) Plaintiff then details Abraham's methodology and how it is reliable. (*Id.* at 4–5.) Ultimately, "[e]ven if all of [LPSO] Defendants' objections to the analysis are valid, they merely demonstrate the existence of disputed material facts as to LPSO's disparate treatment of Black motorists that are more appropriately resolved through testimony at trial." (*Id.* at 6.) Putting the merits aside, "the Court should decline to consider Defendants' untimely and poorly-disguised Daubert challenge to Dr. Abraham." (*Id.*)

### 2. *Applicable Law*

Under Section 601, Title VI, of the Civil Rights Act of 1964, "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 407 (5th Cir. 2015) (quoting 42 U.S.C. § 2000d). "Private individuals can bring suit 'to enforce § 601 of Title VI.'" *Id.* at 408 (quoting *Alexander v. Sandoval*, 532 U.S. 275, 279 (2001)). But, Title VI "prohibits only *intentional* discrimination." *Id.* (quoting *Alexander*, 532 U.S. at 280 (emphasis by *Fennell*)). As a result, "[t]o receive compensatory damages, a Title VI plaintiff must prove discriminatory intent." *Id.* (quoting *Canutillo Indep. Sch. Dist. v. Leija*, 101 F.3d 393, 397 (5th Cir. 1996)).

Thus, "[t]o prevail on a claim for relief under Title VI, a private litigant must prove: (1) that the defendant engaged in *intentional* discrimination based on race, color, or national origin; and (2) that the defendant received federal financial assistance." *Pathria v. Univ. of Tex. Health Sci. Ctr. at S.A.*, 531 F. App'x 454, 455 (5th Cir. 2013) (citing 42 U.S.C. § 2000d). "Plaintiff's subjective beliefs do not create an inference of intentional discrimination." *Doan v. Bd. of Supervisors of La. State Univ.*, No. 17-3471, 2017 WL 4960266, at *2 (E.D. La. Nov. 1, 2017) (citing *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 427 (5th Cir. 2000)). *See also Pathria*, 531 F. App'x at 456 ("Pathria advances only his subjective belief that committee members failed to exercise independent judgment when making their decisions, deferring to Serwer's wishes; this bare allegation does not meet the *Twombly* standard." (citing *Byers*, 209 F.3d at 427)). "Where a plaintiff does not allege the existence of a discriminatory policy, he 'must show that (1) [an] appropriate person with authority, (2) had actual knowledge of discrimination, and (3) that person responded with deliberate indifference.'" *Washington*, 639 F. Supp. 3d at 656–57 (quoting *Doan*,

29

2017 WL 4960266, at *2; and then quoting *Bhombal v. Irving Indep. Sch. Dist.*, 809 F. App'x 233, 237 (5th Cir. 2020) ("Because the Bhombals do not allege a discriminatory policy by IISD, they must plausibly allege that an 'appropriate person' in the district—i.e., someone who could take corrective measures—had 'actual knowledge' of intentional discrimination yet responded with 'deliberate indifference.'")).

"Mere negligence will not suffice" to establish deliberate indifference. *Fennell*, 804 F.3d at 410 (citing *Davis*, 526 U.S. at 642; and then citing *Sanches v. Carrollton–Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 167 (5th Cir. 2011) ("[Deliberate Indifference] is a high bar, and neither negligence nor mere unreasonableness is enough."). "Accordingly, '[o]fficials may avoid liability under a deliberate indifference standard by responding reasonably to a risk of harm, "even if the harm ultimately was not averted."'" *Id.* (quoting *Doe ex rel. Doe v. Dall. Indep. Sch. Dist.*, 220 F.3d 380, 384 (5th Cir. 2000) (Title IX claim) (quoting *Farmer v. Brennan*, 511 U.S. 825, 844 (1994) (Section 1983 claim))). *See also id.* at 408 ("the [Supreme] Court's analysis of what constitutes intentional sexual discrimination under Title IX directly informs our analysis of what constitutes intentional racial discrimination under Title VI (and vice versa)." (citation omitted)).

Thus, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *See Farmer*, 511 U.S. at 837. "[I]t would 'frustrate the purposes' of Title IX to permit a damages recovery against a school district for a teacher's sexual harassment of a student based on principles of *respondeat superior* or constructive notice, *i.e.*, without actual notice to a school district official," *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 285 (1998), and the same principles apply for Title VI, *see Fennell*, 804 F.3d at 408.

### 3. *Analysis*

Preliminarily, the Court need not resolve the much-briefed question of whether Menza's declaration is admissible. While the Court has doubts about the admissibility of this document,[2] the Court finds that, even if it was admissible, Plaintiff's Title VI claim would still be dismissed.

The Court bases this decision on two reasons. First, the Court agrees with LPSO Defendants that, upon further consideration, Plaintiff's Title VI claim is *Heck* barred. The Court previously denied LPSO Defendants' motion to dismiss this claim because:

> Defendants do not cite to any binding precedent applying a *Heck* bar to Title VI claims. (Doc. 100-1 at 7–10.) Nor is the Court aware of any Fifth Circuit precedent applying a *Heck* bar to Title VI claims. Defendants do not move to dismiss Count Twelve on other grounds. (*Id*. at 4.)

(Doc. 136 at 10.) LPSO Defendants agree that there is no binding Fifth Circuit case law, (Doc. 171-1 at 16), but they correctly note that this ruling is incongruent with the Court's decision on the equal protection claim, (Doc. 202 at 17). There, this Court stated:

---

[2] As Wright and Miller explains:

> Attorneys' affidavits are governed by the same rules that apply to other affidavits under Rule 56. Thus, an attorney's affidavit is admissible only to prove facts that are within the attorney's personal knowledge and as to which the attorney is competent to testify; an affidavit stating what the attorney believes or intends to prove at trial will be disregarded. Expressing an even more restrictive view in one patent case, Judge John R. Brown of the Fifth Circuit questioned the propriety of an attorney serving as the vehicle for putting facts, even those within his personal knowledge, before the court. Judge Brown doubted
>
>> that the disposition of patent cases is furthered by counsel being the personal vehicle by which the "undisputed" facts are put before the Court. * * * [W]e think it an unnatural, if not virtually impossible, task for counsel, in his own case, to drop his garments of advocacy and take on the somber garb of an objective fact-stater.
>
> [*Inglett & Co. v. Everglades Fertilizer Co.*, 255 F.2d 342, 349 (5th Cir. 1958).]

10B Wright & Miller's Federal Practice & Procedure § 2738 (4th ed. 2026).

Defendants further argue that Count Eleven, a § 1983 claim for denial of equal protection under the Fourteenth Amendment and La. Const. Art. I § 3, and Count Thirteen, a §§ 1985(3) and 1983 claim for conspiracy to violate equal protection under the Fourteenth Amendment, are *Heck*-barred. (Doc. 100-1 at 3, 4, 7–13). The Fifth Circuit has indicated that such equal protection claims, where they implicate the invalidity of a plaintiff's conviction, are likewise barred by *Heck*. *Guerrero v. Travis Cnty.*, 507 F. App'x 329, 329 (5th Cir. 2013) (per curiam) (holding that a plaintiff's gender-discrimination equal protection challenge was in essence a challenge to the constitutionality of his conviction). *See Kimble v. Jefferson Par. Sheriff's Off.*, No. 22-30078, 2023 U.S. App. LEXIS 2991 at *8 n.6, 2023 WL 1793876 at *3 n.6 (5th Cir. Feb. 7, 2023) (citing Heck, 512 U.S. 477, 486–87 (1994); *Wilkinson v. Dotson*, 544 U.S. 74, 81-82 (2005)). Here, if Plaintiff succeeded in arguing that the stop, search, and force used during his arrest were all a result of intentional discrimination and "racial profiling" absent "any appropriate state interest", and that Defendants had "insufficient suspicion" to stop or search him, it could imply the invalidity of his stop, search, and ultimate arrest. (Doc. 89 at ¶¶ 307–14.)

(Doc. 136 at 9–10 (emphasis added).) Thus, the Court based its ruling in part on the position that, if Plaintiff proved that any constitutional violations were the result of "intentional discrimination," it would necessarily imply the invalidity of the "stop, search, and ultimate arrest" and thus run afoul of *Heck*. (*See id.*)

But, as explained above, Title VI "prohibits only *intentional* discrimination," and "[t]o receive compensatory damages, a Title VI plaintiff must prove discriminatory intent." *Fennell*, 804 F.3d at 408 (cleaned up). Thus, the Court agrees with LPSO Defendants that, for the same reasons given in the Court's prior ruling on equal protection, the Title VI claim is *Heck*-barred.

However, even if the Title VI claim was not *Heck*-barred, it would still be dismissed because Plaintiff has failed to create a question of fact on the issue of deliberate indifference. As explained in the Factual Background *supra*, Plaintiff points to only two pieces of evidence to support his deliberate indifference claim: (a) Menza's declaration, which purports to show that LPSO "had not looked at the statistics they have available for potential race-based discrimination,

32

despite being notified that there was a racial discrimination problem in the department by [Plaintiff's] complaint in this instant matter as well as public records and discovery requests," (Doc. 194 at 32 (citing Menza Decl., Doc. 184-11)), and (b) Busken's supplemental report, which purports to show that the "LPSO defendants had all of the data necessary to see and correct racially biased policing in the department and chose not to, thereby acting with deliberate indifference," (*id.* (citing Doc. 183-3 at 52–53)).

Even if true, neither document establishes deliberate indifference. Again, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. "[I]t would 'frustrate the purposes' of Title IX [and thus Title VI] to permit a damages recovery against a [sheriff] for a [subordinate's misconduct] based on principles of *respondeat superior* or constructive notice, *i.e.*, without actual notice to [the sheriff]." *See Gebser*, 524 U.S. at 285. *See also Fennell*, 804 F.3d at 408 (recognizing that Title IX law applies to Title VI and vice versa). Plaintiff argues nothing more than that Sheriff Ard should have known of the alleged discriminatory practices, but such constructive notice is insufficient under the above case law. Again, "[m]ere negligence will not suffice" to establish deliberate indifference, which is a "high bar[.]" *Fennell*, 804 F.3d at 410 (citations omitted).

Plaintiff also argues that Sheriff Ard's failure to investigate demonstrates his deliberate indifference, but the Court disagrees. Plaintiff himself argues that Sheriff Ard was first put on notice by the filing of this lawsuit and by his discovery requests in this case, (Doc. 194 at 31–32), but Plaintiff's encounter with the officers took place about a year before he filed suit. As LPSO Defendants assert: "Plaintiff cannot argue both that Sheriff Ard knew of racial discrimination before his incident, and is liable because this incident was the event that provided him notice."

33

(Doc. 202 at 20.) That is, it makes little sense to hold that Sheriff Ard's conduct after the lawsuit somehow contributed, caused, or reflects actual knowledge of conditions before the filing of the lawsuit.

As a result, the Court finds that Plaintiff's Title VI is *Heck*-barred, but, even if it was not, Plaintiff fails to demonstrate deliberate indifference. *See also Mohamed for A.M. v. Irving Indep. Sch. Dist.*, 252 F. Supp. 3d 602, 628 (N.D. Tex. 2017) (dismissing Title VI claim in part because the school district could not "be held vicariously liable under Title VI" and in part because "there are no allegations that any 'appropriate person' was aware of unlawful discrimination by Principal Cummings or any other school administrator and responded with 'deliberate indifference.'" (citing *Gebser*, 524 U.S. at 285–88, 290; and then citing *Rubio v. Turner Unified Sch. Dist.*, 475 F. Supp. 2d 1092, 1099 (D. Kan. 2007) (holding that school district was not liable under Title VI for the actions of a principal who allegedly prohibited students from speaking Spanish because the school district did not know the principal had engaged in that behavior)). *See also Washington*, 639 F. Supp. 3d at 658 (dismissing Title VI claim against Sheriff because single "conclusory allegation [could not] support an inference that [the Sheriff] knew about intentional racial discrimination, but nevertheless chose not to act."). As a result, Plaintiff's claim will be dismissed.

### C. State Law Battery and Negligence Claims

#### 1. Parties' Arguments

LPSO Defendants next assert that Plaintiff's state law claims should be dismissed. (Doc. 171-1 at 20.) These defendants say the key question here is whether the use of force was reasonable, which is the same standard as applied under federal law. (*Id.* at 21.) "Again, pointing to the video, there is absolutely nothing depicted that even remotely suggests that the deputies used excessive force in restraining plaintiff." (*Id.*)

34

LPSO Defendants argue that "[P]laintiff cannot prove that the manner in which he was handcuffed by Deputy Hotard failed to confirm to a specific standard, nor can he prove that the handcuffing was the cause of any injury or damages." (*Id.* at 22.) LPSO Defendants point to Hotard checking the tightness of the handcuffs and loosening them, and then they cite to the testimony of Plaintiff's treating physician to show that Plaintiff suffered no injury. (*Id.* at 22–23.) "[P]laintiff's own treating physician has testified that, more likely than not, the handcuffing did not cause the fracture which necessitated plaintiff's surgery," and "Plaintiff has not alleged that any other injury was caused by the 'negligent handcuffing.'" (*Id.* at 24.)

Plaintiff responds that he has suffered more than a *de minimis* injury and that he in fact "continues to suffer from two significant physical injuries[.]" (Doc. 194 at 21.) First, his hand was injured, causing pain and numbness, and it impairs his daily activities. (*Id.* (citing Pl. Ex. 19 at Clark-000537–38).) Plaintiff also needed surgery to repair two ligaments on his hand and suffered a hip injury, which impaired his ability to walk. (*Id.* (citing Clark Dep. 26, 36).) Further, Plaintiff continues to suffer some PTSD and other mental anguish. (*Id.*) Plaintiff also maintains that there are questions of fact as to whether Plaintiff's injuries were caused or exacerbated by Hotard's conduct. (*Id.* at 21–23.)

LPSO Defendants reply that the state law claims should be dismissed for similar reasons as the federal claims. (Doc. 202 at 16.) Here, the force used was reasonable, so there was no battery. (*Id.*) Further, "Plaintiff also cannot support a 'negligent handcuffing' claim because his own treating physician has expressly rejected any notion that plaintiff's hand injuries could have been caused by this incident." (*Id.*)

### 2. *Applicable Law*

#### a. Battery

Louisiana Code of Criminal Procedure Article 220 provides, "A person shall submit peaceably to a lawful arrest. The person making a lawful arrest may use reasonable force to effect the arrest and detention, and also to overcome any resistance or threatened resistance of the person being arrested or detained." La. Code Crim. Proc. art. 220. "The use of force by law enforcement officers must be tested by the 'reasonable force' standard established by this article. The test precludes 'clearly inappropriate force.'" *Kyle v. City of New Orleans*, 353 So. 2d 969, 972 (La. 1977) (quoting La. Code Crim. Proc. art. 220, Official Revision Comment (b)).

"The use of force when necessary to make an arrest is a legitimate police function." *Id.* "But if the officers use unreasonable or excessive force, they and their employer are liable for any injuries which result." *Id.* (citations omitted); *see also Penn v. St. Tammany Par. Sheriff's Off.*, 2002-0893 (La. App. 1 Cir. 4/2/03), 843 So. 2d 1157, 1161 (stating that excessive force transforms authorized use of force into a battery). "Whether the force used is reasonable depends upon the totality of the facts and circumstances in each case." *Kyle*, 353 So. 2d at 973. "A court must evaluate the officers' actions against those of ordinary, prudent, and reasonable men placed in the same position as the officers and with the same knowledge as the officers." *Id.* (citations omitted). "The degree of force employed is a factual issue." *Id.* (citations omitted).

The Louisiana Supreme Court has explained further:

> Several factors to be considered in making this determination are the known character of the arrestee, the risks and dangers faced by the officers, the nature of the offense involved, the chance of the arrestee's escape if the particular means are not employed, the existence of alternative methods of arrest, the physical size, strength, and weaponry of the officers as compared to the arrestee, and the exigencies of the moment.

36

*Id.* (citations omitted).

Ultimately, "excessive force claims under both federal and Louisiana law turn on whether the use of force was objectively reasonable given the totality of the circumstances. This has been widely recognized by [the Fifth Circuit], Louisiana federal district courts, and the Louisiana Supreme Court." *Shepherd on behalf of Est. of Shepherd v. City of Shreveport*, 920 F.3d 278, 286 (5th Cir. 2019) (collecting cases).

b.  <u>Negligence</u>

"The duty-risk analysis is the standard negligence analysis employed in determining whether to impose liability under" Article 2315. *Lemann v. Essen Lane Daiquiris, Inc.*, 2005-1095 (La. 3/10/06), 923 So. 2d 627, 632–33 (citing *Mathieu v. Imperial Toy Corp.*, 94-0952 (La. 11/30/94), 646 So. 2d 318, 321). Under this analysis, a plaintiff must prove five separate elements:

> (1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) the defendant's substandard conduct was a cause in fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) the actual damages (the damages element).

*Id.* at 633 (citing *Fowler v. Roberts*, 556 So. 2d 1, 4 (La. 1989), *reh'g granted on other grounds and original opinion reinstated as supplemented*, 556 So. 2d at 13 (La. 1990)). "A negative answer to any of the inquiries of the duty-risk analysis results in a determination of no liability." *Id.* (citing *Mathieu*, 646 So. 2d at 326).

Ultimately, "[n]egligence is a failure to observe or do something that one ought to have observed and done, and would have done or noticed with ordinary care." *Soileau v. S. Cent. Bell Tel. Co.*, 406 So. 2d 182, 183 (La. 1981) (citations omitted). That is, "[i]t is hornbook law that negligence is the failure to exercise the standard of care that a reasonable prudent person would

37

have exercised in a similar situation." *Pizzetta v. Lake Catherine Marina, LLC*, 2008-0648 (La. App. 4 Cir. 9/17/08); 995 So.2d 26, 32 (Tobias, J., concurring) (citations omitted)). Thus, "[u]nder Louisiana law, a police officer has a duty to act reasonably under the totality of the circumstances." *Tutrix on behalf of DCJH v. Travis*, 595 F. Supp. 3d 488, 513 (M.D. La. 2022) (deGravelles, J.) (citing *Perron v. Travis*, No. 20-221, 2021 WL 1187077, at *8 (M.D. La. Mar. 29, 2021) (citing *Mathieu*, 646 So. 2d at 325)).

### 3. *Analysis*

"The Court need not provide a robust analysis of the state law claims; rather, they largely rise and fall to the same extent as their corresponding federal claims." *Young v. City of Baton Rouge*, No. 19-886, 2026 WL 540551, at *24 (M.D. La. Feb. 26, 2026) (deGravelles, J.). *See also id.* ("Thus, the Court resolves Young's corresponding state law claims (other than negligence and IIED) the same way as it did the federal claims.") (citing in part *Imani v. City of Baton Rouge*, 614 F. Supp. 3d 306, 381 (M.D. La. 2022) (deGravelles, J.) ("Having carefully considered the matter, the Court will deny Defendants' motion, largely for the same reasons the federal excessive force claims survive. In short, questions of fact preclude summary judgment.")). *Cf. Travis*, 595 F. Supp. 3d at 513 ("Plaintiff's assault, battery, and excessive force claims are essentially state law corollaries of her § 1983 claims for excessive force. . . . Given the Court's determination that Plaintiff has pled sufficient facts indicating that Sims did not act reasonably under the circumstances surrounding the encounter with Whitfield, Plaintiff has stated a viable negligence claim against Sims under Louisiana law.").

The Court found above that Hotard was legally entitled to handcuff Plaintiff and to use a reasonable amount of force to effectuate that arrest, including grabbing Plaintiff's arm. The Court said, based on its review of the video, which gave a crystal-clear view of the incident, that: "As

LPSO Defendants argue, '[t]his was, quite literally, the least amount of force the deputies could have possibly used to place plaintiff in handcuffs.' (Doc. 171-1 at 14.) The Court agrees." For the same reasons given above, the Court finds (a) that all reasonable jurors would conclude that the amount of force used was reasonable; and (b) that no reasonable jury would find that Hotard failed to act as a reasonably prudent officer under the circumstances. As a result, Plaintiff's state law battery and negligent handcuffing claim will be dismissed with prejudice.

### D. Vicarious Liability

LPSO Defendants urge that any vicarious liability claim against him should be dismissed, should the Court dismiss any underlying tort against the deputies. (*Id.* at 24.) The Court agrees. *See Courville ex rel. Vincent v. City of Lake Charles*, 98-73 (La. App. 3 Cir. 10/28/98), 720 So. 2d 789, 800 ("Because we affirm the finding of no negligence on the part of the LCPD officers, the claim of vicarious liability against the City must fall."). *Cf. Travis*, 595 F. Supp. 3d at 514 (finding that state law vicarious liability claim against sheriff survived because state law negligence claim against officer survived).

## IV. CONCLUSION

Accordingly,

**IT IS ORDERED** that the *Motion for Leave to File Opposition to Motion to Strike and Surreply to Defendant's Reply Brief* (Doc. 203) filed by Plaintiff Alexander Clark is **GRANTED**, and the attached briefs (Docs. 203-1 and 203-2) will be allowed in the record.

**IT IS FURTHER ORDERED** that the *Motion for Summary Judgment* (Doc. 171) filed by Defendants, Jason Ard, Sheriff of Livingston Parish, State of Louisiana, Deputy Calvin Taylor Bowden, and Deputy Jean Hotard is **GRANTED**, and all claims by Plaintiff Alexander Clark against the LPSO Defendants are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that LPSO Defendants' *Motion to Strike Declaration of Marjorie Menza (Exhibit 13)* (Doc. 202 at 1–3) is **DENIED AS MOOT.**

**IT IS FURTHER ORDERED** that judgment will be entered in this case.

Signed in Baton Rouge, Louisiana, on <u>June 10, 2026</u>.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**